**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
ROBERT L. PUGH, *et al.,*                )
                                                    )
                    Plaintiffs,              )
                                                    )
            v.                                     )            Civil Action No. 02-2026-HHK
                                                    )
SOCIALIST PEOPLE'S LIBYAN        )
ARAB JAMAHIRIYA, *et al.,*           )
                                                    )
                    Defendants.            )
_____)

**PLAINTIFFS' POST-TRIAL PROPOSED
<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................... 1

Procedural Background ......................................................................... 2

Damages Hearing ................................................................................... 4

Proposed Conclusions of Law ............................................................... 6

I.      Methodology for Calculating Damages ..................................... 6

        A.      Damages Against the Libyan State Defendants: Estates and Family
                Members ....................................................................... 6

                1.      Economic Damages .......................................... 7

                2.      Pain and Suffering ............................................ 11

                        a.      Estates ................................................. 12

                        b.      Individual Family Members ................. 18

                3.      Prejudgment Interest ........................................ 22

                        a.      Prejudgment interest is required to "fully compensate"
                                Plaintiffs for their injuries ............................... 22

                        b.      Interest should be calculated based on a rate no lower than
                                the average Treasury Bill rate of interest ......................... 25

                        c.      Interest should be compounded from the date of the
                                bombing ........................................................ 26

        B.      Damages Against Six Individual Defendants:  Estates and
                Individual Family Members ............................................... 28

        C.      Damages Against Six Individual Defendants:  Interlease .................. 30

II.     Applicability of State Law to Damages Claims ................................. 31

        A.      Virginia ....................................................................... 32

                1.      Wrongful Death ................................................ 33

                2.      Intentional Infliction of Emotional Distress .................. 35

                3.      Survival .......................................................... 37

        B.      Texas ......................................................................... 38

                1.      Wrongful Death ................................................ 38

                2.      Intentional Infliction of Emotional Distress .................. 39

                3.      Loss of Consortium ............................................. 40

                4.      Survival .......................................................... 42

C.      New York ....................................................................................... 43

   1.      Wrongful Death............................................................... 43

   2.      Intentional Infliction of Emotional Distress ................................. 45

   3.      Loss of Consortium .......................................................... 46

   4.      Survival....................................................................... 47

D.      Montana........................................................................................ 48

   1.      Wrongful Death............................................................... 48

   2.      Intentional Infliction of Emotional Distress ................................. 50

   3.      Loss of Consortium .......................................................... 52

   4.      Survival....................................................................... 53

E.      California ...................................................................................... 54

   1.      Intentional Infliction of Emotional Distress ................................. 54

F.      Ohio............................................................................................ 55

   1.      Intentional Infliction of Emotional Distress ................................. 55

G.      Indiana......................................................................................... 56

   1.      Intentional Infliction of Emotional Distress ................................. 57

H.      Florida ......................................................................................... 57

   1.      Intentional Infliction of Emotional Distress ................................. 57

I.      Georgia ........................................................................................ 58

   1.      Conversion ................................................................... 58

Proposed Findings of Fact ................................................................................. 59

III.    Summary of Plaintiffs' Testimony and Calculation of Damages ........................ 59

A.      Estate of Bonnie Barnes Pugh ................................................... 59

B.      Ambassador Robert Pugh........................................................ 61

C.      Anne Carey...................................................................... 63

D.      Malcolm Pugh ................................................................... 65

E.      Harvey Mills Coverley........................................................... 67

F.      Sally Chisholm Johnson .......................................................... 68

G.      Estate of Georgia Mae Chisholm................................................. 71

H.      Estate of Mihai Alimanestianu ................................................... 73

I.      Ioana Alimanestianu ............................................................. 75

J.      Joanna Alimanestianu ............................................................ 77

K.      Nicholas Alimanesteanu........................................................... 79

L.     Irina Alimanestianu.................................................................. 80

M.     Alexander Alimanestianu......................................................... 82

N.     Calin Alimanestianu................................................................ 86

O.     Serban Alimanestianu ............................................................. 88

P.     Constantin Alimanestiano ........................................................ 90

Q.     Estate of Mark Edward Corder.................................................. 92

R.     Carla Malkiewicz ................................................................... 93

S.     Therese Coddington ................................................................ 97

T.     Edward Corder ....................................................................... 99

U.     Michael Corder ...................................................................... 100

V.     Estate of Pat Wayne Huff......................................................... 103

W.     Ermine Hailey ....................................................................... 104

X.     Michael Huff ......................................................................... 108

Y.     Glenda Jan Pitillo ................................................................... 112

Z.     James E. Huff ........................................................................ 115

AA.    Janice Huff ........................................................................... 116

BB.    Jared Hill ............................................................................. 118

CC.    Amanda Hill ......................................................................... 122

DD.    Estate of Margaret Schutzius.................................................... 126

EE.    Mary Kathryn Hassett ............................................................. 127

FF.    William Schutzius .................................................................. 129

GG.    Christopher M. Schutzius ......................................................... 131

HH.    Catharine A. Schutzius ............................................................ 133

II.     John B. Schutzius................................................................... 134

JJ.     Estate of James Eldee Turlington, Sr........................................... 136

KK.    Debbie Schooling.................................................................... 138

LL.    Eddie Don Turlington .............................................................. 140

MM.   Joyce Butler .......................................................................... 141

NN.    Estate of Elvee Turlington......................................................... 143

OO.    Russell Turlington .................................................................. 144

PP.    Jimmy Bruce Turlington ........................................................... 145

QQ.    David Olney Turlington ............................................................ 146

RR.    James Eldee Turlington, Jr......................................................... 149

SS.     Christopher Darwyn Turlington ........................................................ 150

TT.     Jana Elizabeth Turlington.................................................................. 152

UU.     Estate of Donald Warner .................................................................. 154

VV.     Janet Warner .................................................................................... 155

WW.     Alvin Warner .................................................................................... 158

XX.     Susan Frazier ................................................................................... 159

YY.     Sherry Warner .................................................................................. 161

ZZ.     Interlease, Inc. ................................................................................. 163

Plaintiffs, by and through their undersigned counsel, hereby submit the following Proposed Findings of Fact and Conclusions of Law based on the testimony and other evidence submitted to the Court in this matter.  On April 9, 2007, this Court granted Plaintiffs summary judgment on liability against all Defendants, and subsequently held a damages hearing on August 13-15, 2007.

## Introduction

This action was brought pursuant to the "terrorism exception" of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7), arising from the September 19, 1989 bombing of Union des Transports Aeriens ("UTA") Flight 772, over the Tenere Desert in the African country of Niger.  The DC-10-30 wide-body aircraft owned by Plaintiff Interlease, Inc. ("Interlease") and operating as UTA Flight 772 was en route to Paris, France from N'djamena, Chad, when a suitcase bomb in the cargo hold exploded, killing all 170 passengers and crew on board.  Seven of the passengers were citizens of the United States.  Their Estates and 44 immediate family members, along with Interlease, a U.S. corporation, are the Plaintiffs in this case.  The Defendants are the Socialist Peoples' Libyan Arab Jamahiriya and the Libyan External Security Organization ("LESO") (collectively, the "Libyan State Defendants"), and six high-ranking Libyan government officials, including the brother-in-law of Colonel Muammar Qadhafi, Abdullah Senoussi, in their personal capacities (collectively, the "Individual Libyan Defendants").  All Defendants are referred to collectively herein as "Libya" or "Defendants."[1]

---

[1]      Colonel Muammar Qadhafi was voluntarily dismissed, with prejudice, from this action by Plaintiffs on August 10, 2007.

**Procedural Background**

1.      Plaintiffs filed their Complaint on October 16, 2002, asserting various federal and state statutory and common law claims pursuant to the "terrorism exception" of the FSIA, 28 U.S.C. § 1605(a)(7).  Plaintiffs sought damages for wrongful death, survival, intentional infliction of emotional distress, loss of solatium, loss of consortium, and, with respect to Interlease, intentional conversion of property.  In addition, pursuant to the Anti-Terrorism Act, 18 U.S.C. § 2333(a), Plaintiffs sought damages for personal injury and, with respect to Interlease, property damage and loss.  In response to the Complaint, Libya moved to dismiss Plaintiffs' claims.  On October 27, 2003, the Honorable Thomas Penfield Jackson, who was then assigned this case, denied the motion in part and granted it in part.  *See Pugh v. Socialist Peoples' Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003) (granting motion only as to Interlease's claims against the Libyan State Defendants but denying the remainder).  Libya noticed an appeal of that decision, which was thereafter dismissed for lack of jurisdiction.  No. 03-7172 (D.C. Cir. Nov. 22, 2004).

2.      Plaintiffs subsequently moved for partial summary judgment on liability and Libya cross-moved for summary judgment.  On May 11, 2006, this Court granted Plaintiffs' motion in its entirety except with respect to liability of the Libyan State Defendants under certain federal causes of action, *e.g.*, the so-called Flatow Amendment, 28 U.S.C. § 1605 note ("Flatow Amendment"), and the Torture Victims Protection Act, 28 U.S.C. § 1350 ("TVPA"). 2006 WL 2384915 (D.D.C. May 11, 2006).  Importantly, this Court noted that, in the face of "a proper, and very detailed, statement of material facts as to which there is no genuine dispute" submitted by Plaintiffs, Libya "not only fail[ed] to submit any contrary evidence, but fail[ed] as well, even to suggest that contrary evidence might exist."  *Id.* at *3.  Thus, this Court held that "plaintiffs'

evidence [in this case] stands undisputed and overwhelmingly establishes defendants' culpability and involvement in the bombing of UTA Flight 772." *Id.* at *4.  The Court then concluded "that the bombing of UTA Flight 772 was carried out by the [Individual Libyan Defendants] while acting within the scope of their office and employment," and "under the authority of the Libyan [S]tate." *Id.* at 17-18.[2]  The Court also issued a liability finding with respect to the six Individual Libyan Defendants under a number of federal statutory causes of action, including the Flatow Amendment, the TVPA and the Anti-Terrorism Act, 18 U.S.C. § 2333(a), and ordered Plaintiffs to amend their Complaint to identify specific applicable state law causes of action and to submit briefing on the proper choice of law for each Plaintiff.  *Id.* at *15-16.

3.    Plaintiffs amended their Complaint on May 19, 2006, and – in compliance with this Court's May 11, 2006 order – filed a legal memorandum on May 30, 2006 outlining the choice-of-law issues and respective state law causes of action in further support of their motion for partial summary judgment as to liability.  Defendants did not respond to Plaintiffs' submission.  Instead, on July 18, 2006, Libya *again* moved to dismiss Plaintiffs' claims on jurisdictional grounds, citing Libya's June 2006 removal from the list of foreign states designated by the United States Government as State sponsors of terrorism.  On September 3, 2006, following full briefing by the parties, this Court denied Libya's motion.  Libya thereafter filed yet *another* interlocutory appeal in the D.C. Circuit.  On April 3, 2007, the Court of Appeals summarily affirmed this Court's denial of Libya's second motion to dismiss.  (No. 07-7167, D.C. Cir. April 3, 2007).  Less than one week later, on April 9, 2007, this Court granted summary judgment to Plaintiffs regarding the remaining liability issues on all claims except

---

2       The heinous acts of murder, and Libya's responsibility for them, are recounted in this Court's May 11, 2006 opinion.  *See id.*

Interlease's claims against the Libyan State Defendants and scheduled a damages hearing for August 2007.

**Damages Hearing**

4.       The damages hearing commenced on August 13 and concluded on August 15, 2007.  Over the two and one half days of the trial, Plaintiffs presented live testimony of eight fact witnesses and four expert witnesses, as well as *de bene esse* deposition testimony of 29 additional fact witnesses,[3] in support of Plaintiffs' claims to damages arising from the savage and malicious bombing of UTA Flight 772.  *See generally*, Trial Transcripts Volumes ("Tr. Vols.") I - III; Trial Exhibits ("Tr. Exhs.") 1-37.  In all, 36 family members testified regarding the grief and mental anguish experienced by the 44 immediate family members of the seven passengers – as well as the economic losses sustained by the passengers' Estates – as a result of the sudden and violent deaths of their loved ones over the Tenere Desert almost 18 years ago.  All such testimony was credible.

5.       In addition, Plaintiffs presented the testimony of an aviation accident reconstruction expert, who testified that given the placement of the bomb and the effect it had on the aircraft when it exploded, it was very likely that many passengers had survived until they hit the ground, retaining consciousness for up to three minutes as they suffocated or burned alive.  *See infra* at I.A.2.a.; Tr. Vol. III at 3-30; *see also* Tr. Exh. 34. Plaintiffs also presented an expert in the psychological and physiological effects of traumatic events resulting in death, who described the excruciating physical and emotional pain experienced by the UTA Flight 772

---

[3]       Plaintiffs did not present the deposition testimony in open court, but rather submitted DVDs and transcripts of each deposition for this Court's independent review.  *See* Tr. Exhs. 1-29.  Counsel for Libya appeared, and participated in, each of the 29 *de bene esse* depositions. *See id*.  All such testimony was admitted without objection.

passengers after the plane exploded in mid-air, as they knowingly plummeted to their certain death.  *See infra* at I.A.2.a.; Tr. Vol. II at 180-213; *see also* Tr. Exh. 35.  Plaintiffs also presented the testimony of an economic and financial expert on projected future income streams regarding the value of the past and future lost wages, benefits, and retirement pay suffered by each passenger's Estate as a result of his or her wrongful death.  *See infra* at I.A.1.; Tr. Vol. II at 3-94; Tr. Exhs. 31-33, and 37.  Finally, Plaintiffs presented fact and expert testimony as to the economic loss suffered by Interlease, Inc., when Libya destroyed the DC-10-30 operating as UTA Flight 772 in September, 1989.  *See infra* at I.C.; Tr. Vol. II at 97-179; Tr. Exh. 36.  All the experts were qualified to testify in their areas of expertise, and  their testimony and expert opinions were well-founded and professionally credible.  In addition, all such expert testimony and opinions were undisputed.

6.      Notably, this litigation is the first fully *contested* case under section 1605(a)(7) of the FSIA against a defending terrorist state to proceed all the way through trial.  Thus, although Defendants presented no direct testimony in their defense at the damages trial, they did defend actively against Plaintiffs' claims at every stage of the proceedings.  Indeed, Defendants vigorously opposed Plaintiffs throughout the extended pretrial and trial phases, filing numerous motions and appeals, and challenging Plaintiffs' evidence at deposition and trial, including cross-examination of the Plaintiff family members and Plaintiffs' expert witnesses.

7.      Indeed, because of Defendants' litigation strategy – "delay at all costs," including the filing of frivolous dispositive motions and meritless appeals, and the interposition of numerous procedural delays and other dilatory tactics as a means to postpone ultimate resolution of Plaintiffs' claims – these Plaintiffs have experienced, over an extended period, uncertainty and an unprecedented inability to achieve closure for these heinous acts that changed their lives..  *See*

*supra* at 2-4; *see also, e.g.*, Tr. Vol. I at 108-109 (testimony by spouse of passenger who perished aboard UTA Flight 772, discussing the six years of litigation before the families finally were able to express in court proceedings what their loved ones meant to them).  As a result, Plaintiffs urge this Court – in addition to considering past judgments and awards against foreign states under the FSIA's "terrorism exception," all of which support an award of damages in this case at the highest possible level – to weigh equitably the additional frustration, suffering, and cumulative loss intentionally visited upon these grief-stricken family members by Defendants' deliberate attempts to delay resolution of  this litigation.

### Proposed Conclusions of Law

I.  **Methodology for Calculating Damages**

8.      Plaintiffs seek damages awards in three categories:

(a) Damages against the Libyan State Defendants for the Estates of the seven victims who perished aboard UTA Flight 772 and their 44 immediate family members;

(b) Damages against the Individual Libyan Defendants for the Estates of the seven victims who perished aboard UTA Flight 772 and their 44 four immediate family members; and

(c) Damages against the Individual Libyan Defendants for Interlease, Inc.[4]

A.      **Damages Against the Libyan State Defendants: Estates and Family Members**

9.      As a matter of clearly established federal and state law, the Estate and family member Plaintiffs are entitled to recover monetary damages – including both economic damages

---

[4]      Although Interlease's claims against the Libyan State Defendants were dismissed by Judge Jackson earlier in this litigation, Plaintiffs nonetheless urge this Court to issue a finding with respect to Interlease's damages attributable to all Defendants.  Such a finding would not be a meaningless gesture, as the Court of Appeals may be asked to reconsider Interlease's entitlement to damages against *all* Defendants, especially the Libyan State, if there are any subsequent appeals arising from this Court's final judgment.

and damages for pain and suffering – from a foreign state, as compensation for death caused by an "extrajudicial killing," *e.g.*, the bombing of UTA Flight 772.  *See* 28 U.S.C. § 1605(a)(7), 1605 note.  As set forth more fully below, all of these Plaintiffs presented at trial testimony and evidence to support awards of compensatory damages against the Libyan State Defendants for:

> (a)  the economic losses of their loved ones' Estates;

> (b)  the horrific and unimaginable physical and emotional pain and suffering of their loved ones as they knowingly plummeted 35,000 feet to their certain deaths; and

> (c)  their own continuing extreme pain and suffering since 1989 in grieving the sudden and violent loss of their loved ones.

Consistent with prior judgments in this Circuit – including specifically awards against foreign terrorist states under § 1605(a)(7) of the FSIA – each award of economic damages should be adjusted to reflect the present value of the victims' economic losses, and compensation for Plaintiffs' pain and suffering similarly should be adjusted by the inclusion of prejudgment interest from the date of the bombing to reflect the "real value" of those damages.[5]  *See infra* at I.A.1. and I.A.3.

### 1.  Economic Damages

10.  The Estates of the seven United States citizens who perished on board UTA Flight 772 are entitled to recover the present value of the economic losses resulting from their wrongful deaths, including wages, benefits and retirement pay, over their life expectancy.  *See, e.g.*,

---

[5]  The report and opinion letters of Steven Wolf admitted into evidence in this case, along with his expert testimony, *see* Tr. Exhs. 31-33 and 37, Tr. Vol. II at 3-93, set forth the present value calculation of the Estate Plaintiffs' economic damages, as well as the proposed methodology for applying prejudgment interest to the awards for the Estate and family member Plaintiffs' for their pain and suffering.  The final awards proposed herein reflect the present value of the amounts Plaintiffs should be awarded as compensatory damages for their economic losses as well as the amounts Plaintiffs should be awarded for their pain and suffering, including prejudgment interest for the 18 years from the date of the bombing.

*Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 199 (D.D.C. 2003) ("[c]ourts have awarded economic damages in the form of lost wages, benefits and retirement pay, and other out of pocket expenses, to individuals in other FSIA cases involving terrorist acts") (citing cases); *Daliberti, et al. v. Republic of Iraq*, 146 F.Supp. 2d 19, 26 (D.D.C. 2001) (awarding economic damages for lost wages to date and the present value of projected future lost wages); *Higgins v. The Islamic Republic of Iran*, Civ. A. No. 99-00377-CKK, 2000 WL 33674311, *5 (D.D.C. Sept. 21, 2000) (adjusting economic loss damages to present value).

11.     To support their claims for economic damages, Plaintiffs introduced the testimony of the Estate representatives and family members of the victims regarding the employment history, income data, and other personal information of each passenger.  *See generally*, Tr. Vol. I.  Plaintiffs also introduced, and the Court admitted and accepted, the testimony and expert reports of Steven A. Wolf, a Principal with LECG, LLC – an economic and financial consulting company – who projected the economic losses of each Estate over the course of what would have been each passenger's expected lifetime of productive work.  *See generally*, Tr. Vol. II at 3-93; Tr. Exh. 31.

12.     Mr. Wolf was qualified by the Court as an expert in the projection of future streams of income.  Tr. Vol. II at 22.  The Court also admitted into evidence Mr. Wolf's expert report detailing his methodology and analyses in calculating the economic losses for each passenger's Estate.  Tr. Vol. II at 58; Tr. Exh. 31.  Mr. Wolf, an accountant, was not asked to

analyze and did not evaluate or opine upon damages for pain and suffering or any other component of compensatory damages.[6]

13.    As an economic and financial consultant, Mr. Wolf reviews, among other things, historic data, economic statistics, financial research, and projections, coupled with "a fair amount of research based upon statistical data," in calculating income streams for specific categories of employees.  He then takes this information and the factual circumstances of each case and projects an income stream over the projected statistical lifespan of the victim, had he or she lived.  Tr. Vol. II at 5-6.  Among his qualifications, Mr. Wolf was deemed an expert in future streams of income by Judge Bates of this Court in *Dammarell,* 281 F. Supp. 2d at 199, as well as in *Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d. 105,111,116 (D.D.C. 2005), and his testimony was credited as such.  He also was deemed an expert on this topic on behalf of a terrorism victim's estate in the September 11 Fund proceedings before Kenneth Feinberg.  Tr. Vol. II at 11-12.

14.    Mr. Wolf's Report – Trial Exhibit 31 – sets forth in more detail the methodology he utilized in reaching the conclusions he did with respect to each Estate.  To summarize, his methodology was limited solely to income projection and not damages for pain and suffering.  Tr. Vol. II at 25-26.  Neither did Mr. Wolf calculate prejudgment interest on any of the individual calculations for the economic damages for the Estates, since he was presented "present value" calculations which already take into account historic interest amounts.  Tr. Vol. II at 93.  Moreover, Mr. Wolf utilized very conservative financial assumptions about the growth

---

[6]    Mr. Wolf did provide a formula for this Court to use in calculating prejudgment interest for the Estate and family member Plaintiffs' damages for pain and suffering and Interlease's damages against the Individual Libyan Defendants.  *See* Tr. Exh. 33; *see also infra* at I.A.

of money over time.  For example, while he could have calculated a discount rate tied to the historically higher "Prime Rate" of interest, Mr. Wolf purposefully used a more conservative approach and relied upon the long-term (and historically lower) average "Treasury Rate" to reach a rate of 6.01%.  *See* Tr. Vol. II at 27-28; Tr. Exh. 31 at 8-9.   He also reviewed historical income data and examined the place of each of the seven deceased victims in their careers in 1989, and projected that income and career path out over the expected work life span of each victim.  For fringe benefit assumptions he applied a conservative rate of 20% to each individual, and an effective tax rate of 20%, based upon statistical evidence and industry practice.  Tr. Vol. II at 32-34, 35-36; Tr. Exh. 31 at 7-8.

15.     With the exception of Mihai Alimanstianu – a passenger who was 70 years old and still working at the time of his death – Mr. Wolf assumed a working lifespan for all passengers to the age of 65.  With Mr. Alimanestianu, Mr. Wolf assumed that he would have worked for an additional seven years.  Tr. Vol. II at 33-35, 40-42; Tr. Exh. 31 at 10-11.

16.     Mr. Wolf did not make any deductions for personal consumption in the calculations of the estate damages.  There is no requirement that he do so in the generally accepted practice of his expertise, and the variables as to what would be deducted vary widely. Moreover, the methodology used here is identical to that used by Mr. Wolf in the *Dammarell, Salazar*, and September 11 cases, in which this methodology was fully credited and applied.  Tr. Vol. II at 37-40.

17.     Applying this methodology, Mr. Wolf made projected income loss calculations for each of the seven decedents, including two scenarios of income streams for Mihai

Alimanestianu, Margaret Schutzius, and Donald Warner, given the stage that each had attained in their respective careers at their time of death.[7]  *See* Tr. Vol. II at 40-58; Tr. Exh. 31.

### 2.    Pain and Suffering

18.    Unlike the calculation for economic damages, there is no set formula for quantifying the pain and suffering Plaintiffs here experienced as a result of  Libya's intentional and malicious acts of murder.  *See, e.g.*, *Cicippio-Puleo v. Islamic Republic of Iran*, Civ. A. No. 01-1496-HHK (D.D.C. Oct. 7, 2005), Slip Op. at 26 ("[t]here is no set formula established for calculating damages for family members such as Plaintiffs [here]").  Certainly, the excruciating physical and emotional pain endured by these seven passengers (along with the other 163 persons who perished) aboard UTA Flight 772 before they finally succumbed to death, and the grief and anguish resulting from the sudden and brutal death of their loved ones endured by 44 immediate family members over the past 18 years, is not precisely quantifiable in monetary terms.  Nevertheless, courts regularly have considered similar circumstances – including, specifically, in the context of terrorist attacks – and have awarded damages to compensate the victims for their pain and suffering.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224-JDB, 2006 WL 2583043 at *1, n.2 (D.D.C. Sept. 7, 2006);  *Stethem v. The Islamic Republic of Iran*, 201 F. Supp. 2d 78, 82, 88-89, 92 (D.D.C. 2002);  *Higgins*, 2000 WL 33674311 at *7-9.

19.    Specifically in the context of terrorist attacks, courts have viewed the acts, *by their very nature*, to incorporate the element of malice, and have required an increase in damages awards to reflect the intentional nature of the terrorist act and its overwhelmingly tragic

---

[7]    The proposed economic damages for each individual Estate, and the bases therefore, is set forth more fully in Exhibit 31 and below in the discussion of each Plaintiffs' testimony and damages.

consequences for the victims.  Thus, in *Kapar v. Islamic Republic of Iran*, Civ. A. No. 02-00078-

HHK (D.D.C. Sep. 22, 2004), Slip Op. at 18-19 , this Court observed that:

> [The terror victim's] physical and emotional injuries were the
> result of a horrific "terrorist attack[], in which the tragedy itself is
> amplified by the malice which inspired the event.  *The malice
> associated with terrorist attacks transcends even that of
> premeditated murder.*  The intended audience of a terrorist attack
> is not limited to the families of those killed and wounded . . . .  The
> terrorist's intent is to strike fear not only for one's own safety, but
> also for that of friends and family, and to manipulate that fear in
> order to achieve political objectives.  Thus, the character of the
> wrongful act itself increases the magnitude of the injury.  *It thus
> demands a corresponding increase in compensation for increased
> injury.*"

(quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998)) (emphasis

added).

20.      In this case, the court should consider past damages awarded to victims of

terrorism – including past awards made by this Court.  Further, because of the uniquely heinous

nature of Libya's acts and the corresponding excruciating pain and suffering endured by

Plaintiffs – including the unfathomable physical suffering and emotional terror endured for as

long as three full minutes by the passengers on board UTA Flight 772 – the awards in this case

should be at least as high as the awards in other terrorism cases.

a.       **Estates**

21.      The Estates of the seven United States citizens who perished on UTA Flight 772

are entitled to damages for the pain and suffering they endured as they plummeted 35,000 feet to

their certain deaths.[8]

---

[8]      Claims on behalf of each Estate properly have been brought by the Estate representative
pursuant to the law of the state in which the state was probated – often the victim's state of

(continued...)

22.     Plaintiffs presented the uncontroverted testimony of Donald Sommer (Tr. Vol. II at 181-213), President and owner of Aeroscope, Inc., "a Colorado corporation that is primarily involved in reconstruction of aircraft accidents." Tr. Vol. II at 181. As Mr. Sommer explained, he examines all manner of airplane mishaps ranging from airframe and engine problems to pilot and weather problems, and often does so in the context of litigation support. *Id.* Mr. Sommer earned a degree in mechanical engineering from the University of Michigan in 1969, and regularly has conducted aviation accident analyses and aviation accident reconstructions since 1975. He estimated that he has worked on more than one thousand such cases. Tr. Vol. II at 182-85.

23.     Mr. Sommer also testified that he has been qualified as an expert on the topics of aviation accident analyses and aircraft accident reconstruction by courts on "close to a hundred" occasions. Tr. Vol. II at 187-88. One of the more well known cases on which he has worked is the crash of professional golfer Payne Stewart's airplane. Based on Mr. Sommer's qualifications, and without objection from the Defendants, the Court qualified Mr. Sommer as an expert in this case on the topics of aviation accident analyses and aircraft accident reconstruction. Tr. Vol. II at 188-91.

24.     Mr. Sommer testified that his review of the official French investigative reports for UTA Flight 772 revealed that a suitcase bomb had exploded in the right forward lower baggage hold of the aircraft about 45 minutes into the flight when the aircraft had climbed to approximately 35,000 feet. This caused a "violation" of the airplane's "structure" and caused it

---

(continued)

domicile at the time of the bombing. *See infra* at II. These claims are based on the applicable states' wrongful death and survival statutes. *Id.*

to break into essentially four major parts, with "many, many little pieces" that ended up being spread across "an 80-kilometer piece of the Tenere Desert." Tr. Vol. II at 192. Mr. Sommer testified as well that when the bomb exploded, the passengers on the plane experienced "explosive decompression," which is what happens when the atmosphere within the plane fills instantly with the atmosphere outside the plane. It takes less than one second to equalize the pressures. Tr. Vol. II at 198. Mr. Sommer testified that the fuel in the DC-10 was contained in three places – the two wings and in the compartment under the fuselage between the two wings. Tr. Vol. II at 196.

25.     When the plane broke up, the four major parts were: (1) the nose section, which is somewhat aerodynamically stable; (2) the section between the nose section and the wings, which essentially disintegrated; (3) the wing section going back to the tail, which caught on fire; and (4) the tail and aft part of the plane. Tr. Vol. II at 196-201.

26.     Mr. Sommer testified (and Dr. Levy, as explained below at, agreed) that many of the passengers very likely survived the bomb explosion and were conscious as they fell to earth from 35,000 feet. Even if some of the passengers temporarily blacked out, they likely would have regained consciousness as they fell since the effects of hypoxia – lack of oxygen – are reversible and would have quickly been reduced as oxygen levels rose throughout a victim's fall to earth. Tr. Vol. II at 201-05.

27.     As Mr. Sommer explained, if one survived the initial explosion, several things likely happened. The passengers experienced the initial shock of explosive decompression as well as the disorienting experience of instantly dropping 129 degrees, from 70 degrees Fahrenheit inside the plane to 49 degrees below zero outside of it.. Among other things, this atmospheric change has a very painful physiological effect on the body, particularly if one has

14

trapped gases.  These body gasses expand and cause "extreme discomfort."  Tr. Vol. II at 201-03.  In addition, the explosion caused shards of metal to fly in every direction, embedding themselves into people badly enough to cause pain but not badly enough to kill someone.  Tr. Vol. II at 205.  Lastly, some of the passengers caught on fire from the explosion.  As a result, many of the passengers burned alive as they plummeted from 35,000 feet.  Tr. Vol. II at 205.  Those that did not die from the explosion or the fire, died from the impact with the ground at a velocity of 150 to 160 miles per hour.  Tr. Vol. II at 206-08.

28.     Mr. Sommer testified that it took 89 seconds to 178 seconds – *i.e.*, somewhere between one and one-half minutes to three minutes – for the passengers to hit the ground following the explosion.  The range of times reflects variations in the passengers' trajectory to the ground, based upon where they were seated on the plane.  Tr. Vol. II at 206-08.

29.     In sum, Mr. Sommer concluded that if passengers were not burned to death, "essentially they were killed by the fall once you get away from the epicenter of the explosion."  Tr. Vol. II at 208.  In Mr. Sommer's expert opinion, to a reasonable degree of scientific certainty, "all 170 people aboard [UTA Flight 772] died a horrific and tragic death due to the acts of terrorism by the Libyan government."  *Id.*

30.     Plaintiffs also presented the uncontroverted testimony of Dr. Richard Levy.  Tr. Vol. III at 3-30.  Dr. Levy is a retired U.S. Air Force flight surgeon who was offered and accepted, without objection by Defendants, as an expert on the topics of the psychological and physiological effects of traumatic events resulting in death.  Tr. Vol. III at 21.  Dr. Levy testified as an expert on the physiological and psychological effects experienced by the passengers on UTA Flight 772 as they fell to their deaths.

15

31.     Dr. Levy's qualifications are varied and extensive.  He graduated Hamilton College in 1953 with a B.A. in psychology, anthropology and biology and gained his M.D. from State University of New York College of Medicine in 1956.  He went on to receive a Board Certification in Psychiatry and Neurology in 1963, and practiced psychiatry until 1976 when he became Chief of the Department of Neuropsychiatry as a civilian with the U.S. Air Force's School of Aerospace Medicine.  Tr. Vol. III at 4-5.  In that position, among other things, he spent four years leading the rehabilitation efforts with prisoners of war (many of them pilots) and their families returning from the Vietnam War.  Eventually he became the Chief of the Department of Neuropsychiatry with the U.S. military's School of Aerospace medicine.  Tr. Vol. III at 8-9.  In 1986, Dr. Levy became the Director of Aerospace Medicine for Systems Command at Andrews Air Force Base in Maryland, followed by an appointment in 1988 as Chief of the Life Sciences Division at the Air Force Safety Center.  Tr. Vol. III at 13-14.  Throughout his career, and particularly in this position, Dr. Levy had occasion, hundreds of times, to study what people experienced in the last seconds of their life when they knew death was imminent.  As part of this study, he listened to dozens of tape recordings of pilots who knew they were about to die.  Tr. Vol. III at 12-16.  Over the past ten years, Dr. Levy has testified in court as an expert on these topics twelve times and has been a deponent approximately 50 times.  Tr. Vol. III at 17-18.

32.     As with Mr. Sommer, Dr. Levy testified that when the bomb exploded on UTA Flight 772, many of the passengers were alive and remained so until they hit the ground.  Tr. Vol. II at 26-27.  He explained that when the bomb exploded, "the ball game changed.  There's noise, smoke, fire, decompression.  All these things scare the living daylights out of people." They have the "flight, fright, fight" response as their adrenalin is released, the heart beats faster, blood pressure goes up, they start to sweat, and they become "very fearful."  Tr. Vol. III at 23.

Then, as they fall through the air, strapped to a seat, on fire or choking, they experience the final resignation that they will not escape from this situation.  Tr. Vol. III at 23-24.

33.     Dr. Levy explained that being burned to death is extremely painful and does not happen at once.  As he testified, "people who are on fire die from lack of oxygen because the fire burns up the oxygen in the atmosphere, the fire burns the upper respiratory passages, the hot gases are at first inhaled, it destroys the lining of their lungs and they cannot exchange oxygen appropriately, and therefore, they basically die of oxygen starvation, which leads to brain damage, and they eventually are unable to maintain necessary functions of life.  So certainly many of them [passengers on UTA Flight 772] must have died from fire, but not immediately." Tr. Vol. III at 24-25.  When asked if the passengers died a painful death, Dr. Levy replied, "being burned is very painful" and "I think there is a significant amount of painful experience, physically speaking of certainly."  Tr. Vol. III at 25-26.

34.     Other unpleasant experiences the passengers likely suffered included loss of control over their sphincters, a severe choking sensation, and the "exceedingly unpleasant" experience of trying to breathe during a fire.  Tr. Vol. III at 27.  In sum, Dr. Levy concluded to a reasonable degree of scientific certainty, like Mr. Sommer, that the passengers on UTA 772 died an excruciatingly painful and horrible death over a period of up to three minutes.  Tr. Vol. III at 27-30.

35.     Taking the testimony of Mr. Sommer and Dr. Levy together, it is clear that many of the passengers aboard UTA Flight 772 likely survived the mid-air explosion of the aircraft and experienced horrific terror and excruciating pain for as long as three minutes as they were burned alive and tumbled to the earth, before ultimately succumbing to death.  The explosion, decompression, fire and mid-air break-up of the aircraft caused the passengers to suffer extreme

terror, painful bodily injury, choking and suffocation, and the tragic realization that their lives would soon terminate with no opportunity to say goodbye to their loved ones.

36.     The passengers in this case were battered and tortured as a result of Libya's intentional acts before succumbing to a brutal, violent, and excruciatingly painful death.  As they suffered incomprehensible physical pain, these Plaintiffs had no hope of living another day or seeing their loved ones ever again.  They were forced to suffer, for as long as three full minutes, with the knowledge that they were going to die and would never again see their spouses, parents, siblings, or children.  They also suffered with the knowledge that those family members would have to endure this unfathomable loss for the rest of their lives.  Based on the undisputed testimony and evidence in this case, the Estates of the seven passengers are entitled to compensation for their excruciating pain and suffering following the mid-air explosion of the aircraft.

37.     In other cases brought pursuant to the "terrorism exception" to the FSIA, the courts have awarded damages as high as $30M to the estates of victims who suffered incredible pain and suffering prior to their ultimate deaths.  *See, e.g.*, *Higgins*, 2000 WL 33674311 at *8.  Here, based on the undisputed testimony of the horrific pain and suffering endured by the UTA Flight 772 passengers before their deaths, Plaintiffs request the Court to award each passenger's Estate pain and suffering damages totaling no less than $18M, reflecting approximately $100,000 per second for the up to three minutes of conscious and gruesome terror, pain, and suffering Libya intentionally inflicted upon them throughout the airplane's final descent.  Each of the seven Estates should receive at least that amount for pain and suffering damages.

