## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **ROBERT L. PUGH, et al.,** |
| **Plaintiffs,** |
| **v.** |
| **SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, et al.,** |
| **Defendants.** |

**Civil Action 02-02026 (HHK)**

### MEMORANDUM

This action is brought pursuant to the "terrorism exception" of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7), arising from the September 19, 1989 bombing of Union des Transports Aeriens ("UTA") Flight 772, over the Tenere Desert in the African country of Niger.  The aircraft operating as UTA Flight 772, a DC-10-30 wide-body aircraft owned by Interlease, Inc. ("Interlease"), was en route to Paris, France from N'Djamena, Chad, when a suitcase bomb in the cargo hold exploded, killing all 170 passengers and crew on board. Seven of the passengers were citizens of the United States.  The Estates of the seven American decedents, 44 of their immediate family members, and Interlease are the plaintiffs in this case. Defendants are the Socialist People's Libyan Arab Jamahiriya and the Libyan External Security Organization ("LESO") (collectively, the "Libyan State Defendants"), and six high-ranking Libyan government officials sued in their personal capacities, Abdallah Senoussi, Ahmed Abdallah Elazragh, Ibrahim Naeli, Abras Musbah, Issa Abdelsalam Shibani, and Abdelsalam Hammouda El Ageli (collectively, the "Individual Libyan Defendants").  All defendants are

referred to collectively herein as "Libya" or "Defendants."

On May 11, 2006, this court granted summary judgment as to liability in favor of plaintiffs and on August 13, 2007, commenced a two and one-half day damages hearing.  During the contested hearing, plaintiffs presented the live testimony of eight fact witnesses and four expert witnesses, as well as *de bene esse* deposition testimony of 29 additional fact witnesses. The expert witnesses presented by plaintiffs were Donald Sommer, an expert on aviation accident analysis and aircraft accident reconstruction, Dr. Richard Levy, an expert on the psychological and physiological effects of traumatic events resulting in death, Steven A. Wolf, a principal with LEGG, LLC, an economic and financial consulting company, and Douglas Kelly, the vice-president and chief aircraft appraiser at AVITAS, Inc.  Each witness's  testimony was credible and reliable in every pertinent respect.  Libya did not present any witnesses.  Based upon the evidence presented at the damages trial, the court makes the following:

## I.  FINDINGS OF FACT

### A.  The Injuries to the Passengers of UTA Flight 772

1.  The fuel in the aircraft that operated as UTA Flight 772 was contained in three places, in the two wings and in the compartment under the fuselage between the two wings.  A suitcase bomb exploded in the right forward lower baggage hold of the aircraft about 45 minutes into the flight when it had climbed to approximately 35,000 feet.  This caused the airplane to break into four major parts, the nose section, the section between the nose section and the wings, the wing section going back to the tail, and the tail and aft part of the plane.

2.  When the bomb exploded, the passengers on the plane experienced "explosive decompression," which happens when the atmosphere within a plane in flight fills instantly with

the atmosphere outside the plane.  It takes less than one second for the pressures to equalize.

3.   Many of the passengers likely survived the bomb explosion and were conscious as they fell to earth from 35,000 feet.  Even if some of the passengers temporarily blacked out, they likely would have regained consciousness as they fell since the effects of hypoxia – lack of oxygen – are reversible and would have quickly been reduced as oxygen levels rose during each victim's fall to earth.

4.   In addition to the initial shock of explosive decompression, a surviving passenger would have experienced the disorienting experience of feeling the temperature instantly drop 129 degrees, from 70 degrees Fahrenheit inside the plane to 49 degrees below zero outside of it.  Among other things, this atmospheric change has a very painful physiological effect on the body, particularly if one has trapped gases.  These body gases expand and cause extreme discomfort.

5.   In addition, the explosion caused shards of metal to fly in every direction, typically embedding themselves into people badly enough to cause pain but not badly enough to kill.

6.   Some of the passengers caught on fire from the explosion.  As a result, many of the passengers burned alive as they plummeted to earth.

7.   Burning to death is extremely painful and does not happen at once.  Dr. Levy testified as follows:

> [P]eople who are on fire die from lack of oxygen because the fire burns up the oxygen in the atmosphere, the fire burns their upper respiratory passages, the hot gases are at first inhaled, it destroys the lining of their lungs and they cannot exchange oxygen appropriately, and therefore, they basically die of oxygen starvation, which leads to brain damage, and they eventually are unable to maintain necessary functions of life.  So certainly many of them [passengers on UTA Flight 772] must have died from fire, but not immediately."

Tr. of Hr'g on Damages ("Tr.") 24:25-25:9, Aug. 15, 2007.

8.  Other unpleasant experiences the passengers likely suffered included loss of control over their sphincters and severe choking sensations.

9.  Those that did not die from the explosion or the fire died from the impact with the ground at a velocity of 150 to 160 miles per hour.

10.  It took 89 seconds to178 seconds, between one and one-half minutes to three minutes, for the passengers to hit the ground following the explosion.  The range of times reflects variations in the passengers' trajectories to the ground, based upon where they were seated on the plane.

11.  All 170 people aboard [UTA Flight 772] died a horrific death.  The many passengers who likely survived the mid-air explosion experienced horrific terror and excruciating pain for as long as three minutes as they were burned alive and tumbled to the earth.  The explosion decompression, fire, and mid-air break-up of the aircraft caused the passengers to suffer extreme terror, painful bodily injury, choking and suffocation, and the tragic realization that their lives would soon terminate**.**

**B.  Plaintiffs' Testimony**

*Estate of Bonnie Barnes Pugh*

12.  Bonnie Barnes Pugh, a United States citizen, was a passenger on UTA Flight 772. Her Estate was administered in the state of Virginia, where she was domiciled at the time of her death.

13.  As the wife of a career diplomat, Mrs. Pugh always was eager to take on the duties of spreading American values and tending to the homemaking needs of the mission of her husband. When her family was posted in Greece, she was active in the Greek-American Woman's

Association, a local civic group dedicated to doing good works in the community.  When she lived in Mauritania, she was deeply involved with the Peace Corps there.  Her daughter Anne testified that in Mauritania, her mother "did as much as she could to make sure that the people who came to work at the embassy felt that they had a bit of a home base."  Pls.' Trial Ex. 1, Anne Carey Dep. 13:13-13:16, July 24, 2007.[1]

14.  Mrs. Pugh's estate is represented by her husband, Ambassador Robert Pugh.  She is survived by her husband, her father Harvey Mills Coverley (now deceased), her mother Georgia Mae Chisholm (now deceased), her sister Sally Chisholm, and her children, Malcolm Pugh (now deceased) and Anne Carey.

*Ambassador Robert Pugh*

15.  Robert Pugh is the husband of Bonnie Barnes Pugh.  Ambassador Pugh is a United States citizen currently residing in Vermont and was domiciled in Virginia at the time of his wife's death.

16.  Ambassador Pugh is a life-long civil servant, having served his country for more than 30 years, first as a marine, and then as a career foreign service officer and ambassador.  As a foreign service officer, he served in foreign countries throughout the world including Turkey, Greece, Iran, and England.  During his many posts, his wife of 34 years lived with him and supported his missions.

17.  Ambassador Pugh met his wife at the University of Washington.  They developed a fast friendship, then a romance, and they married in May 1955.  Throughout their life together, Bonnie was a companion and partner.  The couple had two children, Malcolm and Anne.  During

---

[1]  Plaintiffs' Trial Exhibits #1-29 are *de bene esse* depositions of fact witnesses and all were admitted as evidence at trial.

Ambassador Pugh's appointments in Mauritania as Ambassador and Chad, Bonnie accompanied him and assumed the role of an Ambassador's wife, supporting the mission and building an embassy community.

18.   Ambassador Pugh's foreign service was not without incident, even before his wife was murdered.  In 1983, he was serving as the Deputy Chief of Mission in Beirut, Lebanon, when the United States Embassy was attacked.  During the aftermath, both Ambassador Pugh and Bonnie pitched in to rescue the mission.  Both were recognized for their valor during this difficult time.  Ambassador Pugh received an award from the Ambassador and Bonnie was recognized for her efforts posthumously by her internment in Arlington National Cemetery.

19.   At the conclusion of his service in Lebanon, Ambassador Pugh was appointed United States Ambassador to Mauritania.  He successfully completed his tour in Mauritania, and then received an appointment to be United States Ambassador to Chad.  His wife accompanied him to both posts.

20.   When Ambassador Pugh first heard that his wife's plane was missing, his reaction was simple – "my God, my wife is on that [plane]."  Tr. 24:25-25:1, Aug. 13, 2007.[2]  He then turned his attention to his children, Malcolm and Ann, who were receiving the news back home in Virginia.  He counseled them to prepare for the worst.  Several hours later, his worst fears were confirmed; a French team found the crash site of UTA Flight 772 and what looked like the result of a bomb.  Bonnie's body eventually was found and returned to the United States.  Due to her special relationship with the Marine Corps that developed throughout her years serving, in particular, in Africa and in Beirut, Bonnie was interred in Arlington National Cemetery.

---

[2]  Unless otherwise indicated, all references to the transcript within the Findings of Fact section refer to the transcript of August 13, 2007.

21.  The tragedy of September 19, 1989, destroyed Ambassador Pugh's life, family, and career.  Already a survivor of international terrorism once before, Ambassador Pugh described himself as "[a]drift and devastated."  Tr. 33:3.  His daughter, Anne, described him as a "shell of a human being."  Pls.' Trial Ex. 1, Carey Dep. 40:21-22.  Ambassador Pugh noted that this terrorist act "ended" his career as a foreign service officer because he could not serve out his term as ambassador.  Tr. 32.  This inability to "serve out the tour . . . d[id] not bode well for further assignments."  Tr. 32:18-19.  He had to resign his ambassadorship, return home from Chad, and eventually retire from the Department of State.

22.  Ambassador Pugh succinctly described his life without Bonnie, "lacking my lifetime mate, I frankly didn't know what to do with myself."  Tr. 33:3-4.

23.  Ambassador Pugh also had to deal with a subsequent tragedy within his family, the suicide of their only son, Malcolm.  Malcolm had been especially close to his mother and her loss affected him profoundly.  After his mother's murder, Malcolm felt completely alone.  Malcolm killed himself approximately three years after her death.

*Anne Carey*

24.  Anne Carey is the daughter of Bonnie Barnes Pugh.  Anne was domiciled in Virginia when her mother perished and currently resides in New York.

25. She testified that her mother made growing up in the diplomatic corps a unique experience.  Her mother "never took [the gift of living abroad] for granted."  Pls.' Trial Ex. 1, Carey Dep. 9:22.  She "spent considerable time and effort making sure that [her] . . . children got to experience the culture and the opportunity and the sites . . . that any given country . . . had to offer."  *Id.* at 9:22-10:1.  Ms. Carey also testified that her mother was a traditional mother who

7

"believed that she wanted to be present each morning and each afternoon when [her children] left for school and when [they] came home from school." *Id.* at 11:9-11.  To her children, Bonnie Pugh "was the center of everything." *Id.* at 11:22.

26.  As Anne grew into adulthood, her mother continued to be a strong influence in her life and she and her mother remained close.  Anne remembers times when her mother would visit her in Charlottesville, Virginia and happily stay in her apartment with her college friends.  According to Anne, her mother "just enjoyed being there with the people I spent time with. . . . She enjoyed really being a part of my life." *Id.* at 23:6-9.

27.  Anne first learned of the disappearance of UTA Flight 772 from a friend.  To Anne, it "was so completely unexpected that it was difficult to even absorb that this could be happening." *Id.* at 27:19-20.  Anne was with her brother Malcolm as the news developed.  Eventually, the United States Department of State called the siblings to confirm that their mother was dead.  As Anne described the experience, "I went in and touched [Malcolm's] shoulder, and I simply repeated to him what I had been told.  And we hugged and we cried, and so it began." *Id.* at 28:20-22.

28.  For Anne, the time immediately following her mother's death was "just a blur of shock and disbelief." *Id.* at 29:2.  Bonnie was traveling back to the United States for the final preparation for Anne's wedding, so "the loss was made more horrific by that fact and the timing of what happened." *Id.* at 29:7-9.  In Anne's words, "It was horrendous." *Id.* at 29:9.

29.  After the initial shock faded, Anne began to have dreams about her mother:  "And I know that for not an insignificant period of time, I used to dream about my mother walking in the desert, being there, that somehow she had – had not been killed by the bomb." *Id.* at 32:6-10.

30.  One of Anne's biggest losses resulting from her mother's premature death is that Bonnie never got to meet Anne's children.  *Id.* at 42.

*Estate of Malcolm Pugh*

31.  Malcolm Pugh was domiciled in Virginia when his mother was killed.  He first learned of the disappearance of UTA Flight 772 from his sister, Anne. The siblings came together to comfort one another as the news developed.  They spoke to their father, and tried to "persuade themselves . . . there was some chance that the aircraft had landed for mechanical reasons."  Tr. 25:18-20.

32.  Malcolm was devastated by the loss of his mother – "his world, in particular, became a much lonelier place for him upon her death."  Pls.' Trial Ex. 1, Carey Dep. 39:19-20; *see also*, Tr. 34.  And he never got over it.  "He committed suicide [in] October of 1992," and his sister Anne believes "that the isolation that he felt and the loss that he felt" over his mother's death contributed to his decision to take his own life.  Pls.' Trial Ex. 1, Carey Dep. 39:23-24; 39:24-25. Ambassador Pugh testified, "Bonnie always was there for [Malcolm] and trying to lessen the angst of young adulthood he was coming into.  He could always turn to her."  Tr. 33:21-23.

*Estate of Harvey Mills Coverley*

33.  Harvey Mills Coverly ("Harvey") was the father of Bonnie Barnes Pugh.  He was domiciled in California when his daughter perished.  He died in February 1994.  Harvey's granddaughter, Anne Carey, is the executrix of his estate.

34.  Harvey was close to his daughter during her childhood.  Bonnie was an only child, and Anne testified that "there was always a connection there as only child to . . . father."  Pls.' Trial Ex. 1, Carey Dep. 6:21-23.  Although Bonnie's parents divorced, Bonnie and her father

9

maintained that close relationship as she matured.  *Id.* at 7.  By the time Bonnie was an adult, she and her father "were [in] avid corresponde[nce] together."  *Id.* at 7:5.  Even as she traveled and lived all over the world with her family, Bonnie remained in very close contact with her father. Upon any opportunity she had to return to the United States, she always reserved some time to visit her father in San Francisco.

35.  Harvey "felt a tremendous loss" over the death of his daughter.  *Id.* at 41:3-4.  The funeral service for her exacerbated that loss.  Harvey "had a real sense of who she was and a tremendous sadness over the fact that he would not be able to have an ongoing relationship with her anymore."  *Id.* at 41:17-20.  At the same time, however, Harvey was very "proud of the woman that [Bonnie] had been," as evidenced by the outpouring of mourners at her funeral.  *Id.* at 41:14.

*Sally Chisholm Johnson*

36.  Sally Chisholm Johnson is the younger sister of Bonnie Barnes Pugh.  She currently resides in California and was domiciled in California at the time of her sister's death.

37.  Sally grew up with her mother, Georgia Mae, and Bonnie, her half-sister, in California.  Sally and Bonnie shared the same mother, but have different fathers.  They were raised as "full sisters" their entire lives.  She was 35 years old before she learned what "half-sister" even meant.  Pls.' Trial Ex. 2, Sally Chisholm Johnson Dep. 11-12, June 19, 2007.

38.  Bonnie and Sally were very close to each other and grew up in a small town setting. Sally recalls memories of riding horses together and camping.  Bonnie, because she was older, often served as a second mother to Sally.  Bonnie both took care of Sally and did fun things with her.  Bonnie helped Sally with school and with dance and music lessons.  The two were so close

that Sally even went on dates with Bonnie.  *Id.* at 15-17.

39.   Sally admired Bonnie greatly – Bonnie was her idol as a child and as an adult.  When Bonnie went off to college at Berkeley, Sally missed her very much.  They continued a close relationship even when Bonnie moved out of the house.  *Id.* at 18-19.

40.   As adults, Bonnie and Sally remained close.  Bonnie was charming and pretty, always thoughtful and well regarded.  They spent time together when Bonnie and her family would visit California.  Sally's children fondly remember Bonnie as a caring aunt who would bring them interesting things from overseas.

41.   Sally remembers how she learned that  Bonnie's plane was missing on September 19, 1989.  She opened her mailbox that was at the end of her country road and saw a small article in the newspaper that said "French airliner missing over Africa."  *Id.* at 25:16-17.  Sally almost immediately knew that the plane could be Bonnie's but did not want to say anything to alarm Georgia Mae, their mother, until she had more information.  But when she returned home, several family members and her best friend were already there.  Her mother already had heard the news. Sally then called Bonnie's children, to try and get more information.  She was told that there was not likely to be any good news.  A few days later, Anne, Bonnie's daughter, told Sally that the plane had exploded over the desert and there were no survivors.  After hearing the news Sally first was in denial, and then went completely numb.  *Id.* at 27-28.

42.   At the time of Bonnie's death, Sally was most concerned about the effect of the tragedy on their mother.  As Sally put it, when Bonnie died, "a light went out in [mother's] life never to come back."  *Id.* at 28:16-17.  Bonnie's death, in fact, did lead to a decline in their mother's health.  Sally attended Bonnie's funeral at the Arlington National Cemetery, but their

mother could not, because of her failing health. Georgia Mae said, "Go and bury my baby." *Id.* at 33:7-8.

43.  Sally remembers Bonnie as an amazing person with many friends, each of whom treasured his or her relationship with Bonnie, as Sally did.  Sally remembers how Bonnie loved nature and birds.  Bonnie was thoughtful and generous – she always made everyone's birthday a special occasion.  Sally also described the important role Bonnie played in her life – when Sally had her first child and when Sally's father and first husband died suddenly.  Bonnie traveled to California and stayed with her, caring for her and helping her cope with her great loss.  Sally summed up the impact of Bonnie's life this way, "she made us all a little better person." *Id.* at 37:2-3.

44.  Sally remembers Bonnie often, especially on her birthday and during the month of September.  She feels as though she was robbed of the opportunity to enjoy old age together with Bonnie – sharing special moments as only sisters can. *Id.* at 37-38.

*Estate of Georgia Mae Chisholm*

45.  Georgia Mae Chisholm ("Georgia Mae") was the mother of Bonnie Barnes Pugh.  She was domiciled in California in 1989 and died in 1996.  Georgia Mae's daughter, Sally Chisholm Johnson, is the executrix of her mother Georgia Mae's estate.

46.  Georgia Mae had two children, Bonnie and Sally Chisholm Johnson.  They were raised together from an early age in California, despite the fact they had different fathers. *Id.* at 11.  Georgia Mae and Bonnie were "very close."  Their early relationship set the stage for their relationship the rest of their lives.  Bonnie always took care of her mother.  Bonnie made Georgia Mae a cup of Ovalteen every night.  Sally describes it as almost a reversal of roles – Bonnie often

"mothered" her mother. *Id.* at 14.

47. Bonnie and her mother remained very close even into adulthood. Bonnie would send her mother gifts from her many travels, as well as framed embroidery and afghans. Bonnie became, as Sally put it, "the window on the world" for her mother. *Id.* at 21:1. Bonnie took Georgia Mae to special places and often brought her to Washington, D.C., where they would spend time together sewing and talking. Theirs was a lifelong partnership that ended only when Bonnie was killed.

