[NOT YET SCHEDULED FOR ORAL ARGUMENT]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ROBERT L. PUGH, et al.,

          Plaintiffs-Appellees,

v.

SOCIALIST PEOPLE'S LIBYAN ARAB
JAMAHIRIYA, et al.,

    Defendants-Appellants/Cross-Appellees,

ABDALLAH SENOUSSI, et al.,

        Defendants-Appellants.

Nos.  08-5387, 08-5388

## UNITED STATES' MOTION TO INTERVENE,
## VACATE JUDGMENT, AND DISMISS SUIT WITH PREJUDICE

In light of the Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat.

2999 (2008), the Claims Settlement Agreement Between the United States of America

and the Great Socialist People's Libyan Arab Jamahiriya, and the President's espousal

in Executive Order 13477 of the terrorism-related claims of U.S. nationals against

Libya, the United States respectfully seeks to intervene in this appeal as plaintiff-

appellee, to vacate the district court's judgment in this case, and to dismiss this suit

with prejudice. Counsel for the Libyan state and official defendants-appellants-cross-

appellees have authorized us to say that their clients consent to the relief requested

in this motion. Counsel for plaintiffs-appellees informed us that he must consult with his clients and cannot take a position on the relief requested until he does so.

Intervention is warranted here because the United States has espoused the terrorism-related claims of U.S. nationals against Libya, including plaintiffs' claims. The United States' espousal is pursuant to a claims settlement agreement with the Libyan government, reached as part of a restoration of diplomatic relations with Libya, and involving payment by Libya of a large sum for the benefit of U.S. nationals. In espousing the claims against Libya, the United States has made the plaintiffs' claims its own. Because the United States is now the real party in interest, the Court should permit it to intervene in this suit as plaintiff-appellee. The Court should also vacate the district court's judgment and should dismiss this suit with prejudice. Vacatur of the judgment is necessary to ensure that the judgment has no future legal consequences that could cause the United States to breach its obligations to Libya under the claims settlement agreement. And dismissal is appropriate because the President has directed that pending suits asserting terrorism-related claims against Libya be terminated; because, under the Libyan Claims Resolution Act, U.S. Courts no longer have jurisdiction over terrorism-related claims against Libya; and because Congress has eliminated any private right of action against Libya for terrorism-related claims.

## STATEMENT

**1.** On September 19, 1989, a suitcase bomb exploded on Union des Transports Aeriens Flight 772, over the Tenere Desert in Niger, killing the 170 passengers and crew on board. Plaintiffs in this case are the estates of the seven United States citizen decedents, 44 of their immediate family members, and Interlease, the company that owned the aircraft destroyed in the blast. Plaintiffs sued Libya and six high-ranking Libyan officials, alleging that Libya was behind the bombing. Plaintiffs brought suit under the terrorism exception to foreign sovereign immunity established by the Foreign Sovereign Immunities Act (FSIA). 28 U.S.C. § 1604 (establishing general immunity of foreign sovereigns from the jurisdiction of U.S. courts); *id.* § 1605(a)(7) (establishing exception to foreign sovereign immunity for state-sponsored terrorism).[1]

The district court granted plaintiffs' motion for summary judgment and held that the defendants were liable for the United States' victims' deaths. *Pugh v. Socialist People's Libyan Arab Jamahiriya*, No. 02-02026, 2006 WL 2384915 (May 6, 2006). In January 2008, the district court awarded the plaintiffs approximately

---

[1] Congress repealed Section 1605(a)(7) and replaced it with 28 U.S.C. § 1605A while this case was pending. National Defense Authorization Act for Fiscal Year 2008 (NDAA), Pub. L. No. 110-181, § 1083, 122 Stat. 338 (codified in part at 28 U.S.C. § 1605A). In *Simon v. Iraq*, 529 F.3d 1187 (D.C. Cir. 2008), *cert. granted*, No. 08-539 (Jan. 9, 2009), this Court held that Congress did not eliminate Section 1605(a)(7) as a basis for jurisdiction over claims pending under that provision at the time of the NDAA's enactment.

$1.7 billion against Libya, and $5.7 billion against the individual Libyan officials. *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216 (D.D.C. 2008). Libya and the individual defendants appealed.[2] At the parties' joint request, this Court stayed the appeal on October 10, 2008. The appeal remains stayed.

   **2.** Until recently, the United States and Libya had hostile relations. In 1972, the United States withdrew its ambassador to Libya. *See* Bureau of Near Eastern Affairs, Dep't of State, Background Note: Libya (Oct. 2007), available at http://www.state.gov/r/pa/ei/bgn/5425.htm. In 1979, the United States withdrew its remaining embassy staff and designated Libya a state sponsor of terrorism. *Ibid.* In 1981, the United States expelled Libya's diplomatic representatives to the United States. *Ibid.* And following Libya's acts of terrorism in the 1980s, the United States imposed significant sanctions on Libya, "including a total ban on direct import and export trade, commercial contracts, and travel-related activities." *Ibid.* It also froze Libyan assets in the United States. *See* E.O. 12543 (Jan. 7, 1986). Also in the 1980s,

---

   [2] Initially, Interlease cross-appealed, to contest the district court's earlier dismissal of some if its claims. When the NDAA was enacted, plaintiffs filed a motion in district court to convert their judgment to one under the new Section 1605A, under a provision allowing for such conversion in certain circumstances. *See* NDAA § 1083(c)(2)(A). This Court vacated the district court's judgment and remanded the case to the district court for consideration of plaintiffs' conversion motion. *See* Order, Nos. 08-7029, 08-7035, 08-7036 (Aug. 1, 2008). Plaintiffs subsequently withdrew their conversion motion and the district court reentered its original judgment. Libya and the individual defendants again appealed, but Interlease did not.

Libya and the United States had instances of low-level armed conflict.  Background Note: Libya.