### b.     Individual Family Members

38.     The 44 immediate family members of these seven passengers likewise are entitled to compensation for the severe pain and suffering, mental anguish and grief *they* endured in

18

1989, and thereafter, due to Libya's heinous acts.  *See infra* at II, III.[9]  As this Court observed in

*Kapar*, such unspeakable acts of terror not only are directed at the murdered victims themselves,

but at their friends and family as well, and the magnitude of the injuries caused by these acts

reflects such malice as to *demand* a corresponding increase in compensation.  *See supra* at

I.A.1.b.  Thus,

> [c]ourts have uniformly held that a terrorist attack – by its nature – is
> directed not only at the victims but also at the victims' families . . . . In
> this case, the evidence demonstrates that defendant's campaign of attacks
> against Westerners was intended not only to harm the victims, but to instill
> terror in their loved ones and others in the United States."

*Salazar,* 370 F. Supp. 2d at 115 n.12 (discussing April 1983 bombing of US Embassy in Beirut,

and impact of attack on family member of decedent); *Cicippio-Puleo*, Slip Op. at 23-24 ("'If the

defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm

upon a person which is not present, no essential reason of logic or policy prevents liability.'")

(quoting *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001)).

39.     Libya's carefully planned and executed bombing of UTA Flight 772 – and the

consequent murder of all the passengers on board (including 23 children) – reflects, by its very

nature, Libya's deliberate intent to inflict upon the passengers *and* their families inconsolable

pain and suffering of unspeakable magnitudes.  In cases of such gross and malicious indifference

to human life, the very purpose of the FSIA's "terrorism exception" and corresponding state law

requires a corresponding increase in the compensation for victims who have been injured so

---

[9]     Pursuant to this Court's ruling on applicable choice of law principles, claims on behalf of
each family member properly have been brought pursuant to the laws of each Plaintiff's state of
domicile at the time of the bombing.  *See infra* at II.  These claims are based on theories, *inter
alia*, of intentional infliction of emotional distress, loss of consortium, and loss of solatium
resulting from Libya's actions.  *Id.*

severely by Libya's intentional terrorist acts that they *never* can be made whole again.  *See Kapar,* Slip Op. at 18-19.

40.     When calculating awards for similar losses of solatium and/or consortium under the FSIA, courts in this circuit have considered the following factors:  "(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (*i.e.*, closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death."  *See, e.g.*, *Stethem*, 201 F. Supp. 2d at 89-90; *see also, e.g.*, *Kerr v. The Islamic Republic of Iran*, 245 F. Supp. 2d 59, 64 (D.D.C. 2003) (reciting factors).  Application of each of these factors supports the highest possible award in this case.

41.     In terrorism-related cases, courts also have placed special emphasis on the *cause* of the decedent's death, finding that because of the unfathomable consequences of the loss of a loved one to a terrorist attack, "the fact of death and the cause of death become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time."  *Elahi v. The Islamic Republic of Iran*, 124 F. Supp. 2d 97, 111 (D.D.C. 2001) (quoting *Flatow*, 999 F. Supp. at 31).  The courts further have observed that "death as a result of terrorism, with its attendant horrific surrounding circumstances, prevents the anguish [felt by the decedents' family members] from subsiding."  *Flatow*, 999 F. Supp. at 31; *see also Higgins*, 2000 WL 33674311 at *7.

42.     The individual Plaintiffs seeking money damages in this case all are spouses, children, parents or siblings of the deceased passengers, and therefore are "immediate family members" entitled to recovery.  *See Jenco*, 154 F. Supp. 2d at 36 n.8, *aff'd in part sub nom.*,

*Bettis v. Islamic Republic of Iran*, 315 F. 3d 325 (D.C. Cir. 2003) (defining "immediate family members" to include spouses, parents, siblings and children).  With respect to the *amount* of such recovery – although claims for compensation for mental anguish, bereavement, grief and other suffering as a result of the death of a close family member "cannot be defined through models and variables," *Flatow*, 999 F. Supp. at 32 – the courts have established certain benchmarks to guide calculation of such awards.  Thus, the courts in this Circuit have awarded pain and suffering damages to family members of terror-victims as high as $26M for spouses, *see Hegna v. Islamic Republic of Iran*, 2005 WL 3276307 (D.D.C. Jan. 22, 2002); $5M for parents, *see Stethem*, 201 F. Supp. 2d at 91,93 , *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9-11 (D.D.C. 2000), and *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 137-38 (D.D.C. 2001); $6.5M for siblings, *see Cicippio-Puleo*, Slip Op. at 26-27; and $12M for children, *see Higgins*, 2000 WL 33674311 at *8-9.

43.    Plaintiffs in this case should be awarded damages at similar levels based on the undisputed and deeply affecting testimony reflecting the pain and suffering experienced by each family member, from September 1989 until the present (or their death), as a result of the Libyan Defendants' brutal and deliberately malicious murder of their loved ones.  *See generally* Tr. Vol. I; Tr. Exhs. 1-29; *see also infra* at III.  Specifically, these Plaintiffs have suffered the unique consequences of Libya's terrorist acts, ranging from alcoholism and drug addiction to destruction of family bonds, alienation by parents, and suicide.  They endured months where they could not receive even confirmation that their loved ones had died; indeed many were forced, amidst their grieving, to process numerous information requests by foreign investigators and government officials and to search for inaccessible records simply to help identify their loved one's remains.  Some Plaintiffs spoke of searching for their loved ones for years after the bombing (and still,

even, today) in the hope some mistake may have been made as a body was *never* found.  Others

were forced to relive September 19, 1989 when a casket arrived home with the scattered remains

of what once was their spouse, parent, sibling, or child.  Under these circumstances, the court

should award the highest possible award to correspond appropriately to Libya's malicious acts

and the incredible suffering of each family member over the past 18 years. *See generally infra* at

III.

### 3.    Prejudgment Interest

44.    Consistent with prior terrorism awards in this Circuit, this court should award to

all Plaintiffs, in addition to the compensatory damages awards proposed herein, prejudgment

interest from the date of the bombing on September 19, 1989 until the date of final judgment.[10]

### a.    Prejudgment interest is required to "fully compensate" Plaintiffs for their injuries

45.    The decision to award – and how to compute – prejudgment interest rests within

the sound "discretion of the court [subject to] equitable considerations."  *Oldham v. Korean Air

Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (quoting *Motion Picture Ass'n of Amer.  v. Oman,

Inc.*, 969 F.2d 1154, 1157 (D.C. Cir. 1992)); *see also Forman v. Korean Air Lines, Co.*, 84 F.3d

446, 450 (D.C. Cir. 1996).  Applying this standard, courts in this Circuit have awarded

prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their

injuries – including, specifically, where such injuries were the result of targeted attacks

perpetrated by foreign defendants.  *See, e.g.*, *Oldham*, 127 F.3d at 54 (affirming district court's

decision to award prejudgment interest at Prime Rate to family members of U.S. citizens killed

---

[10]    Because Plaintiffs' proposed economic damages for the passengers' Estates already have
been adjusted by Mr. Wolf to reflect "present value", Plaintiffs seek prejudgment interest *only*
for their damages against all Defendants for their pain and suffering, and for conversion of
property for Interlease's damages against the Individual Libyan Defendants.

in 1983 downing of Korean Air Lines Flight KE007); *Forman,* 84 F.3d at 450-51 (same);

*Dammarell,* 2006 WL 2583043 at *1, n.2 (awarding prejudgment interest to families of U.S.

citizens killed in 1983 bombing of the United States Embassy in Beirut).  Here, too, given the

nature of Plaintiffs' loss and the considerable delay in securing judgment, this Court should

award prejudgment interest to the families of the U.S. citizens murdered by Libya in the

bombing of UTA Flight 772.

       46.     In contrast to punitive damages, which are not available against foreign sovereign

defendants in FSIA cases, "[p]rejudgment interest is an element of *complete compensation*."

*West Virginia v. United States*, 479 U.S. 305, 310-311 (1987) (emphasis added); *cf. Cooper v.

Hartford Fin.. Serv. Group, Inc.*, Civ. A. No. 04-00383-HHK/JMF, 2006 WL 2598030 at *5

(D.D.C. Sept. 11, 2006) (quoting *District of Columbia v. Pierce Assoc., Inc.*, 527 A.2d 306, 310

(D.C. 1987) ("[i]n modern times, the 'penalty theory' of prejudgment interest increasingly has

given way to the 'loss' or 'unjust enrichment' theory . . . . [T]he important question is whether

the plaintiff has been deprived of the use of the money withheld and should be compensated for

the loss") (citation omitted).  Thus, in awarding prejudgment interest to plaintiffs, courts have

observed that the "interest compensates for the time value of money and thus is often necessary

for full compensation."  *Oldham,* 127 F.3d at 54 (quoting *Motion Picture Ass'n of America*, 969

F.2d at 1157); *see also West Virginia*, 479 U.S. at 310-311.  Such compensation is particularly

appropriate here, where an award is "intended to compensate for injuries sustained over the

course of [an extended period]."  *Dammarell*, 2006 WL 2583043, at *1, n.2.  In such cases "the

nominal value attached to such injuries should reflect interest and compounding over time."  *Id*.

47.     In addition to its compensatory purpose, prejudgment interest also is designed to

avoid the unsupportable circumstance of Libya *profiting* from its terrorist acts.  In this sense, the

comments of Judge Easterbrook in the antitrust context are particularly appropriate here:

> Neither a count of judicial noses nor the observation that the
> Sherman Act was silent should obscure the fact that the time value
> of money works in defendants' favor.  Antitrust cases can be long-
> lived affairs.  This one has lasted 14 years, 2 ½ of which passed
> between the findings of liability and the award of damages.
> During all of the time, the defendants held the stakes and earned
> interest.  To deny prejudgment interest is to allow the defendants to
> profit from their wrong, and because 14 years is a long time, the
> profit may be substantial.

*Norman Law v. National Collegiate Athletic Assoc.*, 185 F.R.D. 324, 347 (D. Kan. 1999)

(quoting *Fishman v. Estate of Wirtz*, 807 F.2d 520, 584 (7th Cir. 1986) (Easterbrook, J.,

dissenting).  Thus, as observed by Judge Easterbrook, *even where statutory treble damages are*

*available*, "any erosion of the *trebling* on account of a denial of interest undermines the deterrent

force of the antitrust law … The denial of prejudgment interest systematically undercompensates

victims and undeters putative offenders.  We should allow, *indeed require*, such awards."  *Id.*

(emphasis added).  *A fortiori*, where the defendants are *terrorists* who *murdered* their victims

and have enjoyed the benefit of the damages owed to Plaintiffs for 18 years, there can be little

question that an award of prejudgment interest should be "allow[ed], indeed require[d]" here.  *Id.*

48.     In this case, an award of prejudgment interest is necessary to fully compensate the

plaintiffs for the enormous losses they sustained as a result of Libya's heinous acts.  Like the

plaintiffs in *Dammarell* and the *Korean Air Lines* cases, these Plaintiffs have established through

their undisputed testimony that they suffered economic losses as well as severe pain and

suffering and mental anguish during the eighteen years since Libya intentionally and maliciously

murdered the passengers on board UTA Flight 772 as they flew unsuspecting over the Tenere

Desert in Africa.  Moreover, prejudgment interest is particularly appropriate in this case because

of the substantial delay in judgment for these Plaintiffs caused by Libya's persistent delay tactics over the course of this litigation.  *See supra* ¶¶ 6-7.  Like each of the cases referenced above, an award of prejudgment interest in this case is "necessary for full compensation."  *Oldham*, 127 F.3d at 54 (quoting *Motion Picture Ass'n of America*, 969 F.2d at 1157).  As Judge Bates observed in *Dammarell*, "any assessment of the *real* value of [damages resulting from a terrorist attack nearly two decades prior] must take into consideration that time factor."  *Dammarell*, 2006 WL 2583043 at *1, n.2 (emphasis added).

> **b.    Interest should be calculated based on a rate no lower than the average Treasury Bill rate of interest**

49.    When awarding prejudgment interest, the decision "how to compute [the award] is discretionary with the district court."  *Forman*, 84 F.3d at 450.  Courts in this Circuit have determined the "prime rate" – *i.e.*, "the rate charged by banks on short-term, unsecured loans to their most credit-worthy customers" – to be "well within the district court's discretion" for determining prejudgment interest.  *Id.* (applying prime rate where KAL argued that lower Treasury Bill rate should apply); *accord Oldham*, 127 F.3d at 54 (striking award and remanding for recomputation where court applied the "Ibbotson Index" in lieu of prime rate); *In re Nettel Corp.*, 327 B.R. 8 (Bankr. D.D.C. 2005) (applying prime rate rather than lower Treasury Bill Rate in calculating prejudgment interest) (citing *Forman*, 84 F.3d at 450).  As the D.C. Circuit observed in *Forman*, the prime rate "is what the victim must pay – either explicitly if it borrows money or implicitly if it finances things out of cash on hand – and the rate the wrongdoer has

available to it . . . ."  *Id.* (quoting *In re Oil Spill by the Amoco Cadiz Off the Coast of Fr.*, 954

F.2d 1279, 1332 (7th Cir. 1992)).[11]

50.     In this case, Plaintiffs' damages expert applied a *lower* rate – the average annual

10-year Treasury Bill rate ("Treasury Bill rate") – to derive the formula for calculating

prejudgment interest for compensatory damages for pain and suffering and property loss.  *See* Tr.

Exhs. 31 at 8-9, 32, 33.  Mr. Wolf noted that the Treasury Bill Rate "is conservatively based"

and "is often used as the 'floor' benchmark for purposes of establishing an interest rate when

calculating prejudgment interest."  Tr. Exh. 33 at 2.  According to Mr. Wolf, the average annual

Treasury Bill Rate from 1989 through 2006 was 6.01%, as compared to the 7.45% average Prime

Rate during the same period.  *Id.*  Consistent with the manner in which other courts have

calculated prejudgment interest awards, this Court should apply *at least* Plaintiffs' proposed

Treasury Bill Rate for prejudgment interest.  *See Dammarell*, 2006 WL 2583043, at *1, n.2

(accepting Mr. Wolf's calculations of prejudgment interest based on twenty-one year average

Treasury Bill Rate of 7.33%).

### c.     Interest should be compounded from the date of the bombing

51.     Finally, to compensate Plaintiffs fully, this court should apply a compounded

interest rate for the 18 years from September 19, 1989.[12]  This, too, is consistent with the

---

[11]     Other circuits are consistent with this approach.  *See Forman,* 84 F.3d at 450 (citing
*Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 31 F.3d 581, 587 (7th Cir. 1994), *aff'd* 515
U.S. 189 (1995)); *Mentor Ins. Co. v. Bannkasse*, 996 F.2d 506, 520 (2d Cir. 1993); *Uniroyal,
Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *Alberti v. Klevenhagen*, 896
F.2d 927, 938 (5th Cir.  1990), *vacated in part on other grounds*, 903 F.2d 352 (5th Cir. 1990)).

[12]     For ease of reference, Plaintiffs have calculated prejudgment interest for an exact 18 year
period from September 19, 1989 – the date of the bombing – until September 19, 2007,
notwithstanding that final briefing for this matter will not be completed by that time.  Should

(continued…)

approach taken by Judge Bates in *Dammarell* where the Court calculated prejudgment interest based on the compounded average Treasury Bill rate over the 21 years from the 1983 U.S. Embassy bombing in Beirut.  *See id.* ("the nominal value attached to [plaintiffs'] injuries should reflect interest *and compounding* over time") (emphasis added).  Indeed, Defendants' efforts to unduly prolong this litigation further support following Judge Bates' approach in *Dammarell*. To be "fully compensated," Plaintiffs should be awarded the "real value" of the damages they have suffered, and which Libya has been able to use freely during the pendency of this litigation. *Id*.

52.     Consistent with the prior awards of this Court and others, prejudgment interest should be applied to the Estates' and family members' damages for pain and suffering by multiplying the pain and suffering award for each Plaintiff by the formula $(1+.0601)^{18}$ – reflecting the average Treasury Bill rate, compounded over the 18 years since the date of the bombing.  Tr. Exh. 33.

53.     Thus, for example, Plaintiffs propose a final judgment against the Libyan State Defendants awarding compensatory damages of at least $18M for the pain and suffering of each of the passengers who perished on board UTA Flight 772.  *See supra* at I.A.2.  Using the date of September 19, 2007 as the date of final judgment , *see supra* at n.12, this Court – after applying prejudgment interest to this amount from the date of the passengers' murders ($18M * $(1.0601)^{18}$) –  should award compensatory damages for pain and suffering in the amount of

---

(continued)

final judgment in this case be entered on another date, each Plaintiff's award should be modified by changing the variable "t" in the formula PV*$(1.0601)^{t}$— where PV represents the amount of damages and "t" represents the number of years since the bombing – to reflect the precise number of years (including fractions) since September 19, 1989.  Plaintiffs are available to conduct this calculation upon the Court's request.

$51,465,420.59 to each Estate,  plus the economic damages calculated by Mr. Wolf reflecting the present value of each Estate's loss.

**B.      Damages Against Six Individual Defendants:  Estates and Individual Family Members**

54.     Plaintiffs are entitled separately to identical damages against the Individual Libyan Defendants – *i.e.*, the six Libyan individuals who committed these acts of murder on behalf of the Libyan State Defendants.  In addition, these awards against the Individual Libyan Defendants – including both the economic damages to the Estates and the non-economic "pain and suffering" damages to the Estates and family members, plus prejudgment interest – are subject to the statutory trebling mandate of the Anti-Terrorism Act ("ATA") of 1991, 18 U.S.C. § 2333(a) (2000).[13]  The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism ... may sue therefore in any appropriate district court of the United States and *shall* recover threefold the damages he or she sustains and the cost of the suit, including attorneys' fees."  (emphasis added).[14]

---

[13]     This Court has applied the ATA to acts of terrorism that occurred prior to its 1991 enactment.  *See, e.g.*, *Hurst v. Socialist People's Libya Arab Jamahiriya*, 474 F.Supp.2d 19, 29-30 (applying the ATA to the individuals responsible for the 1988 bombing of Pan Am Flight 103 over Lockerbie Scotland).  Moreover, applying the ATA in this case would further the statute's strong deterrent purpose as evidenced by its legislative history.  As one of the ATA's principle authors Senator Chuck Grassley of Iowa stated: "With the [the ATA], we put terrorist[s] on notice: To keep their hands off Americans and their eyes on their assets."  136 Cong.Rec. S14279-01.  Thus, both caselaw precedent and the legislative history of the ATA demonstrate that the ATA is applicable here, where the acts in questions occurred before 1991.

[14]     This Court recently recognized in *Hurst v. Socialist Libyan Arab Jamahiriya,* 474 F. Supp. 2d 19, 28-29 (D.D.C. 2007), that while ATA trebling claims can be brought against individuals who act on behalf of a foreign State, they cannot be pursued against the State itself.  Therefore, Plaintiffs seek treble damages only against the Individual Libyan Defendants.

55.     Statutory trebling applies equally to economic damages for lost income and non-economic damages for pain and suffering.  In *Sisso v. Islamic Republic of Iran*, 2007 WL 2007582, *10-11 (D.D.C. Jul. 5, 2007), Judge Bates recently held that "injuries consisting of mental anguish and emotional pain and suffering ... are cognizable under the ATA."  Judge Bates therefore trebled a $5M damages award against Hamas to the family member of a bombing-victim, arriving at an ultimate $15M judgment against the terrorist organization pursuant to 28 U.S.C. § 2333(a).  *Id.*  This Court should do the same here, given the Individual Libyan Defendants' intentional and malicious conduct, and the severe mental anguish and emotional pain and suffering of the victims caused by their acts.[15]

56.     Thus, for example, Plaintiffs propose an award of at least $26M for the pain and suffering of each spouse of the passengers who perished on board UTA Flight 772.  *See supra* at I.A.2.b.  Using the date of September 19, 2007 for purposes of calculating prejudgment interest, *see supra* at n.12, this Court should apply prejudgment interest to this amount from the date of the passengers' murders ($26M * (1.0601)[18]) and then treble that amount ($74,338,940.85*3), resulting in a final compensatory damages award to each spouse of the UTA Flight 772 victims in the amount of $223,016,822.54.

57.     Likewise, with respect to the UTA 772 passengers, Plaintiffs propose an award of at least $18M for the pain and suffering of each passenger *plus* economic damages for lost

---

[15]     The trebling of damages against the Individual Libyan Defendants does not impact the applicability or the calculation of prejudgment interest on such awards.  Treble damages are part of Plaintiffs' underlying statutory entitlement to compensation.  Prejudgment interest, by contrast, serves the separate purpose of ensuring that Plaintiffs receive "full compensation" by awarding Plaintiffs the "time value" of their recovery.  *See, e.g., Law*, 185 F.R.D. at 347 (discussing importance of applying *both* treble damages *and* prejudgment interest in antitrust cases to accomplish deterrent purpose of each).

wages, benefits, and retirement pay.  Thus, for example, in the case of Mihai Alimanestianu, this Court should award $18M plus prejudgment interest from the date Mr. Alimanestianu's murder ($18M * (1.0601)[18]), plus Mr. Alimanestianu's economic loss damages ($1,044,000), and then treble that amount ($52,509,420.59*3), resulting in a final compensatory damages award to Mr. Alimanestianu in the amount of $157,528,261.76.

      **C.**    **Damages Against Six Individual Defendants:  Interlease**

    58.    Finally, Plaintiff Interlease, Inc. – the owner of the DC-10 that was operating as UTA Flight 772 – is entitled to damages for the loss of that aircraft which Libya intentionally destroyed over the Tenere Desert on September 19, 1989.  By planting the bomb and ultimately destroying the aircraft, the Individual Libyan Defendants are liable to Interlease for damages for conversion under Georgia law.  *See infra* at II.I.  These damages should be measured by an amount no less than the value of the aircraft as of September 19, 1989.  The undisputed testimony of  Douglas Matthews, CEO and owner of Plaintiff Interlease, and Plaintiffs' aircraft valuation expert, Douglas Kelly, establish this value at no less than $38.1M and as high as $50M. *See infra*; *see also* Tr. Vol. II at 120-22, 173, 176;  Tr. Exh. 36 at 2-3.

    59.    Mr. Kelly is the Vice President of Asset Valuation and Chief Appraiser of AVITAS, Inc. – one of the top aircraft appraisal firms in the world, and the publisher of the "Blue Book," *i.e.*, the industry standard reference guide for aircraft values.  Tr. Vol. II at 119, 163-164.  Kelly is one of 45 appraisers in the world certified by the International Society of Transport Aircraft Trading, and was qualified by the Court as an expert in the field of valuation of commercial jet aircraft.  Tr. Vol. II at 169-171.  According to Mr. Matthews, AVITAS historically has taken a "considered but conservative approach" to valuation.  Tr. Vol. II at 120.

    60.    Mr. Kelly testified that the DC-10 aircraft that Libya destroyed over the Tenere desert had a fair market value "base price" in September 1989 of *at least* $38.1M.  Based on the

condition and maintenance status of the aircraft at that time, Mr. Kelly testified that the "adjusted

fair market value" of the aircraft could be as much as $3M higher, or $41.1M.  Tr. Vol. II at 173,

176; Tr. Exh. 36.  Consistent with Mr. Kelly's testimony, Mr. Matthews testified that, in

September 1989, the aircraft hull itself was worth between $40M and $42M but the aircraft was

worth $45M-$50M to Interlease as a business asset at that time.  Tr. Vol. II at 120-122, 162*; see

also infra* at I.A.3.  As Mr. Kelly testified, "1989 represented one of the strongest periods in

aviation history that we have ever seen.  That was one of the highest peaks in the market, as

Doug Matthews said … especially in 1988, '89, we had incredible massive over ordering from

the airlines and one of the biggest peaks ever in the history of aviation."  Tr. Vol. II at 179.

61.     Moreover, as with the damages for the passengers' estates and family members,

the court should add prejudgment interest to Interlease's award in order to reflect the "time

value" – indeed, the "real value" – of the company's damages resulting from Libya's acts.  *See

supra* at I.A.3.  Finally, because the Individual Libyan Defendants have been found liable to

Interlease pursuant to 18 U.S.C. § 2333(a), Interlease's award – including prejudgment interest –

should be trebled consistent with the statutory mandate of the ATA.

62.     Thus, Plaintiffs propose an award of $50M in compensatory damages for the

loss of the DC-10-30 aircraft that Libya destroyed over the Tenere desert.  Using the date of

September 19, 2007 for purposes of calculating prejudgment interest, *see supra* at n.12, this

Court should apply prejudgment interest to this amount from the date of the bombing ($50M *

$(1.0601)^{18}$) and then treble that amount ($142,959,501.63 * 3), resulting in a final

compensatory damages award to Interlease in the amount of $428,878,504.89.

## II.     Applicability of State Law to Damages Claims

63.     In its April 9, 2007 Order granting partial summary judgment to Plaintiffs with

respect to liability, this Court determined that "the law to be applied to each of the various claims

is that of the forum state where the plaintiff is (or was, in the case of a claim brought by a decedent's estate) domiciled."  April 9, 2007 Order at 1 (citing *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090 at *18-*22 (D.D.C. Mar. 29, 2005).  Consistent with Judge Bates' opinion in *Dammarell*, Plaintiffs set forth herein the law applicable to each Plaintiff based on his or her domicile at the time of bombing on September 19, 1989.[16]  *See Dammarell*, 2005 WL 756090 at *22 ("the state of domicile for [the estates of the victims killed in the attack, and the survivors of those victims] should be assessed as of the date that the … bombing occurred") (citing *Roll v. Tracor, Inc.*, 140 F. Supp. 2d 1073, 1080, n.5 (D. Nev. 2001) ("[i]t is well settled in tort cases that for the purpose of determining domiciliary in choice-of-law analyses the relevant consideration is the domiciliary of the plaintiff at the time of the accident")).

### A.     Virginia

64.     Virginia law applies to the claims of (1) the Estate of UTA Flight 772 passenger Bonnie Barnes Pugh; (2) Robert Pugh, her husband; (3) Ann Carey, her daughter; (4) the Estate of Malcolm Pugh, her son; and (5) John Schutzius, the brother of UTA Flight 772 passenger Margaret Schutzius, each of whom were domiciled in Virginia at the time of the bombing.  *See infra*.

---

[16]     There is substantial overlap between the laws of the various jurisdictions governing the claims in this case as set forth, *infra* at II.A-I.  Indeed, there is no "conflict of laws" between the various states at issue.  Thus, although Plaintiffs provide herein an analysis of the laws of *each* state where Plaintiffs were domiciled at the time of the bombing, under the laws of *any* of these jurisdictions, the damages award would remain the same.

### 1.     Wrongful Death

65.    Virginia's wrongful death statute provides:

> Whenever the death of a person shall be caused by the wrongful
> act, neglect, or default of any person . . . and the act, neglect, or
> default is such as would, if death had not ensued, have entitled the
> party injured to maintain an action . . . then, and in every such
> case, the person who . . . would have been liable, if death had not
> ensued, shall be liable in an action for damages. . .

Va. Code Ann. § 8.01-50(A) (2005).

66.    To be actionable, the defendant must have been at fault in some manner – the

underlying wrongful act may be intentional or negligent – and it must be established that

defendant's wrongful act caused the decedent's death.  CHARLES E. FRIEND, PERSONAL INJURY

LAW IN VIRGINIA 15.2 (2000).

67.    Under Virginia law, "only the decedent's personal representative may sue on

behalf of the statutorily designated wrongful death beneficiary," with wrongful death

beneficiaries not specifically authorized to initiate suits on their own behalf.  *Jones v. Prince

George's County*, 348 F.3d 1014, 1017 (D.C. Cir. 2003); *see* Va. Code Ann. § 8.01-50(B).  Any

amount recovered in a wrongful death action is for the benefit of statutorily designated

beneficiaries listed in Va. Code Ann. § 8.01-53(A), including spouses, children, parents, siblings

and any other relative who is primarily dependant on the deceased.  *Id.*  In terms of the order of

distribution, damages are first distributed to the surviving spouse and children of the deceased; if

there are no "first tier" beneficiaries, then damages are distributed to parents and siblings of the

deceased, and thereafter to any other relative who is dependent upon the deceased.  *See id.*

68.    Virginia Code § 8.01-52 prescribes the damages available in wrongful death

actions.  Specifically, Virginia entitles Plaintiffs to recover both economic and non-economic

damages, including damages for loss of consortium and/or solatium.  As the Supreme Court of

Virginia has observed:

> [D]amages may be awarded not only for the pecuniary loss
> sustained by the statutory beneficiaries (including the probable
> earnings of the deceased for the duration of his life expectancy in
> view of his health, age, business capacity, and experience) but also
> for loss of deceased's care, attention and society, *as well as such
> sum as the jury may deem fair and just as a solatium to the
> beneficiaries for their sorrow and mental anguish caused by the
> death.*

*Wilson v. Whittaker*, 154 S.E. 2d 124, 128 (Va. 1967) (emphasis added) (citations omitted in

original); *see also Rice v. Charles*, 532 S.E. 2d 318, 324 (Va. 2000) (finding jury verdict to be

inadequate as matter of law because it failed to compensate wrongful death plaintiff for "non-

monetary elements of damage, such as sorrow, mental anguish, and loss of solace").  In fact,

evidence of sorrow, mental anguish, and solace – even in the absence of evidence regarding loss

of income and expenses incurred – can be sufficient to support a jury's award in a wrongful

death action.  *Shepard v. Capitol Foundry of Va., Inc.*, 554 S.E.2d 72, 76 (Va. 2001); *see Jan

Paul Fruiterman, M.D. & Assocs. v. Waziri*, 525 S.E.2d 552, 555 (Va. 2000).

69.     Thus, the Virginia Code provides expressly for recovery in wrongful death actions

for:

> 1)  Sorrow, mental anguish and solace which may include society,
>     companionship, comfort, guidance, kindly offices and advice of the decedent;
> 2)  Compensation for reasonably expected loss of (i) income of the decedent and
>     (ii) services, protection, care and assistance provided by the decedent;
> 3)  Expenses for the care, treatment and hospitalization of the decedent incident
>     to the injury resulting in death;
> 4)  Reasonable funeral expenses; and
> 5)  Punitive damages may be recovered for willful or wanton conduct, or such
>     recklessness as evinces a conscious disregard for the safety of others.

Va. Code Ann. § 8.01-52 (2005).

70.     Because Virginia's wrongful death statute requires that the personal representative of the subject estate bring the claim on behalf of all beneficiaries, Robert Pugh – Bonnie Barnes Pugh's husband and executor of her Estate, *see infra* – is the appropriate Plaintiff entitled to bring a claim for the death of Bonnie Barnes Pugh in the bombing of UTA Flight 772. Mr. Pugh is entitled to bring that claim on behalf of, and for the benefit of, all statutorily designated beneficiaries, which include spouses, children, parents and siblings, Va. Code Ann. § 8.01-53(A) (2005). Thus, Mr. Pugh's wrongful death claim is for the benefit of all statutory beneficiaries. Accordingly, judgment against Libya for wrongful death and an award of damages in the amounts set forth below should be issued in favor of the Estate of Bonnie Barnes Pugh.

## 2.     Intentional Infliction of Emotional Distress[17]

71.     Under Virginia law, a cause of action for emotional distress will lie (whether or not accompanied by bodily impact or physical injury) provided that four elements are shown:

---

[17]     Courts have imposed liability for intentional infliction of emotional distress in favor of family members of victims of terrorism who were not physically present for the terrorist acts even where the applicable state law typically requires such presence for a claim to lie. This is no surprise given the speed and power of today's media channels – including live television, internet reporting and the power of modern mass media. It is especially true for terrorist acts. *See, e.g.*, *Burnett v. Al Baraka Inv. and Dev. Corp.*, 274 F.Supp.2d 86, 107 -108 (D.D.C. 2003) (family members of victims of September 11 terrorist attacks stated a claim of intentional infliction of emotional distress under New York law against alleged accomplices of *al Qaeda*; although those family members were not physically present at World Trade Center, Pentagon, or Shanksville the nature of the terrorist acts was to inflict emotional distress on the family members of victims, and due to the pervasive nature of the event, the family members were "virtually present and that is enough"); *Jenco,* 154 F.Supp.2d at 36 ("If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability") (quoting Dan B. Dobbs, *The Law of Torts* § 307 at 834 (2000)); *Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27, 50 (D.D.C. 2001) ("[W]hen an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family"); *see also, Dammarell v. Islamic Republic of Iran,* 404 F.Supp.2d 261, 283, 285-86 (D.D.C. 2005); *Salazar*, 370 F.Supp.2d at 115, n.12.

"[1] the wrongdoer's conduct was intentional or reckless; [2] the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality…; [3] there was a causal connection between the wrongdoer's conduct and the emotional distress; and [4] the emotional distress was severe." *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974) (citing RESTATEMENT (SECOND) OF TORTS § 46 at 71).  The term "emotional distress" encompasses:

> 'mental suffering, mental anguish, mental or nervous shock . . . . It includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea' . . . But liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it.

*Russo v. White*, 400 S.E.2d 160, 163 (Va. 1991) (citing RESTATEMENT (SECOND) OF TORTS § 46 comment j).  A damages award for intentional infliction of emotional distress may include compensatory damages for both pecuniary and non-pecuniary losses.  *See LeBrun v. Yakeley*, No. 209591, 67 Va. Cir. 122, 2005 WL 832207 at *1-2 (Va. Cir. Ct., Mar. 7, 2005) (discussing jury award of $25,000 in compensatory damages and $275,000 in punitive damages for IIED claim);  *Anderson v. Sharma*, Chancery No. 125374, 38 Va. Cir. 22, 1995 WL 1055905 at *1-3, 5 (Va. Cir. Ct., June 26, 1995) (discussing possible bases for damages on IIED claim).

72.    On the undisputed factual record, there is no question that Libya is liable, under Virginia law, for damages for intentional infliction of emotional distress.  Surely Libya's actions, in plotting and carrying out the bombing UTA Flight 772 with the resulting deaths of everyone on board, constituted intentional and malicious acts that affront the "generally accepted" standards of decency and morality.  The direct impact of the killing of the passengers on their immediate family members cannot be doubted – nor can Defendants' intent to have caused such

an impact.  Indeed, by definition, acts of state-sponsored terrorism such as the bombing of UTA

Flight 772 are specifically designed to impact not only those killed or injured in the attack itself,

but their family members as well.  *See Kapar*, Slip. Op. at 18-19.

73.     The record establishes clearly that Plaintiffs suffered unfathomable pain and

suffering in September 1989 and over the years from the sudden and violent loss of their loved

ones in the terrorist bombing of UTA Flight 772.  *See infra*.  The undisputed facts and reasonable

inferences there from leave no doubt that the family members of the passengers aboard UTA

Flight 772 have endured precisely the kind of severe emotional distress for which recovery is

available under Virginia law.

74.     Accordingly, judgment against Libya for intentional infliction of emotional

distress under Virginia law and an award of damages in the amounts set forth below should be

issued in favor of Robert Pugh, Ann Carey, the Estate of Malcolm Pugh, and John Schutzius.

### 3.     Survival

75.     Virginia's survival statute provides:

> Every cause of action whether legal or equitable, which is
> cognizable in the Commonwealth of Virginia, shall survive either
> the death of the person against whom the cause of action is or may
> be asserted, or the death of the person in whose favor the cause of
> action existed. . . .

Va. Code Ann. § 8.01-25 (2005).  Here, had she survived, Bonnie Barnes Pugh would have had

numerous claims against Defendants, including assault and battery, and intentional infliction of

emotional distress.  Accordingly, judgment against Libya pursuant to Virginia's survival statute

and an award of damages in the amount set forth below should be issued in favor of the Estate of

Bonnie Barnes Pugh.