48. Georgia Mae learned of her daughter's death on September 19, 1989, through a series of news reports and discussions with family members and friends. When she learned Bonnie had been murdered, "a light went out in her life never to come back." *Id.* at 28:16-17. She was overwhelmingly sad, lamenting, "[m]y mother was blown up in an explosion when I was a baby. And now my baby daughter has been blown up." *Id.* at. 30:5-6. Although she was devastated by her loss, Georgia Mae, at her advanced age, was not able to attend Bonnie's funeral service in Arlington National Cemetery because of the travel demands involved.

49. As Sally put it, Georgia Mae never recovered from the death of her "favorite" daughter. *Id.* at 28. Georgia Mae lived for seven years after Bonnie died, and the tragedy had an impact on her both mentally and physically. Georgia Mae's health declined after she heard of the death of her daughter, Bonnie.

*Estate of Mihai Alimanestianu*

50. Mihai Alimanestianu ("Mihai") was a passenger on UTA Flight 772 . He was born in Bucharest, Romania on April 2, 1919, and became a United States citizen in 1953. His estate was administered in New York where he was domiciled at the time of his death.

51.  Mihai met his wife, Ioana Alimanestianu when Ioana was 17.  They married in Romania in 1947 when Mihai was 28 and Ioana was 19.  They found their way to the United States in 1948.  Mihai and Ioana had five children, one of whom died as an infant.  The surviving children are Joanna, Nicholas, Irina, and Alexander.

52.  Mihai was a mechanical engineer by profession and he did a lot of oil drilling equipment work when he came to the  United States.  Eventually he became an inventor and held several patents on his inventions.  Among these was an invention for an automated parking garage called Speed Park, as well as inventions for an automated people mover and an automated highway.  Over time Mihai began "free-lancing" with various engineering companies and was doing "quite well" financially.  Tr. 52.

53.  In the years immediately before his death, Mihai worked in Africa – first in Gabon as an engineer helping to build that country's railroad – and then on a contract with the United States Agency for International Development ("USAID") to help rebuild the infrastructure of Chad.  He was returning to the United States in September 1989 because his contract in Chad was over and he was planning to continue working free-lance, redevelop his patents, and develop a parcel of land he owned along the Hudson River in New York into his "dream house."  Tr. 52-54, 58-59.  Even though he was 70 at the time of his death, Mihai was not planning to retire.  He was a very "active" man and "[h]e couldn't have just sat around at home, no, never."  Tr. 58:22-23; 59:11-12.

*Ioana Alimanestianu*

54.  Ioana Alimanestianu ("Ioana") is the wife of Mihai Alimanestianu.  She  lives in New York, and is a United States citizen.  Ioana and Mihai were domiciled in New York in September, 1989.

14

55.  Ioana and Mihai met in Bucharest when she was 17.  They married two years later when she was 19, and they separately escaped from communist Romania in 1947.  They emigrated to the United States the following year and eventually settled in New York.  When Mihai died, he and Ioana had been married for 42 years.  Ioana described their relationship as follows: "really we were very close, he was my best friend."  Tr. 58:17.

56.  Mihai and Ioana had five children, one of whom died as an infant.  When asked to describe Mihai as a father, Ioana said "he was quite demanding, but at the same time very understanding and very much helpful, quite helpful to get everybody to do what they really wanted to do."  Tr. 57:6-8.  As a result their children all have university degrees with one a lawyer and the others architects and engineers.  "So he was very warm, very much alive, very much with plans, always plans, plans."  Tr. 57:11-12.

57.  Ioana received word of UTA 772's crash from one of the children.  One of them called and said, "[t]he plane has disappeared, we don't know what happened."  Tr. 54:21.  Ioana did not learn what happened until the next morning when she "found out it was over the Sahara Desert.  It had crashed on the Sahara Desert in Africa."  Tr. 55:1-3.  As Ioana said, "I knew he was on that plane.  It – well, what can I say? . . . It's something that you can't believe that it happens."  Tr. 55:7-10.

58.  The family had a memorial service on the land Mihai loved overlooking the Hudson River.  Although Irina had asked to see the remains in Paris, the French would not let her "because it was horrible."  Tr. 55:24.  The family received what was left of Mihai's body in New York and buried him on the property next to the Hudson.  Subsequently the family donated the land to a land conservancy trust that promised never to develop it.

15

59.  When asked to describe what the family does to remember Mihai on anniversaries and the like, Ioana said, "I don't know what to tell you.  He is still the same to me.  I mean he is there.  And we try to remember him. … We talk about him.  I have all his patents in my apartment, and I show them what he was planning and doing."  Tr. 59:20-60:4.

*Joanna Alimanestianu*

60.  Joanna Alimanestianu ("Joanna") is the oldest child of Mihai Alimanestianu.  She is a resident of New York, New York and Brussels, Belgium.  She is a United States citizen, having been born in Texas on June 21, 1950.  At the time of her father's death, Joanna was 39 years old and her domicile then, as now, was New York.

61.  Joanna is an architect and city planner.  She attended Barnard College, the Polytechnic in Switzerland, and has a Masters degree from Princeton University.  Pls.' Trial Ex. 3, Joanna Alimanestianu Dep. 7, July 9, 2007.  She became an architect "mostly because" of her father.  *Id.* at 10.  He encouraged Joanna throughout her life and Mihai is the reason she is something of a "workaholic" because "of his enthusiasm for all these things that we can do while we are still alive."  *Id.* at 11:2-4.  Joanna described an instance where he encouraged her in ballet as a young girl, and another instance where he encouraged her through a tough curriculum at the Polytechnic in Switzerland.  *Id.* at 16-18.  Joanna described her father as "always very encouraging."  *Id.* at 11:23-24.  He was to her and her friends something of a larger than life figure.  *Id.* at 12.  He was "absolutely" a reason for Joanna's professional success.  *Id.* at 19:1.

62.  Joanna's close relationship with her father continued into adulthood.  She described her enjoyment at telling her father about projects on which she was working, and delighting in his interest in those projects and in her family.  In fact, he planned to travel on to Brussels after UTA

Flight 772 landed in Paris (before heading back to New York) so that he could visit Joanna and her five month old twins that had been born on April 2, the same day on which Mihai was born. *Id.* at 9, 13.  She also was the first of the family to visit Mihai in Africa after he commenced his work there.  She greatly enjoyed her time in Africa with her father and marveled at his enjoyment of the country.

63.  Joanna heard of the crash of UTA Flight 772 from her husband who told her that he had heard on the news that "the plane that was coming in from Chad had disappeared."  *Id.* at 8:25-9:2.  The only thing Joanna could think of was "what if I had told him [when they had talked a few days earlier] . . . come this day" rather than on September 19.  *Id.* at 9:21-22.

64.  Following Mihai's death, there was a memorial service in the United States and Joanna represented the family in Paris during various French events and proceedings connected to UTA Flight 772, including the criminal trial of the Libyans.  At the close of the nine-year French legal proceedings, Joanna was prepared to present an elaborate "thank you" presentation. However, when she arrived in Paris at the location, she found all she could do was cry.  In fact, she could not stop crying at that point nine years after the bombing.  *Id.* at 22-23.

*Nicholas Alimanestianu*

65.  Nicholas Alimanestianu ("Nicholas") is the son of Mihai Alimanestianu.  He resides in New York and was domiciled there in 1989.  He is a United States citizen, born in Houston, Texas on August 29, 1951.

66.  Like his father, Nicholas is a mechanical engineer by training, having obtained a degree from New York University.  Pls.' Trial Ex. 4, Nicholas Alimanestianu Dep. 7, July 9, 2007.  Nicholas worked with his father during his summers and studied engineering because he

wanted to work on his father's inventions with him.  Nicholas had a close relationship with his father as a child and that close relationship continued into adulthood.  *Id.* at 10.  Nicholas described Mihai as "a very good father, caring."  *Id.* at 20:9-10.

67.  Nicholas learned of his father's death when he was driving on the Long Island Expressway.  His brother Alex called him to say that their father's plane was missing.  *Id.* at 13.  His brother also was the one who later confirmed the plane had crashed.  Mihai's death greatly affected Nicholas, so much so that he could not speak of the days after the bombing of UTA Flight 772 at his deposition.

68.  Nicholas described the memorial service for the victims of UTA Flight 772 in Paris as a "very moving ceremony" at which the President of France spoke.  *Id.* at 16:24.  The entire family attended.  There was a subsequent ceremony in New York at the Orthodox church, and then later on the family's Hudson River property during which Mihai's ashes were interred.

69.  While Mihai's death affected each member of his family, it specifically deprived Nicholas of the opportunity to work with his father on inventions and engineering projects – something he was looking forward to doing.  *Id.* at 18.  Mihai's legacy was that "he left behind a wonderful family and also a great history of his achievements."  *Id.* at 21:24-22:2.  In addition, Mihai "did things that would help humanity and help the public. . . . It was a terrible tragedy that someone like that would get killed by a terrorist attack.  Just a great loss."  *Id.* at 19:14-25.

*Irina Alimanestianu*

70.  Irina Alimanestianu is the daughter of Mihai Alimanestianu.  She resides in California, was domiciled there in 1989, and is a United States citizen.

71.  Mihai was an incredible father and "a larger-than-life figure."  Pls.' Trial Ex. 5, Irina

18

Alimanestianu Dep. 7:7, July 9, 2007.  Irina described how Mihai had created a home life of constant learning, "full of art [and] . . . . all different kinds of magazines and books."  *Id.* at 7:9-10.  Long before it became popular, Mihai taught his children about conservation and environmentalism.  He taught them to be mindful of how their conduct would affect the world.  They were taught never to litter.  Mihai also introduced his children to his passion for planning and land development.  He had them help with building roads and landscaping the property he owned in Nyack, New York.  The family also vacationed together.  They took frequent ski trips, and every summer Mihai took the family to Europe.  *Id.* at 7.

72.  When she became older, Irina worked with Mihai in Africa for three summers.  During her time in Africa, Mihai's instruction on conservation and environmentalism continued.  For instance, Irina was amazed that Mihai designed a suspension bridge with arches large enough for an elephant to walk under so that the bridge would not disturb the delicate ecosystem.  *Id.* at 8.

73.  Irina first heard that her father's plane was missing when she received a call from her brother.  She immediately feared the worst.  While her brother urged the family that "if anybody could survive, it's Mihai," Irina testified that she "somehow . . . just . . . knew" that her father was gone.  *Id.* at 9:24-25; 11:13-14.  Indeed, on her way to work that day, she experienced an overwhelming feeling that the day would bring her sadness.  *Id.* at 12.

74.  In the weeks and months that followed Mihai's death, Irina was devastated.  She could not function normally.  All she could do was go to her husband's downtown office building and pace around the garden.  Eventually, Irina and her siblings traveled to Paris to participate in the French investigation.  The grieving family attempted to view Mihai's body, but the French authorities refused, citing the incomplete and gruesome nature of the remains.  *Id.* at 13-14.

19

75.  Irina has suffered lingering effects of Mihai's death.  She cannot watch movies or news programs that feature terrorist attacks or airplane bombings in particular.  When she rides an airplane, she feels a compulsion to tell absolute strangers the story of her father's sudden death.  *Id.* at 10.

*Alexander Alimanestianu*

76.  Alexander Alimanestianu is the youngest son of Mihai Alimanestianu.  He is and always has been domiciled in New York.  Alexander is a United States citizen and was born on January 31, 1959 in Nyack, New York

77.  Alexander's youth was filled with great memories of Mihai.  Alexander recalls that his father had "an interest in so many . . . things that were fascinating . . . to [Alexander]."  Pls.' Trial Ex. 6, Alexander Alimanestianu Dep. 9:16-18, July 17, 2007.  Overall, Alexander describes his upbringing with his father as "incredibly interesting[,] . . . rich, broad, . . . [and] international."  *Id.* at 9:21-23.  Mihai encouraged Alexander and his siblings to broaden their horizons by learning foreign languages – in Alexander's case, French – and traveling to other countries.  Alexander's relationship with his father was very strong during his childhood and remained strong when Alexander attended school in Switzerland.

78.  Alexander attended the 8th and 9th grades in Switzerland.  During these two years, Mihai brought the family to Switzerland for Christmas and other holidays so that they could "have the holidays together and go skiing and travel around."  *Id.* at 12:16-17.  After completing 9th grade, Alexander returned to the United States and completed high school at Exeter, in New Hampshire.  Alexander remained in close contact with his father while at Exeter.

79.  Alexander kept close contact with his father throughout his college years and into his

adult life.  Mihai owned property in Nyack, New York, and often took Alexander there on

weekends.  Alexander and his father spent time together planting trees and performing general

maintenance.  This property was Mihai's "refuge," so Alexander felt privileged to spend "lots of

weekends" there.  *Id.* at 13:8; 13:9-10.  During college and into adulthood, Mihai continued to

encourage Alexander to see the world, and the two of them traveled "quite a bit" around

California and Europe.  *Id.* at 13:14.  Mihai's job stationed him in Chad and Gabon for several

years, and Alexander recalls, "it wasn't easy . . . to stay in touch [with my father at that time], but

[I] definitely did."  *Id.* at 15:17-18.  Alexander even found a way to stay with his father for several

summers in Chad and Gabon.

80.  Alexander first heard that UTA Flight 772 was missing when his sister, Joanna, called

him at work and informed him that "the plane hasn't landed and [Joanna didn't] know what

happened."  *Id.* at 16:17-18.  Alexander immediately called his mother, Ioana, to relay the

information and then hurried to her apartment.  Alexander and Ioana immediately began calling

around to gather "as much as [they] could about whether [Mihai] was actually on the plane or

not."  *Id.* at 17:6-8.  As the afternoon wore on, Alexander and Ioana received "more and more bad

information."  *Id.* at 17:13.  Alexander only recalls the next few days as a "blur."  *Id.* at 17:15.

81.  Upon the official confirmation that Mihai was dead, Alexander and several other

family members went to Paris.  Since Alexander is a lawyer, Ioana, his mother, "expected [him] to

take charge of . . . handling whatever business issues . . . and estate issues there were," as well as

the "communication and organiz[ation of] the trip to France."  *Id.* at 18:6-9; 18:9-10.  One of the

more "gruesome things was trying to identify [Mihai's] remains . . . [W]hat we had to do was call

[Mihai's] dentist and get his dental records. . . . [T]hat was not a happy phone call."  *Id.* at 20:25-

21:7.  As a result of all of these events, Alexander was suddenly thrust into the "focal point . . .

[in] deal[ing] with the mess" that resulted from the murder of Mihai.  *Id.* at 18:12-13.  Mihai's

family and friends held a memorial service for him in Paris, France, and the family "tried to be

together . . . [to] make sense of what was going on."  *Id.* at 19:6-8.  Mihai's body was cremated

before returning to the United States.

82.  The Alimanestianu family held another memorial service for Mihai upon their return

to the United States.  Alexander and his sister spoke at the service, but one of Alexander's

brothers was "too nervous. . . . [and] couldn't speak."  *Id.* at 20:8-9.  The family spent the weeks

after the service grieving Mihai's death by spending "a lot of family time and time with friends."

*Id.* at19:25.

83.  Alexander's contacts in France provided him with updates on the French investigation

and he learned that Libya was responsible for the bombing of UTA Flight 772.  Alexander was

"shock[ed]" by the "murder. . . . pure and simple, whether [the murder] is by a government or by a

person . . . it's shocking . . . ."  *Id.* at 23:9-12.  On a core level, Alexander felt "confus[ed] to wake

up one day and . . . have just a sudden death like that . . . for such a senseless purpose. . . . [I]t is

just an act of random violence."  *Id.* at 24:23-25:4.

84.  To honor Mihai's memory, Alexander and his family sold Mihai's Nyack, New York

property to a Trust for Public Land, which agreed to never develop the land.  Additionally,

Alexander plans to place a bench on this property in memory of his father.  Even these loving

tributes to Mihai fail to erase the pain caused by his death.  Alexander feels that he and his family

have missed out on significant life events that they would have shared with Mihai.

85.  Alexander was never able to introduce his wife or children to Mihai.  As a result of

Mihai's premature death, Alexander's wife and children were stripped of many memories and relationships that they could have built with Mihai. Alexander's children were deprived of the special bond that a grandparent has with a grandchild – the "relationship and the feeling of the intergenerations of [the] family…. that's what life is about." *Id.* at 24:16-19

86. Alexander and his family specifically honor the memory of Mihai on September 19 as well as on Mihai's birthday. However, Alexander describes the memory of his father as "a constant thing." *Id.* at 27:12. Strong emotions and "anxiety" surface when Alexander or his children "get on an airplane. . . . [We] can't fly without worrying." *Id.* at 27:18-21. Alexander believes that, even if Mihai could look back to his own untimely death, Mihai "wouldn't change his view that people are fundamentally good and the world is a fundamentally good place." *Id.* at 28:11-13. Alexander feels that he has inherited his father's optimistic spirit, and he "[will never] let something like [his father's death] change his . . . view of the world." *Id.* at 28:22-24.

*Estate of Calin Alimanestianu*

87. Calin Alimanestianu was the younger brother of Mihai Alimanetianu. He was domiciled in Florida in 1989, and died on February 12, 2005. Calin's daughter, Simone Desiderio, is the executrix of her father's estate. Calin became a United States citizen in 1961. Simone resides in Florida, and is a United States citizen.

88. Calin was born in Romania in 1922 and grew up with his three brothers, Mihai, Serban, and Constantin. The brothers were all very close from their youth until the time of their deaths. After Calin escaped Romania in the 1950s, he settled in New York near his brother, Mihai. The brothers and their families were always together, including on holidays and other special occasions. Even after Calin moved to Florida in 1973, the families remained very close.

Mihai would visit Calin and Calin's family in Florida quite often, and Calin would bring his family to New York to visit with Mihai, especially during the summers.  Mihai was very close to Calin, all of his brothers, and all of his brothers' children.  After Mihai's death, Calin and his family continued to spend time in New York with Mihai's family and the families of the other brothers; of course, Mihai was missing during those family gatherings.  Pls.' Trial Ex. 7, Simone Desiderio Dep. 10-15, July 19, 2007.

89.   Calin was devastated when he heard the news that his brother had been killed in the bombing.  He was so devastated that he became physically ill, crying and vomiting.  It was an extremely difficult time.  After the bombing, Simone found herself visualizing Mihai's death, wondering how he actually died.  Whenever she flies, she experiences fear because of Mihai's tragic death.  Simone testified that her father Calin had similar reactions and experiences following the bombing – Calin and Mihai were very close brothers and, because of the bombing, Calin's "big brother was gone."  *Id.* at 19:9.  It was a terrible loss to the entire family, including Mihai's brothers.

90.   Calin was deeply angered and hurt upon learning that Mihai had been killed as a result of a bombing by Libya.  Simone testified that it is difficult to express in words just how deep these feelings were; it was difficult for Calin to speak about it at all for some time.  "He just was so sad" and Calin suffered greatly.  *Id.* at 20:19.

91.   Calin remembered Mihai often after the bombing – especially on Mihai's birthday and the birthdays of Mihai's children.  Calin also tracked the story of bombing very closely in the news.  Every time there was an article or anything about cases related to the bombing, Calin would send it along to all of his children.  *Id.* at 21.

92.   Calin looked up to Mihai as a big brother who impressed upon him a love of nature, animals, and humanity.   The loss of his brother caused Calin lasting anger and pain.   Calin loved his brother and would have wanted to have lived to express that love in connection with this litigation.   *Id.* at 22-23.