In December 2003, Libya announced its intention to rid itself of weapons of mass destruction. *Ibid.*  It has since worked toward that goal in cooperation with the United States, the United Kingdom, and various international organizations. *Ibid.* In response, the United States began to normalize its relations with Libya.  In September 2004, the President terminated many of the United States' sanctions against Libya. E.O. 12543 (Sept. 20, 2004).  In 2004, the United States reestablished a diplomatic mission in Libya, as did Libya in the United States.  Background Note: Libya.  Both missions were upgraded to embassies in 2006. *Ibid.*; *see* Secretary of State Condoleezza Rice, U.S. Diplomatic Relations With Libya (May 15, 2006) (announcing "full diplomatic relations with Libya"), *available at* http://www.state .gov/secretary/rm/2006 /66235.htm.  The United States also removed Libya from its list of state sponsors of terrorism. *See* 71 Fed. Reg. 39696 (July 13, 2006).

**3.**  By summer of 2008, there were many plaintiffs with pending suits against Libya for terrorism-related conduct.  They sought hundreds of millions of dollars in damages.  As part of its rapprochement with the United States, Libya sought to settle all terrorism-related claims against it on a state-to-state basis with the United States. Seeking speedy and just compensation for its citizens and further normalization of

relations with Libya, the State Department entered into negotiations with Libya for a resolution of all such claims.

Congress supported the Executive Branch's negotiations with Libya.  On August 4, 2008, Congress enacted the Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008) (Attachment 1).  The Act's "Sense of Congress" provision states that "Congress supports the President in his efforts to provide fair compensation to all nationals of the United States who have terrorism-related claims against Libya through a comprehensive settlement of claims by such nationals against Libya pursuant to an international agreement between the United States and Libya as a part of the process of restoring normal relations between Libya and the United States." *Id.* § 3.

Section 5 of the act authorizes the Secretary of State to certify to Congress that the United States has received from Libya sufficient funds to fully compensate plaintiffs with wrongful death and physical injury claims under the terms of purported (but contested) settlements between plaintiffs and Libya in two suits involving the Pan Am 103 and La Belle Discotheque incidents — cases specifically identified in the legislation — and to provide "fair compensation" for the wrongful death and physical injury claims of other U.S. nationals with terrorism-related cases pending

against Libya on the date of the statute's enactment.  *Id.* § 5(a)(2)(B).[3]  Upon the

Secretary's certification (which was made on October 31, 2008), the statute made

inapplicable to Libya the terrorism-based exceptions to foreign sovereign immunity.

*Id.* § 5(a)(1)(A).  Libya thus became immune from suit for terrorism-related claims,

including in pending cases, such as this one.  The statute also eliminated any cause

of action for terrorism-related claims "against Libya, or any of its agencies,

instrumentalities, officials, employees, or agents."  *Id.* § 5(a)(1)(B).

Congress made clear that the statute applies to pending cases, regardless of

when they were filed.  A "Temporal Scope" provision states that the provisions

restoring Libya's immunity and eliminating any right of action "shall apply only with

respect to any conduct or event occurring before June 30, 2006, regardless of

whether, or the extent to which, application of that subsection affects any action filed

before, on, or after that date."  Pub. L. No. 110-310, § 5(b).[4]

---

[3] Section 5(a)(2)(B)(i) of the Act refers to "payment of the settlements referred to in section 654(b) of division J of the Consolidated Appropriations Act, 2008 (Public Law 110-161; 121 Stat. 2342)."  Section 654(b), in turn, specifically identifies the settlements with certain plaintiffs in suits concerning the Pan Am 103 and La Belle Discotheque incidents.

[4] The United States removed Libya from the list of state-sponsors of terrorism on June 30, 2006.  71 Fed. Reg. 39696.  Since a foreign sovereign's immunity from suit is eliminated for terrorism-related claims only if the state has been designated a state sponsor of terrorism or is so designated as a result of the conduct complained of (*see* 28 U.S.C. § 1605A(a)(2)), the statute thus fully restored Libya's immunity from suit for any terrorism-related claims.

On August 14, 2008, the United States and Libya entered into an international agreement, the purpose of which was to settle all terrorism-related claims against Libya in U.S. courts, and all claims against the United States in Libyan courts related to the United States' military actions against Libya in the 1980s. Claims Settlement Agreement Between the United States of America and the Great Socialist People's Libyan Arab Jamahiriya (Claims Settlement Agreement), Art. I (Attachment 2). Under the agreement, Libya's payment of $1.5 billion to the United States constitutes a full and final settlement of all terrorism-related claims by the United States or its nationals against Libya. *Id.* Art. III(1), Annex (4). The Claims Settlement Agreement prohibits payment to claimants unless covered suits are first dismissed. *Id.* Annex (6). And the agreement imposes on the United States the obligation, upon receipt of the specified funds, to terminate suits pending in U.S. courts that are covered by the agreement. *Id.* Art. III(2).

On October 31, 2008, the Secretary of State made the certification authorized by Section 5 of the Libyan Claims Resolution Act, that the United States had received from Libya funds sufficient to pay the claims identified in the legislation (Attachment 3). The same day, the President issued Executive Order 13477 (Attachment 4), which settled all claims within the terms of the Claims Settlement Agreement. The executive order expressly espoused U.S. nationals' claims coming within the terms of the Claims Settlement Agreement. E.O. 13477 § 1(a). It prohibits U.S. nationals

from "assert[ing] or maintain[ing] any claim within the terms of Article I [of the Claims Settlement Agreement] in any forum, domestic or foreign, except under the procedures provided for by the Secretary of State." *Id.* § 1(a)(i). The order directs that "[a]ny pending suit in any court, domestic or foreign, by United States nationals (including any suit with a judgment that is still subject to appeal or other forms of direct judicial review) coming within the terms of Article I shall be terminated." *Id.* § 1(a)(ii).

The executive order instructs the Secretary of State to "provide for procedures governing applications by United States nationals with claims within the terms of Article I for compensation for those claims." *Id.* § 1(a)(iii). And it directs the Attorney General to "enforce this subsection through all appropriate means, which may include seeking the dismissal, with prejudice, of any claim of a United States national within the terms of Article I pending or filed in any forum, domestic or foreign."[5] *Id.* § 1(a)(iv).