**B.      Texas**

76.      Texas law applies to the claims of (1) the Estate of UTA Flight 772 passenger

Mark Corder; (2) Carla Malkiewicz, his wife; (3) the Estate of UTA Flight 772 passenger Pat

Wayne Huff; (4) Ermine Hailey, his wife; (5) Michael Huff, his brother; (6) Glenda Jan Pitillo,

his sister; (7) Jared Hill, his stepson; (8) Amanda Hill, his stepdaughter; (9) the Estate of James

Huff, his father; (10) the Estate of Janice Huff, his mother; (11) the Estate of UTA Flight 772

passenger Margaret Schutzius; (12) Mary Hassett, her mother; (13) Christopher Schutzius, her

brother; (14) the Estate of UTA Flight 772 passenger James Eldee Turlington, Sr.; (15) Eddie

Don Turlington, his son; (16) Deborah Vaughn Schooling, his daughter; (17) Joyce Butler, his

sister; (18) Russell Turlington, his brother; (19) Jimmy Bruce Turlington, his son; (20) David

Olney Turlington, his son; (21) James Eldee Turlington, Jr., his son; (22) Christopher Darwyn

Turlington, his son; (23) Jana Elizabeth Turlington, his daughter; and (24) the Estate of Elvee

Turlington, his mother, each of whom was domiciled in Texas at the time of the bombing.  *See*

*infra*.

**1.      Wrongful Death**

77.      The Texas wrongful death statute provides in part:

> A person is liable for damages arising from an injury that causes an
> individual's death if the injury was caused by the person's or his
> agent's or servant's wrongful act, neglect, carelessness,
> unskillfulness, or default.

Tex. Civ. Prac. & Rem. Code § 71.002(b) (2007).  "An action to recover damages . . . for

wrongful death is for the exclusive benefit of the deceased's surviving spouse, children, and

parents.  *See id.* § 71.004(a); *Shepherd v. Ledford,* 962 S.W.2d 28, 31 (Tex. 1998).  The action

may be brought by any or all of these beneficiaries individually, or by any one of them on behalf

of the others.  "If none of the individuals entitled to bring an action have begun the action within

three calendar months after the death of the injured individual, his executor or administrator shall bring and prosecute the action unless requested not to by all those individuals." Tex. Civ. Prac. & Rem. Code § 71.004(c) (2007).

78. "The measure of recovery for wrongful death has nothing to do with the injuries sustained by the decedent, but is rather the monetary value of the benefit that the plaintiff reasonably expected to receive from the decedent had he not been killed." *Johnson v. Houston*, 813 S.W.2d 227, 229 (Tex. 1991).

79. On the undisputed factual record, there is no question that Libya is liable under the Texas wrongful death statute – Libya's "wrongful act[s]" caused the death of all 170 passengers aboard UTA Flight 772, including the seven Americans whose estates are represented as Plaintiffs in this case. Thus, the surviving spouses, children and parents of James Turlington, Sr., Margaret Schutzius, Patrick Huff, and Mark Edward Corder, who were domiciled in Texas at the time of the bombing, have claims arising under Texas law.

80. Accordingly, judgment against Libya for wrongful death under Texas law, and an award of damages in the amounts set forth below, should be issued in favor of the Estates of James Turlington, Sr., Margaret Schutzius, Patrick Huff, and Mark Edward Corder, on behalf of their designated beneficiaries.

## 2. Intentional Infliction of Emotional Distress

81. Texas has adopted the elements of the RESTATEMENT (SECOND) OF TORTS § 46 (1965) for the tort of intentional infliction of emotional distress. *See Twyman v. Twyman*, 855 S.W.2d 619, 621-22 (Tex. 1993). To recover under the tort, a plaintiff must show that "1) the defendant acted intentionally or recklessly, 2) the conduct was 'extreme and outrageous,' 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the resulting emotional distress was severe." *Standard Fruit & Veg. Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998)

(citing *Twyman*, 855 S.W.2d at 621-22).  A claimant must, however, "show more than mere worry, anxiety, vexation, embarrassment, or anger."  *Star Houston, Inc. v. Shevack*, 886 S.W.2d 414, 418 (Tex. App. – Hous. [1 Dist.] 1994) (citations omitted).  "The law intervenes only where emotional distress inflicted is so severe that no reasonable person could be expected to endure it. . . [;] [t]he intensity and the duration of the distress are factors to be considered in determining its severity."  *Gonzales v. Willis*, 995 S.W.2d 729, 736 (Tex. App. – San Antonio 1999) (quoting RESTATEMENT (SECOND) OF TORTS § 46 comment j).  Manifestations of severe emotional distress may include the "mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and public humiliation."  *Gant v. Dumas Glass and Mirror, Inc.*, 935 S.W.2d 202, 209 (Tex. App. – Amarillo 1996).

82.     The record establishes clearly that each of the Plaintiffs suffered the most severe emotional distress imaginable upon Libya's horrific murder of their loved ones aboard UTA Flight 772.  *See infra*.  It is beyond dispute that each of the Plaintiffs then domiciled in Texas is entitled to damages for Intentional Infliction of Emotional Distress under Texas law.

83.     Accordingly, judgment against Libya for intentional infliction of emotional distress under Texas law, and an award of damages in the amounts set forth below, should be issued in favor of Carla Malkiewicz, Ermine Hailey, Michael Huff, Glenda Jan Pitillo, Jared Hill, Amanda Hill, the Estate of James Huff, the Estate of Janice Huff, Mary Hassett, Christopher Schutzius, Eddie Don Turlington, Deborah Vaughn Schooling, Joyce Butler, Russell Turlington, Jimmy Bruce Turlington, David Olney Turlington, James Eldee Turlington, Jr., Christopher Darwyn Turlington, Jana Elizabeth Turlington, and the Estate of Elvee Turlington.

### 3.     Loss of Consortium

84.     Texas recognizes claims for loss of consortium, which is defined to include:

> [T]he mutual right of the husband and wife to that affection,
> solace, comfort, companionship, society, assistance, and sexual
> relations necessary to a successful marriage.  This definition
> primarily consists of the emotional or intangible elements of the
> marital relationship.  In Texas, it does not include the "services"
> rendered by a spouse to the marriage.  These elements have been
> referred to as a conceptualistic unity, and the action accrues upon
> the substantial impairment of them.

*Whittlesey v. Miller,* 572 S.W.2d 665, 666 (Tex. 1978) (citations omitted).  The Texas Supreme

Court also has observed that, although the term "loss of consortium" more accurately may be

described as "an element of damage rather than a cause of action," Texas courts "so frequently

used the phrase to denote those actions in which loss of consortium is the major element of

damage that 'loss of consortium' has come to be referred to as a cause of action."  *Id.*  The loss

of consortium can arise from either the intentional or negligent conduct of a third party.  *Id.*

85.     Although, traditionally, loss of consortium only was available between spouses,

Texas also has recognized a claim for loss of consortium between parents and children (including

adult children).  *See Reagan v. Vaughn,* 804 S.W.2d 463 (Tex. 1990) (holding that most children

are dependent on their parents for emotional sustenance).

86.     The undisputed factual record in this case demonstrates beyond question that, as a

result of Libya's actions, the spouses, children and parents of the passengers of UTA Flight 772

have lost the affection, solace, comfort, companionship, society, assistance, and (in the case of

spouses ) sexual relations, of their loved ones who were murdered.  Accordingly, judgment

against Libya for loss of consortium under Texas law, and an award of damages in the amounts

set forth below, should be issued in favor of Carla Malkiewicz, Ermine Hailey, the Estate of

James Huff, the Estate of Janice Huff, Mary Hassett, Eddie Don Turlington, Deborah Vaughn

Schooling, Jimmy Bruce Turlington, David Olney Turlington, James Eldee Turlington, Jr.,

Christopher Darwyn Turlington, Jana Elizabeth Turlington, and the Estate of Elvee Turlington.

### 4.      Survival

87.     Texas's survival statute states:

> (a) A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.
> (b) A personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person. The action survives against the liable person and the person's legal representatives.
> (c) The suit may be instituted and prosecuted as if the liable person were alive.

Tex. Civ. Prac. & Rem. Code § 71.021 (2007).

88.     Under Texas law, "[t]he survival action, as it is sometimes called, is wholly derivative of the decedent's rights.  The actionable wrong is that which the decedent suffered before his death.  The damages recoverable are those which he himself sustained while he was alive and not any damages claimed independently by the survival action plaintiffs (except that funeral expenses may also be recovered if they were not awarded in a wrongful death action)." *Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345 (Tex. 1992).  Therefore, in a survival action, "the heirs or legal representatives of a decedent's estate may recover for the physical pain, suffering, and property damage sustained by the decedent before death, as well as for medical expenses and other damages."  *Borth v. Charley's Concrete Co.*, 139 S.W.3d 391, 395 (Tex. App. 2004*)*.

89.     The undisputed factual record in this case demonstrates clearly that the four Texas domiciliaries who died aboard UTA Flight 772 suffered extreme and excruciating physical pain and anguish as they plunged to their certain death, and are entitled to damages for these injuries caused by Libya's terrorist acts.  Accordingly, judgment against Libya pursuant to Texas's survival statute, and an award of damages in the amounts set forth below, should be issued in

favor of the Estates of Mark Edward Corder, Pat Wayne Huff, Margaret Schutzius, and James

Turlington, Sr.

### C.   New York

90.   New York law applies to the claims of (1) the Estate of UTA Flight 772 passenger

Mihai Alimanestianu; (2) Ioana Alimanestianu, his wife; (3) Joanna Alimanestianu, his daughter;

(4) Nicholas Alimanestianu, his son; (5) Alexander Alimanestianu, his son; (6) the Estate of

Serban Alimanestianu, his brother; and (7) the Estate of Constantin Alimanestianu, his brother,

each of whom was domiciled in New York at the time of the bombing.  *See infra*.

#### 1.   Wrongful Death

91.   New York's wrongful death statute provides that:

> [t]he personal representative, duly appointed in this state or any
> other jurisdiction, of a decedent who is survived by distributees
> may maintain an action to recover damages for a wrongful act,
> neglect or default which caused the decedent's death against a
> person who would have been liable to the decedent by reason of
> such wrongful conduct if death had not ensued.

N.Y. Est. Powers & Trusts Law § 5-4.1(1) (2003).  Wrongful death actions are not brought on

behalf of the decedent's estate, but rather on behalf of the decedent's distributees.  *Green v.*

*Kamalian*, 530 N.Y.S.2d 288, 289 (N.Y.A.D. 3 Dept. 1988).

92.   The elements of a wrongful death action are: (1) the death of a human being; (2)

the wrongful act, neglect or default of defendant by which the decedent's death was caused; (3)

the survival of distributees who suffered pecuniary loss by reason of the death of the decedent;

and (4) the appointment of a personal representative of the decedent.  *Pratt v. George Spalty*

*Sons, Inc.*, 516 N.Y.S.2d 433, 436 (N.Y. Sup. 1987).  The appointment of a qualified

administrator is essential to the maintenance of an action for wrongful death; the statutory right

to recover for wrongful death does not even arise until an administrator has been named through

issuance of letters of administration.  *Dawson v. Langner*, 484 N.Y.S.2d 743, 744 (N.Y.A.D. 4

Dept. 1985).

93.     Plaintiffs in a wrongful death action under New York law are entitled to damages

in the amount the fact finder "deems to be fair and just compensation for the pecuniary injuries

resulting from the decedent's death to the persons for whose benefit the action is brought."  N.Y.

Est. Powers & Trusts Law § 5-4.3(a) (1999).  Plaintiffs specifically are entitled to compensation

for loss of support and assistance (*i.e.*, lost future earnings), loss of parental care and guidance,

and the possibility of inheritance.  *Sand v. Chapin*, 656 N.Y.S.2d 700, 701 (N.Y.A.D. 3 Dept.

1997); *Gonzalez v. New York City Hous. Auth.*, 572 N.E.2d 598, 601 (N.Y. 1991).  Moreover,

"punitive damages may be awarded if such damages would have been recoverable had the

decedent survived."  N.Y. Est. Powers & Trusts Law § 5-4.3(b); *see, e.g., Adelman v. Adelman*,

741 N.Y.S.2d 841, 844-45 (N.Y. Sup. 2002).  Damages recovered in a New York wrongful death

action are to be distributed to the decedent's distributees or, if the decedent has no spouse or

children, decedent's parents.  N.Y. Est. Powers & Trusts Law § 5-4.4(a).

94.     On the undisputed factual record, there is no question that Libya is liable under

New York's wrongful death statute.  Based on the undisputed evidence, it is beyond doubt that

Libya's wrongful acts caused the death of Mihai Alimanestianu (along with all 170 passengers

aboard UTA Flight 772), resulting in pecuniary losses for his surviving family members.

Because New York's wrongful death statute requires that the personal representative of the

subject estate bring the claim on behalf of all designated beneficiaries, Ioana Alimanestianu –

Mihai Alimanestianu's wife and administrator of his estate, *see infra*, – is the appropriate

Plaintiff entitled to bring a claim for the death of Mihai Alimanestianu in the bombing of UTA

Flight 772.  Ms. Alimanestianu is entitled to bring that claim on behalf of all designated

beneficiaries, including herself (as Mihai's widow) and Mihai's children, Joanna, Nicholas, Irina, and Alexander.  Accordingly, judgment against Libya for wrongful death under New York law, and an award of damages in the amounts set forth below, should be issued in favor of Ioana Alimanestianu, acting as personal representative of the Estate of Mihai Alimanestianu, for the designated beneficiaries of that Estate.

### 2.   Intentional Infliction of Emotional Distress

95.    Under New York law, the tort of intentional infliction of emotional distress has four elements:

> (i) extreme and outrageous conduct; (ii) intention to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.

*Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).  The standard for liability is to be broadly defined, as "[t]he tort is as limitless as the human capacity for cruelty."  *Id.*  Thus, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress."  *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983) (quoting RESTATEMENT (SECOND) OF TORTS § 46(1)).  At the same time, liability may be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Howell*, 612 N.E.2d at 702.

96.    The undisputed factual record in this case demonstrates clearly that Libya's actions in connection with the intentional murder of the 170 passengers on board UTA Flight 772 was "extreme and outrageous" conduct intended to cause – and which, of course, did cause – "severe emotional distress" for each of the family members of Mihai Alimanestianu.

Accordingly, judgment against Libya for intentional infliction of emotional distress under New York law, and an award of damages in the amounts set forth below, should be issued in favor of Ioana Alimanestianu, Irina Alimanestianu, Joanna Alimanestianu, Nicholas Alimanestianu, Alexander Alimanestianu, and the Estates of Serban Alimanestianu, Calin Alimanestianu and Constantin Alimanestiano.

### 3.   Loss of Consortium

97.   New York courts have recognized a cause of action for a surviving spouse for loss of consortium. *Millington v. Southeastern Elevator Co.*, 239 N.E.2d 897, 902-03 (N.Y. 1968); *see also Delosovic v. New York*, 541 N.Y.S.2d 685, 692 (N.Y. Sup. 1989) (recognizing loss of consortium action, despite no physical harm to plaintiff arising from husband's injuries).  A loss of consortium under New York law includes not only the surviving spouse's loss of support or services, but also embraces, *inter alia*, the love, companionship, affection, society, sexual relations, and solace as a result of the decedent's death. *Id.* at 899.  In fact, New York law entitles a surviving spouse to seek punitive damages in addition to compensatory damages in an action for loss of consortium. *Young v. Robertshaw Controls Co.*, 474 N.Y.S.2d 886, 892 (N.Y. Sup. 1983).

98.   The undisputed factual record in this case establishes clearly that Libya's actions deprived Ioana Alimanestianu of the love, companionship and support of her husband Mihai Alimanestianu by murdering him along with all 170 individuals on board UTA Flight 772. *See infra* at III.  Accordingly, judgment against Libya for loss of consortium under New York law, and an award of damages in the amount set forth below, should be issued in favor of Ioana Alimanestianu.

### 4.   Survival

99.     No cause of action under New York law for "injury to person or property is lost

because of the death of the person in whose favor the cause of action existed . . . [;] [f]or any

such injury, an action may be brought or continued by the personal representative of the

decedent."  N.Y. Est. Powers & Trusts Law § 11-3.2(b) (2001); *see also* N.Y. Est. Powers &

Trusts Law § 11-3.1 (allowing personal representative to maintain "any action  . . .  as such

action might have been maintained by  . . . his decedent"); *Mingone v. State*, 474 N.Y.S.2d 557,

560 (N.Y.A.D. 2 Dept. 1984) (concluding that personal representative who has received letters of

administration of decedent's estate is "the only party who is authorized to bring" either survival

action or wrongful death action).  Because wrongful death actions and survival actions protect

the rights of different classes of persons and involve different damages, a decedent's

representative may assert one independently of and without the necessity of asserting the other.

*See Adelman*, 741 N.Y.S.2d at 847.  Still, a wrongful death action and survival action may be

prosecuted in a single action.  N.Y. Est. Powers & Trusts Law § 11-3.3(b)(1).

100.    Recovery in a survival action under New York law is limited to "damages for pain

and suffering endured by the deceased, for expenses incurred, and for loss of earnings up to the

time of death."  *Sand*, 656 N.Y.S.2d at 701 (quoting *Kordonsky v. Andrst*, 568 N.Y.S.2d 117,

119 (N.Y.A.D. 2 Dept. 1991)); *see also* N.Y. Est. Powers & Trusts Law § 11-3.3(a).  Any

damages recovered become part of the decedent's estate.  N.Y. Est. Powers & Trusts Law § 11-

3.3(a).

101.    The undisputed factual record in this case demonstrates clearly that Mihai

Alimanestianu – along with all the other passengers of UTA Flight 772 – suffered extreme and

excruciating pain and suffering as he plunged knowingly to his certain death and is entitled to

damages for the injuries he suffered as a result of Libya's terrorist acts.  Accordingly, judgment

against Libya pursuant to New York's survival statute, and an award of damages in the amounts

set forth below, should be issued in favor of the Estate of Mihai Alimanestianu.

### D. Montana

102.   Montana law applies to the claims of (1) the Estate of UTA Flight 772 passenger

Donald Warner; (2) Janet Warner, his mother; (3) the Estate of Alvin Warner, his father; (4)

Susan Frazier, his sister; and (5) Sherry Warner, his sister, each of whom was domiciled in

Montana at the time of the bombing.  *See infra*.

### 1. Wrongful Death

103.   Montana's wrongful death statute provides:

> When injuries to and the death of one person are caused by the
> wrongful act or negligence of another, the personal representative
> of the decedent's estate may maintain an action for damages
> against the person causing the death or, if such person be employed
> by another person who is responsible for his conduct, then also
> against such other person.

Mont. Code Ann. § 27-1-513.  A wrongful death action "is personal to the decedent's heirs and

independent of any cause of action available to the decedent's estate."  *Payne v. Eighth Jud. Dist.*

*Ct.*,  60 P.3d 469, 472 (Mont. 2002).  The personal representative of the decedent's estate is

authorized to pursue a wrongful death claim.  Mont. Code Ann. § 27-1-513; *see Hern v. Safeco*

*Ins. Co. of Ill.,* 125 P.3d 597, 606 (Mont. 2005).  The personal representative then "holds the

proceeds of any damage award for the heirs of the decedent."  *Id.*[18]

104.   The term "heirs" has been defined under Montana law as "those persons entitled

to the property of a decedent under the statutes of intestate succession."  *In re Northwest Capital*

---

[18]   Thus, while there may be multiple beneficiaries to a wrongful death claim, Montana's
wrongful death statute has "been interpreted to mean that *only one* wrongful death action arising
out of a wrongful death may be brought and the decedent's representative is the only person who
may bring such an action."  *Hern*, 128 P.3d at 606 (emphasis in original).

*Mgmt. & Trust Co.*, 607 P.2d 924, 931 (Mont. 1985).  Under Montana's intestate succession

statute, if (as here) there is no surviving spouse then the estate "passes in the following order:"

      (a)    to the decedent's descendants by representation:

      (b)    if there is no surviving descendant, to the decedent's
             parents equally if both survive or to the surviving parent;

      (c)    if there is no surviving descendant or parent, to the
             descendents of the decedent's parents [siblings] or either of
             them by representation.

Mont. Code Ann. § 72-2-113.

      105.    Montana wrongful death damages are "non-specific" and may "be given as under

all the circumstances of the case may be just."  Mont. Code Ann. § 27-1-323; *see Hern*, 125 P.3d

at 604.  Such damages are designed "to compensate the heirs for the harm or damages that they

personally suffered as a result of the decedent's death," *Payne*, 60 P.3d at 472; *see also Swanson*

*v. Champion Int'l Corp.*, 646 P.2d 1166, 1170 (Mont. 1982).  They "generally … will include

loss of consortium by a spouse, loss of comfort and society of the decedent suffered by the

surviving heirs, and the reasonable value of the contributions in money that the decedent would

reasonably have made for the support, education, training and care of the heirs had she lived."

*Hern*, 125 P.3d at 604-05 (quoting *Swanson,* 646 P.2d 1166, 1170 (Mont. 1982)).  Damages for

"loss of comfort and society" encompass specifically emotional pain and suffering, as under

Montana law "[i]t is well established that a [trier of fact] may award 'reasonable compensation

for grief, sorrow and mental anguish' in wrongful death actions."  *Hern*, 125 P.3d at 609 (citing

*Busta v. Columbus Hosp. Corp.,* 916 P.2d 122, 129 (Mont. 1996)).

      106.    On the undisputed factual record, there is no question that Libya is liable under

Montana's wrongful death statute.  It is beyond dispute that Libya's wrongful acts caused the

death of Donald Warner (along with all 170 individuals who perished aboard UTA Flight 772),

resulting in severe injuries to his parents and siblings, including loss of consortium, loss of comfort and society, and pecuniary losses.  The record further establishes conclusively that each of Donald's family members suffered severe emotional loss – including, specifically, extreme grief, sorry and mental anguish – as a result of the sudden and violent murder by Libya of their son and brother as he sat aboard UTA Flight 772.  *See generally infra* at III.

107.    Because Montana's wrongful death statute requires that the representative of the decedent's estate bring the claim on behalf of all designated beneficiaries, Janet Warner – Donald Warner's mother and the administrator of his estate, *see infra* at III, – is the appropriate Plaintiff entitled to bring a claim for Donald's death in the bombing of UTA Flight 772.  Ms. Warner is entitled to bring that claim on behalf of all designated beneficiaries, including herself (as Donald's mother), the Estate of Alvin Warner (Donald's father), and Donald's sisters, Susan Frazier and Sherry Warner.  Accordingly, judgment against Libya for wrongful death under Montana law, and an award of damages in the amounts set forth below, should be issued in favor of the Estate of Donald Warner.

## 2.    Intentional Infliction of Emotional Distress

108.    The Montana Supreme Court recognized intentional infliction of emotional distress as an independent cause of action in *Sacco v. High Country Indep. Press, Inc*.  *See Sacco*, 896 P.2d 411, 426-29 (Mont. 1995).  Under *Sacco* and its progeny, "an independent cause of action for intentional infliction of emotional distress will arise under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's intentional act or omission."  *Id*. at 418; *see Pospisil v. First Nat'l Bank of*

*Lewiston*, 37 P.3d 704, 708 (Mont. 2001).[19]  "Serious or severe" emotional distress, in turn, "includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." *Maloney v. Home & Inv. Ctr.*, 994 P.2d 1124, 1135 (Mont. 2000) (citing RESTATEMENT (SECOND) OF TORTS § 46 COMMENT J).

109.   The emotional and psychological injuries encompassed in an action for intentional infliction of emotional distress "are independent of physical injury and independently compensable in tort law if the emotional injury is sufficiently severe." *Jacobsen v. Farmers Union Mut. Ins. Co.*, 87 P.3d 995, 999 (Mont. 2004).  The damages available for intentional infliction of emotional distress "are compensatory, and, therefore, the focus should be on the reasonable foreseeability that plaintiffs' serious or severe emotional distress was the consequence of the defendant's act or omission." *Sacco*, 896 P.2d at 428.  The Montana Supreme Court further has determined that punitive damages are appropriate to address "the culpability and intentional nature of the defendant's conduct in an intentional infliction of emotional distress case." *Id*.

110.   The undisputed record in this case leaves no doubt that the family members of the passengers who perished aboard UTA Flight 772 suffered "serious or severe emotional distress," and that such emotional distress was a "reasonably foreseeable consequence" of Libya's wrongful acts in murdering their loved ones.  Indeed, the record makes clear that Plaintiffs

---

[19]   As discussed above, because of the peculiar nature of terrorist acts, a particular aim of which is to inflict emotional pain on family members, courts routinely have excused any presence requirement for intentional infliction of emotional distress claims. *See, e.g., Cicippio-Puleo*, Slip Op. at 23-24.  It is worth noting, however, that Montana specifically has abandoned a presence requirement in other contexts as well. *See Wages v. First Nat'l Ins. Co. of Am.*, 79 P.3d 1095, 1100 (Mont. 2003).

suffered precisely the sort of emotions identified by the Montana Supreme Court as supporting an action for intentional infliction of emotional distress, including, *inter alia*, horror, grief, and anger. *See infra* at III. Accordingly, judgment against Libya for intentional infliction of emotional distress under Montana law, and an award of damages in the amounts set forth below, should be issued in favor of Janet Warner, the Estate of Alvin Warner, Susan Frazier, and Sherry Warner.

### 3.    Loss of Consortium

111.    In *Hern*, the Montana Supreme Court recognized that courts may, under certain circumstances, award loss of consortium damages to the parents of a deceased adult child. *See Hern*, 125 P.3d 606-09. In so doing, the Supreme Court noted that "courts have continued to regard loss of consortium to embrace all of those values – tangible and intangible – inherent in the family relationship," and have expanded the notion of consortium to "avoid[] the narrow construction connoting this right derives primarily from the sexual relationship incident to marriage." *Id.* at 606. The Court specifically cited to the 2002 decision in *Bear Medicine v. U.S.*, 192 F. Supp. 2d 1053 (D. Mont. 2002), where the federal district court "speculated . . . that the Montana Supreme Court would adopt such a cause of action [for consortium for parents of adult children,]" and in fact permitted recovery for loss of consortium of an adult child. *Id.* at 607; *see Bear Medicine*, 192 F. Supp. 2d at 1056, 1067-69. Based on its analysis of *Bear Medicine*, the Montana Supreme Court in *Hern* held:

> [T]hat under certain circumstances such as those evidenced by the relationship [in Bear Medicine], the bond between parents and an adult child, and the loss experienced by the parents at the death of or serious injury to their child, may be of such a quality as to warrant recovery by the parents for loss of consortium.

*Id.* at 608.

112.   The undisputed record in this case establishes the close relationship between Donald Warner and his parents, and the tragic and horrific loss they suffered when Libya murdered him while on his way home to them from Chad.  This Court should not hesitate to deem Donald Warner's murder "of such a quality as to warrant recovery by [his] parents for loss of consortium."  *Id*.  Accordingly, judgment against Libya for loss of consortium under Montana law, and an award of damages in the amounts set forth below, should be issued in favor of Janet Warner and the Estate of Alvin Warner.

### 4.   Survival

113.   Montana's survival statute provides:

(1)   An action, cause of action, or defense does not abate because of the death or disability of a party or the transfer of any interest therein, but whenever the cause of action or defense arose in favor of such party prior to his death or disability of transfer of interest therein, it survives and may be maintained by his representatives or successors in interest.  If the action has not been begun or defense interposed, the action may be begun or defense interposed in the name of his representatives or successors in interest.  If the action has been begun or defense imposed, the action or proceeding may be continued as provided in Rule 25, M.R. Civ. P.

(2)   Actions brought under this section and 27-1-513 must be combined in one legal action, and any element of damages may be recovered only once.

Mont. Code Ann. § 27-1-501.

114.   A survival action under Montana law "belongs to the decedent's estate and allows recovery for the injury to the deceased from the action causing death."  *Payne*, 60 P.3d at 472.  Thus, the damages recoverable in a survival action "are personal to the decedent and the estate's right to recovery is identical to the decedent's had he or she lived."  *Payne*, 60 P.3d at 472; *see Swanson*, 646 P.2d at 1169.  These damages include "lost earnings from the time of injury to death, the present value of reasonable earnings during the decedent's remaining life expectancy,

medical and funeral expenses, reasonable compensation for pain and suffering, and other special damages." *Hern*, 125 P.3d at 604 (quoting *Swanson*, 646 P.2d at 1169) (citations omitted). Separate wrongful death and survival claims may be asserted, so long as there is not double recovery of a particular element of damages. *See id.* at 605 ("primary purpose" behind amendment of § 27-1-501 to add second clause "was to prohibit double recovery in wrongful death and survivor actions").

115.    The undisputed factual record in this case demonstrates clearly that Donald Warner – along with all the other passengers of UTA Flight 772 – suffered extreme and excruciating pain and suffering as he plunged knowingly to his certain death and is entitled to damages for the injuries he suffered as a result of Libya's terrorist acts.  Accordingly, judgment against Libya pursuant to Montana's survival statute, and an award of damages in the amounts set forth below, should be issued in favor of the Estate of Donald Warner.

### E.    California

116.    California law applies to the claims of (1) Irina Alimanestianu, daughter of UTA Flight 772 passenger Mihai Alimanestianu; (2) the Estate of Harvey Mills Coverley, father of UTA Flight 772 passenger Bonnie Barnes Pugh; (3) the Estate of Georgia Mae Chisholm, mother of UTA Flight 772 passenger Bonnie Barnes Pugh; and (4) Sally Chisholm Johnson, sister of UTA Flight 772 passenger Bonnie Barnes Pugh, each of whom was domiciled in California at the time of the bombing.  *See infra*.

### 1.    Intentional Infliction of Emotional Distress

117.    Under California law, "the elements of a prima facie case for the tort of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and

actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Cervantez v. J.C. Penney Co.*, 595 P.2d 975, 983 (Cal. 1979). Adopting the Restatement (Second) standard for outrageousness, California courts have held that conduct "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id*. (citing RESTATEMENT (SECOND) OF TORTS § 46 comment d ).

118.    The undisputed record in this case makes clear that Libya's actions – including the mass murder of the 170 passengers aboard UTA Flight 772 – far exceed any bounds *ever* tolerated in a civilized community. Libya's actions were extreme and outrageous, and were intended specifically to cause – and, indeed, did cause – severe emotional distress for the families of the murdered victims, including, specifically, the family members domiciled in California at the time of the bombing. *See infra*. Accordingly, judgment against Libya for intentional infliction of emotional distress under California law, and an award of damages in the amounts set forth below, should be issued in favor of Irina Alimanestianu, Sally Chisholm Johnson, and the Estates of Harvey Mills Coverley and Georgia Mae Coverley.

### F.    Ohio

119.    Ohio law applies to the claims of (1) William Schutzius, father of UTA Flight 772 passenger Margaret Schutzius; and (2) Catharine Schutzius, sister of UTA Flight 772 passenger Margaret Schutzius, each of whom was domiciled in California at the time of the bombing. *See infra* at III.

### 1.    Intentional Infliction of Emotional Distress

120.    In *Yeager v. Local Union 20*, 453 N.E.2d 666 (Ohio 1983), the Ohio Supreme recognized the tort of intentional infliction of emotional distress, adopting the language set forth in Section 46 of the RESTATEMENT (SECOND) OF TORTS that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is

subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Id.* at 671 (quoting RESTATEMENT (SECOND) OF TORTS § 46(1)). The Ohio high court expressly rejected "any requirement that the emotional distress manifest itself in the form of some physical injury." *Yeager*, 453 N.E.2d at 671. Still, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 comment d).

121.    The undisputed record in this case establishes clearly that Libya, in blowing up UTA Flight 772 and murdering all 170 passengers on board – including Margarget Schutzius – acted so outrageously as to transcend any bounds of decency; it is beyond dispute that Libya's conduct was both "atrocious" and "utterly intolerable" in the manner contemplated by the Ohio Supreme Court. It similarly is beyond dispute that Libya's intentional and malicious acts caused the members of Margaret Schutzius' family severe emotional distress which continues to this day. *See infra* at III.

122.    Accordingly, judgment against Libya for intentional infliction of emotional distress under Ohio law, and an award of damages in the amount set forth below, should be issued in favor of William Schutzius and Catharine Schutzius.

### G.    Indiana

123.    Indiana law applies to the claims of (1) Therese Coddington, sister of UTA Flight 772 passenger Mark Edward Corder; (2) Michael Corder, brother of UTA Flight 772 passenger Mark Edward Corder; and (3) the Estate of Edward Corder, the late father of UTA Flight 772 passenger Mark Edward Corder, each of whom was domiciled in Indiana at the time of the bombing. *See infra* at III.

### 1.   Intentional Infliction of Emotional Distress

124.   Under Indiana law, to establish liability for intentional infliction of emotional distress or "outrage," a plaintiff must demonstrate that a defendant, "(1) engaged in 'extreme and outrageous' conduct that (2) intentionally or recklessly (3) caused (4) severe emotional distress." *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 691 (Ind. 1997); *see also Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (citing RESTATEMENT (SECOND) OF TORTS § 46); *Higginbotham,* 103 F. Supp. 2d 1075, 1089 (S.D.Ind. 1999).

125.   The undisputed record in this case establishes clearly that Libya – in bombing UTA Flight 772 and murdering all 170 individuals on board, including Mark Edward Corder, engaged in "extreme and outrageous conduct" that was intended to cause – and, indeed, did cause – Mark's family members severe emotional distress. *See infra* at III.  Accordingly, judgment against Libya for intentional infliction of emotional distress under Indiana law, and an award of damages in the amount set forth below, should be issued in favor of Therese Coddington, Michael Corder, and the Estate of Edward Corder.

### H.   Florida

126.   Florida law applies to the claims of the Estate of Calin Alimanestianu, brother of UTA Flight 772 passenger Mihai Alimanestianu.  Calin was domiciled in Florida at the time of the bombing. *See infra* at III.

### 1.   Intentional Infliction of Emotional Distress

127.   Florida law recognizes the tort of intentional infliction of emotional distress, following the Restatement (Second) of Torts § 46 in imposing liability for emotional distress caused by "extreme or outrageous conduct intentionally or recklessly caus[ing] severe emotional distress to another." *M.M v. M.P.S.*, 556 So.2d 1140, 1140-41 (Fla. Dist. Ct. App. 1989). Florida does not require that the plaintiff demonstrate any "physical harm" in conjunction with

emotional distress as a result of the conduct. *Williams v. City of Minneola*, 575 So.2d 683, 690,

693 (Fla. Dist. Ct. App. 1991). The underlying conduct must, however, be "regarded as

atrocious, and utterly intolerable in a civilized society." *Id.* at 690.

128.   The undisputed record in this case demonstrates that Libya committed "atrocious"

acts, "utterly intolerable in a civilized society" when it detonated a bomb on board UTA Flight

772, causing all 170 passengers to plunge to their horrific deaths. Libya's actions were intended

to cause – and, indeed, did cause – severe emotional distress to Calin Alimanestianu over the

gruesome loss of his brother, Mihai Alimanestianu. *See infra* at III. Accordingly, judgment

against Libya for intentional infliction of emotional distress under Florida law, and an award of

damages in the amount set forth below, should be issued in favor of the Estate of Calin

Alimanestianu.

## I.   Georgia

129.   Georgia law applies to the claims of Interlease, Inc., which was incorporated in

Georgia at the time of the bombing. *See infra* at III.

### 1.   Conversion

130.   Georgia courts define conversion as:

> [A]n unauthorized assumption and exercise of the right of
> ownership over personal property belonging to another, in hostility
> to his rights; an act of dominion over the personal property of
> another inconsistent with his rights; or an unauthorized
> appropriation.

*Maryland Cas. Ins. Co. v. Welchel*, 356 S.E.2d 877, 880 (Ga. 1987). To establish a claim for

conversion a plaintiff must show an "actual conversion" which is "any distinct act of dominion

and control wrongfully asserted over another's personal property, in denial of his right or

inconsistent with his right." *See, e.g., Taylor v. Powertel, Inc.,* 551 S.E.2d 765, 769 (Ga. App.

2001); *Habel v.Tavormina,* 597 S.E.2d 645, 648 (Ga. App. 2004). The undisputed factual record

plainly shows that the unauthorized bombing and complete destruction of Interlease's aircraft constitutes conversion under Georgia law.  Accordingly, judgment against Libya for conversion under Georgia law, and an award of damages in the amount set forth below, should be issued in favor of Interlease.

**Proposed Findings of Fact**

**III.    Summary of Plaintiffs' Testimony and Calculation of Damages**

131.    With the exception of Interlease, Plaintiffs in this matter consist of the Estates of those individuals who were either killed in the Libyan bombing of UTA Flight 772 on September 19, 1989, and "immediate family" members of those killed in that attack.  The testimony of these individuals is set forth below, as provided either during the damages hearing itself or in connection with the *de bene esse* depositions admitted into evidence during that hearing.