*Estate of Serban Alimanestianu*

93.   Serban Alimanestianu was the younger brother of Mihai Alimanestianu.   He was domiciled in New York in 1989, and died on December 15, 2005.   Serban's wife, Kathy Alimanestianu, is the executrix of her husband's estate.   Serban became a United States citizen in the early 1960s.   Kathy resides in Massachusetts, and is a United States citizen.

94.   Serban was born in Romania in 1920 and grew up with his three brothers, Mihai, Calin, and Constantin.   The brothers were all very close from their youth until the time of their deaths.   Pls.' Trial Ex. 8, Katherine Alimanestianu Dep. 12-14, July 26, 2007.   Serban and Mihai were particularly close because "[t]hey were only 16 months apart, so they did everything together."   *Id.* at 12:3-4.   After Serban escaped Romania in the late 1950s, he settled in Texas with his brother, Mihai, and acted as a caregiver to Mihai's children.   When Kathy first met Serban, he was living in the same house as Mihai.   Later, Mihai's family and Serban's family lived next door to one another for more than 10 years.   *Id.* at 13.

95.   Serban "was very sad and devastated and shocked" when he heard the news that his brother had been killed in the bombing.   *Id.* at 17:19.   Kathy stayed home from work to care for her grieving husband, who spent most of his waking hours on the phone trying to console Mihai's adult children.   After the bombing, Serban would have visions of Mihai and sometimes felt like Mihai was in the room.   *Id.* at 18.

96.  Serban remembered Mihai often after the bombing – especially on Mihai's birthday when he would talk to Mihai's widow.  *Id.* at 20.

97.  Serban looked up to Mihai as a big brother and as "kind of the leader of the family." *Id.* at 16:4.  When Mihai died, part of Serban's life was destroyed.  The tragedy "took part of [Serban] away."  *Id.* at 22:10-11.

98.  Kathy decided to continue Serban's participation in this lawsuit "in memory of my late husband whom I loved, who was very saddened and depressed by Mihai's death, and also in memory of Mihai's family and children, who were really devastated by his death."  *Id.* at 11:15-18.

*Estate of Constantin Alimanestiano*

99.  Constantin Alimanestiano was the younger brother of Mihai Alimanestianu. Constantin's wife, Pauline Alimanestiano, is the executrix of her husband Constantin's estate. Constantin was domiciled in New York in 1989, and was a United States citizen at all times relevant to this litigation.

100.  Constantin and Mihai escaped from Romania together.  They traveled through France and Canada, and eventually settled in the United States.  In the United States, the relationship between Constantin and Mihai remained "very close."  Pls.' Trial Ex. 9, Pauline Alimanestiano Dep. 8:10-11, July 9, 2007.  As they grew older, they shared a common vision of their careers, as both were "heavily involved in inventing . . . planning, building, always constructing new ideas."  *Id.* at 8:17-19.  Mihai and Constantin continued to spend a lot of time together after Constantin's marriage to Pauline.  In fact, Constantin and Mihai remained close even when Pauline and Constantin moved to Chicago.  Constantin would occasionally surprise his

wife and children by declaring, "we have to take this weekend and go to New York [to visit Mihai,]" during which Constantin would be "very happy . . . and [have] wonderful times." *Id.* at 9:10-11; 9:12-14.

101.   Mihai had a close relationship with Constantin's children.  "When they were little they enjoyed [Mihai] very much, but as they got older they were very impressed by him" and "he almost had a celebrity status." *Id.* at 9:19-21; 9:22.  Mihai was godfather to all three of Constantin and Pauline's children.  Mihai's close relationship with Constantin's children continued into their adulthood.  *Id.* at 10.

102.   When Constantin heard the first news accounts of the disappearance of UTA Flight 772, he immediately became worried, saying "this is very bad, because I think that Mihai is scheduled to come home this week." *Id.* at 10:25-11:2.  Pauline reassured him that Mihai was most likely not on UTA Flight 772, and they proceeded to dinner and retired to bed early.  In the middle of the night, their daughter Christine called.  Pauline testified that Constantin immediately knew the reason for Christine's call.  Constantin refused to talk about his brother's death, "ke[eping] all his emotions inside," and showed no visible reaction to the tragic news.  *Id.* at 11:13.

103.   Constantin continued to be affected by the death of Mihai and refused to talk about it to anyone for "the first few years." *Id.* at. 13:17.  At the time of Mihai's death, Constantin had been waiting for Mihai to retire so that the two brothers could "put into effect" some of their ideas and programs. *Id.* at 12:23.  Constantin wanted to share his ideas and thoughts with Mihai, as Constantin "very much appreciated [Mihai's] advice and help with his . . . inventions." *Id.* at 13:12-13.  But Constantin lost a significant opportunity due to Mihai's sudden death.  Constantin

shared his "innermost ideas" with Mihai and that "type of being together . . . was a great source of stability" to Constantin.  *Id.* at 16:11; 16:7-8.  He lost not only his older brother, but also his role model.  After Mihai's death, Constantin no longer had Mihai as an emotional and intellectual outlet to share his ideas, inventions, and thoughts.

*Estate of Mark Edward Corder*

104.  Mark Edward Corder was a passenger on UTA Flight 772 and was domiciled in Texas at the time of his death.

105.  Mark was returning from Chad, Africa where he was working as a senior petroleum geologist for Exxon.  As a child, Mark was an altar boy, was in the color guard, and also was a straight-A student in high school.  Mark attended college and graduated with a degree in geology from Ball State University in Indiana. He started working in the oil industry for Dresser Atlas. After one year, he was hired by Exxon to work in Exxon's Weybridge, England office out of which Exxon's European and African operations were run.  While at Exxon, Mark pursued the company's scientific and technical path, earning promotions on a regular basis.  At the time of his death, Mark was earning approximately $75,000 per year in addition to a bonus related to his travel and work assignments in foreign countries.  For his work, Mark regularly earned a 35 to 70 percent bonus on his base salary.  Tr. 114-16.

106.  Mark had no intention to work in any other industry or to change employers.  As his wife, Carla, testified, "He loved it.  He loved it.  That was – he had no other plans except to look at rocks."  Mark also was "very proud to work for Exxon" and had no intention of leaving the company.  Tr. 121:14-15; 121:21.

107.  Mark's estate is represented by his wife, Carla Malkiewicz.  He is survived by his

28

wife, his brother Michael Corder, his sister Therese Coddington[3], and his father, Edward Corder (now deceased).

*Carla Malkiewicz*

108.   Carla Malkiewicz resides in Conroe, Texas, and is a United States citizen.  Mark and Carla were domiciled in Texas at the time of his death.

109.   Carla has known Mark since they were children.  They grew up on the same street, played baseball together, and rode bikes together.  Mark even mowed her grass.  Carla remembers that Mark "always had a crush" on her and she still has his baseball mitt from when he was a little boy that has her name written in it.  Tr. 116:11-12.  Carla does not remember ever not knowing Mark and does not remember "not having him in [her] life."  Tr. 117:2.

110.   After Mark graduated from college, he and Carla became romantically involved and Mark asked Carla to marry him, telling her: "I'll show you the world."  Tr. 118:3.  Mark and Carla were married in 1982.  It was hard for Carla whenever Mark was away for work – "[t]hree weeks was a long time to be without him" – but whenever he came back they shared a "wonderful" and "magical" time together, especially traveling the world.  Tr. 122:14-15; 119.  Carla has been married three times in her life, but she "only had one soul mate, and that was Mark."  Tr. 119:14-15.

111.   Carla recalls that Mark was the "star of [his] family" and that everyone looked up to him.  Tr. 120:18.  Even in the community, she remembers how exciting it was whenever Mark came home to Indiana:  "It was just like the lights went on in Indiana when he was there."  Tr. 121:1-2.

---

[3]  Therese Coddington is also known as Teresa Coddington.

112.   The last time Carla saw Mark was at the airport when he left for his final rotation in Chad.  Mark left on Carla's 40th birthday and they had celebrated at a big party the night before. Carla also spoke to Mark a few days later on September 4, their anniversary.  On September 19, Carla was waiting for Mark to come home to her in Houston after his rotation had completed. Instead, she received a call from Mark's boss saying that Mark's plane was missing.  Carla was volunteering at the YMCA at the time and froze complete, unable to move.  She suddenly felt as if she were underwater and did not know how she would get home.  She began to shake uncontrollably and was still shaking when she arrived at home.  Even after her friend, a nurse, provided her with some medication, she still could not stop shaking.  Carla started calling friends and people started coming over, including the wife of Mark's replacement on the rig who spent the night.  They discussed hopeful scenarios of how Mark could have survived, but then received the call that the plane was found and there were no survivors.  Tr. 124-25.

113.   Following Mark's death, Carla recalls her body feeling so heavy that she could hardly move.  She had difficulty even getting out of bed, and had to do everything one step at a time:  "the tiniest little things were so hard to do."  Tr. 126:16-17.  Carla tried "just to keep [her] head above the water" during this "awful time" when she had to respond to calls from the State Department and others, locate dental records, and deal with the investigators' inability to identify Mark's body or even to confirm that the body existed.  Tr. 127:1; 126-27.  When Carla learned that Mark's death was the result of an intentional act, she was "so devastated . . . just so sad."  Tr. 127.

114.   After the bombing, there were two memorial services for Mark – one in Houston at Mark and Carla's home and another in Indiana, Mark's home town, where 400-500 people

attended.  Carla recalled feeling strange arriving at the Indianapolis airport without Mark.  Some time thereafter, Mark's body was found and returned to the United States, but Carla was still suffering so greatly just to handle her day-to-day functioning that she "couldn't go through another public ceremony."  Tr. 129:18.  Instead, Carla went by herself to the airport, watching through the glass as Mark's body came off the plane and thinking about how much time they had spent together in airports.  This would be the last time.  Carla could not recall how many days, weeks, or months it took for her to come to grips with the fact that Mark was not coming home and that she would never pick him up at the airport again.  She was "so sad" and was "really a wreck in [her heart]" having lost her "soul mate."  Tr. 130:17-18.

115.  The things Carla missed out on because of Mark's murder "are too numerous to even describe" but she knows her life with Mark would have been "wonderful."  Tr. 132:12-13; 132:19.  Carla still thinks about Mark every day and has particularly difficult days on Marks' birthday and their anniversary.  She has undergone grief counseling to help her cope with her loss. Still, Carla testified that she has not been able to "go on with [her] life."  Tr. 135:20-21.

*Therese Coddington*

116.  Therese Coddington is the younger sister of Mark Edward Corder.  She resides in Indianapolis and is a United States citizen.  At the time of Mark's death he was 35 and Therese was 34.  She was domiciled in Indiana in 1989.

117.  Therese was the middle child of three, with Mark being eleven months older, born in 1954, and her brother Michael being two years younger, born in 1957.  The three Corder children were "very close" growing up.  Pls.' Trial Ex. 10, Teresa Coddington Dep. 9:15, May 31, 2007.  Although Therese described Mark as a very shy child, she said he grew "out of his shell" in high

school and "always wanted to protect [her]." *Id.* at 10:17; 11:6.  She has special memories of

camping trips, swimming lessons, and Easters with Mark, and she recalls baking cookies for him

and sending them off to college in Pringles cans. *Id.* at 24-25.  Although Therese described Mark

as "against public displays of affection," the last time she saw him was at an airport where he gave

Therese "a big hug" and said he loved her. *Id.* at 13:3-4.

118.  Therese also has two daughters, ages 29 and 27, who knew Mark when they were

children.  Mark was very close to them as well, always writing them, sending them presents at

Christmas, and otherwise playing with them whenever he was around. *Id.* at 14-15.

119.  On September 19, 1989, Therese first heard that a DC-10 had been lost and at first

thought nothing other than "how in the hell do you lose a DC-10?" *Id.* at 17:21-22.  Later in the

day, Carla, Mark's wife, tracked Therese down on the phone at Therese's part-time job at a retreat

center.  Carla told Therese "Mark is on that plane." *Id.* at 18:7.  The rest of the day and into the

next few days everyone just waited around hoping for news.  Everyone was "in a daze" and

"shocked." *Id.* at 19:14.

120.  The family had a memorial service for Mark but it was without his body.  Mark's

body was returned to his wife Carla at a later date but, as Therese explained, "Carla was in so

much pain that she couldn't allow [the rest of the family] to be with her for that. . . . it was very

hard, very hard for my dad and for us, to not really have that part of the closure." *Id.* at 21:10-16.

121.  Therese remembers Mark every day.  September in particular is a difficult month for

her because Mark died on the 19th, her mother died on the 20th, and her best friend from high

school also died in September.  She feels that "if Mark would have been here today, the three of

us in this family, our lives would have been totally different." *Id.* at 30:2-5.

*Estate of Edward Corder*

122.   The Estate of Edward Alfred Corder is represented by Therese Coddington in her capacity as Executrix of the estate.  Edward Corder, who died in 1996, was the father of Mark Edward Corder.  Edward and his late wife, who died in 1981, had three children – Mark, born in 1954, Therese, born in 1955 and Michael, born in 1957.  Edward Corder was domiciled in Indiana in 1989. *Id.* at 5- 7.

123.   Edward Corder was born in Indianapolis, Indiana on January 3, 1927 and was a citizen of the United States.  The Corder family was a "very loving family" where everything was "done together." *Id.* at 9:11; 9:12.   As Therese testified, "[i]f my parents had things to do and we weren't invited as children, they usually didn't go. . . . we were just very close." *Id.* at 12-15.  As she explained further, "he was a great father." *Id.* at 16:10-11.

124.   The close relationship between father and son continued into Mark's adulthood. Therese testified that while Edward Corder had a close relationship with all three of his children, Mark "made my dad's world bigger" and was "a support person with my dad." *Id.* at 16:16-17; 17:1-2.  She explained how Mark brought their father to England to visit during a period when Mark and his wife Carla lived there.  In describing further her father's relationship with Mark, Therese said, "Mark always gave us something to look forward to, you know, and especially for my dad." *Id.* at 22:8-10.  Mark's wife, Carla, testified that Edward was "so, so proud of Mark," especially because of Mark's higher education, career path, and world travels.  Tr. 120:21.

125.   On September 19, 1989, when the Corder family was first learning of the bombing on UTA 772 and Mark's presence on that flight, the first thing Therese thought was "I've got to get to my dad, because my dad at the time was a heart patient."  Coddington Dep. 16:1-3.  She

explained, "I was afraid literally that my dad would be dead by the time I got to him, and I wanted to be the one to tell him." *Id.* at 16:4-6.

126.  Although Edward Corder was not in good health at the time of Mark's death, Therese testified that Mark's death "was like the beginning of the end for him." *Id.* at 22:3-4. Although Edward Corder lived seven more years, until 1996, Mark's death "affected him more than anything else in his life." *Id.* at 22:25-23:1.  As Therese explained, the loss of a child is "the hardest loss," and in the case of Edward Corder, "I think that it affected my dad because he took it inward, and we didn't talk about it a lot.  I mean we sat there and just stared at each other more." *Id.* at 22:16; 22:17-20.

*Michael Corder*

127.  Michael Corder  is the younger brother of Mark Edward Corder.  Michael lives in Indianapolis, Indiana and is a United States citizen.  Michael was domiciled in Indiana in 1989.

128.  Michael grew up with his older siblings, Mark and Teresa, in Beech Grove, Indiana. Without much by way of financial resources, the children spent most of their time hanging out together, doing things like "playing Zorro."  Pls.' Trial Ex. 11, Michael John Corder Dep. 8:20-21, May 31, 2007.  Michael spent substantial time with his big brother, Mark, going hunting or fishing with their dad, playing baseball, football, and basketball together, and going camping and hiking.  Michael and Mark just liked to do "things little brothers and brothers do." *Id.* at 10:25-11:1.  Michael was "very close" to his big brother, and always wanted to "tag along" with Mark and his friends. *Id.* at 9.  Over Mark's friend's objections, Mark would still bring Michael along. *Id.*

129.  Mark not only was a "good big brother" to Michael, he played an ever greater role in

his life, acting "like a dad" when Michael would find himself in trouble, and "help[ing Michael] to be the man [he is] today." *Id.* at 10:8-9; 10:10-11.  Mark taught Michael a lot, and was "more important to [him] than the President of the United States." *Id.* at 11:18-19.  This relationship continued after Mark left home, as Mark would call Michael "all the time" in order to "make sure [Michael] was walking the straight path, and [Mark] didn't let [Michael] stray too far." *Id.* at13:18; 13:20-21.  Even in adulthood, whenever Michael needed anything, he would always call Mark, who would always be there to help.

130.  Mark was Michael's best man at his wedding, and remained an important part of Michael's life when Michael had children.  Mark was the godfather to Michael's son and was extremely close to each of Michael's two older children.  Mark was killed before he was able to develop a relationship with Michael's youngest child.  Michael and Mark spoke regularly by phone and Mark always spoke about Michael's children and how excited Mark was to be an uncle.  It felt "great" for Michael when Mark would call.  The last time Michael saw his brother Mark was at Michael's son's baptism in 1989.  He last spoke to him in September of that year.  *Id.* at 19.

131.  Michael first learned that Mark's plane was missing when he received a call at the Kindercare day center in Indiana where he was working.  Michael burst into tears, but felt that Mark was not going to die because "Mark was a survivor." *Id.* at 22:3.  Michael ultimately learned that Mark had died, and recalls watching news coverage of the bombing and seeing what he believes to be Mark's lifeless body strapped to a seat on the ground in the desert.  *Id.* at 24.  After learning of Mark's death, Michael was unable to work for several weeks and even when he returned he needed friends and family to help him get along.

132. Mark's death affected Michael deeply. Michael still has trouble as a result of the bombing. He found it hard just to "take life" for several years. Still today, he cannot have any pictures of Mark in his home, because all he can think about is how horrible Mark's death was. *Id.* at 22. Michael has felt a great deal of anger and anxiety regarding Libya as a direct result of the bombing. Michael has not been on an airplane since Mark was killed in the UTA bombing in September 1989.

133. Michael has missed out on a great deal as a result of Mark's death. They were planning special hunting trips together which Michael still has been unable to take. After Mark's death, Michael was not able to go hunting at all, though he used to hunt all the time. *Id.* at 28. Mark always talked about being involved in the lives of Mark's children but was not able to fulfill that role. Michael thinks about Mark all the time. He remembers Mark as the "one of the best men you could ever meet." *Id.* at 29:23-24. Michael said that if he could see his older brother again, he would tell Mark that he loves him dearly, give him a hug, hold him, and shake his hand.

*Estate of Patrick Wayne Huff*

134. Pat Wayne Huff ("Pat") was a passenger on UTA Flight 772. Pat's estate was administered in the state of Texas, where Pat was domiciled at the time of his death.

135. Pat received his high school diploma from Franklin, Texas in 1968 and then completed one year at Texas A&M University before enlisting in the United States Air Force. Pat served as an Air Force Sergeant with a specialty in radar repair. After his honorable discharge from the Air Force, Pat began working in the oil business – first on the DEW oil line in the Arctic Circle and subsequently around the globe in oil fields for the duration of his life. Tr. 87-88.

136.   Pat started his work in the oil field as a Roustabout, and worked his way up to Driller, Supervisor (or "Tool Pusher") and, ultimately, Drilling and Production Superintendent at Parker Drilling for the entire Gulf Coast.  Pat worked "all over the world," including South America, Malaysia, Saudi Arabia, and off the coast of Africa.  Pat's wife, Ermine, recalls that Pat was a dependable, hard worker, who "worked his way up to the top."   Tr. 89-91; 89:17-18.