Pursuant to the executive order, the State Department is establishing procedures for receiving applications for compensation from U.S. nationals who have alleged terrorism-related injuries attributable to Libya, and whose claims come within

---

[5] The executive order settles the terrorism-related claims of foreign nationals against Libya pending in U.S. courts, but it does not preclude foreign nationals from pursuing other available remedies in foreign courts or through foreign governments. E.O. 13477 § 1(b).

the Claims Settlement Agreement.  Because the applicable compensation claims for wrongful death from Libyan terrorist activities are finite and identifiable, the State Department determined that it would itself receive applications and make payments for those claims.  Under the purported settlements identified by Congress in the legislation, such claims were to be paid at $10 million per death.  The State Department determined that $10 million per death would be "fair compensation" (Pub. L. No. 110-301, § 5(a)(2)(B)) for the other wrongful death claims, such as those at issue in this case, that are not covered by settlements with Libya.  Consistent with the United States' obligation under the Claims Settlement Agreement, the State Department requires as a precondition of payment evidence of dismissal of the terrorism suit against Libya.  Under the State Department's procedures, dismissal of a particular plaintiff's claims against Libya is insufficient; the agency requires dismissal of the entire suit against Libya.

In sum, Congress and the President agreed that resolving outstanding terrorism-related claims against Libya was necessary for the further development of the United States' diplomatic relations with that nation, so long as Libya would provide sufficient funds to fairly compensate U.S. victims of terrorism who alleged Libyan responsibility. The Executive Branch thus entered into a claims settlement agreement with Libya, and Libya paid the United States $1.5 billion, as required by the agreement. As a result of the President's espousal of U.S. nationals' terrorism-related

claims against Libya and the immunity provisions of the Libya Claims Resolution Act, claims against Libya such as those at issue in this case are no longer justiciable. U.S. nationals with claims covered by the Claims Settlement Agreement must instead seek compensation from the United States through administrative proceedings established by the Secretary of State for any terrorism-related injuries caused by Libya.

## ARGUMENT

**1.** The United States' authority to espouse the claims of its nationals against a foreign sovereign is well established in international and domestic law.   As then-Judge Scalia explained in an opinion for this Court:

> Under well-established principles of international law, a sovereign possesses the absolute power to assert the private claims of its nationals against another sovereign. This authority to espouse claims does not depend on the consent of the private claimholder, and the fact that a claim has been espoused provides a complete defense for the defendant sovereign in any action by the private individual. Once it has espoused a claim, the sovereign has wide-ranging discretion in disposing of it. It may compromise it, seek to enforce it, or waive it entirely.   Final settlement between the sovereigns wipes out the underlying debt and releases the defendant sovereign from all obligation except as the settlement agreement may provide.

*Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1523 (D.C. Cir. 1987) (citations, quotation and alteration marks omitted).

The principle of espousal is equally well-established in our domestic law. For over 200 years, the United States has espoused the claims of its nationals against

foreign states and foreign states' nationals. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (noting 1799 agreement between the Adams Administration and the Dutch Government as the first example of espousal by executive agreement). While some settlements were effected through joint action by the President and the Senate through a treaty, "there has also been a longstanding practice of settling such claims by executive agreement without the advice and consent of the Senate." *Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981); *see Medellin v. Texas*, 128 S. Ct. 1346, 1371 (2008) (recognizing President's authority to make "executive agreements to settle civil claims between American citizens and foreign governments or foreign nationals").

The Supreme Court has upheld the President's espousal power as part of the United States' establishment of diplomatic relations with a foreign nation, and thus as part of the President's constitutional authority to recognize foreign sovereigns. Thus, in *United States v. Pink*, 315 U.S. 203 (1942), the Supreme Court upheld the President's espousal of U.S. nationals' claims against the Soviet Union, as part of this Nation's establishment of diplomatic relations with that country. The Court explained that

> [n]o * * * obstacle can be placed in the way of rehabilitation of relations between this country and another nation, unless the historical conception of the powers and responsibilities of the President in the conduct of foreign affairs is to be drastically revised. It was the judgment of the political department that full recognition of the Soviet Government

> required the settlement of all outstanding problems including the claims
> of our nationals. Recognition and [the executive agreement] were
> interdependent. We would usurp the executive function if we held that
> that decision was not final and conclusive in the courts.

315 U.S. at 230; *see also United States v. Belmont*, 301 U.S. 324 (1937); *cf. Banco*

*Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition [of

a foreign sovereign] is exclusively a function of the Executive."). The Supreme Court

has also upheld claims settlements outside the context of recognizing foreign

sovereigns, where it found "that Congress has implicitly approved the practice of

claim settlement by executive agreement." *Dames & Moore*, 453 U.S. at 680–82.

    **2.** Against this background, the United States' espousal of its nationals'

terrorism-related claims against Libya and its officials is well founded. The Claims

Settlement Agreement and the United States' espousal of U.S. nationals' terrorism-

related claims against Libya are part of this Nation's "rehabilitation of relations

between this country and another nation." *Pink*, 315 U.S. at 230. The Claims

Settlement Agreement is expressly premised on the two countries' desire "to further

the process of normalization of relations." Claims Settlement Agreement, Intro. So

was the President's subsequent espousal of U.S. nationals' claims, and Congress'

enactment of the Libyan Claims Resolution Act. E.O. 13477, Intro. (settling claims

against Libya "to continue the process of normalizing relations between the United

States and Libya"); *see also* Pub. L. No. 110-310, § 3 (expressing support for

13

President's efforts to enter a claims settlement agreement as "a part of the process of restoring normal relations between Libya and the United States"). And the resolution of claims against Libya was critical to a further development in the diplomatic relations between Libya and the United States: the confirmation of the United States' ambassador to Libya. *Compare* Lautenberg, Menendez, Schumer, Clinton to Block Bush Appointment to Libya: Senators Say U.S. Should Not Pursue Diplomatic Recognition of Libya Until Victims of Libyan Terror are Compensated (press release) (July 12, 2007) (Attachment 5); *with* Office of the Spokesman, Department of State, Confirmation of Gene A. Cretz as Ambassador to Libya (Nov. 28, 2008), *available at* http://www.state.gov/r/pa/prs/ps/2008/nov/112462.htm.