**A.    Estate of Bonnie Barnes Pugh**

132.    Bonnie Barnes Pugh ("Bonnie"), a United States citizen, was a passenger on UTA Flight 772 when the plane was bombed over the Tenere desert in Africa, killing all 170 passengers and crewmembers aboard.  Tr. Vol. I at 17-18.  Bonnie's Estate was administered in the state of Virginia, where Bonnie was domiciled at the time of her death.

133.    As the wife of a career diplomat, Bonnie always was eager to take on the duties of spreading American values and tending to the homemaking needs of the mission.  When her family was posted in Greece, Bonnie was active in the Greek-American Woman's Association, a local civic group dedicated to doing good works in the community.  Deposition *De Bene Esse* of Anne C. Carey, Trial Exhibit 1 ("Tr. Exh. 1") at 12.  When she lived in Mauritania, she was deeply involved with the Peace Corps there.  Tr. Exh. 1 at 13.  Her daughter Anne testified that in Mauritania, Bonnie "did as much as she could to make sure that the people who came to work at the embassy felt that they had a bit of home base."  Tr. Exh. 1 at 13.

59

134.    It was in Lebanon, however, that Bonnie left the most enduring legacy on a

Foreign Service post.  In Lebanon, Bonnie worked very closely with U.S. Marines on site,

developing a reputation as "their den mother."  Tr. Vol. I at 29.  In fact, they affectionately

referred to her as the "Lady of the Corniche," a reference to the road on which all of the Marines

had apartments.  Tr. Exh. 1 at 19.  Anne testified that the Marines in Lebanon "had a very warm

spot" for Bonnie "because of the way she tried to comfort them and help them during the that

period of time."  She was so beloved by the U.S. Marines, in fact, that her remains were interred

at Arlington National Cemetery – an exceedingly rare honor.  Tr. Exh. 1 at 19.

135.    Bonnie's Estate is represented by her husband, Ambassador Robert Pugh.  She is

survived by her husband, her father Harvey Mills Coverley (now deceased), her mother Georgia

Mae Chisholm (now deceased), her sister Sally Chisholm, and her children, Malcolm Pugh (now

deceased) and Anne Carey.  All are Plaintiffs in this litigation.  They are pursuing claims against

the Libyan Defendants for Intentional Infliction of Emotional Distress.

136.    Bonnie Barnes Pugh's Estate is entitled to damages for wrongful death and her

survival action under Virginia law.  *See supra* at II.A.  Based on the foregoing testimony and the

record in this case, the Estate of Bonnie Barnes Pugh should be awarded damages against the

Libyan State Defendants in an amount no less than $51,948,420.59, reflecting $483,000 in

economic damages for income lost to Ambassador Pugh as a result of Bonnie Barnes Pugh's

death, and $18M for her pain and suffering plus prejudgment interest in the amount of

$33,465,420.59.  *See id.*; *see also* Tr. Exh. 31 at 15; Tr. Vol. II at 51.  Against the Individual

Libyan Defendants, the Estate of Bonnie Barnes Pugh should be awarded an amount no less than

$155,845,261.77, reflecting the $51,948,420.59 set forth above, trebled pursuant to the statutory

mandate of 28 U.S.C. § 2333(a).

B.    **Ambassador Robert Pugh**

137.    Plaintiff Ambassador Robert Pugh is the husband of Bonnie Barnes Pugh who perished in the bombing of UTA Flight 772 on September 19, 1989.  Tr. Vol. I at 18 Ambassador Pugh is a United States citizen currently residing in Vermont who was domiciled in Virginia at the time of his wife's death.  Tr. Vol. I. at 9, 12, 23, 34.

138.    Ambassador Pugh is a life-long civil servant, having served his country for more than 30 years, first as a marine, and then as a career foreign service officer and ambassador.  Tr. Vol. I. at 10.  He served his country as a foreign service officer in foreign countries throughout the world including Turkey, Greece, Iran, and England.  Tr. Vol. I. at 10.  During his many posts, his wife of 34 years, Bonnie Pugh, lived with him and supported his missions.  Tr. Vol. I. at 35.

139.    Robert and Bonnie Pugh met at the University of Washington.  Tr. Vol. I. 22. They developed a fast friendship, then a romance, and they married in May, 1955.  Tr. Vol. I. at 17, 22.  Although "[n]o marriage is perfect," Ambassador Pugh testified that he and Bonnie "came pretty close."  Tr. Vol. I. at 23.  Throughout their life together, Bonnie was always a mother, companion, and partner.  The couple had two children, Malcolm and Ann.  Tr. Vol. I at 21.  During Ambassador Pugh's appointments in Mauritania as Ambassador and Chad, Bonnie accompanied him and assumed the role of an Ambassador's wife, supporting the mission and building an embassy community.  Tr. Vol. I at 19-20.

140.    Ambassador Pugh's foreign service was not without incident, even before Bonnie was murdered.  In 1983, Robert Pugh was serving as the Deputy Chief of Mission in Beirut, Lebanon, when the United States embassy was attacked.  During the aftermath, both Ambassador Pugh and Bonnie pitched in to rescue the mission.  Tr. Vol. I at 10-17.  They would both be recognized for their valor during this difficult time, Ambassador Pugh by receiving an award

from the Ambassador, and Bonnie, posthumously, through her internment in Arlington National Cemetery.  Tr. Vol. I at 29, 30.

141.     At the conclusion of his service in Lebanon, Ambassador Pugh was appointed United States Ambassador to Mauritania.  Tr. Vol. I at 20.  He successfully completed his tour in Mauritania, and then received an appointment to be United States Ambassador to Chad.  His wife, Bonnie, accompanied him to both posts.  *Id*.

142.     When Ambassador Pugh first heard that Bonnie's plane was missing, his reaction was simple – "my God, my wife is on that [plane]."  Tr. Vol. I. at 24-25.  He then turned his attention to his children, Malcolm and Ann, who were receiving news back home, in Virginia.  Tr. Vol. I. at 25.  He counseled them to prepare for the worst.  Tr. Vol. I. at 25.  Several hours later, his worst fears were confirmed; a French team found the crash site of UTA Flight 772 and what looked like the result of a bomb.  Tr. Vol. I. at 26-25.  Bonnie's body eventually was found and returned to the United States.  Due to her special relationship with the Marine Corps that developed throughout her years serving, in particular, in Africa and in Beirut, Bonnie was interred in Arlington National Cemetery.  Tr. Vol. I at 29-30.

143.     The tragedy of September 19, 1989 destroyed Ambassador Pugh's life, family, and career.  The Ambassador, already a survivor of international terrorism once before, described himself as "[a]drift and devastated."  Tr. Vol. I at 33.  His daughter, Anne, described him as a "shell of a human being."  Deposition *De Bene Esse* of Anne C. Carey, Trial Exhibit 1 ("Tr. Exh. 1") at 41.  Ambassador Pugh noted that this terrorist act "ended" his career as a foreign service officer because he could not serve out his term as ambassador.  Tr. Vol. I. at 33.  This inability to "serve out the tour . . . d[id] not bode well for further assignments."  Tr. Vol. I at 32.  He had to

resign his ambassadorship, return home from Chad, and eventually retire from the Department of State. Tr. Vol. I at 33-34, 39.

144.    Ambassador Pugh succinctly described his life without Bonnie, "lacking my lifetime mate, I frankly didn't know what to do with myself." Tr. Vol. I at 33. Additionally, Ambassador Pugh had to deal with a subsequent tragedy within his family, the suicide of their only son, Malcolm. Malcolm had been especially close to his mother, Bonnie, and her loss affected him profoundly. Tr. Vol. I at 34. After his mother's murder, Malcolm felt completely "alone." Malcolm killed himself approximately three years after her death. Tr. Vol. I at 33.

145.    Ambassador Pugh is entitled to damages for intentional infliction of emotional distress under Virginia law. *See supra* at II.A. Based on the foregoing testimony and the record in this case, Ambassador Pugh should be awarded damages against the Libyan State Defendants in an amount no less than $74,338,940.85, reflecting $26 million for his pain and suffering, plus prejudgment interest in the amount of $48,338,940.85. Against the Individual Libyan Defendants, Ambassador Pugh should be awarded an amount no less than $223,016,822.54, reflecting the $74,338,940.85 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**C.    Anne Carey**

146.    Plaintiff Anne Carey ("Anne") is the daughter of Bonnie Barnes Pugh who perished in the bombing of UTA Flight 772 on September 19, 1989. Deposition *De Bene Esse* of Anne C. Carey, Trial Exhibit 1 ("Tr. Exh. 1") at 5. Ms. Carey was domiciled in Virginia in 1989. She currently resides in New York, and is a United States citizen. Tr. Exh. 1 at 5.

147.    Anne testified that Bonnie made growing up in the diplomatic corps a unique experience. Bonnie "never took [the gift of living abroad] for granted." Tr. Exh. 1 at 9. She spent "considerable time and effort making sure that [her]…children got to experience the

culture and the opportunity and the sites…that a given country…had to offer." Tr. Exh. 1 at 10.

Anne also testified that Bonnie was a traditional mother who "believed that she wanted to be

present each morning and each afternoon when [her children] left for school when [they] came

home from school." Tr. Exh. 1 at 11.  To her children, Bonnie "was the center of everything."

Tr. Exh. 1 at 11.

148.    As Anne grew into adulthood, Bonnie continued to be a strong influence in her

life, and the mother and daughter remained close.  Tr. Exh. 1 at 22.  Anne remembers times

when Bonnie would visit her in Charlottesville, Virginia and happily stay in her apartment with

her college friends.  According to Anne, Bonnie "just enjoyed being there with the people I spent

time with…She enjoyed really being a part of my life."  Tr. Exh. 1 at 23.

149.    Indeed, being a mother was one of Bonnie's central life goals.  "[S]he never felt

complete until she had children."  Tr. Exh. 1 at 24.

150.    Anne first learned of the disappearance of UTA Flight 772 from a friend.  Tr.

Exh. 1 at 27.  To Anne, it "was so completely unexpected that it was difficult to even absorb that

this could be happening."  Tr. Exh. 1 at 27.  Anne was with her brother Malcolm as the news

developed.  Eventually, the United States Department of State called the siblings to confirm that

their mother was dead.  Tr. Exh.  1 at 28.  As Anne described the experience, "I went in and

touched [Malcolm's] shoulder, and I simply repeated to him what I had been told.  And we

hugged and we cried, and so it began."  Tr. Exh. 1 at 28.

151.    Anne testified that the time immediately following her mother's death was "just a

blur of shock and disbelief."  Tr. Exh. 1 at 29.  Bonnie was traveling back to the United States

for the final preparation for Anne's wedding, so "the loss was made more horrific by that fact

and the timing of what happened." Tr. Exh. 1 at 19.  In Anne's words, "It was horrendous."  Tr. Exh. 1 at 29.

152.    After the initial shock faded, Anne began to have dreams about her mother:  "And I know that for not an insignificant period of time, I used to dream about my mother walking in the desert, being there, that somehow she had – had not been killed by the bomb."  Tr. Exh. 1 at 32.

153.    One of Anne's biggest losses resulting from her mother's premature death is that Bonnie never got to meet Anne's children.  Tr. Exh. 1 at 42.

154.    Anne participated in this litigation because she thinks her "mother was a remarkable woman," and this litigation "allows [her] to share that with the world."  Tr. Exh. 1 at 8.  Anne testified that Bonnie "was a truly fine human being."  Tr. Exh. 1 at 8.

155.    Anne Carey is entitled to damages for intentional infliction of emotional distress under Virginia law.  *See supra* at II.A.  Based on the foregoing testimony and the record in this case, Anne Carey should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for her pain and suffering, plus prejudgment interest in the amount of  $22,310,280.39.  Against the Individual Libyan Defendants, Anne Carey should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### D.    Malcolm Pugh

156.    Plaintiff Malcolm Pugh ("Malcolm") was the son of Bonnie Barnes Pugh who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of Anne C. Carey, Trial Exhibit 1 ("Tr. Exh. 1") at 5.  Malcolm committed suicide in October 1992.  Tr. Exh. 1 at 39.  In 1989, Malcolm was domiciled in Virginia.  Malcolm's father, Ambassador

Robert Pugh, is the executor of his son Malcolm's estate. Tr. Vol. I at 21. Malcolm was a United States citizen.

157.     For her children, Bonnie made growing up in the diplomatic corps a unique experience. Bonnie "never took [the gift of living abroad] for granted." Tr. Exh. 1 at 9. She spent "considerable time and effort making sure that [her]…children got to experience the culture and the opportunity and the sites…that a given country…had to offer." Tr. Exh. 1 at 10. Bonnie was a traditional mother who "believed that she wanted to be present each morning and each afternoon when [her children] left for school [and] when [they] came home from school." Tr. Exh. 1 at 11. To her children, Bonnie "was the center of everything." Tr. Exh. 1 at 11.

158.     Malcolm first learned of the disappearance of UTA Flight 772 from his sister, Anne Carey. Tr. Exh. 1 at 27. The siblings came together to comfort one another as the news developed. Tr. Exh. 1 at 27-28. They spoke to their father, and tried to "persuade themselves…there was some chance that the aircraft had landed for mechanical reasons." Tr. Vol. I at 25. Ambassador Pugh told them, "they had better prepare themselves for the worst." Tr. Vol. I at 25. Eventually, the United States Department of State called the siblings to confirm that their mother was dead. Tr. Exh. 1 at 28. As Anne described the experience, "I went in and touched [Malcolm's] shoulder, and I simply repeated to him what I had been told. And we hugged and we cried, and so it began." Tr. Exh. 1 at 28. "[T]hey were horrified." Tr. Vol. I at 26.

159.     Malcolm was devastated by the loss of his mother – "his world, in particular, became a much lonelier place for him upon her death." Tr. Exh. 1 at 39; *see also*, Tr. Vol. 1 at 34. And he never got over it. Tr. Exh. 1 at 39. "He committed suicide [in] October of 1992," and his sister Anne believes "that the isolation that he felt and the loss that he felt" over his

mother's death contributed to his decision to take his own life.  Tr. Exh. 1 at 39.  Ambassador

Pugh testified, "Bonnie always was there for [Malcom] and trying to lessen the angst of young

adulthood he was coming into.  He could always turn to her."  Tr. Vol. I. at 33.

160.    The Estate of Malcolm Pugh is entitled to damages for intentional infliction of

emotional distress under Virginia law.  *See supra* at II.A.  Based on the foregoing testimony and

the record in this case, Malcolm Pugh should be awarded damages against the Libyan State

Defendants in an amount no less than $34,310,280.39, reflecting $12 million for his pain and

suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual

Libyan Defendants, Malcolm Pugh should be awarded an amount no less than $102,930,841.17,

reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28

U.S.C. § 2333(a).

### E.    Harvey Mills Coverley

161.    Plaintiff Harvey Mills Coverly ("Harvey") was the father of Bonnie Barnes Pugh

who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene*

*Esse* of Anne C. Carey, Trial Exhibit 1 ("Tr. Exh. 1") at 5.  Harvey was domiciled in California

in 1989, and he died in February, 1994.  Tr. Exh. 1 at 7.  Harvey's granddaughter, Anne Carey, is

the executrix of his estate.  Tr. Exh. 1 at 6.  Harvey was a United States citizen at all times

relevant to this litigation.

162.    Harvey was close to Bonnie during her childhood.  Bonnie was an only child, and

Anne testified that "there was always a connection there as only child to…father."  Tr. Exh. 1 at

6.  Although Bonnie's parents divorced, Bonnie and Harvey maintained that close relationship as

she matured.  Tr. Exh. 1 at 7.  By the time Bonnie was an adult, she and Harvey "were [in] avid

corresponde[nce] together."  Tr. Exh. 1 at 7. Even as she traveled and lived all over the world

with her family, Bonnie remained in very close contact with her father.  Upon any opportunity

she had to return to the United States, she always reserved some time to visit her father in San Francisco.  Tr. Exh. 1 at 7.

163.     Harvey "felt a tremendous loss" over the death of Bonnie.  Tr. Exh. 1 at 41.  The funeral service exacerbated that loss "because until that moment" it was hard to understand just "how many people [Bonnie] had impacted through her lifetime."  Harvey "had a real sense of who she was and a tremendous sadness over the fact that he would not be able to have an ongoing relationship with her anymore."  Tr. Exh. 1 at 14.  At the same time, however, Harvey was very "proud of the woman [Bonnie] had been," as evidenced by the outpouring of mourners at her funeral.  Tr. Exh. 1 at 41.

164.     The Estate of Harvey Mills Coverly is entitled to damages for intentional infliction of emotional distress and survival under California law.  *See supra* at II.E.  Based on the foregoing testimony and the record in this case, the Estate of Harvey Mills Coverley should be awarded damages against the Libyan State Defendants in an amount no less than $14,295,950.16, reflecting $5 million for his pain and suffering, plus prejudgment interest in the amount of $9,295,950.16.  Against the Individual Libyan Defendants, the Estate of Harvey Mills Coverley should be awarded an amount no less than $42,887,850.49, reflecting the $14,295,950.16 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**F.     Sally Chisholm Johnson**

165.     Plaintiff Sally Chisholm Johnson ("Sally") is the younger sister of Bonnie Barnes Pugh who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of Sally Johnson, Trial Exhibit 2 ("Tr. Exh. 2") at 7-8.  Ms. Johnson is a United States citizen currently residing in California who was domiciled in California at the time of her sister's death.  Tr. Exh. 2 at 6-7, 24-25.

166.    Sally grew up with her mother, Georgia Mae and Bonnie, her half sister, in California.  Tr. Exh. 2 at 11.  Sally and Bonnie shared the same mother, but have different fathers.  Tr. Exh. 2 at 11.  They were raised as "full sisters" their entire lives.  In fact, Sally was 35 years old before she learned what "half-sister" even meant.  Tr. Exh. 2 at 12.

167.    Bonnie and Sally were very close to each other and grew up in a small town setting.  Tr. Exh. 2 at 17.  Sally recalls memories of riding horses together and camping.  Tr. Exh. 2 at 15.  Bonnie, because she was older, often served as a second mother to Sally.  Bonnie both took care of Sally and did fun things with her.  Tr. Exh. 2 at 16.  Bonnie helped Sally with school and with dance and music lessons.  Tr. Exh. 2 at 16.  The two were so close that Sally even went on dates with Bonnie.  Tr. Exh. 2 at 17.

168.    Sally admired Bonnie greatly—Bonnie was her idol as a child and as an adult. When Bonnie went off to college at Berkley, Sally missed her very much.  They continued a close relationship even when Bonnie moved out of the house.  Tr. Exh. 2 at 17.

169.    As adults, Bonnie and Sally remained close.  Bonnie was charming and pretty, always thoughtful and well regarded.  Tr. Exh. 2 at 19.  They spent time together when Bonnie and her family would visit California.  Sally's children fondly remember Bonnie as a caring aunt who would bring them interesting things from overseas.  Tr. Exh. 2 at 20.

170.    Sally remembers how she found out Bonnie's plane went missing on September 19, 1989.  She opened her mailbox that was at the end of her country road and saw a small article in the newspaper that said "French airliner missing over Africa."  Sally almost immediately knew that the plane could be Bonnie's but did not want to say anything to alarm Georgia Mae, their mother, until she had more information.  Tr. Exh. 2 at 25.  But when she returned home, several family members and her best friend were already there.  Her mother already had heard

69

the news.  Sally then called Bonnie's children, to try and get more information.  She was told

that there was not likely to be any good news. Tr. Exh. 2 at 26.  A few days later, Anne, Bonnie's

daughter, told Sally that the plane had exploded over the desert and there were no survivors.  Tr.

Exh. 2 at 27.  After hearing the news Sally first was in denial, and then went completely numb.

Tr. Exh. 2 at 28.

171.    At the time of Bonnie's death, Sally was most concerned about the effect of the

tragedy on their mother.  As Sally put it, when Bonnie died, "a light went out in her [mother's]

life never to come back." Tr. Exh. 2 at 28. Bonnie's death, in fact, did lead to a decline in their

mother's health.  Tr. Exh. 2 at 30.  Sally attended Bonnie's funeral at the Arlington National

cemetery, but their mother could not, because of her failing health.  Tr. Exh. 2 at 33.  Georgia

Mae said, "Go and bury my baby." Tr. Exh. 2 at 33.

172.    Sally remembers Bonnie as an amazing person with many friends, each of whom

treasured his or her relationship with Bonnie, as Sally did.  Sally remembers how Bonnie loved

nature and birds.  Tr. Exh. 2 at 35.  Bonnie was thoughtful and generous—she always made

everyone's birthday a special occasion.  Tr. Exh. 2 at 35. Sally also described the important role

Bonnie played in her life—when Sally had her first child and when Sally's father and first

husband died suddenly.  Bonnie traveled to California and stayed with her, caring for her and

helping her cope with her great loss.  Tr. Exh. 2 at 36.   Sally summed up the impact of Bonnie's

life on her very powerfully, "she made us all a better person."  Tr. Exh. 2 at 37.

173.    Sally is participating in this suit, "because I want justice for my sister."  Tr. Exh. 2

at 10. Sally remembers Bonnie often, especially on her birthday and during the month of

September.  She feels as though she was robbed of the opportunity to enjoy old age together with

Bonnie—sharing special moments as only sisters can.  Tr. Exh. 2 at 38.  Ultimately, Sally wants to "keep this from ever happening again."  Tr. Exh. 2 at 39.

174.    Sally Chisholm Johnson is entitled to damages for the intentional infliction of emotional distress under California law.  *See supra* at II.E.  Based on the foregoing testimony and the record in this case, Sally Chisholm Johnson should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for her pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, Sally Chisholm Johnson should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### G.    Estate of Georgia Mae Chisholm

175.    Plaintiff Georgia Mae Chisholm ("Georgia Mae") was the mother of Bonnie Barnes Pugh who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of Sally Chisholm Johnson, Trial Exhibit 2 ("Tr. Exh. 2") at 7-8.  Georgia Mae Chisholm was domiciled in California in 1989, and she died in 1996.  Tr. Exh. 2 at 9.  Georgia Mae's daughter, Sally Chisholm Johnson, is the executrix of her mother Georgia Mae's estate.  Tr. Exh. 2 at 9, 26.

176.    Georgia Mae had two children, Bonnie and Sally Chisholm Johnson.  They were raised together from an early age in California, despite the fact they had different fathers.  Tr. Exh. 2 at 11-12.  Georgia Mae and Bonnie were "very close."  Their early relationship set the stage for their relationship the rest of their lives.  Bonnie always took care of her mother.  Bonnie made Georgia Mae a cup of Ovalteen every night.  Sally describes it as almost a reversal of roles—Bonnie often "mothered" her mother.  Tr. Exh. 2 at 14.

177.    Bonnie and her mother remained very close even into adulthood.  Tr. Exh. 2 at 21.

Bonnie would send her mother gifts from her many travels, as well as framed embroidery and

afghans.  Tr. Exh. 2 at 20-21.  Bonnie became, as Sally put it, "the window on the world" for her

mother.  Tr. Exh. 2 at 21.  Bonnie took Georgia Mae to special places and often brought her to

Washington, DC, where they would spend time together sewing and talking.  Tr. Exh. 2 at 21.

Theirs was a life long partnership that ended only when Bonnie was killed.

178.    Georgia Mae learned of her daughter's death on September 19, 1989, through a

series of news reports and discussions with family members and friends.  When she learned

Bonnie had been murdered, "a light went out in her life never to come back."  Tr. Exh. 2 at 28.

She was overwhelmingly sad, lamenting, "my mother was blown up in an explosion when I was

a baby.  And now my daughter has been blown up." Tr. Exh. 2 at 30.  Although she was

devastated by her loss, Georgia Mae, at her advanced age, was not able to attend Bonnie's

funeral service in Arlington National Cemetery because of the travel involved.

179.    As Sally put it, Georgia Mae never recovered from the death of her "favorite"

daughter.  Georgia Mae lived for seven years after Bonnie died, and the tragedy had an impact

on her both mentally and physically.  Georgia Mae's health declined after she heard of the death

of her daughter, Bonnie.  Tr. Exh. 2 at 30.

180.    The Estate of Georgia Mae Chisholm is entitled to damages for the intentional

infliction of emotional distress under California law.  *See supra* at II.E..  Based on the foregoing

testimony and the record in this case, the Estate of Georgia Mae Chisholm should be awarded

damages against the Libyan State Defendants in an amount no less than $14,295,950.16,

reflecting $5 million for her pain and suffering, plus prejudgment interest in the amount of

$9,295,950.16.  Against the Individual Libyan Defendants, the Estate of Georgia Mae Chisholm

should be awarded an amount no less than $42,887,850.49, reflecting the $14,295,950.16 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### H. Estate of Mihai Alimanestianu

181. Mihai Alimanesteanu ("Mihai") was born in Bucharest, Romania on April 2, 1919. He was a passenger on UTA Flight 772 when the plane was bombed over the Tenere desert in Africa, killing all 170 passengers and crewmembers aboard. Tr. Vol. I at 44-45. After escaping from communist Romania and emigrating to the United States, Mihai became a United States citizen in 1953. Tr. Vol. I at 45-46. Mihai's estate was administered in New York where he was domiciled at the time of his death.

182. Mihai was married to his wife, Ioana Alimanestianu, who also escaped from communist Romania. They had met when Ioana was 17 and then married in Romania in 1947 when Mihai was 28 and Ioana was 19. Tr. Vol. I at 46-47. They found there way to the United States in 1948. Mihai and Ioana had five children, one of whom died as an infant. The surviving children – also Plaintiffs here – are Joanna, Nicholas, Irina, and Alexander. Tr. Vol. I at 48-49.

183. Mihai was a mechanical engineer by profession and he did a lot of oil drilling equipment work when first in the United States. Eventually he became an inventor and held several patents on his inventions. Among these was an invention for an automated parking garage called Speed Park, as well as inventions for an automated people mover and an automated highway. Tr. Vol. I at 50-51. *See also* Deposition *De Bene Esse* of Nicholas Alimanestianu, Trial Exhibit 4 ("Tr. Exh. 4") at 10-11. Over time Mihai began "free-lancing" with various engineering companies and was doing "quite well" financially. Tr. Vol. I at 52.

184. In the years immediately before his death, Mihai worked in Africa – first in Gabon as an engineer helping to build that country's railroad – and then on a contract with the United States Agency for International development ("USAID") to help rebuild the infrastructure

of Chad.  Deposition *De Bene Esse* of Irina Alimanestianu, Trial Exhibit 5 ("Tr. Exh. 5") at 12;

Tr. Vol. I at 52-53.  He was returning to the United States in September 1989 because his

contract in Chad was over and he was planning to continue working free-lance, redevelop his

patents, and develop a parcel of land he owned along the Hudson River in New York into his

"dream house."  Tr. Vol. I at 52-54, 58-59.  Even though he was 70 at the time of his death,

Mihai was not planning to retire.  He was a very "active" man and "[h]e couldn't have just sat

around at home, no, never."  Tr. Vol. I at 59.

185.    Mihai's estate is represented by his wife, Ioana Alimanestianu.  He is survived by

his wife, his children Joanna Alimanestianu, Nicholas Alimanestianu, Irina Alimanesteanu, and

Alexander Alimanesteanu, and his brothers Calin Alimanestianu (now deceased), Serban

Alimanestianu (now deceased), and Constantin Alimanestiano (now deceased).[20]  All are

Plaintiffs in this litigation.  They are pursuing claims against the Libyan Defendants for

intentional infliction of emotional distress and loss of consortium.

186.    Mihai's Estate is entitled to damages for wrongful death and his survival action

under New York law.  *See supra* at II.C.  Based on the foregoing testimony and the record in this

case, the Estate of Mihai Alimanestianu should be awarded damages against the Libyan State

Defendants in an amount no less than  $52,509,420.59, reflecting $1,044,000 in economic

damages for lost income, and $18 million for his pain and suffering plus prejudgment interest in

the amount of  $33,465,420.59.  Tr. Exh. 31 at 11; *see also* Tr. Vol. II at 42.  Against the

Individual Libyan Defendants, the Estate of Mihai Alimanestianu should be awarded an amount

---

[20]     Unlike other members of the Alimanestianu family, Constantin ended his last name with
an "o" rather than a "u."

no less than $157,528,261.76, reflecting the  $52,509,420.59 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

       I.     **Ioana Alimanestianu**

187.    Plaintiff Ioana Alimanestianu ("Ioana") is the wife of Mihai Alimanestianu who perished in the bombing of UTA Flight 772 on September 19, 1989.  Ioana lives in New York, and is a United States citizen.  Ioana and Mihai were domiciled in New York in September, 1989.  Ioana was born in Bucharest, Romania on March 27, 1927 and became a United States citizen in 1953.  Tr. Vol. I at 44-45.

188.    Ioana and Mihai met in Bucharest when she was 17.  They married two years later when she was 19, and they separately escaped from communist Romania in 1947.  They emigrated to the United States the following year and eventually settled in New York.  When Mihai died, he and Ioana had been married for 42 years.  Ioana described their relationship as follows: "really we were very close, he was my best friend."  Tr. Vol. I at 45-50, 57-58.

189.    Mihai and Ioana had five children, one of whom died as an infant.  The surviving children – also Plaintiffs here – are Joanna, Nicholas, Irina, and Alexander.  Tr. Vol. I at 48-49.  When asked to describe Mihai as a father, Ioana said "he was quite demanding, but at the same time very understanding and very much helpful, quite helpful to get everybody to do what they really wanted to do."  As a result their children all have university degrees with one a lawyer and the others architects and engineers.  "So he was very warm, very much alive, very much with plans, always plans, plans."  Tr. Vol. I at 57.

190.    Ioana received word of UTA 772's crash from one of the children.  One of them called and said, "the plane has disappeared, we don't know what happened."  Ioana did not learn what happened until the next morning when she "found out it was over the Sahara Desert.  It had

crashed on the Sahara Desert in Africa."  As Ioana said, "I knew he was on that plane.  It – well, what can I say? … It's something that you can't believe that it happens."  Tr. Vol. I at 54-55.

191.    The family had a memorial service on the land Mihai loved overlooking the Hudson River.  Although Irina had asked to see the remains in Paris, the French would not let her "because it was horrible."  The family received what was left of Mihai's body in New York and buried him on the property next to the Hudson.   Subsequently the family donated the land to a land conservancy trust that promised never to develop it.  Tr. Vol. I at 54-56.

192.    When asked to describe what the family does to remember Mihai on anniversaries and the like, Ioana said, "I don't know what to tell you.  He is still the same to me.  I mean he is there.  And we try to remember him. … We talk about him.  I have all his patents in my apartment, and I show them what he was planning and doing."  Tr. Vol. I at 59-60.

193.    When asked why she decided to participate in this case, Ioana explained, "[b]ecause I would like to get it straight, to have justice done, and I don't see any way – any other way."  Tr. Vol. I at 60.

194.    Ioana Alimanestianu is entitled to damages for loss of consortium and intentional infliction of emotional distress under New York law.  *See supra* at II.C..  Based on the foregoing testimony and the record in this case, Ioana Alimanestianu should be awarded damages against the Libyan State Defendants in an amount no less than $74,338,940.85, reflecting $26 million for her pain and suffering, plus prejudgment interest in the amount of $48,338,940.85.  Against the Individual Libyan Defendants, Ioana Alimanestianu should be awarded an amount no less than $223,016,822.54 reflecting the $74,338,940.85 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

J.      **Joanna Alimanestianu**

195.    Plaintiff Joanna Alimanestianu ("Joanna") is the oldest child of Mihai
Alimanesteanu who perished in the bombing of UTA Flight 772 on September 19, 1989.  Joanna
is a resident of New York, New York and Brussels, Belgium.  She is a United States citizen,
having been born in Texas on June 21, 1950.  Deposition *De Bene Esse* of Joanna
Alimanesteanu, Trial Exhibit 3 ("Tr. Exh. 3") at 6-7.  At the time of her father's death Joanna
was 39 years old and her domicile then, as now, was New York.  Tr. Exh. 3 at 6-7.

196.    Joanna is an architect and city planner.  She attended Barnard College, the
Polytechnic in Switzerland, and has a Masters degree from Princeton University.  She became an
architect "mostly because" of her father.  He encouraged Joanna throughout her life and Mihai is
the reason she is something of a "workaholic" because "of his enthusiasm for all these things that
we can do while we are still alive."  Tr. Exh. 3 at 7, 10-11.  Joanna described an instance where
he encouraged her in ballet as a young girl, and another instance where he encouraged her
through a tough curriculum at the Polytechnic in Switzerland.  Tr. Exh. 3 at 16-18.  Joanna
described her father as "always very encouraging."  He was to her and her friends something of a
larger than life figure.  Tr. Exh. 3 at 11-12.  He was "absolutely" a reason for Joanna's
professional success.  Tr. Exh. 3 at 18-19.

197.    Joanna's close relationship with her father continued into adulthood.  She
described her enjoyment at telling her father about projects on which she was working, and
delighting in his interest in those projects and in her family.  Tr. Exh. 3 at 13-16.  In fact, he
planned to travel on to Brussels after UTA Flight 772 landed in Paris (before heading back to
New York) so that he could visit Joanna and her five month old twins that had been born on
April 2, the same day on which Mihai was born.  Tr. Exh. 3 at 9, 13.  She also was the first of the

family to visit Mihai in Africa after he commenced his work there.  She greatly enjoyed her time in Africa with her father and marveled at his enjoyment of the country.  Tr. Exh. 3 at 27-28.

198.    Joanna heard of the crash of UTA Flight 772 from her husband who told her that he had heard on the news that "the plane that was coming in from Chad had disappeared."  The only thing Joanna could think of was "what if I had told him (when they had talked a few days earlier) "come this day" rather than on September 19.  Tr. Exh. 3 at 8-9, 19-20.

199.    Following Mihai's death, there was a memorial service in the United States and Joanna represented the family in Paris during various French events and proceedings connected to UTA Flight 772, including the criminal trial of the Libyans.  Tr. Exh. 3 at 20-22.  At the close of the nine year French legal proceedings Joanna was prepared to present an elaborate "thank you" presentation.  However, when she arrived in Paris at the location, she found all she could do was cry.  In fact, she could not stop crying at that point nine years after the bombing.  Tr. Exh. 3 at 22-23.

200.    Joanna decided to participate in this litigation because "I think he [Mihai] would have felt it was just only fair, that this is the only way to be just."  Tr. Exh. 3 at 28.

201.    Joanna Alimanestianu is entitled to damages for intentional infliction of emotional distress under New York law.  *See supra* at II.C.  Based on the foregoing testimony and the record in this case, Joanna Alimanestianu should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for her pain and suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual Libyan State Defendants, Joanna Alimanestianu should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

K.      **Nicholas Alimanesteanu**

202.    Nicholas Alimanestianu ("Nicholas") is the son of Mihai Alimanestianu who

perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of

Nicholas Alimanestianu, Trial Exhibit 4 ("Tr. Exh. 4") at 7.  Mr. Alimanestianu resides in New

York and was domiciled there in 1989.  He is a United States citizen, born in Houston, Texas on

August 29, 1951.  Tr. Exh. 4 at 6-7.

203.    Like his father, Nicholas is a mechanical engineer by training, having obtained a

degree from New York University.  Tr. Exh. 4 at 7, 10.  Nicholas worked with his father during

his summers and studied engineering because he wanted to work on his father's inventions with

him.  Nicholas had a close relationship with his father as a child and that close relationship

continued into adulthood.  Tr. Exh. 4 at 10-13, 18.  Nicholas described Mihai as "a very good

father, caring."  Tr. Exh. 4 at 20.

204.    Nicholas learned of his father's death when he was driving on the Long Island

Expressway.  His brother Alex called him to say that their father's plane was missing.  His

brother also was the one who later confirmed the plane had crashed.  Tr. Exh. 4 at 13-15.

Mihai's death greatly affected Nicholas, so much so that he could not speak at his deposition of

the days after the bombing of UTA Flight 772.  Tr. Exh. 4 at 15.

205.    Nicholas described the memorial service for the victims of UTA Flight 772 in

Paris as a "very moving ceremony" at which the President of France spoke.  The entire family

attended.  There was a subsequent ceremony in New York at the Orthodox church, and then later

on the family's Hudson River property when Mihai's ashes were interred.  Tr. Exh. 4 at 15.

206.    Nicholas said that while Mihai's death affected all of his family, it specifically

deprived him of the opportunity to work with his father on inventions and engineering projects –

something he was looking forward to doing.  Tr. Exh. 4 at 18.  Mihai's legacy was that "he left

behind a wonderful family and also a great history of his achievements." Tr. Exh. 4 at 21-22. In addition, Mihai "did things that would help humanity and help the public. … It was a terrible tragedy that someone like that would get killed by a terrorist attack. Just a great loss." Tr. Exh. 4 at 19.