137.   Pat worked in the oil industry from 1973 until his death in 1989.  When he died, he was Drilling and Production Superintendent for Parker Drilling, earning approximately $54,000 per year. Tr. 91.  Working in the oil industry was Pat's "specialty" – "it was the only thing he knew . . . he had trained for [it] and his family had been in the business."  Tr. 94:19-21.  According to Ermine, Pat planned to remain in the oil industry for the rest of his life until he retired.  Tr. 94.

138.   Pat's estate is represented by his wife, Ermine Hailey.  He is survived by his wife, his brother Michael Huff, his sister Glenda Jan Pitillo, his parents James and Janice Huff (now deceased), and his step-children, Jared Hill and Amanda Hill.

*Ermine Hailey*

139.   Ermine Hailey is the wife of Patrick Wayne Huff.  She lives in Realiotos, Texas, and was domiciled in Texas on September 19, 1989.

140.   Ermine met Pat in high school when she was teaching swimming lessons at the local pool.  They dated during Ermine's junior and senior years of high school, attended revivals and joined the church together, and "were sweethearts."  Tr. 88; 95:4-5.

141.   After Ermine graduated from college and Pat returned from the Air Force, they reconnected.  By that time, Ermine was divorced with two young children, Jared and Amanda

("Mandy").  She was experiencing financial difficulty, living with her parents and working and

teaching English, while moonlighting as a country western singer.  Pat became Ermine's

"groupie" and the two started dating again "just as if we never left off."  Tr. 93-96; 96:7.  Ermine

and Pat married in May 1980.  Thereafter, Pat considered Jared and Mandy – who were only 18

months and three years old, respectively – his own children and decided not to have any more

children because "two kids is what [he] wanted and [he] had them."  Tr. 92:24.  Pat tried to adopt

the children, but their biological father would not allow it.  He also tried to call the children by his

last name, "Huff," but their biological father interfered there as well.  Tr. 94.

142.  For Ermine, Pat was a "knight in shining armor" – he was an "instant father" and he

"took care of us like he did his whole family.  He loved his family, loved us all."  Tr. 93:15;

93:15-17.  Pat provided for the entire family "financially and emotionally and every other way."

Tr. 93:20-21.  As Ermine recalls, "[h]e was our anchor.  He was the person we could depend on to

help us out no matter what.  He was a wonderful husband and a loving father."  Tr. 96:12-14.

143.  It was difficult for Ermine and the children when Pat was away for his rotations

overseas.  While he was gone, they were "pretty sad and just kind of hung on and did the best

[they] could until he came back."  Tr. 97:1-3.  When Pat came home, however, "it was heaven"

and they "did everything as a family."  Tr. 96:18-19; 96:19.

144.  The last time Ermine saw Pat was when she went with him to the airport prior to his

last rotation in Chad.  Because Pat had received a promotion, they had a little extra money and

used it to spend a special night together at a nice hotel in Dallas from where Pat was departing.

Ermine remembers Pat turning around as he was leaving for his flight and has tried to preserve

that image in her head so that she can "remember seeing him that last day after we had spent a

wonderful night . . . in the big hotel." Tr. 99:15-16.

145. It was a tragic "fluke" that Pat was on UTA Flight 772. Tr. 94. The last time Ermine spoke to Pat, he told her that he was coming back early because he had contracted malaria for which there was treatment in the United States. Ermine and the children were "real happy" that Pat was coming home early.

146. On September 19, 1989, Ermine was at work when her sister arrived and told her that Pat's plane was missing. Ermine remembers falling into her chair unable to believe the news. While she was waiting for more information, she remembers feeling like she was "underwater" and "playing a role in a play" – she could not believe what was happening. Tr. 101:7. Even after learning the plane had been bombed, she and the children were "inventing scenarios" where Pat never boarded the plane. They were just in shock. .

147. Pat's body was not found for several months after the bombing, and Ermine was unable to believe he was actually gone. During this time, Ermine suffered greatly fielding requests for information from the French government while going through the grieving process and hearing news that pieces of the bodies of those who were on UTA Flight 772 were scattered all over the desert, some no bigger than a person's hand. Tr. 103. It was not until December that Pat's remains were shipped home but, even then, Ermine was told not to look inside the casket because "it would not be a good thing to do." Tr. 104:1. The family had a funeral at that time, and Ermine placed one rose on  Pat's casket for each year they were married.

148. After Pat's death, Ermine suffered greatly. With Pat's support, she had just completed four months of sobriety after difficulties with alcoholism and depression and the family was "getting our lives back together." Tr. 104:24. After Pat's death, Ermine relapsed into alcohol

abuse and was hospitalized on multiple occasions.  She remembers painfully that she "was not very helpful to [the] children" who had to go live with their biological father in Utah and who, themselves, experienced emotional problems as a result of losing Pat.  Tr. 105:2-3.  Losing Pat was particularly tragic because his death came at a time when the family was coming through hard times and getting very close with "a lot of hope for the future."  Tr. 107:1.  With Pat's murder, that "hope went away and [the] family disintegrated."  Tr. 107:2.

149.  Ermine remembers Pat as "tall and strong."  Tr. 89:7.  When things got out of hand at work, he was "always the one to break it up" and he would "keep people in line."  Tr. 89:15; 89:16.  He reminded her of John Wayne.  Ermine was "real proud of [Pat]" for the way he "worked his way up to the top" in the oil business.  Tr. 89:16-17; 89:17-18.  Ermine also remembers Pat's "contagious" big smile and how when he laughed, he slapped his knee and everyone in the room would laugh with him.  Tr. 95.  According to Ermine, her years with Pat were the happiest of her life – "[h]e just buoyed you with his spirit."  Tr. 106:9-10.  To this day, she continues to wear his wedding ring and gold bangles she and Pat got in Saudi Arabia together more than 25 years ago.

150.  Ermine was inspired by Pat's memory to pursue this litigation, remembering him saying "where there's a will there's a way."  Tr. 108:4-5.  Thus, while she had lost hope of seeing justice for Pat's murder, she pursued the case for the innocent people "with such potential and love" who perished while "trying to make a difference in the world."  Tr. 109:8; 108:25-109:1.

*Michael Huff*

151.  Michael Huff is the older brother of Patrick Wayne Huff.  Michael is a United States citizen who resides in Texas and was domiciled there at the time of his brother's death.

152.  Mike Huff is the oldest child of James and Janice Huff.  He was six years older than Pat Huff and 12 years older than Jan Pitillo, his younger sister.  As described *supra*, the Huff family was "very" close growing up, they had a "fun life, a good time" together with Pat taking care of the entire family.  Pls.' Trial Ex. 13, Jan Pitillo Dep. 10:18-19, July 12, 2007.  The children's mother, Janice Huff, was sick with cancer during the youngest daughter's childhood, so Pat "was the one that got [her] up in the mornings and sent [her] off to school." *Id.* at 11:15-16.

153.  Mike and Pat grew up together in Texas, where they raised cattle, when they weren't traveling.  Mike and Pat loved animals and took care of the cows that the family owned.  They had dreams of one day opening a ranch together to raise cattle and other livestock.  The family was so excited about their plans that they had already picked out and registered their brand.

154.  Mike recalls special memories growing up with Pat as they traveled throughout the world as a result of their father's work.  They lived together in Chile, Bolivia, and Egypt.  They thought of themselves as "cattlemen" who had a good time growing up in various places.  They were taught to stick together because they were often "outsiders."  This resulted in a very close bond between them.  It was during their childhood that they first discussed their dream of owning a ranch together.  When they were growing up, Mike and Pat "were a team." *Id.* at 9:16.  Pat was the calm one of the family, the negotiator – he kept everything under control.  When Mike left home after graduating high school, Pat took care of their parents, providing stability.

155.  Mike remembers that Pat was a great athlete.  He excelled in football, baseball, and basketball.  He was so good at football that he was elected Most Valuable Player of his high school team.  Mike recalls that Pat always planned a dual occupation, in the oil field and on a ranch.  He thought they went hand and hand.

156.   As an adult, Mike and Pat remained very close.  Pat visited Mike when he was stationed in Germany,where they traveled the country and had a good time.  *Id.* at 14.  Mike has a special memory of Pat caring for him when Mike was wounded while serving his country in Vietnam.  Pat helped Mike get around and cope. As as Mike remembers it, "he took care of me." *Id.* at 12:9-10.  They were constantly talking about their futures, "what we were going to do with the ranch and what kind of cows we wanted."  *Id.* at 13:20-22.

157.   The last time Mike spoke with Pat before his death, they discussed a trip Pat was planning to take to visit Mike in Egypt.  Mike had been stationed in Egypt for work, and Pat was interested in visiting his older brother.  But, because Mike came down with an illness, he was not able to make the trip.

158.   Mike first learned that Pat's plane was missing when he received a call from his mother and father.  At first he was confused, and he simply sat down at his desk and thought about the news.  He then went down to the U.S. Embassy in Egypt to see what he could do.

159.   Following Pat's death, but before his body was recovered, the family held a memorial service that was incredibly well attended.  There were family members, hundreds of people from the community, and former classmates who came to pay their respects.  Mike was very proud of the amazing turnout and the emotional service for his brother.

160.   After the memorial service, but before Mike returned to work in Egypt, his dad pulled him aside and asked him to make sure he brought Pat's body back to Texas.  Mike returned to Egypt, and asked for and received the help of  Egyptian generals in his quest to bring Pat's body home.  Ultimately, Mike was not able to go to the scene of the tragedy to recover Pat's remains, but the French government recovered them and shipped them back to the United States for proper

burial in December.  Mike was relieved to a certain degree that the bodies had been found,

however, he could not help but notice that the casket was too light. Obviously Pat's body was not

completely there.  The family thereafter had a funeral service.  Mike remembers it as a very

somber occasion, with one of Pat's old friends serving as the preacher.

161.  In addition to being very upset, Mike could not prevent also having feelings of

hostility towards the perpetrators of this horrible act.  Not only did the family have to deal with

the horrible loss of his brother, but, he believes, the funeral also expedited his father's death.

James Huff made a special point to Mike to not rest until Pat's body was returned.  And once it

was, Mike and Pat's father passed away within the week.

162.  Even after Pat's death, Mike often thinks about his brother Pat.  He especially thinks

about him when he is working with the cattle.  He notes that there is a void in his life that cannot

be filled; his family was devastated.  Mike also regrets the pain that his daughters have felt over

the loss of their uncle because they were very close to their Uncle Pat.  He also noticed the

considerable decline in health suffered by their mother after Pat's death.  *Id.* at 25-27.  "[W]hen

daddy died, [and after] Pat died[,] she just quit taking her medicine, she quit going to the hospital

and she gave up."  *Id.* at 27:7-9.

163.  Mike believes that Pat leaves a legacy of family back in Franklin, TX.  He

remembers a "[c]alm, happy-go-lucky" brother who brought his family together.  *Id.* at 29:20.

What he misses most of all is Pat's camaraderie.  Mike laments, "[w]e didn't finish our goal."  *Id.*

at 30:22-31:1.

*Glenda Jan Pitillo*

164.  Glenda Jan Pitillo is the younger sister of Patrick Wayne Huff. She resides in Texas

43

and was domiciled there at the time of her brother's death.

165.   Jan grew up with her two older brothers, Mike and Pat, in Texas.  She was the youngest child of the family. Mike is twelve years her senior and Pat was six years older than she. Their family was "very" close growing up, they had "a fun life, a good time" together with Pat taking care of the entire family.  Pls.' Trial Ex. 13, Pitillo Dep. 10:18-19.  Their mother, Janice Huff, was sick with cancer during Jan's childhood, so Pat "was the one that got [her] up in the mornings and sent [her] off to school."  *Id.* at 11:14-16.

166.   Jan and her brothers raised cattle.  She recalls that Pat loved animals and took care of the cows that the family owned.  Pat had dreams of one day opening a ranch with his older brother, Mike, to raise cattle and other livestock.  The family was so excited about their plans that they had already picked out and registered their brand.

167.   Pat was also a great athlete.  He excelled in football, baseball, basketball and tennis. He was so good at football that he was elected Most Valuable Player of his high school team and received a scholarship to play at a junior college.  He did not play football in college, however, because his injured knees prevented him from playing.  Instead, he attended Texas A & M University for one year before entering the military.

168.   As an adult, Jan and Pat remained very close.  Pat still enjoyed working with cows and playing sports.  Pat was "always happy as a grown-up."  *Id.* at 15:7-8.  He remained the "caretaker," tending to their parents' money and taking care of their home.  As Jan said, "he took care of everything basically [for the family]."  *Id.* at 15:21-22.

169.   The last time Jan spoke with Pat before his death, they discussed how the whole family would get together once Pat returned from Chad, to deal with their father's diagnosis.

Their father, James, had recently been diagnosed with cancer and Pat wanted to plan for his care.

170.   Jan first learned that Pat's plane was missing when she received a call from Ermine, Pat's wife.   At first, Jan did not believe that anything could happen to him, so she didn't feel like anything was wrong.   It was only days later, when her older brother Mike called her from Egypt where he was working, did she finally comprehend the news that the plane was destroyed and there were no survivors.   Jan has trouble remembering much about the days immediately following the tragedy.   *Id.* at 17-20.   Just days after the tragedy, Jan had dreams of Pat calling her telling her he was "okay."   *Id.* at 21.   She described his murder as "one of the worst things ever because . . . we all loved him so much.   He was just a special person."   *Id.* at. 21:7-9.

171.   Following Pat's death, but before his body was recovered, the family held a memorial service that was incredibly well attended.   There were family members, hundreds of people from the community, and former classmates who came to pay their respects.   Many speakers discussed what a great person Pat was and how much he meant to everyone.   There were also "big write-ups" in the local newspaper about Pat's death and the bombing.   Members of the community even wrote letters to Congress in support of Pat regarding the bombing. .

172.   Weeks later, the family received Pat's body from the French government.   At that time, the family had a small funeral service for Pat.   Ailing from cancer and distraught over his son's death, Jan's father died only a week after Pat's funeral service.   Their mother, also distraught over the tragedy, further deteriorated from her cancer.   Pat's death effected the family both emotionally and physically.

173.   Even today, Jan still misses Pat "so much."   *Id.* at 21.   She regrets that Pat is not around to share special moments with her and her boys.   Pat had plans to raise cattle with her two

boys, and those plans would never be put into action.  She thinks about him "every day."  *Id.* at

27.  Jan, her husband, and her kids have "missed a lot" due to Pat's death.  She often thinks of "so

many things that [they] would have done if he were here with [them]."  *Id.* at 29:12-13.  Jan stated

simply, "if we had him here . . . it would be wonderful."  *Id.* at 29:17-18.

> *Estate of James E. Huff*

174.  James E. Huff was the father of Patrick Wayne Huff.  James was domiciled in Texas

when his son perished and he died on December 24, 1989.  James's daughter, Jan Pitillo, a United

States citizen, is the executrix of her father's estate.

175.  The Huff family resided in Texas.  James Huff and Janice Huff raised their three

children, Michael, Patrick, and Jan, on a ranch in Franklin.  Their family was "very" close

growing up, they had a "fun life" together, often tending to cattle.  *Id*. at 10:18.  Pat took care of

the entire family.  James's wife, Janice Huff, was sick with cancer during their youngest

daughter's childhood, "[s]o Pat was the one that got [Jan] up in the mornings and sent [her] off to

school."  *Id.* at 11:14-16.  Even after Pat graduated from high school and went off to college and

then the military, he was never really out of the house.  He remained the "caretaker," tending to

their parents' money and taking care of their home.  As Jan said, "he took care of everything

basically [for the family]."  *Id.* at 15:21-22.

176.  Pat's death and the manner in which he died was "the worst thing in the world" for

both James and his wife.  *Id.* at 18:21-22.  James was diagnosed with cancer shortly before Pat left

for Chad.  Because Pat was the family member who took care of everything, his death hit James

particularly hard.  Pat had been the one who was planning for his care.  Upon learning of Pat's

death, James became extremely depressed.  James was already sick at the time, but his health

deteriorated further after he learned his son had died.  His cancer progressed at a rapid pace.  He

lost any positive attitude he had about his own life.

177.  James was too ill to attend the memorial service the family had for Pat.  "[H]e was in

bed pretty much by then and in a lot of pain."  *Id.* at 22:20-21.  James asked Michael Huff, his

oldest son and Pat's older brother, to make sure that Pat's body was recovered and returned to

Texas for proper burial.  The recovery of Pat's body's was particularly important to James.  Once

Pat's body was found by the French government and the family was able to hold a small funeral,

James could rest.   He passed away less than a week after Pat's funeral.

### *Estate of Janice Huff*

178.  Janice Huff was the mother of Patrick Wayne Huff.  Janice was domiciled in Texas

when her son died.  Her daughter, Jan Pitillo, is the executrix of her mother Janice's estate.

179.  The Huff family was "very" close growing up.  They had a "fun life" together, often

tending to cattle and traveling.  Pls.' Trial Ex. 13, Pitillo Dep. 10.  Pat took care of the entire

family.  Janice Huff was suffering from cancer during much of her life as a mother, "[s]o Pat was

the one that got [their youngest daughter] up in the mornings and sent [her] off to school."  *Id.* at

11:14-16.  Even after Pat graduated from high school and went off to college and then the

military, he was never really out of the family house.  Pat remained the "caretaker," tending to

their parents' money and taking care of their home.  *Id.* at 15.

180.  As Jan said, "he took care of everything basically [for the family]."  *Id.* at 15:21-22.

So when Janice heard of Pat's death, that had to be the "worst thing in the world."  *Id.* at 18:21-

22.  Both Janice and her husband, James, "were pretty depressed about [the death]."  *Id.* at 19:13.

They were both sick with cancer at the time of his death, and the tragedy worsened their

condition.  After Pat's death, "[h]er cancer really took over on her."  *Id.* at 26:11-12.

181.  After September 19, 1989, Janice Huff missed her son, Pat, "a lot."  *Id.* at 28.  She missed him more than anyone else because he had always been there to take care of her.  Her cancer progressed.  Like her husband, she had lost any positive attitude toward her own life.  *Id.* at 26.  "She just gave up.  She quit taking her medicine."  Pls.' Trial Ex. 12, Huff Dep. 27:2.

*Jared Hill*

182.  Jared Hill is the step-son of Patrick Wayne Huff.  Jared is domiciled in Texas currently in Iraq serving as an officer in the United States Army.

183.  Jared grew up in Texas with his mother, his sister Amanda Hill ("Mandy"), and his step-father Pat Huff.  Pat entered Jared's life when he was approximately one year old and lived with Pat until Pat's death.  As far back as Jared can remember, Pat was his "dad."  To distinguish between Pat and his biological father, Jared referred to Pat as his "Pat Daddy" when speaking with others.  Still, he called both "dad" because "[t]hey were both daddy to me."  Pls.' Trial Ex. 14, Jared Hill Dep. 11-12; 11:15-16, June 27, 2007.

184.  During his life, Pat considered Jared and Mandy as his children – he and Ermine decided not to have more children because he "considered Mandy and Jared his kids, that's all the kids he ever wanted or needed, and he just felt like they were his kids."  Tr. 92:21-23.  Pat provided for Jared and Mandy "financially, emotionally and every other way."  Tr. 93:20-21.  In fact, Pat wanted to adopt Jared and Mandy, and even started calling them by his last name (Huff), but their biological father would not allow Pat to adopt the children or for the children to use the Huff name.  According to Ermine, "Pat thought of [Jared and Mandy] as his children and he raised them and was responsible for them their entire lives until he was killed."  Tr. 92:13-15.  Even

after Pat's death, Jared and Mandy were treated legally as his children as they received survivor

benefits as a result of the bombing.