The President's espousal of U.S. nationals' terrorism-related claims against Libya is thus an unexceptional exercise of the President's constitutional authority to recognize foreign sovereigns and to establish diplomatic relations. *See Pink*, 315 U.S. at 229 ("[p]ower to remove * * * obstacles to full recognition as settlement of claims of our nationals certainly is a modest implied power of the President['s]" recognition power).

Moreover, Congress has explicitly endorsed the President's efforts to settle the terrorism-related claims of U.S. nationals against Libya. Pub. L. No. 110-301, § 3 ("support[ing] the President['s]" efforts to provide fair compensation for U.S. nationals with terrorism-related claims against Libya through "an international

14

agreement" that would effect "a comprehensive settlement of claims"). The President and Congress share the Nation's foreign affairs powers under the Constitution. *See Garamendi*, 539 U.S. at 414–15. In espousing U.S. nationals' terrorism-related claims against Libya, the President acted "pursuant to an express or implied authorization of Congress." *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Accordingly, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Ibid.* Thus, the President's espousal of terrorism claims against Libya is "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Ibid.*

**3.** Because the United States has espoused plaintiffs' claims, it is appropriate for it to intervene in this case. By espousing plaintiffs' claims, the United States divested plaintiffs of any interest they have in those claims, except to the extent the United States chooses to recognize a continued interest — here, the right to seek compensation from the United States under procedures established by the Secretary of State. By espousing the claims, the United States made them its own, and it has discretion to "compromise [them], seek to enforce [them], or waive [them] entirely." *Asociacion de Reclamantes*, 735 F.2d at 1523. Accordingly, the United States is now

the real party in interest in this suit, and it should be permitted to intervene to seek

vacatur of what is now its judgment and dismissal of what is now its suit.

In addition, the United States is under an international obligation to terminate

covered suits against Libya.   Claims Settlement Agreement, Art. III(2).   That

obligation is itself sufficient to confer party status in this suit on the United States.

*Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 425 (1925) ("[The United

States] has a standing in this suit * * * to carry out its treaty obligations to a foreign

power."); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232–34 (D.C. Cir. 2003)

(affirming district court order authorizing the United States to intervene as of right

to uphold its obligations under an executive international agreement, which would be

violated if plaintiffs obtained a judgment against the foreign sovereign).

**4.** The Court should vacate the district court's judgment and dismiss this suit

with prejudice.

**a.** Vacatur of a district court judgment is an equitable remedy.  *Humane Soc'y

of the United States v. Kempthorne*, 527 F.3d 181, 187 (D.C. Cir. 2008).   Here, the

equities strongly favor vacatur.   Vacatur is in the interest of the United States and

Libya, now the real parties in interest in this case.   The United States and Libya

entered into a bilateral agreement under which Libya would pay the United States

$1.5 billion.   In exchange, the United States undertook the international obligation

to "terminate *permanently* all pending suits (including suits with judgments that are

16

still subject to appeal or other forms of direct judicial review)" involving terrorism-related claims against Libya.  Claims Settlement Agreement, Art. I (emphasis added).  In order to prevent the district court's judgment "from spawning any legal consequences," thereby putting the United States in breach of its international obligations and depriving Libya of the benefit of its agreement, vacatur of the judgement is necessary.  *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41 (1950); *see Loughlin v. United States*, 393 F.3d 155, 171 (D.C. Cir. 2004) (vacating district court judgment to prevent it from spawning legal consequences "irrespective of whether such consequences are imminent or remote" (quotation marks omitted)).  By contrast, plaintiffs do not have a cognizable interest in maintaining the district court's judgment, because, by espousing their claims in this case, the United States divested plaintiffs of any legal interest in those claims (except insofar as plaintiffs may present their claims to the United States).

In addition, vacatur is in the public interest.  *Cf. United States Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 26 (1994) ("As always when federal courts contemplate equitable relief, our holding must also take account of the public interest.").  Enabling the United States to abide by its international commitments is self-evidently in the public's interest.  *Cf. Sanitary Dist. of Chicago*, 266 U.S. at 425.  And while precedential judicial decisions are "presumptively correct and valuable to the legal community as a whole" (*Bonner Mall*, 513 U.S. at 26),

district court decisions are not precedential. *See Russman v. Board of Educ. of Enlarged City School Dist. of City of Watervliet*, 260 F.3d 114, 122 (2d Cir. 2001) (explaining that vacatur of district court decision does not undermine public value of precedent because district court decisions have only persuasive authority). Similarly, while vacatur would not serve the public interest in "a case in which a litigant is attempting to manipulate the courts to obtain the relief it was not able to win in the judicial system," this is not such a case. *Humane Soc'y of the United States*, 527 F.3d at 188. Accordingly, the district court's judgment should be vacated.

**b.** Finally, the Court should dismiss this suit with prejudice. Dismissal is required for three reasons. First, the United States has espoused the claims at issue in this suit and has settled them. E.O. 13477, § 1(a) ("Claims of United States nationals within the terms of Article I are espoused by the United States and are settled according to the terms of the Claims Settlement Agreement."). Accordingly, there remains no case or controversy concerning these claims against Libya, and the federal courts lack subject matter jurisdiction over them. *See Nuclear Info. & Resource Serv. v. Nuclear Regulatory Comm'n*, 509 F.3d 562, 567 (D.C. Cir. 2007) ("Under Article III of the Constitution, federal courts have jurisdiction only to decide cases or controversies.").

Second, dismissal is required because Libya and the Libyan official defendants are immune from suit for terrorism-related claims under the FSIA. The Libyan

Claims Resolution Act restored Libya's immunity from suit and that of Libya's agencies or instrumentalities, upon the Secretary of State's certification that the United States has received sufficient funds to ensure both the payment of specified settlements and "fair compensation" of other U.S. nationals' claims against Libya. Pub. L. No. 110-310, § 5(a)(1)(A).  As noted, the Secretary provided the requisite certification on October 31, 2008.  Accordingly, there is no applicable exception to foreign sovereign immunity under which Libya or the individual Libyan official defendants may be sued.[6]  The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in federal court."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).  And the FSIA provides for jurisdiction over suits against a foreign state only when an exception to foreign sovereign immunity applies. 28 U.S.C. § 1330(a).  Accordingly, the federal courts do not possess jurisdiction to adjudicate this suit against the Libyan defendants, and the suit should be dismissed. Moreover, because the jurisdictional defects in this case cannot be cured, dismissal with prejudice is required.