207.    Nicholas is participating in this case as a Plaintiff because "some kind of justice needs to be done." He feels "very strongly that this is the right thing to do and we can't resort to violence, so this is what we need to do." Tr. Exh. 4 at 21.

208.    Nicholas Alimanestianu is entitled to damages for intentional infliction of emotional distress under New York law. *See supra* at II.C. Based on the foregoing testimony and the record in this case, Nicholas Alimanestianu should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for his pain and suffering, plus prejudgment interest in the amount of $22,310,280.39. Against the Individual Libyan Defendants, Nicholas Alimanestianu should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### L.    Irina Alimanestianu

209.    Plaintiff Irina Alimanestianu ("Irina") is the daughter of Mihai Alimanestianu who perished in the bombing of UTA Flight 772 on September 19, 1989. Deposition *De Bene Esse* of Irina Alimanestianu, Trial Exhibit 5 ("Tr. Exh. 5") at 6. Irina Alimanestianu resides in California, was domiciled there in 1989, and is a United States citizen. Tr. Exh. 5 at 6.

210.    Irina testified that Mihai was an incredible father and "a larger-than-life figure." Tr. Exh. 5 at 7. She described how Mihai had created a home life of constant learning, "full of art [and]…all different kinds of magazines and books." Tr. Exh. 5 at 7. Long before it became popular, Mihai taught his children about conservation and environmentalism. He taught them to

be mindful of their impact on the world and never to litter.  Tr. Exh. 5 at 8.  Mihai also

introduced his children to his passion for planning and land development.  He had them help

with building roads and landscaping the property he owned in Nyack, New York.  Tr. Exh. 5 at

7.  The family also vacationed together.  They took frequent ski trips, and every summer Mihai

took the family to Europe.  Tr. Exh. 5 at 7.

211.    Irina testified that as she got older, she worked with Mihai in Africa for three

summers.  During her time in Africa, Mihai's instruction on conservation and environmentalism

continued.  For instance, Irina was amazed that Mihai designed a suspension bridge with arches

large enough for an elephant to walk under so that the bridge would not disturb the delicate

ecosystem.  Tr. Exh. 5 at 8.

212.    Irina first heard that Mihai's plane was missing when she received a call from her

brother.  She immediately feared the worst.  Tr. Exh. 5 at 10.  While her brother urged the family

that "if anybody could survive, it's Mihai," Irina testified that she "somehow...just...knew" that

her father was gone.  Tr. Exh. 5 at 9-11.  Indeed, on her way to work that day she experienced an

overwhelming feeling that the day would bring her sadness.  She was right.  Tr. Exh. 5 at 12-13.

213.    In the weeks and months that followed Mihai's death, Irina was devastated.  She

could not function normally.  All she could do was go to her husband's downtown office

building and pace around the garden.  Tr. Exh. 5 at 13.  Eventually, Irina and her siblings

traveled to Paris to participate in the French investigation.  The grieving family attempted to

view Mihai's body, but the French authorities refused, citing the incomplete and gruesome

nature of the remains.  Tr. Exh. 5 at 14.

214.    Irina has suffered lingering effects of Mihai's death.  She cannot watch movies or

news programs that feature terrorist attacks or airplane bombings in particular.  Tr. Exh. 5 at 10.

When she rides an airplane, she feels a compulsion to tell absolute strangers the story of her father's sudden death.  Tr. Exh. 5 at 10.

215.     Irina participated in this litigation because she thinks this is the "most civilized way of trying to have consequences" for the horrific bombing of UTA Flight 772.  Tr. Exh. 5 at 21-22.

216.     Irina Alimanestianu is entitled to damages for intentional infliction of emotional distress under California law.  *See supra* at II.E.  Based on the foregoing testimony and the record in this case, Irina Alimanestianu should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for his pain and suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual Libyan Defendants, Irina Alimanestianu should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### M.     Alexander Alimanestianu

217.     Alexander Alimanestianu ("Alexander") is the youngest son of Mihai Alimanestianu, who perished in the bombing of  UTA Flight 772 on September 19, 1989.  He is and always has been domiciled in New York.  Alexander is a United States citizen and was born on January 31, 1959 in Nyack, New York.  Deposition *De Bene Esse* of Alexander Alimanestianu, Trial Exhibit 6 ("Tr. Exh. 6") at 7.

218.     Alexander's youth was filled with great memories of Mihai.  Alexander recalls that his father had "an interest in so many…things that were fascinating…to [Alexander]."  Overall, Alexander describes his upbringing with his father as "incredibly interesting[,]…rich[,]…broad[,]…and international."  Tr. Exh. 6 at 9.  Mihai encouraged Alexander and his siblings to broaden their horizons by learning foreign languages – in

Alexander's case, French – and traveling to other countries. Tr. Exh. 6 at 9-10. Alexander's relationship with his father was very strong during his childhood and remained strong when Alexander attended school in Switzerland.

219.    Alexander attended the 8th and 9th grades in Switzerland. During these two years, Mihai brought the family to Switzerland for Christmas and other holidays so that they could "[be] together[,] go skiing and travel around". After completing 9th grade, Alexander returned to the United States and completed high school at Exeter, in New Hampshire. Alexander remained in close contact with his father while at Exeter. Tr. Exh. 6. at 10-12.

220.    Alexander kept close contact with his father throughout his college years and into his adult life. Mihai owned property in Nyack, New York, and often took Alexander there on weekends. Alexander and his father spent time together planting trees and performing general maintenance. This property was Mihai's "refuge", so Alexander felt privileged to spend "lots of weekends" there. During college and into adulthood, Mihai continued to encourage Alexander to see the world, and the two of them traveled "quite a bit" around California and Europe. Tr. Exh. 6 at 13. Mihai's job stationed him in Chad and Gabon for several years, and Alexander recalls, "it wasn't easy…to stay in touch [with my father at that time], but [I] definitely did." Tr. Exh. 6. at 14-15. Alexander even found a way to stay with his father for several summers in Chad and Gabon. Tr. Exh. 6. at 13,15. Mihai's work in Chad ended, and on September 19, 1989 he was headed back to the United States aboard UTA Flight 772. Tr. Exh. 6 at 15-16.

221.    Alexander first heard that UTA Flight 772 was missing when his sister, Joanna, called him at work and informed him that "the plane hasn't landed and [Joanna didn't] know what happened." Tr. Exh. 6 at 16. Alexander immediately called his mother, Iona, to relay the information and then hurried to her apartment. Alexander and Iona immediately began calling

around to gather "as much as [they] could about whether [Mihai] was actually on the plane or not."  As the afternoon wore on, Alexander and Iona received "more and more bad information."  Tr. Exh. 6 at 17.  Alexander only recalls the next few days as a "blur."  Tr. Exh. 6 at 16-17.

222.    Upon the official confirmation that Mihai was dead, Alexander and several other family members went to Paris.  Since Alexander is a lawyer, Iona, his mother, "expected [him] to take charge of…handling whatever business issues…and estate issues there were," as well as the "communication and organiz[ation] of the trip to France."  Tr. Exh. 6 at 18.  One of the more "gruesome things was trying to identify [Mihai's] remains….[W]hat we had to do is call [Mihai's] dentist and get his dental records….[T]hat was not a happy phone call."  Tr. Exh. 6 at 21.  As a result of all of these events, Alexander was suddenly thrust into the "focal point…[in] deal[ing] with the mess" that resulted from the murder of Mihai.  Tr. Exh. 6 at 17-18.  Mihai's family and friends held a memorial service for him in Paris, France, and the family "tried to be together…[to] make sense of what was going on."  Tr. Exh. 6 at 18-19.  Mihai's body was cremated before returning to the United States.  Tr. Exh. 6 at 20.

223.    The Alimanestianu family held another memorial service for Mihai upon their return to the United States.  Alexander and his sister spoke at the service, but one of Alexander's brothers was "too nervous...[and] couldn't speak."  Tr. Exh. 6. at 20.  The family spent the weeks after the service grieving Mihai's death by spending "a lot of time [with family] and…friends".  Tr. Exh. 6 at 19-20.

224.    Alexander's contacts in France provided him with updates on the investigation conducted by Judge Bruguiere, and he learned that Libya was responsible for the bombing of UTA Flight 772.  Tr. Exh. 6 at 22.  Alexander was "shock[ed]" by the "murder....[W]hether [the murder] is by a government or by a person...it's shocking…pure and simple."  Tr. Exh. 6 at 23.

On a core level, Alexander felt "confus[ed] to wake up one day and...have a sudden death like that...for such a senseless purpose....[I]t is just an *act of random violence*."  Tr. Exh. 6 at 23 (emphasis added).

225.    To honor Mihai's memory, Alexander and his family sold Mihai's Nyack, New York property to a Trust for Public Land, which agreed to never develop the land.  Additionally, Alexander plans to place a bench on this property in memory of his father.  Tr. Exh. 6 at 21-22. Even these loving tributes to Mihai fail to erase the pain caused by his death.  Alexander feels that he and his family have missed out on significant life events that they would have shared with Mihai.  Tr. Exh. 6 at 24.

226.    Alexander was never able to introduce his wife or children to Mihai.  As a result of Mihai's premature death, Alexander's wife and children were stripped of many memories and relationships that they could have built with Mihai.  Alexander's children were deprived of the special bond that a grandparent has with a grandchild – the "relationship and the feeling of the inter-generations of [the] family…. [T]hat is what life is about." Tr. Exh. 6 at 24.

227.    Alexander and his family specifically honor the memory of Mihai on September 19 as well as on Mihai's birthday.  However, Alexander describes the memory of his father as "a constant thing."   Strong emotions and "anxiety" surface when Alexander or his children "get on an airplane....[We] can't fly without worrying."  Tr. Exh. 6 at 27.  Alexander believes that, even if Mihai could look back to his own untimely death, Mihai "wouldn't change his view that people are fundamentally good and the world is a fundamentally good place."  Alexander feels that he has inherited his father's optimistic spirit, and he "[will never] let something like [his father's death] change his…view of the world."  Tr. Exh. 6 at 28.

228.    Alexander Alimanestianu is entitled to damages for intentional infliction of emotional distress under New York law.  *See supra* at II.C.   Based on the foregoing testimony and the record in this case, Alexander Alimanestianu should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for his pain and suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual Libyan Defendants, Alexander Alimanestianu should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### N.    Calin Alimanestianu

229.    Plaintiff Calin Alimanestianu ("Calin") was the younger brother of Mihai Alimanetianu who perished in the bombing of UTA Flight 772 on September 19, 1989. Deposition *De Bene Esse* of Simone Desiderio, Trial Exhibit 7 ("Tr. Exh. 7") at 8-9.  Calin Alimanestianu was domiciled in Florida in 1989, and died on February 12, 2005.  Tr. Exh. 7 at 8. Calin's daughter, Simone Desiderio, is the executrix of her father Calin's estate.  Tr. Exh. 7 at 7. Calin became a United States citizen in 1961.  Tr. Exh. 7 at 12.  Simone resides in Florida, and is a United States citizen.  Tr. Exh. 7 at 7.

230.    Calin was born in Romania in 1922 and grew up with his three brothers, Mihai, Serban, and Constantin.  Tr. Exh. 7 at 8.  The brothers were all very close from their youth until the time of their deaths.  Tr. Exh. 7 at 10.  After Calin escaped Romania in the 1950s, he settled in New York near his brother, Mihai.  The brothers and their families were always together, including on holidays and other special occasions.  Tr. Exh. 7 at 12.  Even after Calin moved to Florida in 1973, the families remained very close.  Mihai would visit Calin and Calin's family in Florida quite often, and Calin would bring his family to New York to visit with Mihai, especially during the summers.  Tr. Exh. 7 at 13-14.  Mihai was very close to Calin, all of his brothers, and

all of his brothers' children.  Tr. Exh. 7 at 15.  After Mihai's death, Calin and his family

continued to spend time in New York with Mihai's family and the families of the other brothers;

of course, Mihai was missing during those family gatherings.  Tr. Exh. 7 at 14.

231.    Calin was devastated when he heard the news that his brother had been killed in

the bombing.  He was so devastated that he became physically ill, crying and vomiting.  It was

an extremely difficult time.  Tr. Exh. 7 at 17.  After the bombing, Simone found herself

visualizing Mihai's death, wondering how he actually died.  Whenever she flies, she experiences

fear because of Mihai's tragic death.  Simone testified that her father Calin had similar reactions

and experiences following the bombing – Calin and Mihai were very close brothers and, because

of the bombing, Calin's "big brother was gone."  It was a terrible loss to the entire family,

including Mihai's brothers.  Tr. Exh. 7 at 19.

232.    Calin was deeply angered and hurt upon learning that Mihai had been killed as a

result of a bombing by Libya.  Simone testified that it is difficult to express in words just how

deep these feelings were; it was difficult for Calin to speak about it at all for some time.  "He

was just so sad" and Calin suffered greatly.  Tr. Exh. 7 at 19-21.

233.    Calin remembered Mihai often after the bombing – especially on Mihai's birthday

and the birthdays of Mihai's children.  Tr. Exh. 7 at 20.  Calin also tracked the story of bombing

very closely in the news.  Every time there was an article or anything about cases related to the

bombing, Calin would send it along to all of his children.  Tr. Exh. 7 at 21.

234.    It was very important to Calin that his daughter pursue this case on his behalf

after his death.  Calin was devastated to lose his brother in such a horrible way and followed this

litigation very closely until his death.  Tr. Exh. 7 at 9.  Calin wanted justice for his brother and

just before he died, he provided his files to Simone, instructing her to take close care of the files and to follow the case closely.  Tr. Exh. 7 at 23.

235.    Calin looked up to Mihai as a big brother who impressed upon him a love of nature, animals, and humanity.  The loss of his brother caused Calin lasting anger and pain. Calin loved his brother and would have wanted to have lived to express that love in connection with this litigation.  Tr. Exh. 7 at 23-24.

236.    The Estate of Calin Alimanestianu is entitled to damages for intentional infliction of emotional distress under Florida law.  *See supra* at II.H.  Based on the foregoing testimony and the record in this case, the Estate of Calin Alimanestianu should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for his pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, the Estate of Calin Alimanestianu should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**O.    Serban Alimanestianu**

237.    Plaintiff Serban Alimanestianu ("Serban") was the younger brother of Mihai Alimanestianu who perished in the bombing of UTA Flight 772 on September 19, 1989. Deposition *De Bene Esse* of Kathy Alimanestianu, Trial Exhibit 8 ("Tr. Exh. 8") at 8-9.  Serban Alimanestianu was domiciled in New York in 1989, and died on December 15, 2005.  Tr. Exh. 8 at 8.  Serban's wife, Kathy Alimanestianu, is the executrix of her husband Serban's estate.  Tr. Exh. 8 at 8.  Serban became a United States citizen in the early 1960s.  Tr. Exh. 8 at 8.  Kathy resides in Massachusetts, and is a United States citizen.  Tr. Exh. 8 at 7.

238.    Serban was born in Romania in 1920 and grew up with his three brothers, Mihai, Calin, and Constantin.  Tr. Exh. 8 at 8.  The brothers were all very close from their youth until

the time of their deaths.  Tr. Exh. 8 at 10-11.  Serban and Mihai were particularly close because "[t]hey were only 16 months apart, so they did everything together."  Tr. Exh. 8 at 12.  After Serban escaped Romania in the late 1950s, he settled in Texas with his brother, Mihai, and acted as a caregiver to Mihai's children.  Tr. Exh. 8 at 15.  When Kathy first met Serban, he was living in the same house as Mihai.  Tr. Exh. 8 at 12.  Later, Mihai's family and Serban's family lived next door to one another for more than 10 years.  Tr. Exh. 8 at 13.

239.    Serban "was very sad and devastated and shocked" when he heard the news that his brother had been killed in the bombing.  Tr. Exh. 8 at 17.  Kathy stayed home from work to care for her grieving husband, who spent most of his waking hours on the phone trying to console Mihai's adult children.  Tr. Exh. 8 at 18.  After the bombing, Serban would have visions of Mihai and sometimes felt like Mihai was in the room.  Tr. Exh.  8 at 18.

240.    Serban remembered Mihai often after the bombing – especially on Mihai's birthday when he would talk to Mihai's widow.  Tr. Exh. 8 at 20.

241.    Serban looked up to Mihai as a big brother and as a "kind of leader of the family."  Tr. Exh. 8 at 16.  When Mihai died, part of Serban's life was destroyed.  Tr. Exh. 8 at 22.  The tragedy "took a part of [Serban] away."  Tr. Exh. 8 at 22.

242.    Kathy testified that she decided to continue Serban's participation in this lawsuit "in memory of my late husband whom I loved, who was very saddened and depressed by Mihai's death, and also in memory of Mihai's family and children, who were really devastated by his death."  Tr. Exh. 8 at 11.

243.    The Estate of Serban Alimanestianu is entitled to damages for intentional infliction of emotional distress under New York law.  *See supra* at II.C.  Based on the foregoing testimony and the record in this case, the Estate of Serban Alimanestianu should be awarded

damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for his pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, the Estate of Serban Alimanestianu should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

###### P.    **Constantin Alimanestiano**

244.    Plaintiff Constantin Alimanestiano ("Constantin") was the younger brother of Mihai Alimanestianu who perished in the bombing of UTA Flight 772 on September 19, 1989. Deposition *De Bene Esse* of Pauline Alimanestiano, Trial Exhibit 9 ("Tr. Exh. 9") at 6. Constantin's wife, Pauline Alimanestiano, is the executrix of her husband Constantin's estate. Tr. Exh. 9 at 5-6.  Constantin was domiciled in New York in 1989, and was a United States citizen at all times relevant to this litigation.  Tr. Exh. 9 at 6.

245.    Constantin and Mihai escaped from Romania together.  They traveled through France and Canada, and eventually settled in the United States.  Tr. Exh. 9 at 7.  In the United States, the relationship between Constantin and Mihai remained "very close."  As they grew older, they shared a common vision of their careers, as both were "heavily involved in inventing…planning, building, and always constructing new ideas."  Mihai and Constantin continued to spend a lot of time together after Constantin's marriage to Pauline.  Tr. Exh. 9 at 8. In fact, Constantin and Mihai remained close even when Pauline and Constantin moved to Chicago.  Pauline testified that Constantin would occasionally surprise his wife and children by declaring, "we *have* to take this weekend and go to New York [to visit Mihai,]" during which Constantin would be "very happy …and [have] wonderful times."  Tr. Exh. 9 at 9.

246.    Mihai had a close relationship with Constantin's children.  "When they were little they enjoyed [Mihai] very much.  As they got older were "very impressed by him" and viewed

him with a "celebrity status."  Tr. Exh. 9 at 9.  Mihai was godfather to all three of Constantin and

Pauline's children.  Mihai's close relationship with Constantin's children continued into their

adulthood.  Tr. Exh. 9 at 10.

247.    When Constantin heard the first news accounts of the disappearance of UTA

Flight 772, he immediately became worried, saying "this is very bad, because I think that Mihai

is scheduled to come home this week."  Tr. Exh. 9 at 10-11.  Pauline reassured him that Mihai

was most likely not on UTA Flight 772, and they proceeded to dinner and retired to bed early.

In the middle of the night, their daughter Christine called.  Pauline testified that Constantin

immediately knew the reason for Christine's call.  Constantin refused to talk about his brother's

death, "ke[eping] all of his emotions inside", and showed no visible reaction to the tragic news.

Tr. Exh. 9 at 11.

248.    Constantin continued to be affected by the death of Mihai and refused to talk

about it to anyone "for years afterward."  Tr. Exh. 9 at 13.  At the time of Mihai's death,

Constantin had been waiting for Mihai to retire so that the two brothers could "put into effect"

some of their ideas and programs.  Constantin wanted to share his ideas and thoughts with Mihai,

as Constantin "very much appreciated [Mihai's] advice and help with his…inventions."  Tr. Exh.

9 at 12-13.  But Constantin lost a significant opportunity due to Mihai's sudden death.

Constantin shared his "innermost ideas" with Mihai and that "type of being together…was a

great source of stability" to Constantin.  Tr. Exh. 9 at 16.  He lost not only his older brother, but

also his role model.  After Mihai's death, Constantin no longer had Mihai as an emotional and

intellectual outlet to share his ideas, inventions, and thoughts.  Tr. Exh. 9 at 15-16.

249.    The Estate of Constantin Alimanestiano is entitled to damages for intentional

infliction of emotional distress under New York law.  *See supra* at II.C.  Based on the foregoing

testimony and the record in this case, the Estate of Constantin Alimanestiano should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for his pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, the Estate of Constantin Alimanestiano should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

> **Q.**    **Estate of Mark Edward Corder**

250.    Mark Edward Corder ("Mark"), a United States citizen, was a passenger on UTA Flight 772 when the plane was bombed over the Tenere Desert in Africa, killing all 170 passengers and crew members aboard.  Tr. Vol. I at 113.  Mark was domiciled in Texas at the time of his death.

251.    Mark was returning from Chad, Africa where he was working as a senior petroleum geologist for Exxon.  Tr. Vol. I at 115, 122.  As a child, Mark was an altar boy, was in the color guard, and also was a straight-A student in high school.  Deposition *De Bene Esse* of Michael Corder, Trial Exhibit 11 ("Tr. Exh. 11") at 11.  Mark attended college and graduated with a degree in geology from Ball State University in Indiana.  Tr. Vol. I at 114-115.  He started working in the oil industry for Dresser Atlas.  After one year, he was hired by Exxon to work in Exxon's Weybridge, England office out of which Exxon's European and African operations were run.  While at Exxon, Mark pursued the company's scientific and technical path, earning promotions on a regular basis.  Tr. Vol. I at 115.  At the time of his death, Mark was earning approximately $75,000 per year in addition to a bonus related to his travel and work assignments in foreign countries.  For his work, Mark regularly earned a 35 to 70 percent bonus on his base salary.  Tr. Vol. I at 116.

252.     Mark had no intention to work in any other industry or to change employers.  As his wife, Carla, testified, "He loved it.  He loved it.  That was --- he had no other plans except to look at rocks."  Mark also was "very proud to work for Exxon" and had no intention of leaving the company.  Tr. Vol. I at 121.

253.     Mark's Estate is represented by his wife, Carla Malkiewicz.  He is survived by his wife, his brother Michael Corder, his sister Therese Coddington, and his father, Edward Corder (now deceased).  All are Plaintiffs in this litigation.  Tr. Vol. I at 113-114.  They are pursuing claims against the Libyan Defendants for Intentional Infliction of Emotional Distress and Loss of Consortium.

254.     The Estate of Mark Edward Corder is entitled to damages for wrongful death and survival under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, the Estate of Mark Edward Corder should be awarded damages against the Libyan State Defendants in an amount no less than $56,285,420.59, reflecting $4,820,000 in economic damages for lost income, and $18 million for his pain and suffering plus prejudgment interest in the amount of $33,465,420.59.  Tr. Exh. 31 at 12; *see also* Tr. Vol. II at 46.  Against the Individual Libyan Defendants, the Estate of Mark Edward Corder should be awarded an amount no less than   $168,856,261.76, reflecting the  $56,285,420.59 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**R.     Carla Malkiewicz**

255.     Plaintiff Carla Malkiewicz ("Carla") is the wife of Mark Edward Corder who perished in the bombing of UTA Flight 772 on September 19, 1989.  Tr. Vol. I at 113.  Carla resides in Conroe, Texas, and is a United States citizen.  Tr. Vol. I at 112-113.  Mark and Carla were domiciled in Texas at the time of his death.

256.    Carla has known Mark since they were children.  They grew up on the same street, played baseball together, and rode bikes together.  Mark even mowed her grass.  Carla remembers that Mark "always had a crush" on her and she still has his baseball mitt from when he was a little boy that has her name written in it.  Carla does not remember ever not knowing Mark and does not remember "not having him in [her] life."  Tr. Vol. I at 116-117.

257.    After Mark graduated from college, he and Carla became romantically involved and Mark asked Carla to marry him, telling her: "I'll show you the world."  Tr. Vol. I at 118-119.  Mark and Carla were married in 1982.  It was hard for Carla whenever Mark was away for work – "[t]hree weeks was a long time to be without him" – but whenever he came back they shared a "wonderful" and "magical" time together, especially traveling the world.  Tr. Vol. I at 119, 122.  Carla has been married three times in her life, but she said she "only [has] one soul mate, and that was Mark."  Tr. Vol. I at 119.

258.    Carla recalls that Mark was the "star of [his] family" and that everyone looked up to him.  Even in the community, she remembers how exciting it was whenever Mark came home to Indiana:  "It was just like the lights went on in Indiana when he was there."  Tr. Vol. I at 120-121.

259.    The last time Carla saw Mark was at the airport when he left for his final rotation in Chad.  Mark left on Carla's 40th birthday and they had celebrated at a big party the night before.  Carla also spoke to Mark a few days later on September 4, their anniversary.  On September 19, Carla was waiting for Mark to come home to her in Houston after his rotation had completed.  Tr. Vol. I at 122-123.  Instead, she received a call from Mark's boss saying that Mark's plane was missing.  Carla was volunteering at the YMCA at the time and froze complete, unable to move.  She suddenly felt as if she were underwater and did not know how she would

get home.  She began to shake uncontrollably and was still shaking when she arrived at home.

Even after her friend, a nurse, provided her with some medication, she still could not stop

shaking.  Carla started calling friends (she cannot recall who she called  first) and people started

coming over, including the wife of Mark's replacement on the rig who spent the night.  They

discussed hopeful scenarios of how Mark could have survived, but then received the call that the

plane was found and there were no survivors.  Tr. Vol. I at 124-125.

260.    Following Mark's death, Carla recalls her body feeling so heavy that she could

hardly move.  She had difficulty even getting out of bed, and had to do everything one step at a

time: "the tiniest little things were so hard to do."  Tr. Vol. I at 126.  Carla tried "just to keep

[her] head above the water" during this "awful time" when she had to respond to calls from the

State Department and others, locate dental records, and deal with the investigators' inability to

identify Mark's body or even to confirm that the body existed.  Tr. Vol. I at 126-127.  When

Carla learned that Mark's death was the result of an intentional act, she was "so devastated …

just so sad."  Tr. Vol. I at 127.

261.    After the bombing, there were two memorial services for Mark – one in Houston

at Mark and Carla's home and another in Indiana, Mark's home town, where 400-500 people

attended.  Carla recalled feeling strange arriving at the Indianapolis airport without Mark.  Tr.

Vol. I at 128-129.  Some time thereafter, Mark's body was found and returned to the United

States, but Carla was still suffering so greatly just to handle her day-to-day functioning that she

"couldn't go through another public ceremony."  Instead, Carla went by herself to the airport,

watching through the glass as Mark's body came off the plane and thinking about how much

time they had spent together in airports.  This would be the last time.  Tr. Vol. I at 130-131.

Carla could not recall how many days, weeks, or months it took for her to come to grips with the

fact that Mark was not coming home and that she would never pick him up at the airport again. She was "so sad" and was "really a wreck in [her heart]" having lost her "soul mate."  Tr. Vol. I at 130.

262.    Carla testified that the things she missed out on because of Mark's murder "are too numerous to even describe" but she knows her life with Mark would have been "wonderful." Tr. Vol. I at 132.  Carla still thinks about Mark every day and has particularly difficult days on Marks' birthday and their anniversary.  Tr. Vol. I at 134.  She has undergone grief counseling to help her cope with her extraordinary loss.  Tr. Vol. I at 133.  Still, Carla testified that she has not been able to "go on with [her] life."  Tr. Vol. I at 135.

263.    Carla testified that she did not want to participate in this litigation because she did not want to "prosper" from Mark's death.  Ultimately, she decided to participate because "Mark's life was taken … without his permission, without his knowledge, and by people who don't value life.  And maybe if it cost them money, they'll think before they do it and someone else has to go through what I've had to go through." Tr. Vol. I at 134-135.

264.    Carla Malkiewicz is entitled to damages for wrongful death, intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Carla Malkiewicz should be awarded damages against the Libyan State Defendants in an amount no less than $74,338,940.85, reflecting $26 million for her pain and suffering, plus prejudgment interest in the amount of $48,338,940.85. Against the Individual Libyan Defendants, Carla Malkiewicz should be awarded an amount no less than $223,016,822.54, reflecting the $74,338,940.85 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

S.      **Therese Coddington**

265.    Plaintiff Therese Coddington ("Therese") is the younger sister of Mark Edward Corder who perished in the bombing of UTA Flight 772 on September 19, 1989.  Ms. Coddington resides in Indianapolis and is a United States citizen.  Deposition *De Bene Esse* of Therese Coddington, Trial Exhibit 10 ("Tr. Exh. 10") at 4-5.[21]  At the time of Mark's death he was 35 and Therese was 34.  Tr. Exh. 10 at 7.  Therese was domiciled in Indiana in 1989.

266.    Therese was the middle child of three, with Mark being eleven months older, born in 1954, and her brother Michael being two years younger, born in 1957.  Tr. Exh. 10 at 5.  The three Corder children were "very close" growing up.  Although Therese described Mark as a very shy child, she said he grew "out of his shell" in high school and "always wanted to protect [her]."  Tr. Exh. 10 at 10-11, 24.  She has special memories of camping trips, swimming lessons, and Easters with Mark, and she recalls baking cookies for him and sending them off to college in Pringles cans.  Tr. Exh. 10 at 24-25.  Although Therese described Mark as "against public displays of affection," the last time she saw him was at an airport where he gave Therese "a big hug" and said he loved her.  Tr. Exh. 10 at 13.

267.    Therese also has two daughters, ages 29 and 27, who knew Mark when they were children.  Mark was very close to them as well, always writing them, sending them presents at Christmas, and otherwise playing with them whenever he was around.  Tr. Exh. 10 at 14-15.

268.    On September 19, 1989, Therese first heard that a DC-10 had been lost and at first thought nothing other than "how in the hell do you lose a DC-10?"  Later in the day, Carla, Mark's wife, tracked Therese down on the phone at Therese's part-time job at a retreat center.

---

[21]    Therese's name is misspelled throughout the transcript.  The proper spelling, as reflected by her signature on page 34 of Exhibit 10 is "Therese."

Carla told Therese "Mark is on that plane." Tr. Exh. 10 at 17-18. The rest of the day and into the next few days everyone just waited around hoping for news. Everyone was "in a daze" and "shocked." Tr. Exh. 10 at 18-19.

269.     The family had a memorial service for Mark but it was without his body. Mark's body did return to his wife Carla at a later date but, as Therese explained, "Carla was in so much pain that she couldn't allow [the rest of the family] to be with her for that … it was very hard, very hard for my dad and for us, to not really have that part of the closure." Tr. Exh. 10 at 21.

270.     Therese remembers Mark every day. Tr. Exh. 10 at 25. September in particular is a difficult month for her because Mark died on the 19th, her mother died on the 20th, and her best friend from high school also died in September. Tr. Exh. 10 at 25-26. Therese decided to participate in this lawsuit because, as she explained, "it's very important that responsibility is taken for my brother's death. He was murdered, along with the other people on that plane, and that is absolutely wrong." Tr. Exh. 10 at 27-28. She wants the Court and the world to know that "if Mark would have been here today, the three of us in this family, our lives would have been totally different." Tr. Exh. 10 at 30.

271.     Therese Coddington is entitled to damages for intentional infliction of emotional distress under Indiana law. *See supra* at II.G. Based on the foregoing testimony and the record in this case, Therese Coddington should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for her pain and suffering, plus prejudgment interest in the amount of $12,084,735.21. Against the Individual Libyan Defendants, Therese Coddington should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**T.**   **Edward Corder**

272.     The Estate of Edward Alfred Corder is represented in this case by Therese Coddington in her capacity as Executrix of the estate.  Edward Corder, who died in 1996, was the father of Mark Edward Corder who perished in the bombing of UTA Flight 772 on September 19, 1989.  Edward and his late wife, who died in 1981, had three children – Mark, born in 1954, Therese, born in 1955 and Michael, born in 1957.  Deposition *De Bene Esse* of Therese Coddington, Trial Exhibit 10 ("Tr. Exh. 10") at 5-7.  Edward Corder was domiciled in Indiana in 1989.

273.     Edward Corder was born in Indianapolis, Indiana on January 3, 1927 and was a citizen of the United States.  The Corder family was a "very loving family" where everything was "done together."  As Therese testified, "[i]f my parents had things to do and we weren't invited as children, they usually didn't go. … we were just very close."  Tr. Exh. 10 at 9.  As she explained further, "he was a great father."  Tr. Exh. 10 at 16.

274.     The close relationship between father and son continued into Mark's adulthood. Therese testified that while Edward Corder had a close relationship with all three of his children, Mark "made my dad's world bigger" and was "a support person with my dad."  She explained how Mark brought their father to England to visit during a period when Mark and his wife Carla lived there.  Tr. Exh. 10 at 15-17.  In describing further her father's relationship with Mark, Therese said, "Mark always gave us something to look forward to, you know, and especially for my dad." Tr. Exh. 10 at 22.  Mark's wife, Carla, testified that Edward was "so, so proud of Mark," especially because of Mark's higher education, career path, and world travels.   Tr. Vol. I at 120.

275.     On September 19, 1989, when the Corder family was first learning of the bombing on UTA 772 and Mark's presence on that flight, the first thing Therese thought was

"I've got to get to my dad, because my dad at the time was a heart patient." She explained, "I was afraid literally that my dad would be dead by the time I got to him, and I wanted to be the one to tell him." Tr. Exh. 10 at 16.

276.   Although Edward Corder was not in good health at the time of Mark's death, Therese testified that Mark's death "was like the beginning of the end for him." Tr. Exh. 10 at 22.  Although Edward Corder lived seven more years, until 1996, Mark's death "affected him more than anything else in his life." As Therese explained, the loss of a child is "the hardest loss," and in the case of Edward Corder, "I think that it affected my dad because he took it inward, and we didn't talk about it a lot.  I mean we sat there and just stared at each other." Tr. Exh. 10 at 22-23.

277.   The Estate of Edward Corder is entitled to damages for intentional infliction of emotional distress under Indiana law. *See supra* at II.G.  Based on the foregoing testimony and the record in this case, the Estate of Edward Alfred Corder should be awarded damages against the Libyan State Defendants in an amount no less than $14,295,950.16, reflecting $5 million for his pain and suffering, plus prejudgment interest in the amount of $9,295,950.16.  Against the Individual Libyan Defendants, the Estate of Edward Alfred Corder should be awarded an amount no less than $42,887,850.49, reflecting the $14,295,950.16 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

U.     **Michael Corder**

278.   Plaintiff Michael Corder ("Michael") is the younger brother of Mark Edward Corder who perished in the bombing of UTA Flight 772 on September 19, 1989.  Michael lives in Indianapolis, Indiana, and is a United States citizen.  Deposition *De Bene Esse* of Michael Corder, Trial Exhibit 11 ("Tr. Exh. 11") at 3, 5.  Michael was domiciled in Indiana in 1989.

279.    Michael grew up with his older siblings, Mark and Theresa, in Beech Grove, Indiana.  Without much by way of financial resources, the children spent most of their time hanging out together, doing things like "playing Zorro."  Tr. Exh. 11 at 7-8.  Michael spent substantial time with his big brother, Mark, going hunting or fishing with their dad, playing baseball, football, and basketball together, and going camping and hiking.  Michael and Mark just liked to do "things that little brothers and brothers do."  Michael was "very close" to his big brother, and always wanted to "tag along" with Mark and his friends.  Over Mark's friend's objections, Mark would still bring Michael along.  Tr. Exh. 11 at 9-11.

280.    Mark not only was a "good big brother" to Michael, he played an ever greater role in his life, acting "like a dad" when Michael would find himself in trouble, and "help[ing] Michael] to be the man [he is] today."  Mark taught Michael a lot, and was "more important to [him] than the President of the United States."  Tr. Exh. 11 at 10-11.  This relationship continued after Mark left home, as Mark would call Michael "all the time" in order to "make sure [Michael] was walking the straight path, and [Mark] didn't let [Michael] stray too far."  Tr. Exh. 11 at 13.  Even in adulthood, whenever Michael needed anything, he would always call Mark, who would always be there to help.  Tr. Exh. 11 at 15.