185.   During Jared's childhood, he had some "rocky" times with Pat related to Pat's

discipline.  Pls.' Trial Ex. 14, Jared Hill Dep. 13.  Near the end of Pat's life, however, "things

started to really turn around for the better for our family."  *Id.* at 13:10-11.  During that time,

Jared's mother also was experiencing difficulties in her life which required her to be hospitalized.

Pat came home from work overseas specifically to participate in family therapy and Jared recalled

sitting together with his family and feeling that "things seemed really bright, seemed like they

were going the right direction" before Pat was killed.  *Id.* at 14:4-5.  That family therapy session

was the last time Jared saw his "Pat-Daddy" alive.  The last time Jared spoke to Pat was shortly

thereafter when Pat called to say that he was coming home.  Jared was "excited, of course," but

Pat never made it home.  *Id.* at 15:21.

186.   Pat held the family together before his death, especially given the troubles Jared's

mother was experiencing.  After Pat's death, "everything just went south" and "the whole family

just split apart."  *Id.* at 17:1; 17:5-6.  According to Jared's mother, Ermine, the children "were

very alone and felt so lonely."  Tr. 105:7.  Because of her alcoholism and depression after Pat's

death which resulted in her hospitalization, Jared and Mandy had to move to Utah to live with

their biological father and they hardly ever again saw their relatives from Pat's family with whom

they had been very close prior to the bombing.  Jared also experienced a great deal of hurt when

his mother began dating another man shortly after Pat's death.  Pls.' Trial Ex. 14, Jared Hill Dep.

27-28.

187.   Ermine recalled that the children "had many emotional problems" as a result of

losing their Pat-Daddy.  "They were without a father.  Tr. 105:10.  And it really affected [Mandy and Jared] to not have a father and to have a mother that had gone into such a bad place."  Tr. 105:14-16.

188.   Jared has fond memories of his childhood with Pat near the end of Pat's life, including when Pat would practice Tae Kwon Do with him and Mandy and take them to practice after he got home from work.  Pat "was always there" for the children.  Pls.' Trial Ex. 14, Jared Hill Dep. 13.  Pat also brought the entire family – including Jared and Mandy – with him to Saudi Arabia for almost a year while he was drilling water for a Sheikh outside Riyadh.  When Pat was overseas by himself, Jared remained in close contact with him, through letters and telephone calls.  Jared recalls looking forward to the letters and calls and feeling a sense of pride at the work Pat was doing in Africa.  Pat also would always bring back "cool stuff" for Jared when he returned from trips overseas.  Jared attributes his interest in pursuing a degree in geographical information systems to Pat's overseas experiences which he shared with Jared.  From Pat, Jared learned to develop an appreciation for countries outside the United States.

189.   Jared was only ten years old on September 19, 1989 when his "Pat-Daddy" was killed.  *Id.* at 10.  He recalls being forced to stay in the kitchen of his grandparents' home with Mandy while the adults talked.  When Jared's mother came home she was "bawling like crazy" and Jared then learned that Pat's plane was missing.  *Id.* at 21:12.  It was a very scary time for the family and their fears were ultimately realized when they learned that the wreckage had been found.

190.   There was a memorial service for Pat shortly after the bombing.  During the service, Jared recalls having to comfort his mother as a ten-year old boy.  At that time, Pat's body had not

yet been found and Jared recalls hoping that Pat had not gotten on the plane: "I was just hoping that he could come back." *Id.* at 25:21. The family also had a funeral a few months later when Pat's remains were returned in a closed casket. Jared recalls that being a "scary" experience because he "had no idea what kind of remains were in there." *Id.* at 26:4-5. Those sentiments resurfaced years later when the French government returned personal effects to the family that turned out not to belong to Pat. Following the funeral, Jared recalls looking up at the sky and saying "God, if you exist, tell Pat that I love him," followed by a feeling "like a warm hug." *Id.* at 28:18-19; 28:20. Later on, Jared had an opportunity through his church to be baptized for and on behalf of Pat as part of the healing process.

191. Pat's death had a lasting effect on Jared's life. Following the bombing, Jared developed a hatred for Libya and its government which was heightened when he learned Libya was taken off the list of "terrorist" states after what they had done to him as a child. *Id.* at 22-23. One of the primary reasons Jared joined the military was because he does not want others to feel the pain that he felt as a child resulting from the murder of his dad. Jared joined the military to protect his family. *Id.* at 18-19. Jared also grieves at the lost opportunity to talk to Pat, once the family had started to grow stronger together, about some of the issues Jared had with his dad during his early childhood. Jared regrets that Pat was unable to be present for his commissioning as a U.S. Army officer or for his graduation; he now salutes whenever he visits Pat's grave.

192. Jared misses Pat greatly and tries not to think about the hurtful memory of Pat's tragic death. He felt as close to Pat as he did to his natural father, and considered Pat his "Daddy." *Id.* at 40.

*Amanda Hill*

193.  Amanda Hill ("Mandy") is the step-daughter of Patrick Wayne Huff.  She resides  in

Texas and was domiciled there at the time of her step-father's death.

194.  Mandy grew up in Texas with her mother Ermine, her brother Jared, and her step-

father Pat Huff.  Pat entered Mandy's life when she was around three years old and lived with Pat

until his death.  As far back as Mandy can remember, Pat was her "dad."  To distinguish between

Pat and her biological father, Mandy referred to Pat as her "Pat Daddy" when speaking with

others.  Tr. 93.  During his life, Pat considered Mandy and Jared as his children – he and Ermine

decided not to have any more children because he "considered Mandy and Jared his kids, that's all

the kids he ever wanted or needed, and he just felt like they were his kids."  Tr. 92:21-23.  Pat

provided for Jared and Mandy "financially, emotionally and every other way."  Tr. 93:20-21.  In

fact, Pat wanted to adopt Mandy and Jared, and even started calling them by his last name (Huff)

but their biological father would not allow Pat to adopt the children or for the children to use the

Huff name.  According to Ermine, "Pat thought of [Mandy and Jared] as his children and he raised

them and was responsible for them their entire lives until he was killed."  Tr. 92:13-15.  Even

after Pat's death, Jared and Mandy were treated legally as his children as they received survivor

benefits as a result of the bombing.

195.  During Mandy's childhood, Pat Daddy was "the strong one . . . [w]e depended on

him."  Pls.' Trial Ex. 15, Amanda Hill Dep. 9:7-8, July 12, 2007.  Pat provided guidance, support,

and stability.  Pat Daddy was "stable and dependable and took care of things" for the his children

and his wife.  *Id.* at 9:11-12.  Pat was a strong father who was the glue that held the family

together when her mother was suffering from problems with alcohol dependency.  Mandy

remembers attending family counseling meetings when her mom was going through these difficult

times related to alcohol.  She remembers her father participating in that process and being the one to "pull us all together."  *Id.* at 13-14; 14:2-3.

196.  Mandy has vibrant memories of her childhood with Pat, including his infectious laugh, horsing around in the pool, and playing on a trampoline.  As Mandy put it, "he just got a kick out of everything."  *Id.* at 11:17-18.  Mandy remained in close contact with Pat even when Pat was overseas, through letters and telephone calls.  Mandy recalls it being difficult when he left for overseas work, and that she would just spend time waiting for him to return home.

197.  Mandy was twelve years old when her Pat Daddy was killed.  She recalls returning from school to her grandparents' house while the adults talked and the television news was on.  Her grandmother was on the phone and then told her that Pat Daddy's plane was missing.  Mandy remembers being confused and just trying to tell herself that everything would be alright.  She thought of different scenarios of what could have happened.  Shortly thereafter, her mother returned home; her mother had been crying and was "a wreck."  *Id.* at 14-16.  Ultimately, it was a very scary time for the entire family; they were confused, and their fears were ultimately realized when they learned that the plane had been destroyed and that there were no survivors.  Mandy was in total shock; she could not stop crying.

198.  There was a memorial service for Pat shortly after the bombing.  During the service, Mandy recalls crying silently, as she did during the funeral when his body was found.  She has few memories of those services besides her tears.  Following the funeral, Mandy recalls returning home after the service and sleeping for a day or so.  She said that her mother eventually found her "in the closet just looking at pictures."  *Id.* at 21:2-3.

199.  Pat's death had a significant and lasting effect on Mandy's life.  Following the

services, "the family [Mandy] knew and felt safe in was gone." *Id.* at 21:6-7.  After Pat's death, "everything just went south" and "the whole family just split apart."  Pls.' Trial Ex. 14, Jared Hill Dep. 17:1; 17:5-6.  According to Mandy's mother, Ermine, the children "were very alone and felt so lonely."  Tr. 105:7.  Immediately after the death, Mandy and Jared had to live with their grandparents as their mother moved to College Station, Texas.  Their lives were "torn up."  Tr. 101:25.  At the end of the school year, and because of Ermine's alcoholism and depression after Pat's death which resulted in her hospitalization, Mandy and Jared were forced to move in with their biological father in Utah.  Pls.' Trial Ex. 15, Amanda Hill Dep. 21.  They hardly ever again saw their relatives from Pat's family with whom they were very close prior to the bombing.

200.  Mandy's years in junior high and high school were "just horrible." *Id.* at 22.  She felt so alone – the person she looked up to and admired, her Pat Daddy, was gone.  She spent many years really depressed and unable to talk to anybody about it.  She remained scared for years – scared of nothing in particular, as she describes it – just scared.  She also had trouble sleeping.  As a result, her biological father put her in a psychiatric unit of a hospital. *Id.* at 22-23.  As Ermine recalls, the children "had many emotional problems" as a result of losing their Pat Daddy – "they were without a father.  And it really affected [Mandy and Jared] to not have a father and to have a mother that had gone into such a bad place."  Tr. 105:10; 105:14-16.

201.  Mandy greatly misses her Pat-Daddy even today.  She "just idolized my Pat Daddy." Pls.' Trial Ex. 15, Amanda Hill Dep. 22:9.  She remembers his "happy face . . . [and] how he really cared about other people." *Id.* at 23:16-18.  Most importantly, she remembers that "he really tried to do everything with his family's welfare in mind." *Id.* at 24:2-3.

*Estate of Margaret Schutzius*

202.  Margaret Schutzius, was a passenger on UTA Flight 772 and was domiciled in Texas at the time of her death.  At the time of her death, Margaret was returning home from Chad, Africa where she had been serving as a volunteer in the Peace Corps.

203.  Margaret was very bright and was always a very good student.  She was a National Merit Scholar.  Tr. 65.

204.  Prior to entering the Peace Corps, Margaret had been a student at the University of Chicago where she was a French major.  She was a senior, but still had two courses to complete to obtain her degree.  Despite her mother encouraging her to complete her course work first, Margaret was determined to enter the Peace Corps at that time so that she could be part of the inaugural mission of the Peace Corps in Chad after many years of absence due to Chad's civil unrest.  Thus, she took a leave of absence from the University of Chicago.  Tr. 68.

205.  Margaret explained to her mother in one of her many letters that she intended to complete her undergraduate degree, and then enter graduate school and take the Foreign Service Officer Exam.  According to her family members who knew her best, Margaret was destined to be a very successful individual.

206.  Margaret's estate is being represented by her mother, Mary Kathryn Hassett.  She is survived by her mother, her father William Schutzius, her brothers Christopher and John Schutzius, and her sister Catharine Schutzius.

*Mary Kathryn Hassett*

207.  Mary Kathryn Hassett ("Mary Kathryn") is the mother of Margaret Schutzius.  Mary Kathryn currently lives in Charlottesville, Virginia, and was domiciled in Texas at the time of the bombing.  She is executrix of Margaret's estate.

208.   Mary Kathryn and her former husband, Plaintiff William Schutzius, had four children.  Margaret was the youngest.  Because she knew that Margaret would be her last child, Mary Kathryn "paid a lot of attention" to Margaret.  The siblings enjoyed a very close relationship, and the family enjoyed playing games together on family trips.

209.   Mary Kathryn enjoyed a good and close relationship with Margaret through her young adult years until she was killed on UTA Flight 772.  She visited her while she was in college, and Margaret would return home to visit with her mother often.  Even while Margaret was in far away Chad serving in the Peace Corps, she kept in regular contact with her mother through extensive, often poignant and funny, letters.

210.   When Margaret was a student at the University of Chicago, she studied in Paris during the Summer after her Junior year.  Mary Kathryn visited her there and the two took a two week trip together.  This was one of the many, although more memorable, experiences that Mary Kathryn and Margaret shared together.

211.   Margaret was on UTA Flight 772 because she had finished her Peace Corps service and intended to travel in Europe before returning home to complete her studies.  Mary Kathryn very much looked forward to Margaret's return.  Tr. 75.

212.  Mary Kathryn's first indication that Margaret's plane might be missing was from a news report in her car.  When she first spoke to the Peace Corps to determine whether Margaret was on the missing UTA Flight 772, she was told that the Peace Corps thought Margaret had changed her plans and did not take that flight.  The Peace Corps called several hours later, however, to inform Mary Kathryn that Margaret was on that flight.  Then, hours after that, she learned from the airline that the plane was scattered over the desert with no survivors.  Tr. 73-74.

213.   In the aftermath of Margaret's killing, Mary Kathryn "had to leave Texas" because she could not bear to be in the same place that she heard the news of Margaret's demise, and "wanted to be closer to the family and extended family."  Tr. 75:22; 75:24.

214.   About a year after the bombing, Mary Kathryn attended a ceremony in the town in Chad where Margaret taught while serving in the Peace Corps during which they dedicated an infirmary to Margaret and named it after her.

215.   In addition to the loss she feels in her life without Margaret, Mary Kathryn grieves for her other children who have lost a sibling.  She also believes that other family members, including her grandchildren who would have been Margaret's nieces and nephew, have suffered a great loss by not having Margaret in their lives.

216.   Mary Kathryn believes that she carries with her today the enormous responsibility of ensuring that Margaret's voice is heard, and that the other victims of the bombing are not forgotten.  Margaret's death continues to cause Mary Kathryn a great deal of pain.  Tr. 82-83.

*William Schutzius*

217.   William Schutzius is the father of Margaret Schutzius.  He is a retired professor who lives in Cincinnati, Ohio, and was domiciled there at the time of the bombing.

218.   The Schutzius family had four children in the order of Christopher, Catherine, John (or "Jack"), and Margaret.  Although William and his former wife Mary Kathryn Hassett divorced in 1973 when Margaret was ten, the family remained close and had a number of vacations and family gatherings together.  Pls.' Trial Ex. 16, William Schutzius Dep. 9, June 25, 2007.

219.   William described Margaret as "a perfectly charming child and mature way beyond her years."  *Id.* at 17:4-5.  She had a "great sense of humor" and was both a "[v]ery affectionate

person and a joy to be with." *Id.* at 17:9-10.

220.   When Margaret was in Chad, she and her father kept in close contact with each other by  the letters they exchanged at least weekly.  William still has all of Margaret's letters.  They also spoke by telephone on Sunday afternoons her last summer in Chad.

221.   When William first learned from his son Chris that Margaret's plane had crashed, he at first "absolutely denied it."  *Id.* at 18:6-7.  He went on to say, "[i]t was stunning. Overwhelming.  I never had such feelings."  *Id.* at 18:10-11.  He explained that "the death of a child is overwhelming, and totally unexpected, and there was so much to look forward to."  *Id.* at 19:13-15.

222.   There was a memorial service for Margaret in the United States and in Paris that William and his current wife attended.  There was no body but eventually Margaret's remains were cremated in Paris and returned to Cincinnati, where they were buried.  He described two memorials to Margaret – one a local hero award at the Freedom Center in Cincinnati, and the other a dispensary in Mondou, Chad that is named after her.

223.   When William learned that Libya was the cause of the bombing and Margaret's death, he was very "angry."  *Id.* at 21.  He decided to join in this legal action, among other reasons, because he was "very dissatisfied" with the criminal trial in France at which no Libyans were present, even though they were convicted.  *Id.* at 26.  He wants, among other things, "an apology" from Libya.  *Id.* at 26:19.

*Christopher M. Schutzius*

224.   Christopher Schutzius is the older brother of Margaret Schutzius.  He lives in Cincinnati, Ohio, and was domiciled in Texas at the time of the bombing.

225.  Christopher is the oldest of the four Schutzius siblings and Margaret was the youngest.  They were six years apart.  The family was "all very close."  Tr. 64.  Of the siblings, Christopher and Margaret "had very similar sensibilities" and "were pretty close."  Pls.' Trial Ex. 17, Christopher Schutzius Dep. 12:16-17; 12:17, June 25, 2007.  Christopher played the role of an older brother to Margaret and sought to protect and nurture her.  He discussed her college choice with her.  .

226.  While Margaret was serving in the Peace Corps in Chad, she and Christopher kept in regular contact through letters and audiotapes.

227.  Christopher first learned that a plane that Margaret might have been on was missing from the news.  Being "very concerned," he called his father to relay the news.  His father, however, had understood that the plane was headed in the opposite direction and thus assumed that Margaret was not on it.  Thereafter, Christopher learned from his mother that Margaret was on the missing flight, and subsequently learned from the airline that the wreckage had been located and there were no survivors.  It fell upon Christopher to inform his mother of the tragic news.  He described that time as the "[t]oughest night of [his] life."  *Id.* at 10:9.  It was "unmitigatedly sad."  *Id.* at 11:4.

228.  Christopher still thinks about Margaret "virtually every day."  *Id.* at 24:3.  A few years ago, when the National Underground Railroad Freedom Center was opening in Cincinnati, Christopher nominated Margaret for an award of someone who fought for freedom.

229.  Christopher suffered from alcoholism and drug addiction in the wake of the bombing, and testified that Margaret's death "changed [his] life permanently" and made him "a sadder person forever."  *Id.* at 24; 25:2-3; 25:7.

*Catharine A. Schutzius*

230.  Catharine Schutzius ("Catharine") is the older sister of Margaret Schutzius.  She lives in Oak Park, Illinois, and was domiciled in Ohio at the time of the bombing.

231.  Catharine was four years older than Margaret, her only sister.  They had two brothers, Christopher, the oldest, and John, who was between Catharine and Margaret.  Catharine and Margaret shared a room and "were very close."  Pls.' Trial Ex. 18, Catharine Schutzius Dep. 6, June 26, 2007.

232.  Catharine and Margaret discussed boys, relationships, college, and other life experiences.  Catharine took Margaret to college, along with their father, and visited her there to meet her friends, and offer older sister advice.

233.  While Margaret was in Chad during her Peace Corps service, she and Catharine continued to correspond regularly.

234.  Catharine first learned that Margaret's plane was missing when her mother called  The call from her mother was followed by a call from her father.  *Id.* at 10.  She "was devastated," and "felt that, although [she] couldn't say it and no one said it for hours and hours, that she was dead."  *Id.* at 11:5; 11:6-7.  Even though the family did not receive confirmation that there were no survivors until the next morning, Catharine testified that she "knew the whole 12 hours that [they] waited for that news that that's what it was going to be."  *Id.* at 11:13-15.

235.  In the immediate aftermath of learning of Margaret's death, Catharine was with her family, who had a close relationship, and fielded calls from newspapers, the Peace Corps, friends and family.  She testified that "it was awful.  And my parents were heartbroken.  We all were." *Id.* at 12:12-13.

236.  Catharine misses Margaret "terribly," and "certainly miss[es] having a sister."  *Id.* at

16:12.  She also regrets that her son did not have the opportunity to know Margaret.  *Id.* at 16.