Finally, the Libyan Claims Resolution Act has eliminated any private right of action against Libya for terrorism-related claims.  Pub. L. No. 110-301, § 5(a)(1)(B).

---

[6] Under the law of this Circuit, a foreign official who "acts in his official capacity for the state" qualifies as an "agency or instrumentality" of the state within the meaning of the FSIA, and so is entitled to the immunity from suit provided by that statute.  *Belhas v. Ya'alon*, 515 F.3d 1279, 1283 (D.C. Cir. 2008).

The statute makes clear that the elimination of all rights of action applies to all conduct occurring before June 30, 2006 (such as the conduct at issue in this case), and "regardless of whether, or the extent to which" the elimination of the right of action "affects any action filed before, on, or after that date." *Id.* § 5(b). Accordingly, dismissal would be required even if the courts continued to have jurisdiction over claims such as those presented here. *See Landgraf v. USI Film Products*, 511 U.S. 244, 273 (1994) ("[A] court should apply the law in effect at the time it renders its decision." (quotation marks omitted)); *ibid.* (noting that there is no conflict between the foregoing principle and the presumption against retroactivity, when Congress makes clear its intention that the statute apply retroactively).

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion to intervene, it should vacate the district court's judgment, and it should dismiss this suit with prejudice.

Respectfully submitted,

DOUGLAS N. LETTER
LEWIS S. YELIN
*Attorney, Appellate Staff*
*Civil Division*
*United States Department of Justice*
*950 Pennsylvania Avenue, NW, Rm. 7322*
*Washington, D.C. 20530*
*(202) 514-3425*

January 9, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January, 2009, I caused the foregoing

United States' Motion to Intervene, Vacate Judgment, and Dismiss Suit with

Prejudice to be filed with the Court and served on counsel by causing an original and

four copies to be delivered via HAND DELIVERY to:

> Mark Langer, Clerk of the Court
> United States Court of Appeals
>   for the District of Columbia Circuit
> E. Barrett Prettyman US Courthouse
> 333 Constitution Avenue, NW, Rm. 5423
> Washington, DC 20001-2866
> 202-216-7000

and by causing one copy to be delivered via OVERNIGHT DELIVERY (courtesy

copy by e-mail) to:

> Stuart H. Newberger          Alex Blanton
> Michael L. Martinez          Alan M. Freeman
> Laurel Pyke Malson           Blank Rome LLP
> Crowell & Moring LLP         600 New Hampshire Ave., NW
> 1001 Pennsylvania Ave., NW   Washington, DC 20037
> Washington, DC 20004         202-772-5909
> 202-624-2500

> Eric L. Lewis
> A. Katherine Toomey
> 1201 F Street NW, Ste. 500
> Washington, DC 20004
> 202-833-8900

_____
Lewis S. Yelin

**Attachment 1**

PUBLIC LAW 110–301—AUG. 4, 2008          122 STAT. 2999

Public Law 110–301
110th Congress

An Act

To resolve pending claims against Libya by United States nationals, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Libyan Claims Resolution Act".

**SEC. 2. DEFINITIONS.**

In this Act—

(1) the term "appropriate congressional committees" means the Committee on Foreign Relations and the Committee on the Judiciary of the Senate and the Committee on Foreign Affairs and the Committee on the Judiciary of the House of Representatives;

(2) the term "claims agreement" means an international agreement between the United States and Libya, binding under international law, that provides for the settlement of terrorism-related claims of nationals of the United States against Libya through fair compensation;

(3) the term "national of the United States" has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

(4) the term "Secretary" means the Secretary of State; and

(5) the term "state sponsor of terrorism" means a country the government of which the Secretary has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.

**SEC. 3. SENSE OF CONGRESS.**

Congress supports the President in his efforts to provide fair compensation to all nationals of the United States who have terrorism-related claims against Libya through a comprehensive settlement of claims by such nationals against Libya pursuant to an international agreement between the United States and Libya as a part of the process of restoring normal relations between Libya and the United States.

Aug. 4, 2008
[S. 3370]

Libyan Claims
Resolution Act.
28 USC 1605A
note.

28 USC 1605A
note.

28 USC 1605A
note.

122 STAT. 3000      PUBLIC LAW 110–301—AUG. 4, 2008

28 USC 1605A note.

**SEC. 4. ENTITY TO ASSIST IN IMPLEMENTATION OF CLAIMS AGREE-MENT.**

(a) DESIGNATION OF ENTITY.—

Federal Register, publication.

(1) DESIGNATION.—The Secretary, by publication in the Federal Register, may, after consultation with the appropriate congressional committees, designate 1 or more entities to assist in providing compensation to nationals of the United States, pursuant to a claims agreement.

(2) AUTHORITY OF THE SECRETARY.—The designation of an entity under paragraph (1) is within the sole discretion of the Secretary, and may not be delegated. The designation shall not be subject to judicial review.

(b) IMMUNITY.—

(1) PROPERTY.—

(A) IN GENERAL.—Notwithstanding any other provision of law, if the Secretary designates any entity under subsection (a)(1), any property described in subparagraph (B) of this paragraph shall be immune from attachment or any other judicial process. Such immunity shall be in addition to any other applicable immunity.

(B) PROPERTY DESCRIBED.—The property described in this subparagraph is any property that—

(i) relates to the claims agreement; and

(ii) for the purpose of implementing the claims agreement, is—

(I) held by an entity designated by the Secretary under subsection (a)(1);

(II) transferred to the entity; or

(III) transferred from the entity.

(2) OTHER ACTS.—An entity designated by the Secretary under subsection (a)(1), and any person acting through or on behalf of such entity, shall not be liable in any Federal or State court for any action taken to implement a claims agreement.

(c) NONAPPLICABILITY OF THE GOVERNMENT CORPORATION CONTROL ACT.—An entity designated by the Secretary under subsection (a)(1) shall not be subject to chapter 91 of title 31, United States Code (commonly known as the "Government Corporation Control Act").