281.    Mark was Michael's best man at his wedding, and remained an important part of Michael's life when Michael had children.  Mark was the godfather to Michael's son and was extremely close to each of Michael's two older children.  Mark was killed before he was able to develop a relationship with Michael's youngest child.  Tr. Exh. 11 at 15-16.  Michael and Mark spoke regularly by phone and Mark always spoke about Michael's children and how excited Mark was to be an uncle.  It felt "great" for Michael when Mark would call.  The last time

Michael saw his brother Mark was at Michael's son's baptism in 1989.  He last spoke to him in September of that year.  Tr. Exh. 11 at 19-20.

282.    Michael first learned that Mark's plane was missing when he received a call at the Kindercare day center in Indiana where he was working.  Michael burst into tears, but felt that Mark was not going to die because "Mark was a survivor."  Michael ultimately learned that Mark had died, and recalls watching news coverage of the bombing and seeing what he believes to be Mark's lifeless body strapped to a seat on the ground in the desert.  Tr. Exh. 11 at 24.  After learning of Mark's death, Michael was unable to work for several weeks and even when he returned he needed friends and family to help him get along.  Tr. Exh. 11 at 21-22.

283.    Mark's death affected Michael deeply.  Michael still has trouble as a result of the bombing.  He found it hard just to "take life" for several years.  Still today, he cannot have any pictures of Mark in his home, because all he can think about is how horrible Mark's death was.  Michael has felt a great deal of anger and anxiety regarding Libya as a direct result of the bombing.  Tr. Exh. 11 at 22, 24-25.  Michael has not been on an airplane since Mark was killed in the UTA bombing in September 1989.  Tr. Exh. 11 at 7.

284.    Michael has missed out on a great deal as a result of Mark's death.  They were planning special hunting trips together which Michael still has been unable to take.  After Mark's death, Michael was not able to go hunting at all, though he used to hunt all the time.  Tr. Exh. 11 at 28.  Mark always talked about being involved in the lives of Mark's children but was not able to fulfill that role.  Michael thinks about Mark all the time.  He remembers Mark as the "one of the best men you could ever meet."  Tr. Exh. 11 at 29. Michael said that if he could see his older brother again, he would tell Mark that he loves him dearly, give him a hug, hold him, and shake his hand.  Tr. Exh. 11 at 29-33.

285.    Michael Corder is entitled to damages for intentional infliction of emotional distress under Indiana law.  *See supra* at II.G.  Based on the foregoing testimony and the record in this case, Michael Corder should be awarded damages in an amount no less than $18,584,735.21, reflecting $6.5 million for his pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, Michael Corder should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**V.    Estate of Pat Wayne Huff**

286.    Pat Wayne Huff ("Pat"), a United States citizen, was a passenger on UTA Flight 772 when the plane was bombed over the Tenere Desert in Africa, killing all 170 passengers and crew members aboard.  Tr. Vol. I at 86-87.  Pat's Estate was administered in the state of Texas, where Pat was domiciled at the time of his death.

287.    Pat received his high school diploma from Franklin, Texas in 1968 and then completed one year at Texas A&M University before enlisting in the United States Air Force. Pat served as an Air Force Sergeant with a specialty in radar repair.  Tr. Vol. I at 87-88.  After his honorable discharge from the Air Force, Pat began working in the oil business – first on the DEW oil line in the Arctic Circle and subsequently around the globe in oil fields for the duration of his life.  Tr. Vol. I at 88-89.

288.    Pat started his work in the oil field as a Roustabout, and worked his way up to Driller, Supervisor (or "Tool Pusher") and, ultimately, Drilling and Production Superintendent at Parker Drilling for the entire Gulf Coast.  Pat worked "all over the world," including South America, Malaysia, Saudi Arabia, and off the coast of Africa.  Pat's wife, Ermine, recalls that Pat was a dependable, hard worker, who "worked his way up to the top."   Tr. Vol. I at 89-91.

289.    Pat worked in the oil industry from 1973 until his death in 1989.  When he died, he was Drilling and Production Superintendent for Parker Drilling, earning approximately $54,000 per year.  Tr. Vol. I at 91.  Working in the oil industry was Pat's "specialty" – "it was the only thing he knew . . . [he] had trained for [it] and his family had been in the business." According to Ermine, Pat planned to remain in the oil industry for the rest of his life until he retired.  Tr. Vol. I at 94.

290.    Pat's Estate is represented by his wife, Ermine Hailey.  He is survived by his wife, his brother Michael Huff, his sister Glenda Jan Pitillo, his parents James and Janice Huff (now deceased), and his step-children, Jared Hill and Amanda Hill.  All are Plaintiffs in this litigation. They are pursuing claims against the Libyan Defendants for intentional infliction of emotional distress and loss of consortium.

291.    The Estate of Pat Wayne Huff is entitled to damages for wrongful death and his survival action under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, the Estate of Pat Wayne Huff should be awarded damages against the Libyan State Defendants in an amount no less than $54,694,420.59, reflecting $3,229,000 in economic damages for lost income, and $18 million for his pain and suffering plus prejudgment interest in the amount of $33,465,420.59.  Tr. Exh. 31 at 13; *see also* Tr. Vol. II at 49.  Against the Individual Libyan Defendants, the Estate of Pat Wayne Huff should be awarded an amount no less than $164,083,261.76, reflecting the  $54,694,420.59 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**W.    Ermine Hailey**

292.    Plaintiff Ermine Hailey ("Ermine") is the wife of Pat Wayne Huff who perished in the bombing of UTA Flight 772 on September 19, 1989.  Ermine lives in Realiotos, Texas,

and is a United States citizen.  Ermine was domiciled in Texas on September 19, 1989.  Tr. Vol. I at 86.

293.    Ermine met Pat in high school when she was teaching swimming lessons at the local pool.  They dated during Ermine's junior and senior years of high school, attended revivals and joined the church together, and "were sweethearts."  Tr. Vol. I at 88, 95.

294.    After Ermine graduated from college and Pat returned from the Air Force, they reconnected.  By that time, Ermine was divorced with two young children, Jared and Amanda ("Mandy").  She was experiencing financial difficulty, living with her parents and working and teaching English, while moonlighting as a country western singer.  Pat became Ermine's "groupie" and the two started dating again "just as if we never left off."  Tr. Vol. I at 93-96.  Ermine and Pat married in May 1980.  Tr. Vol. I at 87.  Thereafter, Pat considered Jared and Mandy – who were only 18 months and three years old, respectively – his own children and decided not to have any more children because "two kids is what [he] wanted and [he] had them."  Tr. Vol. I at 92.  Pat tried to adopt the children, but their biological father would not allow it.  He also tried to call the children by his last name, "Huff," but their biological father interfered there as well.  Tr. Vol. I at 94.

295.    For Ermine, Pat was a "knight in shining armor" – he was an "instant father" and he "took care of us like he did his whole family.  He loved his family, loved us all."  Tr. Vol. I at 93.  Pat provided for the entire family "financially and emotionally and every other way."  Tr. Vol. I at 93.  As Ermine recalls, "[h]e was our anchor.  He was the person we could depend on to help us out no matter what.  He was a wonderful husband and a loving father."  Tr. Vol. I at 96.

296.    It was difficult for Ermine and the children when Pat was away for his rotations overseas.  While he was gone, they were "pretty sad and just kind of hung on and did the best

[they] could until he came back."  When Pat came home, however, "it was heaven" and they "did

everything as a family."  Tr. Vol. I at 96-97.

297.    The last time Ermine saw Pat was when she went with him to the airport prior to

his last rotation in Chad.  Because Pat had received a promotion, they had a little extra money

and used it to spend a special night together at a nice hotel in Dallas from where Pat was

departing.  Ermine remembers Pat turning around as he was leaving for his flight and has tried to

preserve that image in her head so that she can "remember seeing him that last day after we had

spent a wonderful night … in the big hotel."  Tr. Vol. I at 99.

298.    It was a tragic "fluke" that Pat was on UTA Flight 772.  Tr. Vol. I at 94.  The last

time Ermine spoke to Pat, he told her that he was coming back early because he had contracted

malaria for which there was treatment in the United States.  Ermine and the children were "real

happy" that Pat was coming home early.  Tr. Vol. I at 99.

299.    On September 19, 1989, Ermine was at work when her sister arrived and told

her that Pat's plane was missing.  Ermine remembers falling into her chair unable to believe the

news.  While she was waiting for more information, she remembers feeling like she was

"underwater" and "playing a role in a play" – she could not believe what was happening.   Tr.

Vol. I at 100-101.  Even after learning the plane had been bombed, she and the children were

"inventing scenarios" where Pat never boarded the plane.  They were just in shock.  Tr. Vol. I at

102.

300.    Pat's body was not found for several months after the bombing, and Ermine was

unable to believe he was actually gone.  During this time, Ermine suffered greatly fielding

requests for information from the French government while going through the grieving process

and hearing news that pieces of the bodies were scattered all over the desert with pieces no

bigger than a person's hand.  Tr. Vol. I at 103.  It was not until December that Pat's remains were shipped home but, even then, Ermine was told not to look inside the casket because "it would not be a good thing to do."  Tr. Vol. I at 103-104.  The family had a funeral at that time, and Ermine placed with Pat one rose for each year they were married.  Tr. Vol. I at 104.

301.    After Pat's death, Ermine suffered greatly.  With Pat's support, she had just completed four months of sobriety after difficulties with alcoholism and depression and the family was "getting our lives back together."  After Pat's death, Ermine relapsed into alcohol abuse and was hospitalized on multiple occasions.  She remembers painfully that she "was not very helpful to [the] children]" who had to go live with their biological father in Utah and who, themselves, experienced emotional problems as a result of losing Pat.  Tr. Vol. I at 104-105. Losing Pat was particularly tragic because his death came at a time when the family was coming through hard times and getting very close with "a lot of hope for the future."  With Pat's murder, that "hope went away and [the] family disintegrated."  Tr. Vol. I at 106-107.

302.    Ermine remembers Pat as "tall and strong."  When things got out of hand at work, he was "always the one to break it up" and he would "keep people in line."  He reminded her of John Wayne.  Ermine was "real proud of [Pat"] for the way he "worked his way up to the top" in the oil business.  Tr. Vol. I at 89.  Ermine also remembers Pat's "contagious" big smile and how when he laughed, he slapped his knee and everyone in the room would laugh with him.  Tr. Vol. I at 95.  According to Ermine, her years with Pat were the happiest of her life – "he just buoyed you with his spirit."  Tr. Vol. I at 106.  To this day, she continues to wear his wedding ring and gold bangles she and Pat got in Saudi Arabia together more than 25 years ago.  Tr. Vol. I at 108.

303.    Ermine was inspired by Pat's memory to pursue this litigation, remembering him saying "where there's a will there's a way."  Thus, while she had lost hope of seeing justice for

Pat's murder, she pursued the case for the innocent people "with such potential and love" who perished while "trying to make a difference in the world."  Tr. Vol. I at 108-109.

304.    Ermine Hailey is entitled to damages for intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Ermine Hailey should be awarded damages against the Libyan State Defendants in an amount no less than $74,338,940.85, reflecting $26 million for her pain and suffering, plus prejudgment interest in the amount of $48,338,940.85.  Against the Individual Libyan Defendants, Ermine Hailey should be awarded an amount no less than $223,016,822.54, reflecting the $74,338,940.85 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**X.    Michael Huff**

305.    Plaintiff Michael Huff ("Mike") was the older brother of Patrick Wayne Huff who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of Michael Huff, Trial Exhibit 12 ("Tr. Exh. 12") at 6-7.  Mr. Huff is a United States citizen currently residing in Texas who was domiciled in Texas at the time of his brother's death.  Tr. Exh. 12 at 5-7.

306.    Mike Huff is the oldest child of James and Janice Huff.  He was six years older than Pat Huff and 12 years older than Jan Pitillo, his little sister.  Tr. Exh. 12 at 6.  As described *supra*, the Huff family was "very" close growing up, they had a "fun life, a good time" together with Pat taking care of the entire family.  Deposition *De Bene Esse* of Jan Pitillo, Trial Exhibit 13 ("Tr. Exh. 13") at 10.  The children's mother, Janice Huff, was sick with cancer during the youngest daughter's childhood, so Pat "was the one who got [her] up in the mornings and sent [her] off to school."  Tr. Exh. 13 at 11.

307.    Mike and Pat grew up together in Texas, where they raised cattle, when they weren't traveling.  Tr. Exh. 12 at 8.  Mike and Pat loved animals and took care of the cows that the family owned.  Tr. Exh. 13 at 12.  They had dreams of one day opening a ranch together to raise cattle and other livestock.  Tr. Exh. 13 at 12-13.  The family was so excited about their plans that they had already picked out and registered their brand.  Tr. Exh. 13 at 13.

308.    Mike recalls special memories growing up with Pat as they traveled throughout the world as a result of their father's work.  They lived together in Chile, Bolivia, and Egypt. Tr. Exh. 12 at 7-8.  They thought of themselves as "cattlemen" who had a good time growing up in various places.  Tr. Exh. 12 at 8.  They were taught to stick together because they were often "outsiders."  This resulted in a very close bond between them.  It was during their childhood that they first discussed their dream of owning a ranch together.  Tr. Exh. 12 at 9, 11.  When they were growing up, Mike and Pat "were a team."  Pat was the calm one of the family, the negotiator—he kept everything under control.  When Mike left home after graduating high school, Pat took care of their parents, providing stability.  Tr. Exh. 12 at 10, 12.

309.    Mike remembers that Pat was a great athlete.  He excelled in football, baseball, and basketball.  Tr. Exh. 12 at 10.  He was so good at football that he was elected Most Valuable Player of his high school team.  Mike recalls that Pat always planned a dual occupation, in the oil field and on a ranch.  Tr. Exh. 12 at 11.  He thought they went hand and hand.

310.    As an adult, Mike and Pat remained very close.  Pat visited Mike when he was stationed in Germany—they traveled the country and had a good time.  Tr. Exh. 12 at 13.  Mike has a special memory of Pat caring for him when Mike was wounded serving his country in Vietnam.  Tr. Exh. 12 at 12.  Pat helped Mike get around and cope—as Mike remembers it, "he

took care of me." Tr. Exh. 12 at 12.  They were constantly talking about their futures, "what they were going to do with the ranch and what kind of cows they wanted." Tr. Exh. 12 at 13.

311.    The last time Mike spoke with Pat before his death aboard UTA Flight 772, they discussed a trip Pat was planning to take to visit Mike in Egypt.  Tr. Exh. 12 at 16.  Mike had been stationed in Egypt for work, and Pat was interested in visiting his older brother.  But, because Mike came down with an illness, he was not able to make the trip.  Tr. Exh. 12 at 16.

312.    Mike first learned that Pat's plane was missing when he received a call from his mother and father.  Tr. Exh. 12 at 16.  At first he was confused, and he simply sat down at his desk and thought about the news.  He then made some calls to the U.S. Embassy in Egypt to see what he could do.  Tr. Exh. 12 at 17.

313.    Following Pat's death, but before his body was recovered, the family held a memorial service that was incredibly well attended.  Tr. Exh. 13 at 22; Tr. Exh. 12 at 19.  There were family members, hundreds of people from the community, and former classmates who came to pay their respects.  Mike was very proud of the amazing turnout and the emotional service for his brother.  Tr. Exh. 12 at 19.

314.    After the memorial service, but before Mike returned to work in Egypt, his dad pulled him aside and asked him to make sure he brought Pat's body back to Texas.  Tr. Exh. 12 at 20.  Mike returned to Egypt, and asked for and received the help of the Egyptian generals in his quest to bring Pat's body home.  Ultimately, Mike was not able to go to the scene of the tragedy to recover Pat's remains, but the French government recovered them and shipped them back to the US for proper burial in December.  Mike was relieved to a certain degree that the bodies had been found, however, he could not help but notice that the casket was too light— obviously Pat's body was not completely there.  Tr. Exh. 12 at 21.  The family thereafter had a

funeral service.  Mike remembers it as a very somber occasion, with one of Pat's old friends serving as the preacher.  Tr. Exh. 12 at 22.

315.    In addition to being very upset, Mike could not prevent also having feelings of hostility towards the perpetrators of this horrible act.  Tr. Exh. 12 at 23. Not only did the family have to deal with the horrible loss of his brother, but, he believes, the funeral also expedited his father's death.  James Huff made a special point to Mike to not rest until Pat's body was returned.  And once it was, Mike and Pat's father passed away within the week.  Tr. Exh. 12 at 23-24.

316.    Even after Pat's death, Mike often thinks about his brother Pat.  Tr. Exh. 12 at 25. He especially thinks about him when he is working with the cattle.  Tr. Exh. 12 at 25.  He notes that there is a void in his life that cannot be filled; his family was devastated.  Tr. Exh. 12 at 25, 30.  Mike also regrets the pain that his daughters have felt over the loss of their uncle because they were very close to their Uncle Pat.  Tr. Exh. 12 at 25.  He also noticed the considerable decline in health suffered by their mother after Pat's death.  "When daddy died, [and after] Pat died[,] she just quit taking her medicine, she quit going to the hospital and she gave up."  Tr. Exh. 12 at 27.

317.    Mike believes that Pat leaves a legacy of family back in Franklin, TX.  He remembers a calm, happy-go-lucky brother who brought his family together.  Tr. Exh. 12 29-30. What he misses most of all is Pat's camaraderie.  Tr. Exh. 12 at 30.  Mike laments, "We didn't finish our goal."  Tr. Exh. at 31.

318.    Michael Huff is entitled to damages for the intentional infliction of emotional distress under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Michael Huff should be awarded damages against the Libyan State Defendants in an

amount no less than $18,584,735.21, reflecting $6.5 million for his pain and suffering, plus

prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan

Defendants, Michael Huff should be awarded an amount no less than $55,754,205.64, reflecting

the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C.

§ 2333(a).

**Y.    Glenda Jan Pitillo**

319.    Plaintiff Glenda Jan Pitillo ("Jan") is the younger sister of Patrick Wayne Huff

who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene*

*Esse* of Jan Pitillo, Trial Exhibit 13 ("Tr. Exh. 13") at 6-7.  Ms. Pitillo is a United States citizen

currently residing in Texas who was domiciled in Texas at the time of her brother's death.  Tr.

Exh. 13 at 5-7.

320.    Jan grew up with her two older brothers, Mike and Pat, in Texas.  She was the

youngest child of the family, with Mike 12 years, and Pat six years, her senior.  Tr. Exh. 13 at 7.

Their family was "very" close growing up, they had a "fun life, a good time" together with Pat

taking care of the entire family.  Tr. Exh. 13 at 10.  Their mother, Janice Huff, was sick with

cancer during Jan's childhood, so Pat "was the one who got [her] up in the mornings and sent

[her] off to school."  Tr. Exh. 13 at 11.

321.    Jan and her brothers raised cattle.  She recalls that Pat loved animals and took care

of the cows that the family owned.  Tr. Exh. 13 at 12.  Pat had dreams of one day opening a

ranch with his older brother, Mike, to raise cattle and other livestock.  Tr. Exh. 13 at 12-13.  The

family was so excited about their plans that they had already picked out and registered their

brand.  Tr. Exh. 13 at 13.

322.    Pat was also a great athlete.  He excelled in football, baseball, basketball and

tennis.  Tr. Exh. 13 at 12.  He was so good at football that he was elected Most Valuable Player

of his high school team and received a scholarship to play at a junior college.  He did not play football in college, though, because his injured knees prevented him from playing.  Instead, he attended Texas A & M University for one year before entering the military.  Tr. Exh. 13 at 12-13.

323.    As an adult, Jan and Pat remained very close.  Pat still enjoyed working with cows and playing sports.  Tr. Exh. 13 at 14-15.  Pat was "always happy as a grown-up."  Tr. Exh. 13 at 15.  He remained the "caretaker," tending to their parents' money and taking care of their home.  As Jan said, "he took care of everything basically [for the family.]"  Tr. Exh. 13 at 15.

324.    The last time Jan spoke with Pat before his death, they discussed how the whole family would get together once Pat returned from Chad, to deal with their father's diagnosis.  Tr. Exh. 13 at 16.  Their father, James, had recently been diagnosed with cancer and Pat wanted to plan for his care.  Tr. Exh. 13 at 16-17.

325.    Jan first learned that Pat's plane was missing when she received a call from Ermine, Pat's wife.  Tr. Exh. 13 at 18.  At first, Jan did not believe that anything could happen to him, so she didn't feel like anything was wrong with him.  Tr. Exh. 13 at 18.  It was only days later, when her older brother Mike called her from Egypt where he was working, did she finally comprehend the news that the plane was destroyed and there were no survivors.  Tr. Exh. 13 at 18.  Jan has trouble remembering much about the days immediately following the tragedy.  Tr. Exh. 13 at 20.  Just days after the tragedy, Jan had dreams of Pat calling her telling her he was "ok."  Tr. Exh. 13 at 21.  She described his murder as one of "the worst things ever because . . . we loved him so much.  He was just a special person."  Tr. Exh. 13 at 21.

326.    Following Pat's death, but before his body was recovered, the family held a memorial service that was incredibly well attended.  Tr. Exh. 13 at 22.  There were family

members, hundreds of people from the community, and former classmates who came to pay their respects.  Many speakers discussed what a great person Pat was and how much he meant to everyone.  Tr. Exh. 13 at 22.  There were also "big write-ups" in the local newspaper about Pat's death and the bombing.  Members of the community even wrote letters to Congress in support of Pat regarding the bombing.  Tr. Exh. 13 at 23.

327.    Weeks later, the family received Pat's body from the French government.  At that time, the family had a small funeral service for Pat.  Tr. Exh. 13 at 25.  Ailing from cancer and distraught over his son's death, Jan's father died only a week after Pat's funeral service.  Tr. Exh. 13 at 25.  Her mother, also distraught over the tragedy, further deteriorated from her cancer. Pat's death impacted the family both emotionally and physically.

328.    Even today, Jan still misses Pat "so much."  Tr. Exh. 13 at 21.  She regrets that Pat is not around to share special moments with her and her boys.  Pat had plans to raise cattle with her two boys, and those plans would never be put into action.  Tr. Exh. 13 at 20.  She thinks about him "every day."  Tr. Exh. 13 at 27. Jan, her husband and her kids, have "missed a lot" due to Pat's death.  She often thinks of "so many things [they] could have done if he were here with [them]."  Tr. Exh. 13 at 29.  Jan stated simply, "if we had him here—it would be wonderful."  Tr. Exh. 13 at 29.

329.    Glenda Jan Pitillo is entitled to damages for the intentional infliction of emotional distress under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Glenda Jan Pitillo should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for her pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, Glenda Jan Pitillo should be awarded an amount no less than $55,754,205.64,

reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**Z.**     **James E. Huff**

330.     Plaintiff James E. Huff ("James") was the father of Patrick Wayne Huff who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of Jan Pitillo, Trial Exhibit 13 ("Tr. Exh. 13") at 6-7.  James was a Texas domiciliary who died on December 24, 1989.  Tr. Exh. 13 at 8.  James's daughter, Jan Pitillo, a United States citizen, is the executrix of her father James's estate.  Tr. Exh. 13 at 6-8.

331.     The Huff family resided in Texas.  James Huff and Janice Huff raised their three children—Michael, Patrick, and Jan—on a ranch in Franklin.  Tr. Exh. 13 at 7, 10.  Their family was "very" close growing up, they had a "fun life" together, often tending to cattle.  Pat took care of the entire family.  Tr. Exh. 13 at 10.  James's wife, Janice Huff, was sick with cancer during their youngest daughter's childhood, so Pat "was the one who got [Jan] up in the mornings and sent [her] off to school."  Tr. Exh. 13 at 11.  Even after Pat graduated from high school and went off to college and then the military, he was never really out of the house.  Tr. Exh. 13 at 13.  He remained the "caretaker," tending to their parents' money and taking care of their home.  As Jan said, "he took care of everything basically [for the family.]"  Tr. Exh. 13 at 15.

332.     Pat's death aboard UTA Flight 772 on September 19, 1989, was "the worst thing in the world" for both James and his wife.  Tr. Exh. 13 at 19.  James was diagnosed with cancer shortly before Pat left for Chad.  Because Pat was the family member who took care of everything, his death hit James particularly hard.  Pat had been the one who was planning for his care.  Upon learning of Pat's death, James became extremely depressed.  Tr. Exh. 13 at 19. James was already sick at the time, but his health deteriorated further after he learned his son had

died.  His cancer progressed at a rapid pace.  Tr. Exh. 13 at 26.  He had lost any positive attitude he had about his own life.  *Id.*

333.     James was too ill to attend the memorial service the family had for Pat.  "He was in pretty bad shape by then and in a lot of pain."  Tr. Exh. 13 at 22.  James asked Michael Huff, his oldest son and Pat's older brother, to make sure that Pat's body was recovered and returned to Texas for proper burial.  Deposition *De Bene Esse* of Michael Huff, Trial Exhibit 12 ("Tr. Exh. 12") at 20.  The recovery of Pat's body's was particularly important to James.  *Id.*  Once Pat's body was found by the French government and the family was able to hold a small funeral, James could rest.  Deposition.  Tr. Exh. 12 at 24.  James Huff passed away less than a week after Pat's funeral.  Tr. Exhs. 12 at 23-24; 13 at 25.

334.     The Estate of James Huff is entitled to damages for the intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, the Estate of James Huff should be awarded damages against the Libyan State Defendants in an amount no less than $14,295,950.16, reflecting $5 million for his pain and suffering, plus prejudgment interest in the amount of $9,295,950.16.  Against the Individual Libyan Defendants, the Estate of James Huff should be awarded an amount no less than $42,887,850.49, reflecting the $14,295,950.16 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### AA.     Janice Huff

335.     Plaintiff Janice Huff ("Janice") was the mother of Patrick Wayne Huff who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of Jan Pitillo, Trial Exhibit 13 ("Tr. Exh. 13") at 6-7.  Janice was a Texas domiciliary who died in September, 1994.  Tr. Exh. 13 at 8.  Janice's daughter, Jan Pitillo, a United States citizen, is the executrix of her mother Janice's estate.  Tr. Exh. 13 at 6, 8-9.

336.     As described *supra*, the Huff family resided in Texas.  James Huff and Janice

Huff raised their three children—Michael, Patrick, and Jan—on a ranch.  Tr. Exh. 13 at 7, 10.

Their family was "very" close growing up.  They had a "fun life" together, often tending to cattle

and traveling.  Pat took care of the entire family.  Tr. Exh. 13 at 10.  Janice Huff was suffering

from cancer during much of her life as a mother, so Pat "was the one who got [their youngest

daughter] up in the mornings and sent [her] off to school."  Tr. Exh. 13 at 11.  Even after Pat

graduated from high school and went off to college and then the military, he was never really out

of the family house.  Tr. Exh. 13 at 13.  Pat remained the "caretaker," tending to their parents'

money and taking care of their home.

337.     As Jan said, "he took care of everything basically [for the family.]"  Tr. Exh. 13 at

15.  So when Janice heard of Pat's death, that had to be the "worst thing in the world."  Both

Janice and her husband, James, "were pretty depressed about [the death]."  They were both sick

with cancer at the time of his death, and the tragedy worsened their condition.  Tr. Exh. 13 at 19.

After Pat's death, "her cancer really took over her."  Tr. Exh. 13 at 26.

338.     After September 19, 1989, Janice Huff missed her son, Pat, "a lot."  Tr. Exh. 13 at

28. She missed him more than anyone else because he had always been there to take care of her.

Tr. Exh. 13 at 28.  Her cancer progressed.  Like her husband, she had lost any positive attitude

toward her own life.  Tr. Exh. 13 at 26.  "She just gave up.  She quit taking her medicine."  Tr.

Exh. 12 at 27.

339.     Janice Huff is entitled to damages for the intentional infliction of emotional

distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing

testimony and the record in this case, the Estate of Janice Huff should be awarded damages

against the Libyan State Defendants in an amount no less than $14,295,950.16, reflecting $5

million for his pain and suffering, plus prejudgment interest in the amount of $9,295,950.16.
Against the Individual Libyan Defendants, the Estate of Janice Huff should be awarded an
amount no less than $42,887,850.49, reflecting the $14,295,950.16 set forth above, trebled
pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**BB.**    **Jared Hill**

340.    Plaintiff Jared Hill ("Jared") is the step-son of Patrick Wayne Huff, who perished
in the bombing of UTA Flight 772 on September 19, 1989.  Jared is a United States citizen and a
Texas domiciliary currently in Iraq serving as an officer in the United States Army as part of
Operation Iraqi Freedom.  Deposition *De Bene Esse* of Jared Hill, Trial Exhibit 14 ("Tr. Exh.
14") at 9-11.

341.    Jared grew up in Texas with his mother, his sister Amanda Hill ("Mandy"), and
his step-father Pat Huff.  Pat entered Jared's life when he was around one year old and lived with
Pat until Pat's death.  As far back as Jared can remember, Pat was his "dad."  To distinguish
between Pat and his biological father, Jared referred to Pat as his "Pat Daddy" when speaking
with others.  Still, he called both "dad" because "[t]hey were both daddy to me."  Tr. Exh. 14 at
11-12.  During his life, Pat considered Jared and Mandy as his children – he and Ermine decided
not to have more children because he "considered Mandy and Jared his kids, that's all the kids he
ever wanted or needed, and he just felt like they were his kids."  Tr. Vol. I at 92.  Pat provided
for Jared and Mandy "financially, emotionally and every other way."  Tr. Vol. I at 93.  In fact,
Pat wanted to adopt Jared and Mandy, and even started calling them by his last name (Huff), but
their biological father would not allow Pat to adopt the children or for the children to use the
Huff name.  Tr. Vol. I at 94.  According to Ermine, "Pat thought of [Jared and Mandy] as his
children and he raised them and was responsible for them their entire lives until he was killed."

118

Tr. Vol. I at 92.  Even after Pat's death, Jared and Mandy were treated legally as his children as they received survivor benefits as a result of the bombing.  Tr. Exh. 14 at 12.

342.    During Jared's childhood, he had some "rocky" times with Pat related to Pat's discipline.  Near the end of Pat's life, however, "things started to really turn around for the better of [the] family."  Tr. Exh. 14 at 13.  During that time, Jared's mother also was experiencing difficulties in her life which required her to be hospitalized.  Pat came home from work overseas specifically to participate in family therapy and Jared recalled sitting together with his family and feeling that "things seemed really bright, seemed like they were going in the right direction" before Pat was killed on UTA 772.  That family therapy session was the last time Jared saw his "Pat-Daddy" alive.  Tr. Exh. 14 at 13-14.  The last time Jared spoke to Pat was shortly thereafter when Pat called to say that he was coming home.  Jared was "excited, of course," but Pat never made it home.  Tr. Exh. 14 at 15.

343.    Pat held the family together before his death, especially given the troubles Jared's mother was experiencing.  After Pat's death, "everything just went south" and "the whole family just split apart."  Tr. Exh. 14 at 16-17, 27.  According to Jared's mother, Ermine, the children "were very alone and felt so lonely."  Tr. Vol. I at 105.  Because of her alcoholism and depression after Pat's death which resulted in her hospitalization, Jared and Mandy had to move to Utah to live with their biological father and they hardly ever again saw their relatives from Pat's family with whom they had been very close prior to the bombing.  Tr. Vol. I at 105; Tr. Exh. 14 at 16-17, 27.  Jared also experiencing a great deal of hurt when his mother began dating another man shortly after Pat's death.  Tr. Exh. 14 at 28.  Ermine recalled that the children "had many emotional problems" as a result of losing their Pat-Daddy – "they were without a father.

And it really affected [Mandy and Jared] not to have a father and to have a mother that had gone into such a bad place."  Tr. Vol. I at 105.

344.    Jared has fond memories of his childhood with Pat near the end of Pat's life, including Pat practicing Tae Kwon Do with Jared and Mandy and taking them to practice after he got home from work.  Pat "was always there" for the children.  Tr. Exh. 14 at 13.  Pat also brought the entire family – including Jared and Mandy – with him to Saudi Arabia for almost a year while he was drilling water for a Sheikh outside Riyadh.  Tr. Vol. I at 90, 97.  When Pat was overseas by himself, Jared remained in close contact with him, through letters and telephone calls.  Jared recalls looking forward to the letters and calls and feeling a sense of pride at the work Pat was doing in Africa.  Tr. Exh. 14 at 19-20.  Pat also "would always bring back cool stuff" for Jared when he returned from trips overseas.  Jared attributes his interest in pursuing a degree in geographical information systems to Pat's overseas experiences which he shared with Jared.  From Pat, Jared learned to develop an appreciation for countries outside the United States.  Tr. Exh.14 at 17-18.

345.    Jared was only ten years old on September 19, 1989 when his "Pat-Daddy" was killed.  Tr. Exh. 14 at 10.  He recalls being forced to stay in the kitchen of his grandparents' home with Mandy while the adults talked.  When Jared's mother came home she was "bawling like crazy" and Jared then learned that Pat's plane was missing.  It was a very scary time for the family and their fears were ultimately realized when they learned that the wreckage had been found.  Tr. Exh. 14 at 21.

346.    There was a memorial service for Pat shortly after the bombing.  During the service, Jared recalls having to comfort his mother as a ten-year old boy.  Tr. Exh. 14 at 23.  At that time, Pat's body had not yet been found and Jared recalls hoping that Pat had not gotten on

the plane: "I was just hoping that he could come back."  Tr. Exh. 14 at 24-25.  The family also had a funeral a few months later when Pat's remains were returned in a closed casket.  Jared recalls that being a "scary" experience because he "had no idea what kind of remains were in there."  Those sentiments resurfaced years later when the French government returned personal effects to the family that turned out not to belong to Pat.  Tr. Exh. 14 at 26-27.  Following the funeral, Jared recalls looking up at the sky and saying "God, if you exist, tell Pat that I love him," followed by a feeling "like a warm hug."  Tr. Exh. 14 at 28.  Later on, Jared had an opportunity through his church to be baptized for and on behalf of Pat as part of the healing process.  Tr. Exh. 14 at 29.

347.    There were many lasting impacts of Pat's death on Jared's life.   Following the bombing, Jared developed a hatred for Libya and its government which was heightened when he learned Libya was taken off the list of "terrorist" states after what they had done to him as a child.  Tr. Exh. 14 at 22-23.  One of the primary reasons Jared joined the military was because he does not want others to feel the pain that he felt as a child resulting from the murder of his dad.  Jared joined the military to protect his family.  Tr. Exh. 14 at 19.  Jared also grieves at the lost opportunity to talk to Pat, once the family had started to grow stronger together, about some of the issues Jared had with his dad during his early childhood.  Tr. Exh. 14 at 29.  Jared regrets that Pat was unable to be present for his commissioning as a U.S. Army officer or for his graduation; he now salutes whenever he visits Pat's grave.  Tr. Exh. 14 at 33.

348.    Jared misses Pat greatly and tries not to think about the hurtful memory of Pat's tragic death.  Tr. Exh. 14 at 34-35.  He felt as close to Pat as he did to his natural father, and considered Pat his "Daddy."  Tr. Exh. 14 at 40.

349.     Jared Hill is entitled to damages for intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Jared Hill should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for his pain and suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual Libyan Defendants, Jared Hill should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### CC.   Amanda Hill

350.     Plaintiff Amanda Hill ("Mandy") is the step-daughter of Patrick Wayne Huff ("Pat"), who perished in the bombing of UTA Flight 772 on September 19, 1989.  Mandy is a United States citizen currently residing in Texas who was domiciled in Texas at the time of her step-father's death.  Deposition *De Bene Esse* of Amanda Hill, Trial Exhibit 15 ("Tr. Exh. 15") at 5-9, 15-16.

351.     Mandy grew up in Texas with her mother Ermine, her brother Jared, and her step-father Pat Huff.  Tr. Exh. 15 at 8-9.  Pat entered Mandy's life when she was around three years old and lived with Pat until his death.  As far back as Mandy can remember, Pat was her "dad."  To distinguish between Pat and her biological father, Mandy referred to Pat as her "Pat Daddy" when speaking with others.  Tr. Exh. 15 at 8.  During his life, Pat considered Mandy and Jared as his children – he and Ermine decided not to have any more children because he "considered Mandy and Jared his kids, that's all the kids he ever wanted or needed, and he just felt like they were his kids."  Tr. Vol. I at 92.  Pat provided for Jared and Mandy "financially, emotionally and every other way."  Tr. Vol. I at 93.  In fact, Pat wanted to adopt Mandy and Jared, and even started calling them by his last name (Huff) but their biological father would not allow Pat to

adopt the children or for the children to use the Huff name.  Tr. Vol. I at 94.  According to

Ermine, "Pat thought of [Mandy and Jared] as his children and he raised them and was

responsible for them their entire lives until he was killed."  Tr. Vol. I at 92.  Even after Pat's

death, Jared and Mandy were treated legally as his children as they received survivor benefits as

a result of the bombing.  Deposition *De Bene Esse* of Jared Hill, Trial Exhibit 14 ("Tr. Exh. 14")

at 12.