Margaret's death remains a "tremendously sad part" of Catharine's life.  *Id.* at 19:24.  Catharine

described it as "a kind of grief that we lost her that I would rather not know about but I sure do."

*Id.* at 20:1-2.

*John B. Schutzius*

237.  John Schutzius is the older brother of Margaret Schutzius.  John lives in Alexandria,

Virginia, and was domiciled in Virginia at the time of the bombing.

238.  John and Margaret were two years apart, the closest in age of the four siblings.  They

grew up in a "[c]lose family" and had a "good relationship" "like a brother and sister should be."

Pls.' Trial Ex. 19, John B. Schutzius Dep. 7:16-17, July 18, 2007.  They played together, attended

the same schools together, and were always together growing up.  They shared some of the same

friends, and regularly shared their experiences with one another.

239.  When it came time for Margaret to attend college, John advised her on what to

expect from the experience.  At the time that Margaret was enrolling in the Peace Corps, John was

in graduate school studying international affairs.  Their interest in international issues was

something they shared.  Margaret consulted with John at the time she was deciding to join the

Peace Corps.

240.  While Margaret was serving in the Peace Corps in Chad, she and John corresponded

regularly.  When Margaret returned to the U.S. due to an illness, she was sent to Washington for

treatment for a month and a half.  She and John spent a lot of time together during that period.

241.  John first learned that Margaret's plane was missing when he received a call from his

mother.  He immediately suffered "terrible anxiety" because it was a "fairly pessimistic outlook." *Id.* at 12:16.  Nonetheless, John remained hopeful until finally learning that Margaret had indeed perished on the flight, particularly because the cable television news "host mentioned that survivors were expected initially and then corrected herself." *Id.* at 13:6-8.  He was haunted for years with the thought that "somehow maybe she survived." *Id.* at 13:10-11.

242.  The immediate aftermath of Margaret's death was "a terribly grief stricken time" for John.  *Id.* at 14:4-5.  He testified that "losing a family member like that" "makes your life worse forever," and makes his "outlook about the world . . . more pessimistic." *Id.* at 14:14-15; 14:13-14; 15:14-15.

243.  As a result of the bombing, John has apprehension every time he travels by airplane.  Also, notwithstanding his graduate work in the area of international affairs, he believes that the bombing may have influenced his decision not to pursue work in this area.

244.  John deeply misses his sister.  He has a picture of her on his desk, and thinks about her almost every day.  He named his daughter after her, and wishes his daughter could have known Margaret.  He attended the dedication to Margaret of a clinic in the town in Chad where she served.

245.  Ultimately, John views the loss of his sister as "absolutely devastating," and something that damaged his life forever.  He describes himself as a "wounded person." *Id.* at 23-24.

*Estate of James Eldee Turlington, Sr.*

246.  James Eldee Turlington, Sr. was a passenger on UTA Flight 772 .  James was a citizen of the United States, and was domiciled in Texas at the time of his death.  His daughter

Debbie Schooling is the Executrix of his estate.

247.   When James died he was working for Exxon in Chad.  He had worked for Exxon at that point for approximately 11 or 12 years.  He was a drilling operation supervisor and made approximately $89,000 per year at that time.  That was roughly the same amount of money James had made in the previous few years, plus bonuses.

248.   James was married three times and had a total of seven children.  His first marriage yielded three children – Jimmy Bruce and twins Debbie Schooling and Eddie Don Turlington.  His second marriage yielded one child – David Olney Turlington.  His third marriage also yielded three children – James Eldee Turlington, Jr., Christopher Darwyn Turlington, and Jana Elizabeth Turlington.

249.   James intended his September 1989 trip home from Chad to be his final trip home from overseas.  He planned on working two more years for Exxon in Houston and then retiring from the oil business.  James planned on becoming a cattle rancher and making money at that business as a second career.  Part of what drove this decision was his kidnaping and being held hostage for a period of time in Chad.  Tr. 157-58.

250.   Debbie Schooling testified that her father was the glue of the family and that everyone's life in the family would have been better had he lived.  His remains were buried in Bellville, Texas outside of Houston.  Tr. 165-66.

251.   James's estate is represented by his daughter Debbie Schooling.  James is survived by his sister Joyce Butler, his brother Russell Turlington, his mother Elvee Turlington (now deceased), and by his seven children, Jimmy Bruce Turlington, Debbie Schooling, Eddie Don Turlington, David Olney Turlington, James Eldee Turlington, Jr., Christopher Darwyn Turlington

and Jana Elizabeth Turlington.

*Debbie Schooling*

252.   Debbie Schooling is the daughter of James Eldee Turlington, Sr.  She and her brother Eddie Don are twins and the second and third of James's seven children.  Debbie resides in Texas and was domiciled there  in 1989.

253.   Because James remarried after separating from Debbie's mother, she did not see him as much as a child that she would have liked.  He called and would visit them.  However, as Debbie and her siblings grew older, the relationship developed and improved, particularly during and after 1980.  She has many fond memories of family reunions and Fourth of July celebrations, among other things.  Tr. 153.

254.   Debbie testified that her father had a good relationship with all of his children.  She said , "he had a good relationship with all of us," and "he loved each and every one of his kids." Tr. 157:14; 157:13-14.

255.   Debbie first heard the news about UTA Flight 772 on CNN when she heard that a plane was missing in Chad.  Later James's fiancée called Debbie to tell her that James was on that plane.  She was uncertain of his fate for  period of time before finally realizing that James was dead.  It was "very sad."  Tr. 161-62.  It made Debbie very angry when she learned later that Libya was responsible for her father's death.  Tr. 163.  Debbie went to the memorial service for her father, along with her brother Eddie Don and other family members.

256.   The loss of her father still affects Debbie eighteen years later.  She explained that things would have been much better for everyone in the family had this terrible event not occurred.  She feels there is much they could have done together and that he could have done with

the family.  She describes  James as "the glue" of the family.  Tr. 164-66.

*Eddie Don Turlington*

257.  Eddie Don Turlington ("Eddie") is the son of James Eldee Turlington, Sr.  He lives

in Amarillo, Texas, and was domiciled in Texas at the time of the bombing.

258.  Due to family circumstances, Eddie did not spend much  personal time with his

father when he was a child.  He reestablished a close relationship with his father when he became

a young adult, however.  Eddie and his father enjoyed spending time together, shared an interest in

sports and spent time together with Eddie's son.  They would attend sporting events, particularly

Astros games to watch Nolan Ryan together.  And, as Eddie's son got involved in sports, James

became more and more involved in Eddie's life.

259.  Eddie first heard about Flight 772 from the cable news, but learned that his father

was on the flight from his father's fiancée.  His father was returning from Chad, and it was his last

trip abroad.  His father planned to stay in the U.S. when he returned.  Eddie very much looked

forward to that time so that they could spend even more time together.

260.  Eddie regrets that his father did not have the opportunity to play a role in his younger

children's lives, the way he did with Eddie's oldest son.  He also testified that many other lives –

particularly those of James' other children and grandchildren – have been adversely effected by

James' death.  Eddie believes many lives would have been enriched by James had he not been

killed in the bombing of Flight 772.

261.  Eddie also believes that his relationship with his father, which was very good, would

have continued to grow and strengthen.  Eddie feels deprived of that opportunity.  He thinks about

his father often, particular on special occasions like his children's birthdays and the anniversary of

the bombing, which also is his mother's birthday

*Joyce Butler*

262.  Joyce Butler is the sister of James Eldee Turlington, Sr.  She was the eldest of the three surviving Turlington children, along with her younger brother Russell and then James. Joyce resides in Texas and was domiciled there in 1989.

263.  Joyce and James had a loving relationship growing up as children.  She described James as a "rascal."  Pls.' Trial Ex. 20, Joyce Butler Dep. 7, July 11, 2007.  He would tease but was "sweet and loving" also.  *Id*  She loved James.

264.  After Joyce was married and moved away she stayed in touch with James, but it was difficult on her since she did not see him much.  Still, Joyce related how James would telephone her and say "hi" and she knew immediately that it was him.  It is "just not the same without him" and she misses him a lot.  *Id.* at 14, 14:22.

265.  Joyce first heard that James's plane had gone down when someone from Exxon called her.  She received many more calls before the French confirmed what happened.  She was "devastated" and said that "even after 18 years, it still doesn't seem – seem real."  *Id.* at 9, 10:14-15.

*Estate of Elvee Turlington*

266.  The Estate of Elvee Turlington is represented by the Executrix Joyce Butler.  Elvee Turlington ("Elvee") was the mother of James Eldee Turlington, Sr.  Elvee had three children who grew into adulthood and were alive in 1989, Joyce, Russell, and James.  *Id.* at 5-7.[4]

---

[4]  The name "Elvee" is misspelled throughout the *de bene esse* deposition transcript as "Eldee," perhaps because her son's middle name was Eldee.  *See, e.g.,* Pls.' Trial Ex. 20, Joyce Butler Dep. 6:8, July 11, 2007.  The correct first name of James's mother is "Elvee."

267.  Elvee died at the age of 74 on November 9, 1989, and was domiciled in Texas at the time.

268.  Elvee loved James very much.  James was the baby of the family and perhaps is the reason Elvee loved him so much.

269.  At the time of James' death Elvee was in a nursing home and was ill.  James' death was very hard on her .  When she heard of his death she was "heartbroken."  She died two months later in November 1989.  Joyce believes that Elvee "grieved herself to death."  *Id.* at 15, 15:13.

*Russell Turlington*

270.  Russell Turlington is the older brother of James Eldee Turlington, Sr.  He lives in Odessa, Texas, and was domiciled in Texas at the time of the bombing.

271.  Russell described his brother James as "a very loving brother and close friend."  Pls.' Trial Ex. 21,  Russell Turlington Dep. 5:16-17, July 11, 2007.  They were "very close" and "loved each other deeply."  *Id.* at 6:19.

272.  When they were adults, Russell and James "stayed close" and "shared good times together."  *Id.* at 6:24-25.

273.  Russell first learned from news reports that a plane was missing, and later that his brother was aboard.  Upon hearing the news that James had perished, Russell was "hurt, disappointed, and full of sorrow and anger at whoever was responsible."  *Id.* at 9:7-8.  He was very distraught in the aftermath of James' death, and found it to be a "strenuous, grievous time."  *Id.* at 12:10.

274.  Russell misses his brother greatly, thinks of him daily and often wishes that James were around to share experiences with him.  Russell believes he was robbed of his brother's love

and companionship.  *Id.* at 12-13.

*Jimmy Bruce Turlington*

275.  Jimmy Bruce Turlington is the son of James Turlington, Sr.  As a result of a stroke, Jimmy now has a condition known as aphasia.  As the videotape of his deposition reveals, it is difficult for Jimmy to communicate.  Consequently his sister Debbie Schooling assisted him at his short *de bene esse* deposition.  Jimmy was domiciled in Texas in 1989.

276.  Jimmy was "shocked" at his father's death and "misses him."  Pls.' Trial Ex. 22, Jimmy Turlington Dep. 7, July 11, 2007.

277.  Jimmy decided to participate as a Plaintiff in this case so that "justice" could be done.

*David Olney Turlington*

278.  David Olney Turlington ("David") is the son of James Eldee Turlington, Sr.  He resides in Texas who was domiciled there at the time of his father's death.

279.  David is one of the seven children of James Turlington.  He grew up partially with his father and step-mother, and partially with his mother and step-father.  When he lived with his father, he traveled all over the world due to his father James's job.  He lived in Norway and Malta, as well as Texas.  David had a good relationship with his father.  However, he had difficulties living with his step-mother.  Pls.' Trial Ex. 23, David Turlington Dep. 8-9, July 12, 2007.

280.  David remembers that during his childhood, his father stressed that he needed to "do right . . . . to grow up and be his little man."  *Id.* at 9:10-12.  He recalls fondly a special memory of his father getting him a brand new 10-speed bicycle.  He characterized his relationship with his father as "great."  His father's role in the family was that of the breadwinner; "he was the man."

*Id.* at 10:20.  David recalled that he always wanted to learn from his father.

281.  David's young adulthood was filled with great joy.  After having lost contact with his father for a short time, he was surprised to hear that not only did his father want to renew their close ties, but he also wanted to live together again.  When David told his father that his life now included a woman and a new child, his father welcomed them all into his house.  David was thrilled to be so accepted.

282.  David vaguely remembers the last time he saw his father before James's death.  Earlier, in 1989, David was struck by a truck, losing his legs and putting him in a coma.  He would spend the subsequent weeks after the accident in the hospital under medication and in a coma.  After hearing about the grave injury and returning home from overseas, James immediately went to the hospital to visit David.  James comforted him and assured David that "we're going to make it through this and I'm going to help you and everything will be alright."  *Id.* at 11:20-22.  Those were the last words the two ever shared.

283.  David recalls how he heard about his father's death on September 19, 1989.  He was in his second rehabilitation center after his accident when the nurses came in and handed him a phone.  It was his mother on the line and she said "your Daddy's dead."  *Id.* at 17:11.  David cried when he heard the news.  His father's murder, "shattered" his dreams and what he had left in his life.  *Id.* at 18.  He was devastated – he "pretty much wanted to die."  *Id.* at 18:16.

284.  In the immediate aftermath of his father's death, David  became impossible to deal with for the doctors and the nurses at his rehabilitation center.  He did not want to talk to anyone or to participate in any of his rehab activities.  He was unable to attend James' memorial service because he was still in the rehabilitation center.  The doctors felt that if David attended the service

it would lead to further damage.  *Id.* at 19, 21.

285.  In the months and years following James' death, David tried to kill himself with alcohol, drugs, and cars.  *Id.* at 22.   It took some time before he was able to get his life together. He  began to follow what his dad taught him, "[to] do things the right way."  *Id.* at 24:7.  He realized that one dream he shared with his father – to follow in James's footsteps and work in the oil industry – was now never going to happen.  He also realized that another one of their dreams, to start their own roofing business, was also now never going to happen.  *Id.* at 24-25.

286.  Today, David "miss[es] him a lot."  *Id.* at 25:19.  He believes that if James had lived, they would now be living close to each other and would be in business together.  James left a legacy of hard work and personal achievement.  David explained that his father started out with nothing and earned a lot through hard work.  *Id.* at 26.

287.  David misses the little things in life that one shares with one's father.  He misses going fishing with him, playing pool with him, and working with him on cars in the garage.  He also misses the big things – like his father's presence at the birth of his children or his father's fiftieth birthday.  *Id.* at 28-29.  David thinks about his dad every week.  And he keeps hearing him say, through all of David's hardships, "just push forward."  *Id.* at 31:4-5.  It is that voice that has motivated David to learn to walk again, to "not . . . quit" on life.  *Id.* at 32:11.

*James Eldee Turlington, Jr.*

288.  James Eldee Turlington, Jr. is the son of James Eldee Turlington, Sr.  James lives in Canyon, Texas, and was domiciled in Texas at the time of the bombing.

289.  James is named after his father.  He lived with his father throughout his childhood. Although James did not always agree with or fully appreciate his father growing up, he loved him

very much.  Pls.' Trial Ex. 24, James Eldee Turlington, Jr. Dep. 6-7, July 11, 2007.

290.   When James was growing up, his father drove him to be the best and supported his sporting and other activities.  No matter what James did, his father was there for him.  "He was a good dad."  *Id.* at 19:6-7.

291.   James first heard that his father's plane was missing on the news.  He was in denial at that time, believing that his father was a tough guy so nothing could hurt him.  When he learned that his father had died, James "was just numb," and "didn't know what to feel."  *Id.* at 9:10; 9:12.

292.  James was only 17 when his father died.  Unable to cope with the tragic news, James "ran" and "took off and started drinking a whole lot."  *Id.* at 9, 10:7-8.

293.   James was so distraught that he could not attend his father's memorial service, but did visit his father's grave a week later.  He was upset about how arrangements for his father had been handled, and it was very important to him that his father be memorialized in the right way.

294.   In the years following his father's death and continuing to the present, James has been haunted by the fact that he did not have the opportunity to reconcile with his father and apologize.  He deeply regrets not having the opportunity to have a "man to man relationship" with his father, and believes his father would be proud of him and his children.  *Id.* at 11:16-17;18.

295.   James misses his father in many respects, and very much wishes his father could have met and played a role in his children's lives.  He is very pained by his father's absence.

*Christopher Darwyn Turlington*

296.   Christopher Darwyn Turlington is the son of James Eldee Turlington, Sr. Christopher lives in Canyon, Texas, and was domiciled in Texas at the time of the bombing.

297.   Christopher lived with his father throughout his childhood.  When Christopher was

growing up he thought his father was "a hard man."  Pls.' Trial Ex. 25, Christopher Darwin

Turlington Dep. 7, July 11, 2007.  He realizes now, however,  that his father "was instilling good

values and just trying to make [the kids] good people," and that "he was just being a good father."

*Id.* at 7:6-7; 7:5-6.  Despite their differences, Christopher very much loved his father.

298.  Christopher was only 16 when his father was killed.  When he learned of his father's

death, Christopher "put walls up."  *Id.* at 9:8.  He "didn't deal with it," and was in a period of

denial.  *Id.* at 10:14.  He was particularly angry because his father was returning from his last trip

abroad, and planned to stay in the United Staes thereafter.  *Id.* at 9-10.

299.  Christopher deeply regrets not having the opportunity to thank his father and

apologize to him.  He wishes he could tell his father how much he loved him and appreciated him.

He believes that he and his father would have had a good relationship and feels deprived of that

opportunity.  He also feels deprived of the opportunity to have his father play a role his children's

lives.

300.  Christopher testified that his father's death really "screwed [him] up," and that he

has "had no closure."  *Id.* at 13:11; 13:12.  He carries with him daily the pain of not having had

the opportunity to deal with his emotions resulting from his father's death.  He believes that his

father's death changed him from a happy person to someone who is "just mad, just angry, not too

happy."  *Id.* at 14:4.  He thinks about and grieves for his father "all the time."  *Id.* at 11:23.

*Jana Elizabeth Turlington*

301.  Jana Elizabeth Turlington is the daughter of James Eldee Turlington, Sr.  She resides

in Texas and was domiciled there at the time of her father's death.

302.  Jana is one of the seven children of James Turlington, Sr.  All of the children are the

children of James, though they have different mothers.  James, Eddie, and Debbie share the same mother; and Jana, James, and Chris share the same mother.  David does not share the same mother as any of the other children.

303.   Jana grew up living with her father James, even after he divorced her mother, along with her brothers James and Chris.  She fondly remembers her childhood, explaining that "[w]e had a ball.  We had fun."  Pls.' Trial Ex. 26, Jana Elizabeth Turlington Dep. 7:1, July 17, 2007. She recounts living in a rural community attending dances, barbeques, and picnics.  Jana had a close relationship with her father.  They talked about everything, including the importance of school.  He was the provider in the family.  Jana depended on her dad for "everything."  *Id.* at 9. He was the sole provider both financially and emotionally.

304.   The last time Jana saw her father was about two weeks before his death.  They spent the time chatting about life.  Of course, she had no idea that that meeting would be their last, so she regrets not getting a chance to really say goodbye.  *Id.* at 12.  Then, on September 19, 1989, she received a telephone call and was told that her father's plane had disappeared.  She was fifteen and confused.  Another call followed and she was told that the plane had exploded over the desert and that there were no survivors.  She was in shock.  *Id.* at 12-13.  She recounts that "[i]t was one of the worst days of my life."  *Id.* at 14:10-11.  The days and weeks following her father's death were filled with confusion and disarray.  There were questions regarding where Jana and her brothers would live.  All during this time Jana "just cried and cried."  *Id.* at 16:17.