28 USC 1605A note.

**SEC. 5. RECEIPT OF ADEQUATE FUNDS; IMMUNITIES OF LIBYA.**

(a) IMMUNITY.—

(1) IN GENERAL.—Notwithstanding any other provision of law, upon submission of a certification described in paragraph (2)—

(A) Libya, an agency or instrumentality of Libya, and the property of Libya or an agency or instrumentality of Libya, shall not be subject to the exceptions to immunity from jurisdiction, liens, attachment, and execution contained in section 1605A, 1605(a)(7), or 1610 (insofar as section 1610 relates to a judgment under such section 1605A or 1605(a)(7)) of title 28, United States Code;

(B) section 1605A(c) of title 28, United States Code, section 1083(c) of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110–181; 122 Stat. 342;

PUBLIC LAW 110–301—AUG. 4, 2008          122 STAT. 3001

28 U.S.C. 1605A note), section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (28 U.S.C. 1605 note), and any other private right of action relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law shall not apply with respect to claims against Libya, or any of its agencies, instrumentalities, officials, employees, or agents in any action in a Federal or State court; and

(C) any attachment, decree, lien, execution, garnishment, or other judicial process brought against property of Libya, or property of any agency, instrumentality, official, employee, or agent of Libya, in connection with an action that would be precluded by subparagraph (A) or (B) shall be void.

(2) CERTIFICATION.—A certification described in this paragraph is a certification—

(A) by the Secretary to the appropriate congressional committees; and

(B) stating that the United States Government has received funds pursuant to the claims agreement that are sufficient to ensure—

(i) payment of the settlements referred to in section 654(b) of division J of the Consolidated Appropriations Act, 2008 (Public Law 110–161; 121 Stat. 2342); and

(ii) fair compensation of claims of nationals of the United States for wrongful death or physical injury in cases pending on the date of enactment of this Act against Libya arising under section 1605A of title 28, United States Code (including any action brought under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (28 U.S.C. 1605 note), that has been given effect as if the action had originally been filed under 1605A(c) of title 28, United States Code, pursuant to section 1083(c) of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110–181; 122 Stat. 342; 28 U.S.C. 1605A note)).

(b) TEMPORAL SCOPE.—Subsection (a) shall apply only with respect to any conduct or event occurring before June 30, 2006, regardless of whether, or the extent to which, application of that subsection affects any action filed before, on, or after that date.

122 STAT. 3002          PUBLIC LAW 110–301—AUG. 4, 2008

(c) AUTHORITY OF THE SECRETARY.—The certification by the Secretary referred to in subsection (a)(2) may not be delegated, and shall not be subject to judicial review.

Approved August 4, 2008.

LEGISLATIVE HISTORY—S. 3370:

CONGRESSIONAL RECORD, Vol. 154 (2008):
        July 31, considered and passed Senate and House.

○

**Attachment 2**

CLAIMS SETTLEMENT AGREEMENT BETWEEN
THE UNITED STATES OF AMERICA AND
THE GREAT SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA

In order to further the process of normalization of relations on the basis of equality and mutual benefit, the United States of America and the Great Socialist People's Libyan Arab Jamahiriya (collectively "the Parties") have agreed on the following:

## ARTICLE I

The objective of this Agreement is to:

(1) reach a final settlement of the Parties' claims, and those of their nationals (including natural and juridical persons);

(2) terminate permanently all pending suits (including suits with judgments that are still subject to appeal or other forms of direct judicial review); and

(3) preclude any future suits that may be taken to their courts

if such claim or suit is against the other Party or its agencies or instrumentalities, or against officials, employees, or agents thereof (whether such officials, employees, or agents are sued in an official and/or personal capacity), or (where the claim or suit implicates in any way the responsibility of any of the foregoing) against the other Party's nationals; and such claim or suit is brought by or on behalf of a Party's nationals (including natural and juridical persons) or such suit is brought by or on behalf of others (including natural and juridical persons); and such claim or suit arises from personal injury (whether physical or non-physical, including emotional distress), death, or property loss caused by any of the following acts occurring prior to June 30, 2006:

(a) an act of torture, extrajudicial killing, aircraft sabotage, hostage taking or detention or other terrorist act, or the provision of material support or resources for such an act; or

(b) military measures.

1

## ARTICLE II

1. The two Parties agree to authorize the establishment of a humanitarian settlement fund ("the Fund") as the basis for settling the claims and terminating and precluding the suits specified in Article I.

2. The Fund shall be established, operated, and financed as set out in the Annex to this Agreement. The Fund will allocate resources for distribution in accordance with the Annex.

## ARTICLE III

1. Each Party shall accept the resources for distribution as a full and final settlement of its claims and suits and those of its nationals as specified in Article I.

2. Upon receipt of resources from the Fund in accordance with the Annex, each Party shall:

> (a) Secure, with the assistance of the other Party if need be, the termination of any suits pending in its courts, as specified in Article I (including proceedings to secure and enforce court judgments), and preclude any new suits in its courts, as specified in Article I.

> (b) Provide the same sovereign, diplomatic and official immunity to the other Party and its property, and to its agencies, instrumentalities, officials and their property, as is normally provided within its legal system to other states and their property and to their agencies, instrumentalities, officials and their property.

> (c) Refrain from presenting to the other Party, on its behalf or on behalf of another, any claim specified in Article I. If any such claim is presented directly by a national of one of the Parties to the other Party, the other Party should refer it back to the first Party.

2

## ARTICLE IV

Each Party shall take necessary measures to ensure that the Fund resources shall not be subject to attachment or any other judicial process that would in any way interfere with the Fund's possession of resources or the transfer of resources to the Fund or from the Fund in accordance with this Agreement.

## ARTICLE V

The Annex attached hereto is an integral part of this Agreement.  The Agreement shall enter into force on the date of signature.

This Agreement was signed on August 14th, 2008 at Tripoli, in duplicate, in the English and Arabic languages, both versions being equally authentic.

FOR THE UNITED STATES
OF AMERICA

FOR THE GREAT SOCIALIST
PEOPLE'S LIBYAN ARAB
JAMAHIRIYA

3

## ANNEX

1. The Parties have agreed to authorize the establishment of a humanitarian settlement fund (the "Fund") in furtherance of their Claims Settlement Agreement (the "Agreement"), of which this Annex is an integral part.