352.    During Mandy's childhood, Pat Daddy was "the strong one . . . we depended on

him."  Tr. Exh. 15 at 9.  Pat provided guidance, support, and stability.  *Id*.  Pat Daddy was "stable

and dependable and took care of things" for the his children and his wife.  Tr. Exh. 15 at 9.

Similar to his role with his own parents, Pat Daddy, as Mandy knew him, took care of everyone,

"everyone's welfare was his responsibility."  Tr. Exh. 15 at 10.  Pat was a strong father who was

the glue that held the family together when her mother was suffering from problems with alcohol

dependency.  Tr. Exh. 15 at 10.  Mandy remembers attending family counseling meetings when

her mom was going through these difficult times related to alcohol.  She remembers her father

participating in that process and being the one to "pull us all together." Tr. Exh. 15 at 14; Tr.

Exh. 14 at 1-14.

353.    Mandy has vibrant memories of her childhood with Pat, including his infectious

laugh, horsing around in the pool, and playing on a trampoline.  Tr. Exh. 15 at 10, 11.  As Mandy

put it, "he just got a kick out of everything."  Tr. Exh. 15 at 11.  Mandy remained in close contact

with Pat even when Pat was overseas, through letters and telephone calls.  Mandy recalls it being

difficult when he left for overseas work, and that she would just spend time waiting for him to

return home.  Tr. Exh. 15 at 12.

354.    Mandy was twelve years old on September 19, 1989 when her Pat Daddy was killed.  Tr. Exh. 15 at 6.  She recalls returning from school to her grandparents' house while the adults talked and the television news was on.  Tr. Exh. 15 at 16.  Her grandmother was on the phone and then told her that Pat Daddy's plane had gone missing.  Tr. Exh. 15 at 16.  Mandy remembers being confused and just trying to tell herself that everything would be ok—she was running through different scenarios of what could have happened to Pat Daddy.  Shortly thereafter, her mother returned home; her mother had been crying and was "a wreck."  Tr. Exh. 15 at 16.  Ultimately, it was a very scary time for the entire family; they were confused, and their fears were ultimately realized when they learned that the plane had been destroyed and that there were no survivors.  Tr. Exh. 15 at 17-18.  Mandy was in total shock; she could not stop crying.  Tr. Exh. 15 at 18; Tr. Vol. I at 102.

355.    There was a memorial service for Pat shortly after the bombing.  During the service, Mandy recalls crying silently, as she did during the funeral when his body was found.  Tr. Exh. 15 at 19-20.  She has few memories of those services besides her tears.  Tr. Exh. 15 at 20. Following the funeral, Mandy recalls returning home after the service and sleeping for a day or so.  She said that her mother eventually found her "in a closet just looking at pictures."  Tr. Exh. 15 at 21.

356.    There was a significant and lasting impact of Pat's death on Mandy's life.  Following the services, "the family [Mandy] knew and felt safe [in] was gone."  Tr. Exh. 15 at 21.  After Pat's death, "everything just went south" and the whole family just split apart."  Tr. Exh. 14 at 16-17, 27.  According to Mandy's mother, Ermine, the children "were very alone and felt so lonely."  Tr. Vol. I at 105.  Immediately after the death, Mandy and Jared had to live with their grandparents as their mother moved to College Station, Texas.  Their lives were "torn up."

Tr. Vol. I at 101.  At the end of the school year, and because of Ermine's alcoholism and depression after Pat's death which resulted in her hospitalization, Mandy and Jared were forced to move in with their biological father in Utah.  Tr. Exh. 15 at 21.  They hardly ever again saw their relatives from Pat's family with whom they were very close prior to the bombing.  Tr. Vol. I at 105; Tr. Exh. 14 at 16-17, 27.

357.    Mandy's years in junior high and high school were "just horrible."  Tr. Exh. 15 at 22.  She felt so alone—the person she looked up to and admired, her Pat Daddy, was gone.  Tr. Exh. 15 at 22.  She spent many years really depressed and unable to talk to anybody about it.  Tr. Exh. 15 at 22.  She remained scared for years—scared of nothing in particular, as she describes it—just scared.  She also had trouble sleeping.  As a result, her biological father put her in a psychiatric unit of a hospital.  Tr. Exh. 15 at 23.  As Ermine recalls it, the children "had many emotional problems" as a result of losing their Pat Daddy – "they were without a father.  And it really affected [Mandy and Jared] not to have a father and to have a mother that had gone into such a bad place." Tr. Vol. I at 105.

358.    Mandy greatly misses her Pat-Daddy even today.  She "just idolized her Pat daddy."  Tr. Exh. 15 at 22.  She remembers his "happy face . . . [and] how he really cared about other people."  Tr. Exh. 15 at 23.  Most importantly, she remembers that "he really tried to do everything with his family's welfare in mind." Tr. Exh. 15 at 24.

359.    Amanda Hill is entitled to damages for the intentional infliction of emotional distress under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Amanda Hill should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for her pain and suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual Libyan

Defendants, Amanda Hill should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**DD.   Estate of Margaret Schutzius**

360.    Margaret Schutzius ("Margaret"), a United States citizen and Texas domiciliary, was a passenger on UTA Flight 772 when the plane was bombed over the Tenere Desert in Africa, killing all 170 passengers and crew members aboard.  Tr. Vol. I at 62, 63, 75.

361.    At the time of her death, Margaret was returning home from Chad, Africa where she had been serving as a volunteer in the Peace Corps.  Tr. Vol. I at 67.

362.    Margaret was very bright and was always a very good student.  Tr. Vol. I at 65; Tr. Exh. 18 at 8; Tr. Exh. 19 at 11.  She was a National Merit Scholar.  Tr. Vol. I at 65.

363.    Prior to entering the Peace Corps, Margaret had been a student at the University of Chicago where she was a French major.  She was a senior, but still had two courses to complete to obtain her degree.  Despite her mother encouraging her to complete her course work first, Margaret was determined to enter the Peace Corps at that time so that she could be part of the inaugural mission of the Peace Corps in Chad after many years of absence due to Chad's civil unrest.  Thus, she took a leave of absence from the University of Chicago.  Tr. Vol. I at 68.

364.    As Margaret explained to her mother in one of her many letters, Margaret did intend to complete her undergraduate degree, and then enter graduate school and take the Foreign Service Officer Exam.  Tr. Vol. I at 68-69; Tr. Exh. 16 at 12; Tr. Exh. 18 at 9, 14, 15. According to her family members who knew her best, Margaret was destined to be a very successful individual.  Tr. Exh. 19 at 21; Tr. Exh. 17 at 14.

365.    Margaret's Estate is being represented by her mother, Mary Kathryn Hassett.  She is survived by her mother, her father William Schutzius, her brothers Christopher and John

Schutzius, and her sister Catharine Schutzius.  Tr. Vol. I at 62.  All are Plaintiffs in this litigation.

They are pursuing claims against the Libyan Defendants for intentional infliction of emotional

distress and loss of consortium.

366.    The Estate of Margaret Schutzius is entitled to damages for wrongful death and

her survival action under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and

the record in this case, the Estate of Margaret Schutzius should be awarded damages against the

Libyan State Defendants in an amount no less than  $55,563,420.59,, reflecting $4,098,000 in

economic damages for lost income, and $18 million for her pain and suffering plus prejudgment

interest in the amount of $33,465,420.59.  Tr. Exh. 31 at 16; *see also* Tr. Vol. II at 54.  Against

the Individual Libyan Defendants, the Estate of Margaret Schutzius should be awarded an

amount no less than   $55,563,420.59 , reflecting the  $166,690,261.76 set forth above, trebled

pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**EE.    Mary Kathryn Hassett**

367.    Plaintiff Mary Kathryn Hassett ("Mary Kathryn") is the mother of Margaret

Schutzius, who perished in the bombing of UTA Flight 772 on September 19, 1989.  Mary

Kathryn currently lives in Charlottesville, Virginia, and was domiciled in Texas at the time of the

bombing.  She is a United States citizen.  Tr. Vol. I at 61-62, 74.  Mary Kathryn is executrix of

Margaret's Estate and is representing Margaret's Estate in this litigation.  Tr. Vol. I at 62.

368.    Mary Kathryn and her former husband, Plaintiff William Schutzius, had four

children.  Margaret was the youngest.  Tr. Vol. I at 63.  Because she knew that Margaret would

be her last child, Mary Kathryn "paid a lot of attention" to Margaret.  The siblings enjoyed a very

close relationship, and the family enjoyed playing games together on family trips.  Tr. Vol. I at

63-64.

369.     Mary Kathryn enjoyed a good and close relationship with Margaret through her young adult years until she was killed on UTA Flight 772.  She visited her while she was in college, and Margaret would return home to visit with her mother often.  Tr. Vol. I at 66.  Even while Margaret was in far away Chad serving in the Peace Corps, she kept in regular contact with her mother through extensive, often poignant and funny, letters.  Tr. Vol. I at 67, 69, 70-72.

370.     When Margaret was a student at the University of Chicago, she studied in Paris during the Summer after her Junior year.  Mary Kathryn visited her there and the two took a two week trip together.  Tr. Vol. I at 66.  This was one of the many, although more memorable, experiences that Mary Kathryn and Margaret shared together.  Tr. Vol. I at 66.

371.     Margaret was on UTA Flight 772 because she had finished her Peace Corps service and was going to travel in Europe before returning home to complete her studies.  Mary Kathryn very much looked forward to Margaret's return.  Tr. Vol. I at 75.

372.     Mary Kathryn's first indication that Margaret's plane might be missing was from a news report in her car.  When she first spoke to the Peace Corps to determine whether Margaret was on the missing UTA Flight 772, she was told that the Peace Corps thought Margaret had changed her plans and did not take that flight.  The Peace Corps called several hours later, however, to inform Mary Kathryn that indeed Margaret was on that flight.  Tr. Vol. I at 73.  Then, hours after that, she learned from the airline that the plane was scattered over the desert with no survivors.  Tr. Vol. I at 74.

373.     In the aftermath of Margaret's killing, Mary Kathryn "had to leave Texas" because she could not bear to be in the same place that she heard the news of Margaret's demise, and "wanted to be closer to the family and extended family."  Tr. Vol. I at 75-76.

374.    About a year after the bombing, Mary Kathryn attended a ceremony in the town in Chad where Margaret taught while serving in the Peace Corps during which they dedicated an infirmary to Margaret and named it after her.  Tr. Vol. I at 78.

375.    In addition to the loss she feels in her life without Margaret, Mary Kathryn grieves for her other children who have lost a sibling.  Tr. Vol. I at 79.  She also believes that other family members, including her grandchildren who would have been Margaret's nieces and nephew, have suffered a great loss by not having Margaret in their lives.  Tr. Vol. I at 80.

376.    Mary Kathryn believes that she carries with her today the enormous responsibility of ensuring that Margaret's voice is heard, and that the other victims of the bombing are not forgotten.  Tr. Vol. I at 72-73, 82.  Margaret's death continues to cause Mary Kathryn a great deal of pain.  Tr. Vol. I at 82.

377.    Mary Kathryn Hassett is entitled to damages for intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Mary Kathryn Hassett should be awarded damages in an amount no less than $14,295,950.16, reflecting $5 million for her pain and suffering, plus prejudgment interest in the amount of $9,295,950.16.  Against the Individual Libyan Defendants, Mary Kathryn Hassett should be awarded an amount no less than $42,887,850.49, reflecting the $14,295,950.16 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### FF.    William Schutzius

378.    Plaintiff William Schutzius ("William") is the father of Margaret Schutzius, who perished in the bombing of UTA Flight 772 on September 19, 1989.  William is a retired professor who lives in Cincinnati, Ohio, and was domiciled there at the time of the bombing.  He

is a United States citizen, having been born in St. Louis, Missouri on September 4, 1933.

Deposition *De Bene Esse* of William Schutzius, Trial Exhibit 16 ("Tr. Exh. 16") at 7-8.

379.    The Schutzius family had four children in the order of Christopher, Catherine,

John (or "Jack"), and Margaret.  Although William and his former wife Mary Kathryn Hassett

divorced in 1973 when Margaret was ten, the family remained close and did a number of

vacations and family gatherings together.  Tr. Exh. 16 at 9-11.

380.    William described Margaret as "a perfectly charming child and mature beyond

her years."  She had a "great sense of humor" and was both a "[v]ery affectionate person and a

joy to be with."  Tr. Exh. 16 at 17.

381.    Despite the fact that Margaret was assigned to the Peace Corps in remote Chad,

and despite the fact that this was before the days of electronic mail, William and Margaret kept

in close contact via the letters they exchanged at least weekly.  William still has all of Margaret's

letters.  They also could speak via telephone on Sunday afternoons her last summer in Chad,

which they did.  Tr. Exh. 16 at 15.

382.    When William first learned from his son Chris that Margaret's plane had crashed,

he at first "absolutely denied it."  He went on to say, "[i]t was stunning.  Overwhelming.  I never

had such feelings."  Tr. Exh. 16 at 18.  He explained that "the death of a child is overwhelming,

and totally unexpected, and there was so much to look forward to."  Tr. Exh. 16 at 19.

383.    There was a memorial service for Margaret and then he and his current wife Lucy

flew to Paris for a memorial service there.  There was no body but eventually Margaret's remains

were cremated in Paris and returned to Cincinnati, where they were buried.  Tr. Exh. 16 at 18-20.

He described two memorials to Margaret – one a local hero award at the Freedom Center in

Cincinnati, and the other a dispensary in Mondou, Chad that is named after her.  Tr. Exh. 16 at

24-25; *see also* Deposition *De Bene Esse* of Christopher Schutzius, Trial Exhibit 17 ("Tr. Exh. 17") at 22-23.

384.     When William learned that Libya was the cause of the bombing and Margaret's death, he was very "angry." Tr. Exh. 16 at 21. He decided to join in this legal action, among other reasons, because he was "very dissatisfied" with the criminal trial in France at which no Libyans were present, even though they were convicted. He wants, among other things, "an apology" from Libya. Tr. Exh. 16 at 25-26.

385.     William Schutzius is entitled to damages for intentional infliction of emotional distress under Ohio law. *See supra* at II.F. Based on the foregoing testimony and the record in this case, William Schutzius should be awarded damages against the Libyan State Defendants in an amount no less than $14,295,950.16, reflecting $5 million for his pain and suffering, plus prejudgment interest in the amount of $9,295,950.16. Against the Individual Libyan Defendants, William Schutzius should be awarded an amount no less than $42,887,850.49, reflecting the $14,295,950.16 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**GG.**   **Christopher M. Schutzius**

386.     Plaintiff Christopher Schutzius is the older brother of Margaret Schutzius, who perished in the bombing of UTA Flight 772 on September 19, 1989. Christopher currently lives in Cincinnati, Ohio, and was domiciled in Texas at the time of the bombing. He is a United States citizen. Deposition *De Bene Esse* of Christopher Schutzius, Trial Exhibit 17 ("Tr. Exh. 17") at 7, 8.

387.     Christopher is the oldest of the four Schutzius siblings, and Margaret was the youngest; they were six years apart. Tr. Exh. 17 at 12. The family was "all very close." Tr. Exh. 17 at 17. Of the siblings, Christopher and Margaret "had very similar sensibilities" and "were pretty close." Christopher played the role of an older brother to Margaret and sought to

protect and nurture her.  Tr. Exh. 17 at 12.  He discussed her college choice with her.  Tr. Exh. 17 at 13.

388.     While Margaret was serving in the Peace Corps in Chad, she and Christopher kept in regular contact through letters and audiotapes.  Tr. Exh. 17 at 15.

389.     Christopher first learned that a plane that Margaret might have been on was missing from the news.  Being "very concerned," he called his father to relay the news.  His father, however, had understood that the plane was headed in the opposite direction and thus assumed that Margaret was not on it.  Tr. Exh. 17 at 8.  Thereafter, Christopher learned from his mother that Margaret was on the missing flight, and subsequently learned from the airline that the wreckage had been located and there were no survivors.  It fell upon Christopher to inform his mother of the tragic news.  Tr. Exh. 17 at 9.  He described that time as the "toughest night of [his] life."  Tr. Exh. 17 at 10.  It was "unmitigatedly sad."

390.     Christopher still thinks about Margaret "virtually every day."  Tr. Exh. 17 at 24.  A few years ago, when the National Underground Railroad Freedom Center was opening in Cincinnati, Christopher nominated Margaret for an award of someone who fought for freedom.  Tr. Exh. 17 at 22-23.

391.     Christopher suffered from alcoholism and drug addiction in the wake of the bombing, and testified that Margaret's death "changed [his] life permanently" and made him "a sadder person forever."  Tr. Exh. 17 at 24, 26.

392.     Christopher Schutzius is entitled to damages for intentional infliction of emotional distress under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Christopher Schutzius should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for his pain and suffering, plus

prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, Christopher Schutzius should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**HH.  Catharine A. Schutzius**

393.    Plaintiff Catharine Schutzius ("Catharine") is the older sister of Margaret Schutzius, who perished in the bombing of UTA Flight 772 on September 19, 1989.  Catharine currently lives in Oak Park, Illinois, and was domiciled in Ohio at the time of the bombing.  She is a United States citizen.  Deposition *De Bene Esse* of Catharine Schutzius, Trial Exhibit 18 ("Tr. Exh. 18") at 5, 10.

394.    Catharine was four years older than Margaret, her only sister; they had two brothers, Christopher, the oldest, and John, who was in between Catharine and Margaret.  Catharine and Margaret shared a room and "were very close."  Tr. Exh. 18 at 6-7.

395.    Catharine and Margaret discussed boys, relationships, college, and other life experiences.  Catharine took Margaret to college, along with their father, and visited her there to meet her friends, and offer older sister advice.  Tr. Exh. 18 at 7-9.

396.    While Margaret was in Chad during her Peace Corps service, she and Catharine continued to correspond regularly.  Tr. Exh. 18 at 12-13.

397.    Catharine first learned that Margaret's plane was missing from a call from her mother, which was followed by a call from her father.  Tr. Exh. 18 at 11.  She "was devastated," and "felt that, although [she] couldn't say it and no one said it for hours and hours, that she was dead."  Even though the family did not receive confirmation that there were no survivors until the next morning, Catharine testified that she "knew the whole 12 hours that [they] waited for that news that that's what it was going to be."  Tr. Exh. 18 at 11.

398.    In the immediate aftermath of learning of Margaret's death, Catharine was with her family, who had a close relationship, and fielded calls from newspapers, the Peace Corps, friends and family.  She testified that "it was awful.  And my parents were heartbroken.  We all were."  Tr. Exh. 18 at 12.

399.    Catharine misses Margaret "terribly," and "certainly miss[es] having a sister." She also regrets that her son did not have the opportunity to know Margaret.  Tr. Exh. 18 at 16. Margaret's death remains a "tremendously sad part" of Catharine's life.  Catharine described it as "a kind of grief that we lost her that I would rather not know about but I sure do."  Tr. Exh. 18 at 19-20, 21.

400.    Catharine Schutzius is entitled to damages for intentional infliction of emotional distress under Ohio law.  *See supra* at II.F.  Based on the foregoing testimony and the record in this case, Catharine Schutzius should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for her pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, Catharine Schutzius should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**II.**    **John B. Schutzius**

401.    Plaintiff John Schutzius ("John") is the older brother of Margaret Schutzius, who perished in the bombing of UTA Flight 772 on September 19, 1989.  John lives in Alexandria, Virginia, and was domiciled in Virginia at the time of the bombing.  He is a United States citizen.  Deposition *De Bene Esse* of John Schutzius, Trial Exhibit 19 ("Tr. Exh. 19") at 6, 11.

402.    John and Margaret were two years apart, the closest in age of the four siblings. They grew up in a "[c]lose family" and had a "good relationship" "like a brother and sister

should be."  They played together, attended the same schools together, and were always together

growing up.  They shared some of the same friends, and regularly shared their experiences with

one another.  Tr. Exh. 19 at 7-8.

403.    When it came time for Margaret to attend college, John advised her on what to

expect from the experience.  At the time that Margaret was enrolling in the Peace Corps, John

was in graduate school studying international affairs.  Their interest in international issues was

something they shared.  Margaret consulted with John at the time she was deciding to join the

Peace Corps.  Tr. Exh. 19 at 9-10.

404.    While Margaret was serving in the Peace Corps in Chad, she and John

corresponded regularly.  When Margaret returned to the U.S. due to an illness, she was sent to

Washington for treatment for a month and a half.  She and John spent a lot of time together

during that period.  Tr. Exh. 19 at 19.

405.    John first learned that Margaret's plane was missing when he received a call from

his mother.  Tr. Exh. 19 at 11-12.  He immediately suffered "terrible anxiety" because it was a

"fairly pessimistic outlook."  Nonetheless, John remained hopeful until finally learning that

Margaret had indeed perished on the flight, particularly because the cable television news "host

mentioned that survivors were expected initially and then corrected herself."  Tr. Exh. 19 at 12-

13.  He was haunted for years with the thought that "somehow maybe she survived."  Tr. Exh. 19

at 13.

406.    The immediate aftermath of Margaret's death was "a terribly grief stricken time"

for John.  He testified that "losing a family member like that" "makes your life worse forever,"

and makes his "outlook about the world … more pessimistic."  Tr. Exh. 19 at 14, 15.

407. As a result of the bombing, John has apprehension every time he flies. Tr. Exh. 19 at 14. In addition, he believes that the bombing may have been a contributing factor to the fact that he never pursued international affairs, notwithstanding his graduate work in the area. Tr. Exh. 19 at 15.

408. John deeply misses his sister. He has a picture of her on his desk, and thinks about her almost every day. Tr. Exh. 19 at 22. He named his daughter after her, and wishes his daughter could have known Margaret. Tr. Exh. 19 at 17-18. He attended the dedication to Margaret of a clinic in the town in Chad where she served. Tr. Exh. 19 at 20.

409. Ultimately, John views the loss of his sister as "absolutely devastating," and something that damaged his life forever. He described himself as a "wounded person." Tr. Exh. 19 at 23-24.

410. John Schutzius is entitled to damages for intentional infliction of emotional distress under Virginia law. *See supra* at II.A. Based on the foregoing testimony and the record in this case, John Schutzius should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for his pain and suffering, plus prejudgment interest in the amount of $12,084,735.21. Against the Individual Libyan Defendants, John Schutzius should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**JJ.**    **Estate of James Eldee Turlington, Sr.**

411. James Eldee Turlington Sr. ("James") was a passenger on UTA Flight 772 when the plane was bombed over the Tenere desert in Africa, killing all 170 passengers and crewmembers aboard. Tr. Vol. I at 155. James was a citizen of the United States, having been born on November 4, 1940 in Texas. He also was domiciled at the time of his death in Texas

and his estate was administered in Texas.  His daughter Debbie Schooling is the Executrix of his estate.  Tr. Vol. I at 150-51, 155.

412.     When James died he was working for Exxon in Chad.  He had worked for Exxon at that point for approximately 11 or 12 years.  He was a drilling operation supervisor and made approximately $89,000 per year at that time.  Tr. Vol. I at 155-56.  That was roughly the same amount of money James had made in the previous few years, plus bonuses.  Tr. Vol. I at 156. These various financial records were provided to Plaintiffs' expert Steven Wolf, who made a future income projection for James.  Tr. Vol. I at 157; Tr. Vol. II at 54-55.

413.     James was married three times and had a total of seven children, each of which is a Plaintiff in this case.  His first marriage yielded three children – Jimmy Bruce and twins Debbie Schooling and Eddie Don Turlington.  His second marriage yielded one child – David Olney Turlington.  His third marriage also yielded three children – James Eldee Turlington, Jr., Christopher Darwyn Turlington, and Jana Elizabeth Turlington.  Tr. Vol. I at 152-53.

414.     James intended his September 1989 trip home from Chad to be his final trip home from overseas.  He planned on working two more years for Exxon in Houston and then retiring from the oil business.  James planned on becoming a cattle rancher and making money at that business as a second career.  Part of what drove this decision was the fact that James had been kidnapped and held hostage for a period in Chad.  Tr. Vol. I at 157-60.

415.     Debbie Schooling testified that her father was the glue of the family and that everyone's life in the family would have been better had he lived.  His remains were buried in Bellville, Texas outside of Houston.  Tr. Vol. I at 162-63, 165-66.

416.     James's estate is represented by his daughter Debbie Schooling.  James is survived by his sister Joyce Butler, his brother Russell Turlington, his mother Elvee Turlington

(now deceased), and by his seven children, Jimmy Bruce Turlington, Debbie Schooling, Eddie Don Turlington, David Olney Turlington, James Eldee Turlington, Jr., Christopher Darwyn Turlington and Jana Elizabeth Turlington.  All are Plaintiffs in this case.  They are pursuing claims against the Libyan Defendants for intentional infliction of emotional distress and loss of consortium.

417.    The Estate of James Eldee Turlington, Sr. is entitled to damages for wrongful death and his survival action under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, the Estate of James Eldee Turlington, Sr. should be awarded damages against the Libyan State Defendants in an amount no less than $54,800,420.59 , reflecting $3,335,000 in economic damages for lost income, and $18 million for his pain and suffering plus prejudgment interest in the amount of $33,465,420.59.  Tr. Exh. 31 at 17; *see also* Tr. Vol. II at 55.  Against the Individual Libyan Defendants, the Estate of James Eldee Turlington, Sr. should be awarded an amount no less than $164,401,261.76 , reflecting the $54,800,420.59 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**KK.    Debbie Schooling**

418.    Plaintiff Debbie Schooling ("Debbie") is the daughter of James Eldee Turlington, Sr. who perished in the bombing of UTA Flight 772 on September 19, 1989.  Debbie and her brother Eddie Don are twins and the second and third of James's seven children.  Debbie is a citizen of the United States, born in Pampa, Texas on April 17, 1960.  She is, and in 1989 was, domiciled in Texas.  Tr. Vol. I at 149-50.

419.    Because James remarried after separating from Debbie's mother, she did not see him as much as a child that she would have liked.  He called and would visit them.  However, as Debbie and her siblings grew older, the relationship developed and improved, particularly during

and after 1980.  She has many fond memories of family reunions and Fourth of July celebrations, among other things.  Tr. Vol. I at 152-54.

420.    Debbie testified that her father had a good relationship with all of his children.  As she described it, "he had a good relationship with all of us," and "he loved each and every one of his kids."  Tr. Vol. I at 157.

421.    Debbie first heard the news about UTA Flight 772 on CNN when she heard that a plane was missing in Chad.  Later James's fiancée called Debbie to tell her that James was on that plane.  A period of time went on when they were uncertain of his fate, before they finally realized that James was dead.  It was "very sad."  Tr. Vol. I at 162-63.  It made Debbie very angry when she learned later that Libya was responsible for her father's death.  Tr. Vol. I at 163-64.  Debbie went to the memorial service for her father, along with her brother Eddie Don and other family members.  Tr. Vol. I at 162-63.

422.    The loss of her father is still affecting Debbie eighteen years later.  She explained that things would have been much better for everyone in the family had this terrible event not occurred.  She feels there is much they could have done together and that he could have done with the family, but that cannot happen in light of Libya's actions.  As she described it, James was "the glue" of the family.  Tr. Vol. I at 164-66.

423.    Debbie testified that she decided to participate as a Plaintiff in this case "for justice" and so that somebody can "be held accountable."  Libya should not be able to get away with murder.  Tr. Vol. I at 166-67.

424.    Debbie Schooling is entitled to damages for intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Debbie Schooling should be awarded damages against the

Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for her

pain and suffering, plus prejudgment interest in the amount of $22,310,280.39. Against the

Individual Libyan Defendants, Debbie Schooling should be awarded an amount no less than

$102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory

mandate of 28 U.S.C. § 2333(a).

      **LL.**   **Eddie Don Turlington**

     425.    Plaintiff Eddie Don Turlington ("Eddie") is the son of James Eldee Turlington,

Sr., who perished in the bombing of UTA Flight 772 on September 19, 1989. Eddie lives in

Amarillo, Texas, and was domiciled in Texas at the time of the bombing. He is a United States

citizen. Tr. Vol. I at 137.

     426.    Although due to family circumstances, Eddie did not spend a great deal of

personal time with his father when he was a child, he reestablished a close relationship with his

father when he became a young adult. Eddie and his father enjoyed spending time together,

shared an interest in sports and spent time together with Eddie's son. They would attend

sporting events, particularly Astros games to watch Nolan Ryan together. And, as Eddie's son

got involved in sports, James became more and more involved in Eddie's life. Tr. Vol. I at 140-

41.

     427.    Eddie first heard about Flight 772 from the cable news, but learned that his father

was on the flight from his father's fiancée. Tr. Vol. I at 142. His father was returning from

Chad, and it was his last trip abroad. His father planned to stay in the U.S. when he returned.

Eddie very much looked forward to that time so that they could spend even more time together.

Tr. Vol. I at 142-43.

     428.    Eddie regrets that his father did not have the opportunity to play a role of his

younger children's lives, the way he did with Eddie's oldest son. He also testified that many

other lives – particularly those of James' other children and grandchildren – have been impacted adversely by James' death.  Eddie believes many lives would have been enriched by James had he not been killed in the bombing of Flight 772.  Tr. Vol. I at 146.

429.     Eddie also believes that his relationship with his father, which was very good, would have continued to grow and strengthen.  Eddie feels deprived of that opportunity.  He thinks about his father often, particular on special occasions like his children's birthdays and the anniversary of the bombing, which also is his mother's birthday.  Tr. Vol. I at 149.

430.     Eddie Don Turlington is entitled to damages for wrongful death, intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B. Based on the foregoing testimony and the record in this case, Eddie Don Turlington should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for his pain and suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual Libyan Defendants, Eddie Don Turlington should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**MM.   Joyce Butler**

431.     Plaintiff Joyce Butler ("Joyce") is the sister of James Eldee Turlington, Sr. who perished in the bombing of UTA Flight 772 on September 19, 1989.  Joyce was the eldest of the three surviving Turlington children, along with her younger brother Russell and then James. Deposition *De Bene Esse* of Joyce Butler, Trial Exhibit 20 ("Tr. Exh. 20") 5-7.  Joyce was born on October 2, 1935 in Oklahoma and is a citizen of the United States.  In 1989, she was, and currently is, a domiciliary of Texas.  Tr. Exh. 20 at 5.

432.    Joyce and James had a loving relationship growing up as children.  She described James as a "rascal."  He would tease but was "sweet and loving" also.  She loved James.  Tr. Exh. 20 at 7.

433.    After Joyce was married and moved away she stayed in touch with James, but it was difficult on her since she did not see him much.  Tr. Exh. 20 at 8-9.  Still, Joyce related how James would telephone her and say "hi" and she knew immediately that it was him.  It is "just not the same without him" and she misses him a lot.  Tr. Exh. 20 at 14.

434.    Joyce first heard that James's plane had gone down when someone from Exxon called her.  She received many more calls before the French confirmed what happened.  She was "devastated" and said that "even after 18 years, it still doesn't seem – seem real."  Tr. Exh. 20 at 9-10.

435.    Joyce decided to participate in this lawsuit because she feels "that something has to be done to – when terrorists take innocent people's lives, something has to be done to stop them.  They have to be punished in some way, and I know that nothing can ever bring my brother back, but I know that maybe this will stop some of it if they can be prosecuted and – and can realize that they can't get away with things like that.  Justice has to be served."  Tr. Exh. 20 at 15-16.

436.    Joyce Butler is entitled to damages for intentional infliction of emotional distress under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Joyce Butler should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for her pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, Joyce

Butler should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### NN.  Estate of Elvee Turlington

437.   Plaintiff Estate of Elvee Turlington is represented by the Executrix Joyce Butler. Elvee Turlington ("Elvee") was the mother of James Eldee Turlington, Sr. who perished in the bombing of UTA Flight 772 on September 19, 1989.  Elvee had three children who grew into adulthood and were alive in 1989 – in order of birth: Joyce, Russell, and James.  Deposition *De Bene Esse* of Joyce Butler, Trial Exhibit 20 ("Tr. Exh. 20") 5-7.[22]

438.   Elvee was a citizen of the United States and was born in the United States.  She died at the age of 74 on November 9, 1989, and was domiciled in Texas at the time (living in Pampa, Texas).  Tr. Exh. 20 at 7-8, 17-18.

439.   Elvee loved James very much.  As Joyce explained, James was the baby of the family and they always figured that was why Elvee loved him so much.  Tr. Exh. 20 at 9.

440.   At the time of James' death Elvee was in a nursing home and was ill.  James' death was very hard on her – she took it very hard and said that she thought something like this might happen.  When she heard of his death she was "heartbroken."  She died two months later in November 1989.  Tr. Exh. 20 at 10-11, 15.  Joyce believes that Elvee "grieved herself to death."  Tr. Exh. 20 at 15.

441.   The Estate of Elvee Turlington is entitled to damages for intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, the Estate of Elvee Turlington should be

---

[22]   The name "Elvee" is misspelled throughout the *de bene esse* deposition transcript (Tr. Exh. 20) as "Eldee," perhaps because her son's middle name was Eldee.  In any event, the correct first name of James's mother is "Elvee."

awarded damages against the Libyan State Defendants in an amount no less than $14,295,950.16, reflecting $5 million for her pain and suffering, plus prejudgment interest in the amount of $9,295,950.16.  Against the Individual Libyan Defendants, the Estate of Elvee Turlington should be awarded an amount no less than $42,887,850.49, reflecting the $14,295,950.16 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**OO.**   **Russell Turlington**

442.    Plaintiff Russell Turlington ("Russell") is the older brother of James Eldee Turlington, Sr., who perished in the bombing of UTA Flight 772 on September 19, 1989. Russell lives in Odessa, Texas, and was domiciled in Texas at the time of the bombing.  He is a United States citizen.  Deposition *De Bene Esse* of Russell Turlington, Trial Exhibit 21 ("Tr. Exh. 21") at 5.

443.    Russell described his brother James as "a very loving brother and close friend." Tr. Exh. 21 at 5.  They were "very close" and "loved each other deeply."  Tr. Exh. 21 at 6.

444.    When they were adults, Russell and James "stayed close" and "shared good times together."  Tr. Exh. 21 at 6.

445.    Russell first learned from news reports that a plane was missing, and later that his brother was aboard.  Upon hearing the news that James had perished, Russell was "hurt, disappointed, full of sorrow and anger at whoever was responsible."  Tr. Exh. 21 at 9.  He was very distraught in the aftermath of James' death, and found it to be a "strenuous, grievous time." Tr. Exh. 21 at 12.

446.    Russell misses his brother greatly, thinks of him daily and often wishes that James were around to share experiences with him.  Tr. Exh. 21 at 12.  Russell believes he was robbed of his brother's love and companionship.  Tr. Exh. 21 at 13.

447.     Russell Turlington is entitled to damages for intentional infliction of emotional distress under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Russell Turlington should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for his pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, Russell Turlington should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**PP.     Jimmy Bruce Turlington**

448.     Plaintiff Jimmy Bruce Turlington ("Jimmy") is the son of James Turlington, Sr. who perished in the bombing of UTA Flight 772 on September 19, 1989.  As a result of a stroke, Jimmy now has a condition known as aphasia.  As the videotape of his deposition reveals, it is difficult for Jimmy to communicate.  Consequently his sister Debbie Schooling assisted him at his short *de bene esse* deposition.  Jimmy is a United States citizen, having been born in Texas on June 21, 1958.  He also was domiciled in Texas in 1989.  Deposition *De Bene Esse* of Jimmy Turlington, Trial Exhibit 22 ("Tr. Exh. 22") at 4-7.

449.     Jimmy said he was "shocked" at his father's death and that he "misses him."  Tr. Exh. 22 at 7-8.

450.     Jimmy decided to participate as a Plaintiff in this case so that "justice" could be done.  Tr. Exh. 22 at 10.

451.     Jimmy Bruce Turlington is entitled to damages for intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, Jimmy Bruce Turlington should be awarded damages in an amount no less than $34,310,280.39, reflecting $12 million for his pain and

suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual

Libyan Defendants, Jimmy Bruce Turlington should be awarded an amount no less than

$102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory

mandate of 28 U.S.C. § 2333(a).