305.   Jana attempted to cope with her father's death by abusing drugs and alcohol.  She also moved out on her own.  She was unable to get along with her mother, and thought she needed independence.

73

306.   Jana recalled that her family essentially ceased to exist after her father was killed. Her brother Chris went in one direction, her other brother James went in another, and her mom went in still another direction.  Her dreams also were destroyed.  She had planned to be a doctor. Jana had always done well in school and was an honors student.  Her dad had high expectations and was a key motivating influence in her education.  After he died, however, her grades declined precipitously.  She eventually quit school completely.  Jana is sure that she would have remained in school had her father lived.  "[T]here [is] no doubt in my mind . . . I loved to go to school.  I loved it."  *Id.* at 19:22-20:2.

307.   Jana felt alone without her father.  She laments, "I still miss him.  I mean, not a day doesn't go by [that] I don't think about my dad and what if . . . ."  *Id.* at 21:15-17.  Jana still cries over her father, even today, almost twenty years later.  "I guess I'll always do that," Jana testified. *Id.* at 22:2.

308.   Jana was deeply affected by her father's death.  She is never going to see him again and she realizes that he will never see his grandchildren.  She believes her entire life has been missed because of her father's death.  *Id.* at 23.  She turned to running the streets and using drugs, instead of becoming a doctor.

*Estate of Donald Warner*

309.   Donald Warner, was a passenger on UTA Flight 772 and was domiciled in Montana when he perished.

310.   At the time of his death, Donald was returning from Chad, Africa where he was working as a paramedic for Parker Drilling.  Donald's interest in the medical field began when he worked as a trainer for his school athletic teams.  After high school, he joined the Navy where he

74

was stationed in San Diego, Florida, and Iceland, working as a cook and a paramedic.  After he was honorably discharged from the Navy, he worked as an ambulance medic in California before moving back home to Billings, where he also worked as an ambulance medic.  In 1988, he joined Parker Drilling as a paramedic so that he could earn some money to go to school to become a doctor or physician's assistant.  Donald wanted to work in the medical field because he wanted to "help people."  Pls.' Trial Ex. 28, Susan Frazier Dep. 11, June 21, 2007.

311.  Donald's estate is represented by his mother, Janet Warner.  He is survived by his mother, his father Alvin Warner (now deceased), and his younger sisters, Sherry Warner and Susan Frazier.

*Janet Warner*

312.  Janet Warner is the mother of Donald Warner.  She is domiciled in Terry, Montana.

313.  Janet and her husband Alvin raised their children, Donald, Sherry, and Susan, on a ranch between Terry and Miles City, Montana.  They lived there until 1978 when Alvin got a job with the City of Terry and the family moved to Terry.  The Warners were a close family.  Pls.' Trial Ex. 27, Janet Warner Dep. 11, June 21, 2007.

314.  Janet was close to her son Donald, who participated in many activities in school, including football, basketball and choir.  Donald also became the trainer for some of the sports teams.  Janet remembers Donald playing with blocks and building forts when he was younger.  She also remembers him riding horses.

315.  After high school, Donald joined the Navy and was stationed in various locations around the United States and beyond.  Janet and Donald remained in close contact while he was away, writing letters and communicating by telephone every week.  They would talk about what

was going on at home and at the local school Donald attended.

316.   In 1988, Donald joined Parker Drilling.  He was excited about traveling to Chad and Janet still keeps a picture of Donald from Chad with a monkey sitting on his shoulder.  *Id.* at 18-19.  Janet was worried about Donald traveling to Chad, "but he was a young man and you can't keep them home all the time."  *Id.* at 23:18-19.  Donald communicated to Janet that he enjoyed his time in Chad, and particularly the Chadian people, and he brought her wooden masks to hang on the walls in Montana.

317.   The last time Donald was home with his parents was in the summer of 1989.  During that time, he visited with Janet and Alvin and his grandparents in Miles City before returning to Africa.  This was the last time Janet saw her son Donald alive.  When Donald was killed in the bombing of UTA Flight 772, Donald was returning home from his last rotation in Chad.

318.   On September 19, 1989, Janet received a telephone call from Donald's employer informing her that Donald's plane was missing, and then another telephone call informing her that it had crashed and there were no survivors.  Alvin was with her at the time.  Janet's reaction was one of disbelief – she just "couldn't believe it."  *Id.* at 23:6.  After the bombing, Janet and Alvin were left to just wait to have a funeral or memorial service because Donald's body was never found.  Ultimately, there was a memorial service without the body.  It was "quite large" with many of Donald's friends in attendance.  *Id.* at 24.  Janet recalls that she was "just kind of numb" at the service.  *Id.* at 24:18.  Though there was no body to bury, a marker was placed in the Terry cemetery in Donald's memory.  Some of Janet's co-workers also gave her a Montana flag in Donald's honor.  A flagpole was erected by the nursing home where Janet works.  A plaque is there to tell how Donald died in this tragedy and the flag continues to fly today.  Janet and Alvin

also started a scholarship in Donald's name for local high school seniors looking to pursue a career in the medical field.  That scholarship still exists today.

319.  Janet tries not to think about Donald's terrible death.  She tries to keep busy working as a nurse's aide to help her avoid thinking about it.  Janet also has not traveled by airplane since Donald's death, as she had done prior to the tragedy.  Pls.' Trial Ex. 27, Janet Warner Dep. 26.

320.  Janet misses Donald especially around Christmas time.  Before Donald was killed, she would put up a tree and make cookies and candy.  Today, Janet only has a fiber optic tree and she no longer makes candy or decorates the house.

321.  Janet misses the opportunity to have seen her son get married and have children.

*Estate of Alvin Warner*

322.  Alvin Warner was the father of Donald Warner.  He was domiciled in Montana in 1989 and died in January, 2002.  Alvin's wife, Janet Warner, is the executrix of his estate.

323.  Alvin and Janet raised Donald together, along with their two daughters, Sherry and Susan.  The family grew up together around Terry, Montana.  Janet recalled special times between Donald and Alvin, including when Alvin taught Donald to drive their pickup truck out in the country when he was a young boy.  *Id.* at 11.

324.  When he learned of Donald's death, Alvin tried to be brave, but was just in disbelief that Donald was gone.  Alvin did not speak much of Donald's death, and Alvin's health – including a heart condition – deteriorated after Donald was killed.  Alvin and Janet experienced similar grief and related experiences as a result of Donald's death.  *Id.* at 25-26.

*Susan Frazier*

325.  Susan (Warner) Frazier is the youngest sister of Donald Warner.  She resides in

Billings, Montana and was domiciled in Montana in 1989.

326.   Susan grew up with her older brother Donald and sister Sherry on a ranch in Montana.  The family was close at that time, and Susan had a good relationship with Donald, who was a "typical older brother."  Pls.' Trial Ex. 28, Susan Frazier Dep. 11:6.  He helped his parents out with the younger children.  Susan remembers Donald chasing her around when they played tag together.  After Donald left the house, Susan stayed in contact with him.  They would talk about how he was doing and that he enjoyed what he was doing, "which he always said he did."  *Id.* at 12:13.  Donald enjoyed traveling to different places and meeting different people, which inspired Susan to pursue the same sort of experiences.

327.   On September 19, 1989, Susan's mother called to tell her that Donald's plane was missing.  The next morning she  learned that the plane was gone and there were no survivors.  Susan could not believe the news when she heard it.  Her sister Sherry had the same reaction.  She spoke again to her mother and could hear the sadness and tears in her voice.

328.   After the bombing, Susan went to spend some time with her parents.  She joined her parents again on Veteran's Day in 1989 for a memorial service for Donald.  During the service, there was a video tribute of Donald's life.  This was very important to Susan but watching it made her "cry like a baby."  *Id.* at 17:15.  To this day, when she hears the song from that video, she remembers Donald and still cries the same way.

329.   Donald's body was never found.  This left Susan without closure because, without a body, "there's always that possibility."  *Id.* at 17:22-18:1.

330.   After Donald's death, everyone in the family was just "more quiet."  *Id.* at 19.  They would talk about his death and share in the sadness but tried later on to focus more on the "good

times." *Id.* at 19-20.

331. Susan recalls Donald as a happy and funny older brother.  He told jokes and played tricks.  *Id.* at 20.  He also liked to cook all kinds of recipes.  Susan now uses the wok that Donald had before his death.

332. Susan regrets that she never had the opportunity to introduce Donald to her children.  She keeps a picture of Donald in her living room so that they always will know who he was.  She also named her son after Donald.  *Id.* at 20.

*Sherry Warner*

333. Sherry Warner is the younger sister of Donald Warner.  Sherry was domiciled in Montana in 1989, and currently lives in Miles City, Montana.

334. Sherry grew up with Donald, her sister Susan, and her parents Janet and Alvin on a ranch between Terry and Miles City, and ultimately in the town of Terry itself.  The Warners were a close family.  Sherry and Donald used to help gather cattle on the ranch and rode horses together.  She remembers Donald taking hunting classes and driving the family pickup trucks up and down the road.  Sherry remembers her brother Donald as "always happy," "laughing all the time, laughing and having fun, and . . . just being around friends."  Pls.' Trial Ex. 29, Sherry Warner Dep. 11; 13:11-12.   Sherry and Donald got along well as brother and sister.  Donald was a "good older brother."  *Id.* at 12.

335. Even after Donald left home, Sherry stayed in contact with him, especially on holidays when the family would get together.  During those times they would visit and joke around.

336. Donald was the most social person in the family – the "life of the party."  *Id.* at 15:7.

Sherry, on the other hand, was always shy but was "starting to come out of [her] shell" while Donald was in Chad. *Id.* at 16:13.  In September 1989, Sherry was anxious to see Donald and was waiting for him to come home from Chad so she could see his reaction to her new personality; Donald never made it home.

337.  Sherry was concerned for Donald's safety when he was in Chad, but felt there was nothing she could do about it – Donald was an adult, and was "not going to listen to his younger sister" and stay home.

338.  On September 19, 1989, Sherry was told by her mother that the plane had disappeared.  Sherry  thought the plane would show up somewhere safe and waited for further news.  The next day she learned that the plane was gone and Donald was dead.  Sherry was in shock and could not believe the news.  After learning of Donald's death, Sherry tried to avoid being alone and surrounded herself with friends.  Within a day or two, she went to Terry to grieve with her family.  Sherry recalls that her parents tried to be brave but were just in shock over the loss of  Donald.

339.  Donald's death was extremely hard on Sherry.  She found it hard to be alone "for the longest time" and would always try to be with friends after work so that she would not be home by herself.  Sherry still finds it hard to believe that Donald is gone.  Donald's body was never recovered and Sherry would find herself looking for him and seeing people that she thought might be him.  Sherry feels that she still looks for him today.

340.  There was a memorial service for Donald but Sherry could not bring herself to attend.  She wanted to attend, but just couldn't face up to the reality of the situation.  She just sat at home and joined her family afterwards.  There was a video tribute shown at the memorial

service but Sherry still has been unable to watch it because she "just [hasn't] been able to let go." *Id.* at 20:1.

341.   Sherry continues to grieve for her brother Donald today.   She always remembers Donald and thinks of him especially on his birthday.   She tries to live her life one day at a time and tries to be even closer to her mother and her sister.   She has not been on an airplane since Donald's death.

342.   Sherry misses Donald's advice.   She regrets that she cannot go to him for advice about traveling or being social – "just big brother advice."   *Id.* at 22:7.

343.   Sherry is participating in this litigation to find some closure with respect to the murder of her older brother.   It was very hard for her to accept what happened in 1989 and it remains difficult to accept today.

344.   In order to establish the value of the DC-10 owned by Interlease that was operating as UTA Flight 772, Interlease presented the testimony of Douglas Kelly, the Vice President of Asset Valuation and Chief Appraiser of AVITAS, Inc. – one of the top aircraft appraisal firms in the world, and the publisher of the "Blue Book," *i.e.*, the industry standard reference guide for aircraft values.   Tr. 119; 163-64, Aug. 14, 2007.   Kelly is one of 45 appraisers in the world certified by the International Society of Transport Aircraft Trading, and was qualified by the Court as an expert in the field of valuation of commercial jet aircraft.   *Id.* at 169.

345.   Mr. Kelly testified that the DC-10 aircraft that Libya destroyed had a fair market value "base price" in September 1989 of *at least* $38.1M.   Based on the condition and maintenance status of the aircraft at that time,  the "adjusted fair market value" of the aircraft could be as much as $3M higher, or $41.1M.   *Id.* at 173, 176; Pls.' Trial Ex. 36, Expert Report of

Douglas B. Kelly, July 20, 2007.

346.  Douglas  Matthews, the Chief Executive Officer and owner of Interlease, testified

that, in September 1989, the aircraft hull itself was worth between $40M and $42M but the

aircraft was worth $45M-$50M to Interlease as a business asset at that time.  Tr. 120-22, Aug. 14,

2007.  Mr. Kelly testified that "1989 represented one of the strongest periods in aviation history

that we have ever seen.  That was one of the highest peaks in the market, as Doug Matthews said.

. . . especially in 1988, '89, we had incredible massive over ordering from the airlines and one of

the biggest peaks ever in the history of aviation."  *Id.* at 179:3-9.

## II. CONCLUSIONS OF LAW

### A.  Award of Damages to Plaintiff Estates and Family Members.

1.  The sources of law for determining the damages to which the decedents' estates and the

decedents' family members are entitled are the laws of the states in which the plaintiff family

members were domiciled at the time of the bombing of UTA Flight 772 or the decedents' estates

were  probated.  Each state's laws provide a basis for recovery under the state's survival statute,

and for wrongful death, intentional infliction of emotional distress, battery, and loss of

consortium.  There is no conflict of laws between the various states.

2.  The laws of each state of each plaintiff's domicile provide a basis for awarding the

estates of the seven American citizens  who perished aboard UTA Flight 772 and their 44

immediate family monetary damages, both economic damages and non-economic damages for

pain and suffering, against the Libyan State Defendants and the individual Libyan Defendants..

3.  In addition, this court's damages awards against the Individual Libyan Defendants are

subject to the statutory trebling provision of the Anti-Terrorism Act ("ATA") of 1991, 18 U.S.C.

§ 2333(a) (2000).  The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism . . . may sue therefor in any appropriate district court of the United States and *shall* recover threefold the damages he or she sustains and the cost of the suit, including attorneys' fees."  18 U.S.C. § 2333(a) (emphasis added).

4.   While ATA trebling claims can be brought against individuals who act on behalf of a foreign State, they cannot be pursued against the State itself.  *Hurst v. Socialist People's Libyan Arab Jamahiriya,* 474 F. Supp. 2d 19, 28-29 (D.D.C. 2007).

*Economic Damages*

5.   The estates of the seven United States citizens who perished onboard UTA Flight 772 are entitled to recover the present value of the economic losses resulting from their wrongful deaths, including wages, benefits and retirement pay, over their life expectancy.

6.   To support their claims for economic damages, plaintiffs introduced the testimony of the estate representatives and family members of the victims regarding the employment history, income data, and other personal information of each passenger.  Plaintiffs also introduced, and the court admitted and accepted, the testimony and expert reports of Steven A. Wolf, a Principal with LECG, LLC – an economic and financial consulting company – who projected the economic losses of each estate over the course of what would have been each passenger's expected lifetime of productive work.

7.   Mr. Wolf's methodology for determining economic damages is valid and he employed conservative financial assumptions about the growth of money over time in projecting the income loss of the seven decedents whose estates are plaintiffs in this litigation.

*Pain and Suffering*

8.  Unlike the calculation for economic damages, there is no set formula for quantifying the pain and suffering plaintiffs experienced as a result of Libya's intentional and malicious acts of murder.  *See, e.g.*, *Cicippio-Puleo v. Islamic Republic of Iran*, No. 01-1496, slip op. at 26 (D.D.C. Oct. 7, 2005) ("[t]here is no set formula established for calculating damages for family members such as Plaintiffs [here].").  The excruciating physical and emotional pain endured by the seven American passengers aboard UTA Flight 772 before they died and the grief and anguish endured by their immediate family members over the past 18 years can not be precisely quantified in monetary terms.  Nevertheless, courts regularly have considered similar circumstances – including, specifically, in the context of terrorist attacks – and have awarded damages to compensate the victims for their pain and suffering.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 2006 WL 2583043 at *1, n.2 (D.D.C. Sept. 7, 2006);  *Stethem v. The Islamic Republic of Iran*, 201 F. Supp. 2d 78, 82, 88-89, 92 (D.D.C. 2002);  *Higgins v. The Islamic Republic of Iran*, 2000 WL 33674311 at *7-9 (D.D.C. Sept. 21, 2000).

*Prejudgment Interest*

9.  It is within this court's discretion to award plaintiffs prejudgment interest from the date of the bombing on September 19, 1989, until the date of final judgment.

10.  The decision to award – and how to compute – prejudgment interest rests within the sound "discretion of the court [subject to] equitable considerations."  *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (quoting *Motion Picture Ass'n of Amer. v. Oman, Inc.*, 969 F.2d 1154, 1157 (D.C. Cir. 1992)); *see also Forman v. Korean Air Lines, Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996).  Applying this standard, courts in this Circuit have awarded prejudgment interest

in cases where plaintiffs were delayed in recovering compensation for their injuries – including,

specifically, where such injuries were the result of targeted attacks perpetrated by foreign

defendants.  *See, e.g.*, *Oldham*, 127 F.3d at 54 (affirming district court's decision to award

prejudgment interest at prime rate to family members of U.S. citizens killed in 1983 downing of

Korean Air Lines Flight KE007); *Forman,* 84 F.3d at 450-51 (same); *Dammarell,* 2006 WL

2583043 at *1, n.2 (awarding prejudgment interest to families of U.S. citizens killed in 1983

bombing of the United States Embassy in Beirut).  Here, too, given the nature of plaintiffs' loss

and the considerable delay in securing judgment, this court will award prejudgment interest to the

families of the U.S. citizens murdered by Libya  in the bombing of UTA Flight 772.

      11.  In contrast to punitive damages, which can not be imposed against foreign sovereign

defendants in FSIA cases, "[p]rejudgment interest is an element of *complete compensation*."  *West*

*Virginia v. United States*, 479 U.S. 305, 310 (1987) (emphasis added); *cf. Cooper v. Hartford*

*Fin.. Serv. Group, Inc.*, 2006 WL 2598030 at *5 (D.D.C. Sept. 11, 2006) (quoting *District of*

*Columbia v. Pierce Assoc., Inc.*, 527 A.2d 306, 310 (D.C. 1987) ("[i]n modern times, the 'penalty

theory' of prejudgment interest increasingly has given way to the 'loss' or 'unjust enrichment'

theory . . . . [T]he important question is whether the plaintiff has been deprived of the use of the

money withheld and should be compensated for the loss") (citation omitted).  Thus, in awarding

prejudgment interest to plaintiffs, courts have observed that the "interest compensates for the time

value of money and thus is often necessary for full compensation."  *Oldham,* 127 F.3d at 54

(quoting *Motion Picture Ass'n of America*, 969 F.2d at 1157); *see also West Virginia*, 479 U.S. at

310-311.

      12.  Such compensation is particularly appropriate here, where an award is "intended to

compensate for injuries sustained over the course of [an extended period]." *Dammarell*, 2006 WL 2583043, at *1, n.2.  In such cases "the nominal value attached to such injuries should reflect interest and compounding over time." *Id*.