2. The Fund shall be established in accordance with the authorization. The Fund shall open an interest-bearing account (the "Fund Account") for the purpose of receiving contributions.

3. Each Party directly, or through its authorized representative, will direct the opening of an account for the purpose of depositing money received from the Fund Account. Account A will hold funds for distribution by the United States of America. Account B will hold funds for distribution by the Great Jamahiriya or its authorized representative. Funds held for distribution by each Party may be invested as is acceptable to the competent authorities of that Party.

4. Once contributions to the Fund Account reach the amount of U.S. $1.8 billion (one billion eight hundred million U.S. dollars), the amount of U.S. $1.5 billion (one billion five hundred million U.S. dollars) shall be deposited into Account A and the amount of U.S. $300 million (three hundred million U.S. dollars) shall be deposited into Account B, which in both cases shall constitute the receipt of resources under Article III (2) of the Agreement.

5. No resources shall be distributed from Account A until the United States of America has implemented Article III (2) (b), and no resources shall be distributed from Account B until the Great Jamahiriya has implemented Article III (2) (b).

6. No resources shall be distributed to any claimant from Accounts A or B unless any suit of that claimant within the scope of Article I is terminated in accordance with Article III (2) (a).

7. The Fund will have a duration of six months from its creation unless otherwise agreed by the Parties. In the event there are any residual balances in the Fund Account at the time of the Fund's expiration, those balances will be transferred pursuant to arrangements agreed between the Parties.

4

**Attachment 3**



United States Department of State

*Washington, D.C. 20520*

OCT 3 1 2008

Dear Mr. Chairman:

I am herein transmitting the certification of the Secretary of State under section 5(a) of the Libya Claims Resolution Act, 2008 (P.L. 110-103), covering receipt by the U.S. Government of funds sufficient to ensure payments described in the legislation. The reasons for the Secretary's certification are set forth in the attached Memorandum of Justification.

Please do not hesitate to contact us if we can be of any assistance on this matter.

Sincerely,

Matthew A. Reynolds
Assistant Secretary
Legislative Affairs

Enclosure:
    As stated.

The Honorable
        Joseph R. Biden, Jr., Chairman,
            Committee on Foreign Relations,
                United States Senate.

CERTIFICATION UNDER SECTION 5(A)(2) OF THE LIBYAN CLAIMS
RESOLUTION ACT RELATING TO THE RECEIPT OF FUNDS FOR
SETTLEMENT OF CLAIMS AGAINST LIBYA

By virtue of the authority vested in me as Secretary of State and
pursuant to section 5(a)(2) of the Libyan Claims Resolution Act (P.L. 110-
103) (the "Act"), I hereby certify that the United States Government has
received funds pursuant to the United States-Libya Claims Settlement
Agreement that are sufficient to ensure:

1) payment of the settlements referred to in section 654(b) of the
Department of State, Foreign Operations, and Related Programs
Appropriations Act, 2008 (Div. J, P. L. 110-161; 121 Stat. 2342) and;

2) fair compensation of claims of nationals of the United States for
wrongful death or physical injury in cases pending on the date of enactment
of the Act against Libya arising under section 1605A of title 28, United
States Code (including any action brought under section 1605(a)(7) of title
28, United States Code, or section 589 of the Foreign Operations, Export
Financing, and Related Programs Appropriations Act, 1997 (28 U.S.C. 1605
note), that has been given effect as if the action had originally been filed
under 1605A(c) of title 28, United States Code, pursuant to section 1083(c)
of the National Defense Authorization Act for Fiscal Year 2008 (Public Law
110-181; 122 Stat. 342; 28 U.S.C. 1605A note)).

This certification shall be published in the <u>Federal Register</u> and
transmitted to the appropriate congressional committees.

OCT 3 1 2008
_____
Date

_____
Condoleezza Rice
Secretary of State

MEMORANDUM OF JUSTIFICATION

The Libyan Claims Resolution Act (P.L. 110-301) (the "Act") provides Libya with legal protection from terrorism-related claims predating its removal from the state sponsors of terrorism list upon the Secretary of State certifying to the appropriate congressional committees that the United States Government has received sufficient funds to ensure payment of the Pan Am and LaBelle settlements and fair compensation for other U.S. death and physical injury claims in pending cases against Libya.

On August 14, 2008, the U.S.-Libya Claims Settlement Agreement (the "Agreement") was signed by the U.S. Government and the Government of Libya. The Agreement establishes a process whereby each Party receives resources for the full and final settlement of its claims and suits and those of its nationals and, upon receipt, each party is obligated to take certain actions, including the restoration of sovereign immunity and the dismissal of all covered suits. On October 31, 2008, the United States received the agreed-upon amount of $1.5 billion for distribution as a full and final settlement of its claims and suits and those of U.S. nationals.

This amount is sufficient to ensure the remaining payment of $536 million for the Pan Am 103 settlement and $283 million for the La Belle settlement, the two settlements referred to in section 654(b) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008 (Div. J, P. L. 110-161; 121 Stat. 2342). The remaining $681 million is sufficient to ensure fair compensation for the claims of nationals of the United States for wrongful death or physical injury in those cases described in the Act which were pending against Libya on the date of enactment of the Act (August 4, 2008) as well as other terrorism-related claims against Libya.

The receipt of these funds provides the basis for the certification by the Secretary of State that the United States Government has received funds pursuant to the Agreement that, as required by Section 5(a)(2) of the Act, are sufficient to ensure:

 i. payment of the settlements referred to in section 654(b) of division J of the Consolidated Appropriations Act, 2008 (Public Law 110-161; 121 Stat. 2342) and;

ii. fair compensation of claims of nationals of the United States for wrongful death or physical injury in cases pending on the date of enactment of the Act against Libya arising under section 1605A of title 28, United States Code (including any action brought under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (28 U.S.C. 1605 note), that has been given effect as if the action had originally been filed under 1605A(c) of title 28, United States Code, pursuant to section 1083(c) of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110-181; 122 Stat. 342; 28 U.S.C. 1605A note)).