### QQ.   David Olney Turlington

452.    Plaintiff David Olney Turlington ("David") is the son of James Eldee Turlington,

Jr., who perished in the bombing of UTA Flight 772 on September 19, 1989.   David is a United

States citizen currently residing in Texas who was domiciled in Texas at the time of his father's

death.  Deposition *De Bene Esse* of David Turlington, Trial Exhibit 23 ("Tr. Exh. 23") at 5-7, 16-

17.

453.    David is one of the seven children of James Turlington.  Tr. Exh. 23 at 7.  He

grew up partially with his father and step-mother, and partially with his mother and step-father.

Tr. Exh. 23 at 8.  When he lived with his father, he traveled all over the world due to his father

James's job.  He lived in Norway and Malta, as well as Texas.  Tr. Exh. 23 at 8.  David got along

well with his father.  However, he had difficulties living with his step-mother.  Tr. Exh. 23 at 8-

9.

454.    David remembers that during his childhood, his father stressed that he needed to

"do right . . . to grow up and be his little man."  Tr. Exh. 23 at 9. He recalls fondly a special

memory of his father getting him a brand new 10-speed bicycle.  He characterized his

relationship with his father as "great."  His father's role in the family was that of the

breadwinner; "he was the man."  Tr. Exh. 23 at 10.  David recalled that he always wanted to

learn from his father.  Tr. Exh. 23 at 11.

455.    David's young adulthood was filled with great joy.  After having lost contact with

his father for a short time, he was surprised to hear that not only did his father want to renew

their close ties, but he also wanted to again live together.  Tr. Exh. 23 at 15.  When David told

his father that his life now included a woman and a new child, his father welcomed them all into

his house.  David was thrilled to be so accepted.  Tr. Exh. 23 at 14-15.

456.     David vaguely remembers the last time he saw his father before James's death.

Earlier, in 1989, David was struck by a truck, losing his legs and putting him in a coma.  He

would spend the subsequent weeks after the accident in the hospital under medication and in a

coma.  Tr. Exh. 23 at 11, 13.  After hearing about the grave injury and returning home from

overseas, James immediately went to the hospital to visit David.   James comforted him and

assured David that "we're going to make it through this and I'm going to help you and

everything will be alright."  Tr. Exh. 23 at 11.  Those were the last words the two ever shared.

457.     David recalls how he heard about his father's death on September 19, 1989.  He

was in his second rehabilitation center after his accident when the nurses came in and handed

him a phone.  It was his mother on the line and she said "your daddy is dead."  Tr. Exh. 23 at 17.

David cried when he heard the news.  Tr. Exh. 23 at 18.  He said that his father's murder,

"shattered" his dreams and what he had left in his life.  Tr. Exh. 23 at 18.  He was devastated—

he "pretty much wanted to die." Tr. Exh. 23 at 18.

458.     David recalls that, during the immediate aftermath of the knowledge of his

father's death.  He recalls that he became impossible to deal with for the doctors and the nurses

at his rehabilitation center.  Tr. Exh. 23 at 19.  He did not want to talk to anyone or to participate

in any of his rehab activities.  He was unable to attend James' memorial service because he was

still in the rehabilitation center.  Tr. Exh. 23 at 21.  The doctors felt that if David attended the

service it would lead to further damage.

459.    In the months and years following James' death, David tried to kill himself with alcohol, drugs, and cars.  Tr. Exh. 23 at 22.  It took some time before he was able to get his life together.  He began to follow what his dad taught him, "[to] do things the right way."  Tr. Exh. 23 at 24.  He realized that one dream he shared with his father – to follow in James's footsteps and work in the oil industry – was now never going to happen.  He also realized that another one of their dreams, to start their own roofing business, was also now never going to happen.  Tr. Exh. 23 at 24.

460.    Today, David "misses [his father]a lot."  He believes that if James had lived, they would now be living close to each other and would be in business together.  Tr. Exh. 23 at 25.  James left a legacy of hard work and personal achievement.  David explained that his father started out with nothing and earned a lot through hard work.  Tr. Exh. 23 at 26.

461.    David misses the little things in life that one shares with one's father.  He misses going fishing with him, playing pool with him, and working with him on cars in the garage.  Tr. Exh. 23 at 28.  He also misses the big things—like his father's presence at the birth of his children or his father's fiftieth birthday.  Tr. Exh. 23 at 29.  David thinks about his dad every week.  And he keeps hearing him say, through all of David's hardships, "just push forward."  Tr. Exh. 23 at 31.  It is that voice that has motivated David to learn to walk again, to "not quit" on life.  Tr. Exh. 23 at 32.

462.    David Olney Turlington is entitled to damages for intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, David Olney Turlington should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for his pain and suffering, plus prejudgment interest in the amount of

$22,310,280.39.  Against the Individual Libyan Defendants, David Olney Turlington should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

   **RR.   James Eldee Turlington, Jr.**

   463.    Plaintiff James Eldee Turlington, Jr. ("James") is the son of James Eldee Turlington, Sr., who perished in the bombing of UTA Flight 772 on September 19, 1989.  James lives in Canyon, Texas, and was domiciled in Texas at the time of the bombing.  He is a United States citizen.  Deposition *De Bene Esse* of James Eldee Turlington, Jr., Trial Exhibit 24 ("Tr. Exh. 24") at 5.

   464.    James is named after his father.  He lived with his father throughout his childhood.  Tr. Exh. 24 at 6.  Although James did not always agree with or fully appreciate his father growing up, he loved him very much.  Tr. Exh. 24 at 6-7, 11, 17.

   465.    When James was growing up, his father drove him to be the best and supported his sporting and other activities.  Tr. Exh. 24 at 11, 19.  No matter what James did, his father was there for him.  "He was a good dad."  Tr. Exh. 24 at 19.

   466.    James first heard the news that the plane his father was on was missing from the news.  He was in denial at that time, believing that his father was a tough guy so nothing could hurt him.  Tr. Exh. 24 at 8.  When he learned that his father in fact had died, James "was just numb," and "didn't know what to feel."  Tr. Exh. 24 at 9.

   467.    James was only 17 when his father died.  Tr. Exh. 24 at 6.  Unable to cope with the tragic news, James "ran" and "took off and started drinking a whole lot."  Tr. Exh. 24 at 9-10.

   468.    James was so distraught that he could not attend his father's memorial service, but did visit his father's grave a week later.  He was upset about how arrangements for his father had

been handled, and it was very important to him that his father be memorialized in the right way. Tr. Exh. 24 at 15-16.

469.    In the years following his father's death and continuing to the present, James has been haunted by the fact that he did not have the opportunity to reconcile with his father and apologize.  Tr. Exh. 24 at 10, 18.  He deeply regrets not having the opportunity to have a "man to man relationship" with his father, and believes his father would be proud of him and his children. Tr. Exh. 24 at 11, 13, 18.

470.    James misses his father in many respects, and very much wishes his father could have met and played a role in his children's lives.  Tr. Exh. 24 at 12, 13.  He is very pained by his father's absence.

471.    James Eldee Turlington, Jr. is entitled to damages for intentional infliction of emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the foregoing testimony and the record in this case, James Eldee Turlington, Jr. should be awarded damages against the Libyan State Defendants in an amount no less than $34,310,280.39, reflecting $12 million for her pain and suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual Libyan Defendants, James Eldee Turlington, Jr. should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**SS.    Christopher Darwyn Turlington**

472.    Plaintiff Christopher Darwyn Turlington ("Christopher") is the son of James Eldee Turlington, Sr., who perished in the bombing of UTA Flight 772 on September 19, 1989. Christopher lives in Canyon, Texas, and was domiciled in Texas at the time of the bombing.  He is a United States citizen.  Deposition *De Bene Esse* of Christopher Darwyn Turlington, Trial Exhibit 24 ("Tr. Exh. 25") at 5.

150

473.     Christopher lived with his father throughout his childhood.  Tr. Exh. 25 at 6.
Although when Christopher was growing up he thought his father was "a hard man," he realizes
now that his father "was instilling good values and just trying to make [the kids] good people,"
and that "he was just being a good father."  Tr. Exh. 25 at 7.  Despite their differences,
Christopher very much loved his father.  Tr. Exh. 25 at 11.

474.     Christopher was only 16 when his father was killed.  Tr. Exh. 25 at 8.  When he
learned of his father's death, Christopher "put walls up."  He "didn't deal with it," and was in a
period of denial.  He was particularly angry because his father was returning from his last trip
abroad, and planned to stay in the U.S. thereafter.  Tr. Exh. 25 at 9-10.

475.     Christopher deeply regrets not having the opportunity to thank his father and
apologize to him.  Tr. Exh. 25 at 7, 12.  He wishes he could tell his father how much he loved
him and appreciated him.  He believes that he and his father would have had a good relationship
and feels deprived of that opportunity.  Tr. Exh. 25 at 12.  He also feels deprived of the
opportunity to have his father play a role his children's lives.  Tr. Exh. 25 at 11.

476.     Christopher testified that his father's death really "screwed [him] up," and that he
has "had no closure."  He carries with him daily the pain of not having had the opportunity to
deal with his emotions resulting from his father's death.  He believes that his father's death
changed him from a happy person to someone who is "just mad, just angry, not too happy."  Tr.
Exh. 25 at 14.  He thinks about and grieves for his father "all the time."  Tr. Exh. 25 at 11.

477.     Christopher Darwyn Turlington is entitled to damages for intentional infliction of
emotional distress, and loss of consortium under Texas law.  *See supra* at II.B.  Based on the
foregoing testimony and the record in this case, Christopher Darwyn Turlington should be
awarded damages against the Libyan State Defendants in an amount no less than

$34,310,280.39, reflecting $12 million for his pain and suffering, plus prejudgment interest in the amount of $22,310,280.39.  Against the Individual Libyan Defendants, Christopher Darwyn Turlington should be awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

     **TT.**   **Jana Elizabeth Turlington**

478.    Plaintiff Jana Elizabeth Turlington ("Jana") is the daughter of James Eldee Turlington, Sr., who perished in the bombing of UTA Flight 772 on September 19, 1989.   Jana is a United States citizen currently residing in Texas who was domiciled in Texas at the time of her father's death.  Deposition *De Bene Esse* of Jana Elizabeth Turlington, Trial Exhibit 26 ("Tr. Exh. 26") at 5-8, 12-13.

479.    Jana is one of the seven children of James Turlington.  Tr. Exh. 23 at 7.  All of the children are the children of James, though they have different mothers.  James, Eddie, and Debbie share the same mother; and Jana, James, and Chris share the same mother.  David does not share the same mother as any of the other children.

480.    Jana grew up living with her father James, even after he divorced her mother, along with her brothers James and Chris.  Tr. Exh. 26 at 6-7.  She fondly remembers her childhood, explaining that "we had a ball. We had fun."  She recounts living in a rural community attending dances, barbeques, and picnics.  Tr. Exh. 26 at 7.  Jana had a close relationship with her father.  They talked about everything, including the importance of school.  Tr. Exh. 26 at 9.  He was the provider in the family.  Tr. Exh. 26 at 9.  Jana depended on her dad for "everything."  He was the sole provider both financially and emotionally.  Tr. Exh. 26 at 15.  She remembers him as a good dad.  Tr. Exh. 26 at 15.

481.    Jana remembers the last time she saw her father; it was about two weeks before his death.  They spent the time chatting about life.  Tr. Exh. 26 at 12.  Of course, she had no idea

that that meeting would be their last, so she regrets not getting a chance to really say goodbye. Tr. Exh. 26 at 12.  Then, on September 19, 1989, she received a call telling her that her father's plane had disappeared.  She was fifteen and confused.  Another call followed, and in that call she learned that the plane had exploded over the desert—there were no survivors.  Tr. Exh. 26 at 12-13.  When she learned of the news, she was in shock.  She recounts that "[i]t was one of the worst days of my life."  Tr. Exh. 26 at 14.  The days and weeks following her father's death were filled with confusion and disarray.  There were questions regarding where Jana and her brothers would live.  Tr. Exh. 26 at 15-16.  All during this time Jana "just cried and cried."  Tr. Exh. 26 at 16.

482.    Jana attempted to cope with her father's death by abusing drugs and alcohol.  Tr. Exh. 26 at 16-17, 26-27.  She also moved out on her own.  She was unable to get along with her mother, and thought she needed independence.

483.    Jana recalled that her family essentially ceased to exist after her father was murdered.  Her brother Chris went in one direction, her other brother James went in another, and her mom went in still another direction.  Tr. Exh. 26 at 18.  Her dreams also were destroyed.  She had planned to be a doctor.  Tr. Exh. 26 at 18.  Jana had always done well in school—she was an honors student.  Tr. Exh. 26 at 18.  Her dad had expected that and was a key motivating influence in her education.  Tr. Exh. 26 at 18-19.  After he died, however, her grades declined precipitously.  She eventually stopped going and quit school completely.  Tr. Exh. 26 at 19.  Jana testified that she has no doubt that she would have remained in school had her father lived.  "There [is] no doubt in my mind. . . I loved to go to school. I loved it."  Tr. Exh. 26 at 20.

484.    Jana felt alone without her father.  Tr. Exh. 26 at 21.  She laments, "I still miss him.  I mean, not a day [] goes by [that] I don't think about my dad and what if . . . ."  Tr. Exh. 26

at 21.  Jana still cries over her father, even today, almost twenty years later. "I guess I'll always

do that," Jana  testified.  Tr. Exh. 26 at 22.

486.     Jana was deeply affected by her father's death.  She is never going to see him

again.  He is also never going to see his grandchildren.  Tr. Exh. 26 at 23.  She believes her entire

life has been missed because of her father's death.  She turned to running the streets and using

drugs, instead of becoming a doctor.  Tr. Exh. 26 at 23.

486.     Jana Elizabeth Turlington is entitled to damages for intentional infliction of

emotional distress and loss of consortium under Texas law.  *See supra* at II.B.  Based on the

foregoing testimony and the record in this case, Jana Elizabeth Turlington should be awarded

damages against the Libyan State Defendants in an amount no less than $34,310,280.39,

reflecting $12 million for her pain and suffering, plus prejudgment interest in the amount of

$22,310,280.39.  Against the Individual Libyan Defendants, Jana Elizabeth Turlington should be

awarded an amount no less than $102,930,841.17, reflecting the $34,310,280.39 set forth above,

trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

**UU.**   **Estate of Donald Warner**

487.     Donald Warner ("Donald"), a United States citizen and Montana domiciliary, was

a passenger on UTA Flight 772 when the plane was bombed over the Tenere desert in Africa,

killing all 170 passengers and crew members aboard.  Deposition *De Bene Esse* of Janet Warner,

Trial Exhibit 27 ("Tr. Exh. 27") at 10-11.

488.     At the time of his death, Donald was returning from Chad, Africa where he was

working as a paramedic for Parker Drilling.  Tr. Exh. 27 at 10-11.  Donald's interest in the

medical field began when he worked as a trainer for his school athletic teams.  Tr. Exh. 27 at 13-

14.  After high school, Donald joined the Navy where he was stationed in San Diego, Florida,

and Iceland, working as a cook and a paramedic.  Tr. Exh. 27 at 15-16.  After he was honorably

discharged from the Navy, Donald worked as an ambulance medic in California before moving back home to Billings, where he also worked as an ambulance medic.  Tr. Exh. 27 at 17-18.  In 1988, Donald joined Parker Drilling as a paramedic so that he could earn some money to go to school to become a doctor or physician's assistant.  Tr. Exh. 27 at 14, 18-20.  Donald said that he wanted to work in the medical field because he wanted to "help people."  Deposition *De Bene Esse* of Susan Frazier, Trial Exhibit 28 ("Tr. Exh. 28") at 11.

489.    Donald's Estate is represented by his mother, Janet Warner.  He is survived by his mother, his father Alvin Warner (now deceased), and his younger sisters, Sherry Warner and Susan Frazier.  All are Plaintiffs in this litigation.  Tr. Exh. 27 at 7.  They are pursuing claims against the Libyan Defendants for intentional infliction of emotional distress and loss of consortium.

490.    The Estate of Donald Warner is entitled to damages for wrongful death and his survival action under Montana law.  *See supra* at II.D.  Based on the foregoing testimony and the record in this case, the Estate of Donald Warner should be awarded damages against the Libyan State Defendants in an amount no less than $54,485,420.59 , reflecting $3,020,000 in economic damages for lost income, and $18 million for his pain and suffering plus prejudgment interest in the amount of $33,465,420.59.  Tr. Exh. 31 at 18; *see also* Tr. Vol. II at 58.  Against the Individual Libyan Defendants, the Estate of Donald Warner should be awarded an amount no less than $163,456,261.76 , reflecting the $54,485,420.59 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

## VV.    Janet Warner

491.    Plaintiff Janet Warner ("Janet") is the mother of Donald Warner, who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of Janet

Warner, Trial Exhibit 27 ("Tr. Exh. 27") at 7.  Janet is domiciled in Terry, Montana and is a United States citizen.  Tr. Exh. 27 at 6.

492.    Janet and her husband Alvin raised their children, Donald, Sherry, and Susan, on a ranch between Terry and Miles City, Montana.  Tr. Exh. 27 at 11.  They lived there until 1978 when Alvin got a job with the City of Terry and the family moved to Terry.  The Warners were a close family.  Tr. Exh. 27 at 11.

493.    Janet was close to her son Donald, who participated in many activities in school, including football, basketball and choir.  Donald also became the trainer for some of the sports teams.  Tr. Exh. 27 at 12.  Janet remembers Donald playing with blocks and building forts when he was younger.  She also remembers him riding horses.  Tr. Exh. 27 at 13.

494.    After high school, Donald joined the Navy and was stationed in various locations around the United States and beyond.  Tr. Exh. 27 at 16-17.  Janet and Donald remained in close contact while he was away, writing letters and communicating by phone every week.  Tr. Exh. 27 at 17.  They would talk about what was going on at home and at the local school Donald attended.  Tr. Exh. 27 at 17-18.

495.    In 1988, Donald joined Parker Drilling.  He was excited about traveling to Chad and Janet still keeps a picture of Donald from Chad with a monkey sitting on his shoulder.  Tr. Exh. 27 at 19.  Janet was worried about Donald traveling to Chad, "but he was a young man and you can't keep them home all the time."  Tr. Exh. 27 at 23.  Donald communicated to Janet that he enjoyed his time in Chad, and particularly the Chadian people, and he brought her wooden masks to hang on the walls in Montana.  Tr. Exh. 27 at 20-21.

496.    The last time Donald was home with his parents was in the summer of 1989.  During that time, he visited with Janet and Alvin and his grandparents in Miles City before

returning to Africa.  Tr. Exh. 27 at 20.  This was the last time Janet saw her son Donald alive.

Tr. Exh. 27 at 21.  When Donald was killed in the bombing of UTA Flight 772, Donald was

returning home from his last rotation in Chad.  Tr. Exh. 27 at 20.

497.     On September 19, 1989, Janet received a call from Parker Drilling that the plane

was missing, and then another call that it had crashed and there were no survivors.  Alvin was

with her at the time.  Janet's reaction was one of disbelief – she just "couldn't believe it."  Tr.

Exh. 27 at 22-23.  After the bombing, Janet and Alvin were left to just wait to have a funeral or

memorial service because Donald's body was never found.  Ultimately, there was a memorial

service without the body.  It was "quite large" with many of Donald's friends in attendance.

Janet recalls that she was "just kind of numb" at the service.  Tr. Exh. 27 at 23-24.  Though there

was no body to bury, a marker was placed in the Terry cemetery in Donald's memory.  Tr. Exh.

27 at 25.  Some of Janet's co-workers also gave her a Montana flag in Donald's honor.  A

flagpole was erected by the nursing home where Janet works.  A plaque is there to tell how

Donald died in this tragedy and the flag continues to fly today.  Tr. Exh. 27 at 24.  Janet and

Alvin also started a scholarship in Donald's name for local high school seniors looking to pursue

a career in the medical field.  That scholarship still exists today.  Deposition *De Bene Esse* of

Sherry Warner, Trial Exhibit 29 ("Tr. Exh. 29") at 20.

498.     Janet tries not to think about Donald's terrible death.  She tries to keep busy

working as a nurse's aide to help her avoid thinking about it.  Tr. Exh. 27 at 26-27.  Janet also

has not flown since Donald's death, though she had flown prior to the tragedy.  Tr. Exh. 27 at 10.

499.     Janet misses Donald especially around Christmas time.  They used to have a tree

and Janet would make cookies and candy.  Today, Janet only has a fiber optic tree and she no

longer makes candy or decorates the house.  Tr. Exh. 27 at 27-28.  Janet also misses the

opportunity to have seen her son get married and have children.  Tr. Exh. 27 at 27.  Janet is

participating in this lawsuit to see justice brought to those who killed her son on UTA Flight 772.

Tr. Exh. 27 at 8-9.

500.    Janet Warner is entitled to damages for intentional infliction of emotional distress

and loss of consortium under Montana law.  *See supra* at II.D.  Based on the foregoing testimony

and the record in this case, Janet Warner should be awarded damages against the Libyan State

Defendants in an amount no less than $14,295,950.16, reflecting $5 million for her pain and

suffering, plus prejudgment interest in the amount of $9,295,950.16.  Against the Individual

Libyan Defendants, Janet Warner should be awarded an amount no less than $42,887,850.49,

reflecting the $14,295,950.16 set forth above, trebled pursuant to the statutory mandate of 28

U.S.C. § 2333(a).

**WW.   Alvin Warner**

501.    Plaintiff Alvin Warner ("Alvin") was the father of Donald Warner who perished

in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of Janet

Warner, Trial Exhibit 27 ("Tr. Exh. 27") at 7-8.  Alvin was domiciled in Montana in 1989, and

he died in January, 2002.  Tr. Exh. 27 at 25.  Alvin's wife, Janet Warner, is the executrix of his

estate.  Tr. Exh. 27 at 8.

502.    Alvin and Janet raised Donald together, along with their two daughters, Sherry

and Susan.  The family grew up together around Terry, Montana.  Janet recalled special times

between Donald and Alvin, including when Alvin taught Donald to drive their pickup truck out

in the country when he was a young boy.  Tr. Exh. 27 at 11.

503.    When he learned of Donald's death, Alvin tried to be brave, but was just in

disbelief that Donald was gone.  Tr. Exh. 27 at 23; Deposition *De Bene Esse* of Sherry Warner,

Trial Exhibit 29 ("Tr. Exh. 29") at 19.  Alvin did not speak much of Donald's death, and Alvin's

health – including a heart condition – deteriorated after Donald was killed.  Tr. Exh. 27 at 26; Tr. Exh. 29 at 20-21.  Alvin and Janet experienced similar grief and related experiences as a result of Donald's death.  *See, e.g.*, Tr. Exh. 27 at 22-28.

504.    The Estate of Alvin Warner is entitled to damages for intentional infliction of emotional distress and loss of consortium under Montana law.  *See supra* at II.D.  Based on the foregoing testimony and the record in this case, the Estate of Alvin Warner should be awarded damages against the Libyan State Defendants in an amount no less than $14,295,950.16, reflecting $5 million for his pain and suffering, plus prejudgment interest in the amount of $9,295,950.16.  Against the Individual Libyan Defendants, the Estate of Alvin Warner should be awarded an amount no less than $42,887,850.49, reflecting the $14,295,950.16 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

## XX.    Susan Frazier

505.    Plaintiff Susan (Warner) Frazier ("Susan") is the youngest sister of Donald Warner, who perished in the bombing of UTA Flight 772 on September 19, 1989.  Deposition *De Bene Esse* of Susan Frazier, Trial Exhibit 28 ("Tr. Exh. 28") at 7-8.  Susan resides in Billings, Montana, was domiciled in Montana in 1989,  and is a United States citizen.  Tr. Exh. 28 at 7.

506.    Susan grew up with her older brother Donald and sister Sherry on a ranch in Montana.  Tr. Exh. 28 at 9-10.  The family was close at that time, and Susan had a good relationship with Donald, who was a "typical older brother."  He helped his parents out with the younger children.  Susan remembers Donald chasing her around when they played tag together. Tr. Exh. 28 at 11-12.  After Donald left the house, Susan stayed in contact with him.  They would talk about how he was doing and that he enjoyed what he was doing, "which he always said he did."  Tr. Exh. 28 at 12.  Donald enjoyed traveling to different places and meeting different people, which inspired Susan to pursue the same sort of experiences.  Tr. Exh. 28 at 12.

507.     On September 19, 1989, Susan's mother called to tell her that Donald's plane was missing.  She saw on the news the next morning and learned that the plane was gone and there were no survivors.  Susan could not believe the news when she heard it.  Her sister Sherry had the same reaction.  She spoke again to her mother and could hear the sadness and tears in her voice.  Tr. Exh. 28 at 15-16.

508.     After the bombing, Susan went to spend some time with her parents.  She joined her parents again on Veteran's Day in 1989 for a memorial service for Donald.  During the service, there was a video tribute of Donald's life.  This was very important to Susan but watching it made her "cry like a baby."  To this day, when she hears the song from that video, she remembers Donald and still cries the same way.  Tr. Exh. 28 at 17.

509.     Donald's body was never found.  This left Susan without closure because, without a body, "there's always that possibility."  Tr. Exh. 28 at 17-18.

510.     After Donald's death, everyone in the family was just "more quiet."  They would talk about his death and share in the sadness but tried later on to focus more on the "good times." Tr. Exh. 28 at 19-20.

511.     Susan recalls Donald as a happy and funny older brother.  He told jokes and played tricks.  Tr. Exh. 28 at 20.  He also liked to cook all kinds of recipes.  Susan now uses the wok that Donald had before his death.  Tr. Exh. 28 at 13.

512.     Susan regrets that she never had the opportunity to introduce Donald to her children.  She keeps a picture of Donald in her living room so that they always will know who he was.  She also named her son after Donald.  Tr. Exh. 20-21.

513.     Susan Frazier is entitled to damages for intentional infliction of emotional distress under Montana law.  *See supra* at II.D.  Based on the foregoing testimony and the record in this

case, Susan Frazier should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for her pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, Susan Frazier should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

### YY.   Sherry Warner

514.    Plaintiff Sherry Warner is the younger sister of Donald Warner, who perished in the bombing of UTA Flight 772 on September 19, 1989.  Tr. Exh. 29 at 7-8.  Sherry was domiciled in Montana in 1989, and currently lives in Miles City, Montana.  She is a United States citizen.  Tr. Exh. 29 at 7.

515.    Sherry grew up with Donald, her sister Susan, and her parents Janet and Alvin on a ranch between Terry and Miles City, and ultimately in the town of Terry itself.  The Warners were a close family.  Tr. Exh. 29 at 10, 14.  Sherry and Donald used to help gather cattle on the ranch and rode horses together.  She remembers Donald taking hunting classes and driving the family pickup trucks up and down the road.  Sherry remembers her brother Donald as "always happy," "laughing all the time, laughing and having fun, and … just being around friends."  Tr. Exh. 29 at 12-13.  Sherry and Donald got along well as brother and sister.  Tr. Exh. 29 at 11.  Donald was a "good older brother."  Tr. Exh. 29 at 12.

516.    Even after Donald left home, Sherry stayed in contact with him, especially on holidays when the family would get together.  During those times they would visit and joke around.  Tr. Exh. 29 at 13.

517.    Donald was the most social person in the family – the "life of the party."  Tr. Exh. 29 at 15.  Sherry, on the other hand, was always shy but was "starting to come out of [her] shell"

while Donald was in Chad.  In September, 1989, Sherry was anxious to see Donald and was waiting for him to come home from Chad so she could see his reaction to her new personality; Donald never made it home.  Tr. Exh. 29 at 16.

518.    Sherry was concerned for Donald's safety when he was in Chad, but felt there was nothing she could do about it – Donald was an adult, and was "not going to listen to his younger sister" and stay home.  Tr. Exh. 29 at 15-16.

519.    On September 19, 1989, Sherry was told by her mother that the plane had disappeared.  Sherry thought the plane would show up somewhere safe and waited for further news.  The next day she received a call that the plane was gone and Donald was dead.  Sherry was in shock and could not believe the news.  After learning of Donald's death, Sherry tried to avoid being alone and surrounded herself with friends.  Within a day or two, she went to Terry to grieve with her family.  Tr. Exh. 29 at 17-18.  Sherry recalls that her parents tried to be brave but were just in shock over Donald's loss.  Tr. Exh. 29 at 19.

520.    Donald's death was extremely hard on Sherry.  She found it hard to be alone "for the longest time" and would always try to be with friends after work so that she would not be home by herself.  Sherry still finds it hard to believe that Donald is gone.  Donald's body was never recovered and Sherry would find herself looking for him and seeing people that she thought might be him.  Sherry feels that she still looks for him today.  Tr. Exh. 29 at 18-19.

521.    There was a memorial service for Donald but Sherry could not get herself to attend.  She wanted to attend but just couldn't face up to the reality of the situation.  She just sat at home and joined her family afterwards.  There was a video tribute shown at the memorial service but Sherry still has been unable to watch it because she "just [hasn't] been able to let go." Tr. Exh. 29 at 19-20.

522.     Sherry continues to grieve for her brother Donald today.  Tr. Exh. 29 at 21.  She always remembers Donald and thinks of him on his birthday.  Tr. Exh. 29 at 20.  She tries to live her life one day at a time and tries to be even closer to her mother and her sister.  Tr. Exh. 29 at 21.  She has not been on an airplane since Donald's death.  Tr. Exh. 29 at 9.

523.     Sherry misses Donald's advice.  She regrets that she cannot go to him for advice about traveling or being social – "just big brother advice."  Tr. Exh. 29 at 21-22.

524.     Sherry is participating in this litigation to find some closure with respect to the murder of her older brother.  It was very hard for her to accept what happened in 1989 and it remains difficult to accept today.  Tr. Exh. 29 at 9.  Sherry just wants to ask Donald why he could not have taken a different plane to come home, or not to have gone to Chad in the first place.  But she knows she could not stop him.  Tr. Exh. 29 at 22.

525.     Sherry Warner is entitled to damages for intentional infliction of emotional distress under Montana law.  *See supra* at II.D.  Based on the foregoing testimony and the record in this case, Sherry Warner should be awarded damages against the Libyan State Defendants in an amount no less than $18,584,735.21, reflecting $6.5 million for her pain and suffering, plus prejudgment interest in the amount of $12,084,735.21.  Against the Individual Libyan Defendants, Sherry Warner should be awarded an amount no less than $55,754,205.64, reflecting the $18,584,735.21 set forth above, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).

## ZZ.   **Interlease, Inc.**

526.     Plaintiff Interlease, Inc. ("Interlease") was the owner of the DC-10-30 aircraft that was operating as UTA Flight 772 and was destroyed by Libya on September 19, 1989.  Tr. Vol. II at 112-113, 141.  Interlease is incorporated in Georgia and was on Sep. 19, 1989.  Tr. Vol. II at

144. Douglas Matthews has been the CEO and owner of Interlease since the early 1980s.  Tr. Vol. II at 97.

527.     Mr. Matthews is an experienced military and civilian pilot and an expert in the area of wide-body commercial jets and their operation.  For the past 40 years, Mr. Matthews has worked on or around aircraft, including 155 combat missions as a Navy Lt. Commander in Vietnam, 2,000 hours of flight time as a factory test pilot and demonstration pilot and 13,000 hours as a pilot and captain instructor for Delta Air Lines, and more than 20 years of experience in aircraft financing and leasing for Interlease.  Tr. Vol. II at 98-112.[23]  Mr. Matthews specifically has extensive technical and operational expertise involving large, passenger-carrying commercial jets, including the wide-body Lockheed L1011, an aircraft that is "almost identical" to the McDonnell Douglas DC-10.  Tr. Vol. II at 100-06.  Since the early 1980s, Mr. Matthews has worked – as the CEO of the company he founded, *i.e.*, Interlease – in the area of aircraft financing and leasing, purchasing aircraft and leasing them to major international carriers.  Tr. Vol. II at 106-108, 112.  As the CEO of Interlease, Mr. Matthews had firsthand experience and knowledge of dealing with these international carriers and was directly and personally involved as the "dealmaker" in the transactions.  Tr. Vol. II at 110-112.

528.     Mr. Matthews acquired the DC-10 at issue in this litigation in 1987, and leased the aircraft to UTA as part of a complicated commercial transaction.  Tr. Vol. II at 114.  Around this time, Interlease owned six or seven DC-10 aircraft, and Mr. Matthews "knew the market, the valuation fairly well."  Tr. Vol. II at 115.  The UTA Flight 772 aircraft was built in 1973, but

---

[23]     Plaintiffs did not seek to certify Mr. Matthews as an expert for purposes of these proceedings, although he clearly would qualify as an expert.  He testified exclusively as a fact witness in his capacity as the CEO of Plaintiff Interlease and based on his unique knowledge regarding the DC-10 aircraft that was operating as UTA Flight 772 on September 19, 1989.

was "more valuable" in 1989 than when it came off the production line at McDonnell Douglas.

Tr. Vol. II at 117; Tr. Exh. 36 at 21.  For almost 40 years since they came onto the market in the

1950s, used jet transport aircraft were more valuable than new aircraft because they were

actually available on the market immediately as opposed to new aircraft which could take several

years to procure.  Tr. Vol. II at 118.  Moreover, in 1989, "market values had been appreciating

for years" – indeed, that year reflected "one of the biggest [valuation] peaks ever in the history of

aviation."  Tr. Vol. II at 117, 179.  In 1989, the UTA Flight 772 aircraft was worth $45M to

$50M as a business asset to Interlease based on industry conditions.  Tr. Vol. II at 118, 120-22.[24]

529.    While the aircraft was being operated by UTA, Mr. Matthews received reports

every three months regarding the DC-10's maintenance status and was aware of "exactly the

condition" of the aircraft.  Tr. Vol. II at 122-123.  In September, 1989, the DC-10 was at "much

better than half time condition" – *i.e.*, the benchmark for adjusting fair market value of an

aircraft based on its maintenance status.  All three of the aircraft's engines had been refurbished

within six months of the bombing, and all other relevant maintenance checks had been

completed with the equipment overhauled during the months prior to the attack.  In addition, the

aircraft was maintained by UTA, a major international carrier, subject to the regulatory and

certification requirements of no fewer than four separate governments.  The aircraft had been

properly maintained and operated by UTA in accordance with all regulatory manufacturing and

airworthiness requirements, and was in comparable shape, and being utilized similarly to, other

DC-10 aircraft flying at the time.  Tr. Vol. II at 125-130, 144, 174.

---

[24]    Mr. Matthews testified that the value of the aircraft hull itself was between $40M and
$42M.  As a business asset, however, the "total package" was worth closer to $50M to Interlease.
Tr. Vol. II at 122.

530.     Interlease is entitled to damages for conversion under Georgia law.  *See supra* at II.I.  Based on the foregoing testimony and the record in this case, Interlease should be awarded damages against the Individual Libyan Defendants in an amount no less than $428,878,504.89, reflecting $50M in economic damages plus $92,959,501.63 in prejudgment interest, trebled pursuant to the statutory mandate of 28 U.S.C. § 2333(a).  For the reasons set forth *supra* at n.4, Plaintiffs further ask this Court to issue a finding that the Libyan State Defendants caused Interlease damages in an amount no less than $142,959,501.63, reflecting $50M in economic damages plus $92,959,501.63 in prejudgment interest.  Of course, such a finding is not part of the requested Final Judgment, in light of the prior rulings in this case.

## **<u>CONCLUSION</u>**

Based on this Court's prior rulings – including, *inter alia*, this Court's April 9, 2007 ruling finding Libya responsible for the deaths of the passengers aboard UTA Flight 772 – as well as the testimony and other evidence presented to this Court, Plaintiffs seek a final judgment in the amount of $6,454,109,772.66 in compensatory damages, as set forth, *supra*.  For the Court's convenience, Plaintiffs have attached a summary of proposed damages for each plaintiff as Attachment A in the form of a Proposed Final Judgment Order.  Plaintiffs request – given the lengthy delays engendered by Libya during the course of this litigation and their need for closure – that this Court issue Final Judgment at the earliest possible opportunity in order to bring this long and painful saga to closure.

Date:  September 5, 2007                    Respectfully submitted,


                                        _____/s/_____
                                        Stuart H. Newberger, D.C. Bar #294793
                                        Michael L. Martinez, D.C. Bar #347310
                                        Laurel Pyke Malson, D.C. Bar #317776
                                        CROWELL & MORING LLP
                                        1001 Pennsylvania Avenue, N.W.
                                        Washington, D.C. 20004-2595
                                        (202) 624-2500

                                        *Counsel for Plaintiffs*