13.  In addition to its compensatory purpose, prejudgment interest also is designed to avoid the unsupportable circumstance of Libya *profiting* from its terrorist acts.  In this sense, the comments of Judge Easterbrook in the antitrust context are particularly appropriate here:

> Neither a count of judicial noses nor the observation that the Sherman Act was silent should obscure the fact that the time value of money works in defendants' favor.  Antitrust cases can be long-lived affairs.  This one has lasted 14 years, 2 ½ of which passed between the findings of liability and the award of damages.  During all of the time, the defendants held the stakes and earned interest . . . .  To deny prejudgment interest is to allow the defendants to profit from their wrong, and because 14 years is a long time, the profit may be substantial.

*Norman Law v. National Collegiate Athletic Ass'n.*, 185 F.R.D. 324, 347 (D. Kan. 1999) (quoting *Fishman v. Estate of Wirtz*, 807 F.2d 520, 584 (7th Cir. 1986) (Easterbrook, J., dissenting)).

14.  Thus, as observed by Judge Easterbrook, even where statutory treble damages are available, "[a]ny erosion of the *trebling* on account of a denial of interest undermines the deterrent force of the antitrust law . . . .  The denial of prejudgment interest systematically undercompensates victims and undeters putative offenders.  We should allow, indeed require, such awards." *Id*. (emphasis added).

15.  Here, an award of prejudgment interest is entirely appropriate and necessary to fully compensate plaintiffs for the enormous losses they sustained as a result of Libya's heinous acts.  Like the plaintiffs in *Dammarell* and the *Korean Air Lines* cases, plaintiffs here have established through their undisputed testimony that they suffered economic losses as well as severe pain and suffering and mental anguish during the eighteen years since Libya intentionally and maliciously

murdered the passengers on board UTA Flight 772 as they flew unsuspecting over the Tenere

Desert in Africa.  Moreover, prejudgment interest is particularly appropriate in this case because

of the substantial delay in judgment for these plaintiffs caused by Libya's persistent delay tactics

over the course of this litigation.

16.  When awarding prejudgment interest, the decision "how to compute [the award] is

discretionary with the district court."  *Forman*, 84 F.3d at 450.  Courts in this Circuit have

determined the "prime rate" – *i.e.*, "the rate charged by banks on short-term, unsecured loans to

their most creditworthy customers" – to be "well within the district court's discretion" for

determining prejudgment interest.  *Id*. (applying prime rate where KAL argued that lower

Treasury Bill rate should apply); *accord Oldham*, 127 F.3d at 54 (striking award and remanding

for recomputation where court applied the "Ibbotson Index" in lieu of prime rate); *In re Nettel*

*Corp.*, 327 B.R. 8 (Bankr. D.D.C. 2005) (applying prime rate rather than lower Treasury Bill Rate

in calculating prejudgment interest).  As the D.C. Circuit observed in *Forman*, the prime rate "is

what the victim must pay – either explicitly if it borrows money or implicitly if it finances things

out of cash on hand – and the rate the wrongdoer has available to it . . . ."  *Forman*, 84 F.3d at

450-51.  (quoting *In the Matter of Oil Spill by the Amoco Cadiz Off the Coast of Fr. on March 16,*

*1978*, 954 F.2d 1279, 1332 (7th Cir. 1992)).

17.  In this case, plaintiffs' damages expert applied a *lower* rate – the average annual 10-

year Treasury Bill rate ("Treasury Bill rate") – to derive the formula for calculating prejudgment

interest for compensatory damages for pain and suffering and property loss.  *See* Pls.' Trial Ex.

31, Report of Steven A. Wolf 8-9; Pls.' Trial Ex. 32, Letter from Steven A. Wolf to Michael

Martinez, July 20, 2007 ("Letter 1"); Pls.' Trial Ex. 33, Letter from Steven A. Wolf to Michael

Martinez, July 20, 2007 ("Letter 2").  Mr. Wolf noted that the Treasury Bill Rate "is

conservatively based" and "is often used as the 'floor' benchmark for purposes of establishing an

interest rate when calculating prejudgment interest."  Letter 1 at 1.  According to Mr. Wolf, the

average annual Treasury Bill Rate from 1989 through 2006 was 6.01%, as compared to the 7.45%

average Prime Rate during the same period.  *Id.*

18.   This court applies a 6.01% prejudgment interest rate here though a higher rate, an

average of the prime rate, also would have been justified.  Further, to fully compensate plaintiffs,

this court shall apply a compounded interest rate for the 18 years from September 19, 1989

through the date of the final judgment.  The prejudgment interest for each plaintiff's estate and

family member, therefore, is derived by multiplying the estate's and family member's damages for

pain and suffering by the formula (1+.0601) – reflecting the average Treasury Bill rate,

compounded over the 18 years since the date of the bombing.

### B.  Award of Damages to Interlease

19.   Interlease, the owner-lessor  of the DC-10 that was operating as UTA Flight 772, is

entitled to damages for conversion under the law of the state of Georgia, where it was

incorporated at the time of the bombing.

20.   The damages to which Interlease is entitled is the value of the aircraft as of

September 19, 1989, plus prejudgment interest, which amount shall be trebled consistent with the

statutory mandate of the ATA.

### C.  Damages to Which Plaintiffs Are Entitled

21.   The Estate of Bonnie Barnes Pugh is entitled to damages under Virginia law for

wrongful death and for Libya's intentional infliction of emotional distress.  The Estate of Bonnie

Barnes Pugh shall be awarded damages against the Libyan State Defendants in an amount that reflects $483,000 in economic damages and $18 million for her pain and suffering plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Bonnie Barnes Pugh shall be awarded an amount that reflects that amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a)**.**

22.  Ambassador Pugh is entitled to damages under Virginia law for Libya's intentional infliction of emotional distress.  Ambassador Pugh shall be awarded damages against the Libyan State Defendants in an amount that reflects $26 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Ambassador Pugh shall be awarded an amount that reflects that amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

23.  Anne Carey is entitled to damages under Virginia law for Libya's intentional infliction of emotional distress.  Anne Carey shall be awarded damages against the Libyan State Defendants in an amount that reflects $10 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Anne Carey shall be awarded an amount that reflects that amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

24.  The Estate of Malcolm Pugh is entitled to damages under Virginia law for Libya's intentional infliction of emotional distress.  The Estate of Malcolm Pugh shall be awarded damages against the Libyan State Defendants in an amount that reflects $2 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against

the Individual Libyan Defendants, the Estate of Malcolm Pugh shall be awarded an amount that

reflects that amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C.

§ 2333(a).

25.   The Estate of Harvey Mills Coverly is entitled to damages under California law for

Libya's intentional infliction of emotional distress.  The Estate of Harvey Mills Coverly shall be

awarded damages against the Libyan State Defendants in an amount that reflects $5 million for his

pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.

Against the Individual Libyan Defendants, the Estate of Harvey Mills Coverly shall be awarded an

amount that reflects that amount that is derived above trebled pursuant to the statutory mandate of

18 U.S.C. § 2333(a).

26.   Sally Chisholm Johnson is entitled to damages under California law for Libya's

intentional infliction of emotional distress and survival.  Sally Chisholm Johnson shall be awarded

damages against the Libyan State Defendants in an amount that reflects $8 million for her pain

and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against

the Individual Libyan Defendants, Sally Chisholm Johnson shall be awarded an amount that

reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C.

§ 2333.

27.   The Estate of Georgia Mae Chisholm is entitled to damages under California law for

Libya's intentional infliction of emotional distress.  The Estate of Georgia Mae Chisholm shall be

awarded damages against the Libyan State Defendants in an amount that reflects $5 million for

her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.

Against the Individual Libyan Defendants, the Estate of Georgia Mae Chisholm shall be awarded

an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

28.  The Estate of Mihai Alimanestianu is entitled to damages under New York law for wrongful death and for Libya's intentional infliction of emotional distress.  The Estate of Mihai Alimanestianu shall be awarded damages against the Libyan State Defendants in an amount that reflects $1,044,000 in economic damages and $18 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Mihai Alimanestianu shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

29.  Ioana Alimanestianu is entitled to damages under New York Law for loss of consortium and intentional infliction of emotional distress.  Ioana Alimanestianu shall be awarded damages against the Libyan State Defendants in an amount that reflects $26 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Ioana Alimanestianu shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333.

30.  Joanna Alimanestianu is entitled to damages under New York law for Libya's intentional infliction of emotional distress.  Joanna Alimanestianu shall be awarded damages against the Libyan State Defendants in an amount that reflects $10 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Joanna Alimanestianu  shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

31.  Nicholas Alimanestianu is entitled to damages under New York law for Libya's

intentional infliction of emotional distress.  Nicholas Alimanestianu shall be awarded damages against the Libyan State Defendants in an amount that reflects $10 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Nicholas Alimanestianu shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333.

32.  Irina Alimanestianu is entitled to damages under California law for Libya's intentional infliction of emotional distress.  Irina Alimanestianu shall be awarded damages against the Libyan State Defendants in an amount that reflects $10 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Irina Alimanestianu shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

33.  Alexander Alimanestianu is entitled to damages under New York law for Libya's intentional infliction of emotional distress.  Alexander Alimanestianu shall be awarded damages against the Libyan State Defendants in an amount that reflects $10 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Alexander Alimanestianu shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333.

34.  The Estate of Calin Alimanestianu is entitled to damages under Florida law for intentional infliction of emotional distress.  The Estate of Calin Alimanestianu shall be awarded damages against the Libyan State Defendants in an amount that reflects $8 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Calin Alimanestianu shall be awarded an amount

that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

35.   The Estate of Serban Alimanestianu is entitled to damages under New York law for Libya's intentional infliction of emotional distress.  The Estate of Serban Alimanestianu shall be awarded damages against the Libyan State Defendants in an amount that reflects $8  million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Serban Alimanestianu shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

36.   The Estate of Constantin Alimanestianu is entitled to damages under New York law for Libya's intentional infliction of emotional distress.  The Estate of Constantin Alimanestianu shall be awarded damages against the Libyan State Defendants in an amount that reflects $8 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Constantin Alimanestianu shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

37.   The Estate of Mark Edward Corder is entitled to damages under Texas law for wrongful death and Libya's intentional infliction of emotional distress.  The Estate of Mark Edward Corder shall be awarded damages against the Libyan State Defendants in an amount that reflects $4,820,000 in economic damages and $18 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Mark Edward Corder shall be awarded an amount that reflects

the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

38.  Carla Malkiewicz is entitled to damages under Texas law for loss of consortium and Libya's intentional infliction of emotional distress.  Carla Malkiewicz shall be awarded damages against the Libyan State Defendants in an amount that reflects $26 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Carla Malkiewicz shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

39.  Therese Coddington is entitled to damages under Indiana law for Libya's intentional infliction of emotional distress.  Therese Coddington shall be awarded damages against the Libyan State Defendants in an amount that reflects $8 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Therese Coddington shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

40.  The Estate of Edward Alfred Corder is entitled to damages under Indiana law for Libya's intentional infliction of emotional distress.  The Estate of Edward Alfred Corder shall be awarded damages against the Libyan State Defendants in an amount that reflects $5 million for Edward Alfred Corder's pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Edward Alfred Corder shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

41.  Michael Corder is entitled to damages under Indiana law for Libya's intentional infliction of emotional distress.  Michael Corder shall be awarded damages against the Libyan

State Defendants in the amount of $8 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Michael Corder shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a)

42.   The Estate of Pat Wayne Huff is entitled to damages under Texas law for wrongful death and for Libya's intentional infliction of emotional distress.  The Estate of Pat Wayne Huff shall be awarded damages against the Libyan State Defendants in the amount of $3,229,000 in economic damages and $18 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Pat Wayne Huff shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

43.   Ermine Hailey is entitled to damages under Texas law for intentional infliction of emotional distress and loss of consortium.  Ermine Hailey shall be awarded damages against the Libyan State Defendants in the amount of $26 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Ermine Hailey shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

44.   Michael Huff is entitled to damages under Texas law for Libya' intentional infliction of emotional distress.  Michael Huff shall be awarded damages against the Libyan State Defendants in the amount of $8 million for his pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Michael Huff shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the

statutory mandate of 18 U.S.C. § 2333(a).

45.   Glenda Jan Pitillo is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  Glenda Jan Pitillo shall be awarded damages against the Libyan State Defendants in the amount of $8 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Glenda Jan Pitillo shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

46.   The Estate of James E. Huff is entitled to damages pursuant to Texas law for Libya's intentional infliction of emotional distress.  The Estate of James Huff shall be awarded damages against the Libyan State Defendants in the amount of $750,000 for James Huff's pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of James Huff shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

47.   The Estate of Janice Huff is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  The Estate of James Huff shall be awarded damages against the Libyan State Defendants in the amount of $5 million for Janice Huff's pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Janice Huff shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

48.   Jared Hill is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  Jared Hill shall be awarded damages against the Libyan State Defendants in the amount of 10 million for his pain and suffering, plus prejudgment interest to the date a

judgment is entered in this action.  Against the Individual Libyan Defendants, Jared Hill shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

49.  Amanda Hill is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  Amanda Hill shall be awarded damages against the Libyan State Defendants in the amount of $10 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Amanda Hill shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

50.  The Estate of Margaret Schultzius is entitled to damages under Texas law for wrongful death and Libya's intentional infliction of emotional distress.  The Estate of Margaret Schultzius shall be awarded damages against the Libyan State Defendants in the amount of $4,098,000 for economic damages and $18 million for Margaret Schultzius' pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Margaret Schultzius shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

51.  Mary Kathryn Hasset is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  Mary Kathryn Hasset shall be awarded damages against the Libyan State Defendants in the amount of $5 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Mary Kathryn Hasset shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

52. William Schutzius is entitled to damages under Ohio law for Libya's intentional infliction of emotional distress. William Schutzius shall be awarded damages against the Libyan State Defendants in the amount of $5million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action. Against the Individual Libyan Defendants, William Schutzius shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

53. Christopher M. Schutzius is entitled to damages under Texas law for Libya's intentional infliction of emotional distress. Christopher M. Schutzius shall be awarded damages against the Libyan State Defendants in the amount of $8 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action. Against the Individual Libyan Defendants, Christopher M. Schutzius shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

54. Catherine Schutzius is entitled to damages under Ohio law for Libya's intentional infliction of emotional distress. Catherine Schutzius shall be awarded damages against the Libyan State Defendants in the amount of $8 million for her pain and suffering, plus prejudgment interest to the date a judgment is entered in this action. Against the Individual Libyan Defendants, Catherine Schutzius shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

55. John B. Schutzius is entitled to damages under Virginia law for Libya's intentional infliction of emotional distress. John B. Schutzius shall be awarded damages against the Libyan State Defendants in the amount of $8 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action. Against the Individual Libyan Defendants, John B.

Schutzius shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

56.   The Estate of James Eldee Turlington, Sr. is entitled to damages under Texas law for wrongful death and Libya's intentional infliction of emotional distress.   The Estate of James Eldee Turlington, Sr. shall be awarded damages against the Libyan State Defendants in the amount of $3,335,000 for economic damages and $18 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.   Against the Individual Libyan Defendants, the Estate of James Eldee Turlington, Sr. shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

57.   Debbie Schooling is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.   Debbie Schooling shall be awarded damages against the Libyan State Defendants in the amount of $10 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.   Against the Individual Libyan Defendants, Debbie Schooling shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

58.   Eddie Don Turlington is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.   Eddie Don Turlington shall be awarded damages against the Libyan State Defendants in the amount of $10 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.   Against the Individual Libyan Defendants, Eddie Don Turlington shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

59.   Joyce Butler is entitled to damages under Texas law for Libya's intentional infliction

of emotional distress.  Joyce Butler shall be awarded damages against the Libyan State Defendants in the amount of $8 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Joyce Butler shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

60.  The Estate of Elvee Turlington is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  The Estate of Elvee Turlington shall be awarded damages against the Libyan State Defendants in the amount of $5 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of Elvee Turlington shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

61.  Russell Turlington is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  Russell Turlington shall be awarded damages against the Libyan State Defendants in the amount of $8 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Russell Turlington shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

62.  Jimmy Bruce Turlington is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  Jimmy Bruce Turlington shall be awarded damages against the Libyan State Defendants in the amount of $10 miilion for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Jimmy Bruce Turlington shall be awarded an amount that reflects the amount

100

that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

63.  David Olney Turlington is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  David Olney Turlington shall be awarded damages against the Libyan State Defendants in the amount of $10 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, David Olney Turlington shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

64.  James Eldee Turlington, Jr. is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  James Eldee Turlington, Jr. shall be awarded damages against the Libyan State Defendants in the amount of $10 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, James Eldee Turlington, Jr. shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

65.  Christopher Darwyn Turlington is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  Christopher Darwyn Turlington shall be awarded damages against the Libyan State Defendants in the amount of $10 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Christopher Darwyn Turlington shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

66.  Jana Elizabeth Turlington is entitled to damages under Texas law for Libya's intentional infliction of emotional distress.  Jana Elizabeth Turlington shall be awarded damages against the Libyan State Defendants in the amount of $10 million for pain and suffering, plus

prejudgment interest to the date a judgment is entered in this action.  Against the Individual

Libyan Defendants, Jana Elizabeth Turlington shall be awarded an amount that reflects the

amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

67.  The Estate of Donald Warner is entitled to damages under Montana law for wrongful

death and Libya's intentional infliction of emotional distress.  The Estate of Donald Warner shall

be awarded damages against the Libyan State Defendants in the amount of $3,020,000 for

economic damages and $18 million for pain and suffering, plus prejudgment interest to the date a

judgment is entered in this action.  Against the Individual Libyan Defendants, the Estate of

Donald Warner  shall be awarded an amount that reflects the amount that is derived above trebled

pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

68.  Janet Warner is entitled to damages under Montana law for Libya's intentional

infliction of emotional distress.  Janet Warner shall be awarded damages against the Libyan State

Defendants in the amount of $5 million for pain and suffering, plus prejudgment interest to the

date a judgment is entered in this action.  Against the Individual Libyan Defendants, Janet Warner

shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the

statutory mandate of 18 U.S.C. § 2333(a).

69.  The Estate of Alvin Warner is entitled to damages under Montana law for Libya's

intentional infliction of emotional distress.  The Estate of Alvin Warner shall be awarded damages

against the Libyan State Defendants in the amount of $5 million for pain and suffering, plus

prejudgment interest to the date a judgment is entered in this action.  Against the Individual

Libyan Defendants, the Estate of Alvin Warner shall be awarded an amount that reflects the

amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

70.  Susan Frazier is entitled to damages under Montana law for Libya's intentional infliction of emotional distress.  Susan Frazier shall be awarded damages against the Libyan State Defendants in the amount of $8 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Susan Frazier shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

71.  Sherry Warner is entitled to damages under Montana law for Libya's intentional infliction of emotional distress.  Sherry Warner shall be awarded damages against the Libyan State Defendants in the amount of $8 million for pain and suffering, plus prejudgment interest to the date a judgment is entered in this action.  Against the Individual Libyan Defendants, Sherry Warner shall be awarded an amount that reflects the amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

72.  Interlease, Inc. is entitled to damages under Georgia law for conversion.  Interlease, Inc. shall be awarded damages against the Individual Libyan Defendants in the amount of $41million in economic damages, plus prejudgment interest to the date a judgment is entered in this action, which amount shall be trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

*     *     *     *     *     *     *

_____An appropriate order accompanies this memorandum**.**

_____
_____Henry H. Kennedy, Jr.
                                         United Sates District Judge

Dated: January 23, 2008