**Attachment 4**

Federal Register

Vol. 73, No. 215

Wednesday, November 5, 2008

# Presidential Documents

Title 3—

The President

**Executive Order 13477 of October 31, 2008**

## Settlement of Claims Against Libya

By the authority vested in me as President by the Constitution and the laws of the United States of America, and pursuant to the August 14, 2008, claims settlement agreement between the United States of America and Libya (Claims Settlement Agreement), and in recognition of the October 31, 2008, certification of the Secretary of State, pursuant to section 5(a)(2) of the Libyan Claims Resolution Act (Public Law 110–301), and in order to continue the process of normalizing relations between the United States and Libya, it is hereby ordered as follows:

**Section 1.** All claims within the terms of Article I of the Claims Settlement Agreement (Article I) are settled.

(a) Claims of United States nationals within the terms of Article I are espoused by the United States and are settled according to the terms of the Claims Settlement Agreement.

(i) No United States national may assert or maintain any claim within the terms of Article I in any forum, domestic or foreign, except under the procedures provided for by the Secretary of State.

(ii) Any pending suit in any court, domestic or foreign, by United States nationals (including any suit with a judgment that is still subject to appeal or other forms of direct judicial review) coming within the terms of Article I shall be terminated.

(iii) The Secretary of State shall provide for procedures governing applications by United States nationals with claims within the terms of Article I for compensation for those claims.

(iv) The Attorney General shall enforce this subsection through all appropriate means, which may include seeking the dismissal, with prejudice, of any claim of a United States national within the terms of Article I pending or filed in any forum, domestic or foreign.

(b) Claims of foreign nationals within the terms of Article I are settled according to the terms of the Claims Settlement Agreement.

(i) No foreign national may assert or maintain any claim coming within the terms of Article I in any court in the United States.

(ii) Any pending suit in any court in the United States by foreign nationals (including any suit with a judgment that is still subject to appeal or other forms of direct judicial review) coming within the terms of Article I shall be terminated.

(iii) Neither the dismissal of the lawsuit, nor anything in this order, shall affect the ability of any foreign national to pursue other available remedies for claims coming within the terms of Article I in foreign courts or through the efforts of foreign governments.

(iv) The Attorney General shall enforce this subsection through all appropriate means, which may include seeking the dismissal, with prejudice, of any claim of a foreign national within the terms of Article I pending or filed in any court in the United States.

**Sec. 2.** For purposes of this order:

(a) The term "United States national" has the same meaning as "national of the United States" in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)), but also includes any entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches).

(b) The term "foreign national" means any person other than a United States national.

(c) The term "person" means any individual or entity, including both natural and juridical persons.

(d) The term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization.

**Sec. 3.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

THE WHITE HOUSE,
*Washington, October 31, 2008.*

[FR Doc. E8–26531
Filed 11–4–08; 8:45 am]
Billing code 3195–W9–P

**Attachment 5**

NEW YORK
**Senator Hillary Rodham Clinton**

STATEMENTS & RELEASES

Home | News | Contact | About | Services | Issues | New York

July 12, 2007

## Lautenberg, Menendez, Schumer, Clinton to Block Bush Appointment to Libya

*Senators Say U.S. Should Not Pursue Diplomatic Recognition of Libya Until Victims of Libyan Terror are Compensated*

**Washington, DC** – Sen. Frank R. Lautenberg (D-NJ) today announced he would lead a Senate coalition, including Sen. Robert Menendez (D-NJ), Sen. Charles Schumer (D-NY) and Sen. Hillary Clinton (D-NY), to block the confirmation of Gene Kretz to be Ambassador to Libya.

The Senators further announced that they would maintain their hold on Cretz's nomination until Libya fully compensates American victims of Libyan terrorist attacks in the 1980's.

"Libya has failed to fulfill financial commitments they made to American victims of their terrorist acts," said Sen. Lautenberg, a member of the Senate Appropriations Committee. "Libya voluntarily settled these claims. To not deliver on their promise is a slap in the face to American families that have waited for years for accountability for Libya's crimes. Libya must no longer be allowed to drag its feet and the U.S. must not pursue fully normalized diplomatic relations with Libya until they fulfill their legal obligations to American families."

"A promise made must be a promise kept. Libya has not made good on its promise to the victims of Pan Am Flight 103, and it must be held responsible," said Sen. Menendez. "Sending an ambassador to Libya is sending the wrong message to the world about how the U.S. will tolerate terrorism and the murder of American citizens. As we face a continuing terrorist threat, this is a message that we cannot afford to deliver."

"Until Libya fully compensates the Pan Am families, no U.S. ambassador should set foot in Tripoli," said Sen. Schumer, who is supporting the hold on Cretz's nomination. "We're serious about improving relations, but Libya needs to show that it is too. Paying off this long overdue debt would be a start."

"Libya has been responsible for numerous murderous terrorist attacks against American citizens over the past several decades. These attacks have caused unending pain and suffering for Americans, especially the Pan Am families. We must pressure Libya and President Qaddafi to settle the remaining terrorism cases against his country before fully normalized diplomatic relations with the United States can take place. That includes blocking the confirmation of the President's nominee to be Ambassador to Libya until these cases are resolved," said Sen. Clinton

President Bush yesterday announced that he intends to nominate Cretz to be U.S. Ambassador.

Last month, Sen. Lautenberg inserted a provision into legislation to block funding for a U.S. Embassy in Tripoli, Libya until the Libyan government honors its financial commitments to compensate America victims of Libyan terrorist attacks in the 1980s.

In 1988, Libyan terrorists killed 270 people in the Pan Am Flight 103 Lockerbie bombing. The Libyan government acknowledged its role in the Lockerbie bombing in 2003 and committed to a settlement to each victim's family. To date, Libya has not fulfilled its commitments.

In 1986, Libyan terrorists bombed the LaBelle discotheque in Berlin that killed two

Share with a Friend
Email Sen. Clinton
Get Updates
RSS Feed

American servicemen and injured 90 other service members. In 2006, Libya entered into a settlement agreement with these victims and notified the State Department of their intentions. To date, Libya has also not fulfilled its commitment.

###

**clinton.senate.gov**